1          **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE**

4

5    **UNITED STATES OF AMERICA,**           )
                                             )
6                    **PLAINTIFF,**          ) **CASE NO.**
                                             ) **2:07-cr-01221-GHK**
7           **VS.**                          )
                                             )
8    **STANLEY DAN RECZKO III,**             )
                                             )
9                    **DEFENDANT.**          )
     _____)

10

11

12

13

14                   **REPORTER'S TRANSCRIPT OF**
                     **JURY TRIAL - DAY 1**
15               **TUESDAY, FEBRUARY 17, 2015**
                          **9:06 A.M.**
16                 **LOS ANGELES, CALIFORNIA**

17

18

19

20

21

22    _____

23          **KHOWOONSUN CHONG, CSR 12907, CRR, RMR**
                F E D E R A L   O F F I C I A L   C O U R T   R E P O R T E R
24          2 5 5   E A S T   T E M P L E   S T R E E T ,   R O O M   1 8 1 - G
                L O S   A N G E L E S ,   C A L I F O R N I A   9 0 0 1 2
25                 k c h o n g 1 2 9 0 7 @ y a h o o . c o m

**UNITED STATES DISTRICT COURT**

1                     **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4      STEPHANIE YONEKURA
       UNITED STATES ATTORNEY

5      BY:   JOEY L. BLANCH
          VANESSA BAEHR-JONES

6      Assistants United States Attorney
       United States Courthouse

7      312 North Spring Street
       Los Angeles, California 90012

8

9   **FOR THE DEFENDANT:**

10     DAVID J.P. KALOYANIDES LAW OFFICES
      BY:  DAVID KALOYANIDES

11     Attorney At Law
      15538 Central Avenue

12     Chino, California 91710

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1

**I N D E X**

2

**Tuesday, February 17, 2015**

3

--------------------------------------------------------

4

**CHRONOLOGICAL INDEX OF WITNESSES**

5

6

WITNESSES                                                PAGE

7

ANECITA F. SUICO
        DIRECT EXAMINATION BY MS. BAEHR-JONES          205
8       CROSS-EXAMINATION BY MR. KALOYANIDES            213

9   DARYL PURVIANCE
        DIRECT EXAMINATION BY MS. BAEHR-JONES          220

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1

**<u>INDEX OF EXHIBITS</u>**

2

<u>MARKED FOR IDENTIFICATION</u>

3

(NONE)

4

5

6

<u>RECEIVED INTO EVIDENCE</u>

7

EXHIBIT NUMBER                                           PAGE

8

9-A                                                      226

9

9-B                                                      211

10

10                                                       227

11

10-A                                                     227

12

10-B                                                     230

13

16                                                       234

14

17-A                                                     235

15

18-A                                                     236

16

19                                                       237

17

19-A                                                     238

18

19-B                                                     238

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          LOS ANGELES, CALIFORNIA; TUESDAY, FEBRUARY 17, 2015

2

3                           9:06 A.M.

4                             -oOo-

5

6          THE CLERK:  Please remain seated and come to order.

7  This United States District Court is now in session.  The

8  Honorable George H. King, Chief Judge presiding.  Calling Item

9  No. 1 on the Court's calendar, Criminal 07-1221(B),

10 United States of America versus Stanley Dan Reczko III.

11     Counsel, would you please state your appearances for the

12 record.

13          MS. BLANCH:  Good morning, Your Honor.  Joey Blanch

14 and Vanessa Baehr-Jones for the Government.  And also present

15 at counsel table is case agent Meghan Madden.

16          THE DEFENDANT:  Good morning, Your Honor.

17 Mr. Reczko in pro se.

18          THE COURT:  And you have with you Mr. Filipiak and

19 Mr. Fischbach.

20          THE DEFENDANT:  Correct.

21          THE COURT:  Are these the two gentlemen you want to

22 be at the table with you, Mr. Reczko, to assist you in the --

23          THE DEFENDANT:  For right now, yes, sir.

24          THE COURT:  Very good.

25     Is that Ms. Caulfield also in the audience?

1          PERSON IN AUDIENCE:  (Nods head.)

2          MR. KALOYANIDES:  Good morning, Your Honor.  David

3    Kaloyanides, stand-by counsel.

4          THE COURT:  I just have a few things I want to take

5    up with you folks here, final last-minute matters, and the jury

6    panel will be here at 9:30.

7          One of the things that I did work out -- well, first of

8    all, Mr. Reczko, we received from the Government a copy of your

9    notice of appeal that you had filed with the -- or sent to the

10   Ninth Circuit on or about February 9 that was dated February 6.

11   To our understanding, it has not been docketed by either the

12   Central District or by the Ninth Circuit.

13         But in any event, we compared it.  It is similar to but

14   not the same as the first appeal which you had filed, which I

15   believe at this point has been docketed by the Ninth Circuit.

16   But in any event, the Court is still of the view that, to the

17   extent that we can decipher what you are saying in the single

18   paragraph, that these matters do not appear to the Court to be

19   appealable issues at this time.

20         And therefore the Court does not lose jurisdiction, and we

21   are not divested of jurisdiction, and it is our intention to

22   proceed unless and until instructed otherwise by the Ninth

23   Circuit.

24         Secondly, if you look around, we've come up with a

25   slightly different way of dealing with the problem with the

```
 1    sidebar issue.  You recall last time I said there would be no
 2    sidebars, and during the course of jury selection, if we need
 3    to confer with you and counsel, Mr. Reczko, we would send the
 4    jurors out.  That becomes cumbersome.  We have all of these
 5    people.  Everybody has to get up and vacate, and then we have
 6    to wait for them to come in and find their seats and so forth.
 7    That seems overly cumbersome.
 8         So the I.T. staff and the Court came up with something
 9    that's agreeable with the marshals, which I want to bring to
10    your attention and that I want you to observe.  The table
11    behind you there -- well, those chairs should not be arranged
12    in that fashion.
13         Bea --
14              THE CLERK:  Yes, Your Honor.
15              THE COURT:  -- I want two of the chairs on one side
16    and then one on the end and one on the side closest to
17    Mr. Reczko.  We should use the same chairs, don't use the
18    different colored chair.  One on the end.  Okay.  Right there.
19    Two on the far side.
20              THE CLERK:  Like this?
21              THE COURT:  Move those two closer.  Right.  Okay.
22         Take a look at that, Mr. Reczko, because I want to
23    describe to you what I want you to do.  When I need to have a
24    sidebar during the course of the jury selection process, when I
25    call a sidebar -- you will see there's a microphone there.  I
```

1    want you to walk directly from where you are to the single seat

2    on the side closest to you.  Not at the end, the side closest

3    to you.  Do only that, walk directly to that seat and sit down.

4        I will come down from the bench and take a seat across the

5    table from you.  Government counsel will have a seat at the end

6    of the table.  We'll all whisper into the microphone, which

7    will be piped into my court reporter through earphones.  And

8    white noise will be piped into the where the jurors are.

9    They're not going to hear what we say.  We're going to whisper

10   into that microphone so that my court reporter can hear it and

11   report it, nothing else, nobody else.  That's how we're going

12   to do it.

13       If there is an instance where there's a juror, for

14   instance, and the juror says "I don't want to talk about it in

15   front of everybody, can I come to sidebar," we're going to do

16   that.  That juror will have a seat next to me.  That's why we

17   have two seats on that side.

18       So I believe, Marshal, you had indicated that you wanted

19   Mr. Reczko's movement away from everybody else, or how do you

20   want that, Deputy Rice?

21              THE DEPUTY MARSHAL:  Just Mr. Reczko stay seated

22   until everybody leaves.

23              THE COURT:  What about before everybody shows up?

24   Should he have a seat first?

25              THE DEPUTY MARSHAL:  Yes.

1          THE COURT:  Do you understand that, Mr. Reczko?

2          THE DEFENDANT:  Yes.

3          THE COURT:  So sidebar conference, first thing you

4  do is you go and have a seat, sit down.  That's it, and then

5  let everybody else come to the table.  When sidebar is over,

6  you stay seated until everybody has left, and then you get up

7  and take your seat.  Okay?

8          THE DEFENDANT:  Yes.

9          THE COURT:  All right.  You will also see that there

10 are lines in the carpeting.  Those are taped down, but they're

11 taped in a way which looks just like the many wires that we

12 have taped down, so it doesn't look any different, but those

13 are your boundaries.  Do not exceed the boundaries.  If you

14 exceed the boundaries, the marshals will have to react.  If

15 you're in that boundary, everything is fine.

16     When you need to go up to the lectern to examine a

17 witness, you may go directly from where you are, behind

18 Mr. Filipiak, and go to the lectern.  You will see that there's

19 also a line on the far side of the lectern.  That's also "do

20 not cross."  If you cross that, the marshals will have to

21 react.  If you don't, nothing will happen.  You can move to the

22 lectern when it's your turn to examine.  You come back, and you

23 sit down.  You go to the sidebar when there's a sidebar, and

24 you stay seated until everybody else has a seat.

25          MS. BAEHR-JONES:  Would it be permissible for second

```
 1   Government counsel to stand behind first or --
 2             THE COURT:  Yes, that's fine.
 3             MS. BAEHR-JONES:  Thank you.
 4             THE COURT:  So that's the sidebar procedure.
 5       I have considered your voir dire questions.  I've directed
 6   the clerk to file them.  Some of the ones that you want to
 7   modify of the Government, I'm not doing anyway; so it's all
 8   moot.
 9       There is one of yours that I think is reasonable, and I
10   will give that.  Otherwise, it will be deemed denied.  I have
11   considered all, and you will see them reflected as I go through
12   the voir dire.
13       The Government has proposed jury instructions.  I believe
14   I told you, Mr. Reczko, that you can have until tomorrow to
15   propose jury instructions; is that right?
16             THE DEFENDANT:  Yes.
17             THE COURT:  And you intend to propose them by
18   tomorrow?
19             THE DEFENDANT:  Yes.
20             THE COURT:  I looked at the Government's witness
21   list.  It seems like the witnesses are growing rather than
22   shrinking.  We're going the wrong direction.  I certainly don't
23   hope you folks are planning on calling all 17.  Who is
24   Mr. Miranda?  I can figure out everybody else.  I can't figure
25   out who Mr. Miranda is.
```

1          MS. BLANCH:  Your Honor.  Officer Miranda was the

2   L.A.P.D. officer who registered the defendant as a convicted

3   sex offender.  We're not planning to call him on the first part

4   of the trial.  He is on the list for the bifurcated proceeding.

5          THE COURT:  I don't really need to read his name, do

6   I?

7          MS. BLANCH:  No.  I don't think you need to read his

8   name.

9          THE COURT:  Let me go through the list.  How many do

10  you think I should read?  Otherwise, I was going to read all of

11  them because I didn't know.

12         MS. BLANCH:  Your Honor, I think, to be safe, you

13  should read all of them.  The people that are more tentative

14  are the other family members, and they seem important enough,

15  and they're also on the defendant's list.  We should probably

16  read them.

17         THE COURT:  Who are the seven that you believe you

18  will be calling?

19         MS. BLANCH:  Anita Suico.

20         THE COURT:  Anita Suico.  Okay.  Who is she again?

21         MS. BLANCH:  She is the social worker who assisted

22  the victim in collecting the Baby Wow CD and other evidence

23  from the apartment.

24         THE COURT:  Okay.

25         MS. BLANCH:  Daryl Purviance.

```
 1              THE COURT:  Okay.

 2              MS. BLANCH:  Dante Orate for about three minutes,

 3   just to talk about the fact that he damaged the Baby Wow CD,

 4   and that is all.

 5       Mitch Worley, only to say that he picked up the copy of

 6   the Baby Wow CD from IJM and sent it to the United States.  So

 7   he will be about two minutes.

 8              THE COURT:  Okay.

 9              MS. BLANCH:  The victim, EDR.

10              THE COURT:  Her name is --

11              MS. BLANCH:  Elcita.

12              THE COURT:  E-l-c-i-t-a; is that right?

13              MS. BLANCH:  Yes.  And they call her Sheryl.

14              THE COURT:  Okay.  Do you want me to say "Also known

15   as Sheryl" to the --

16              MS. BLANCH:  Yes, Your Honor, please.

17              THE COURT:  -- jury?

18              MS. BLANCH:  Please.  Bruce Pixley.

19              THE COURT:  Yes.

20              MS. BLANCH:  Richelle Reczko.

21              THE COURT:  Richelle Reczko.

22              MS. BLANCH:  Olga Sagalovich, again very briefly

23   just to discuss items that she seized from the defendant's

24   suitcase at LAX.

25       And James Clemente.
```

1      And the other people are on the list depending on what the

2  defendant does at trial, particularly with respect to chain of

3  custody.

4           THE COURT:  All right.  Let me just also tell you,

5  I'm going to give you a little leeway in terms of setting up

6  the background and so forth, especially in terms of

7  Mr. Clemente's testimony.  But I don't want you to go

8  overboard.  You say you have maps and all that.  Who doesn't

9  know where the Philippines are?  Let's not turn this into a dog

10 and pony show.  Just focus on what we need to do and keep

11 moving.  Okay?

12      Last time I did say that I would reserve ruling on the

13 admissibility of the three photographs as well as the letter

14 seized from the suitcase.  I have given it due consideration

15 over the weekend, and I am going to admit those documents.  But

16 I do want you folks to propose an appropriate limiting

17 instruction to the jury that this is not being used for the

18 truth of the matter, because I think the hearsay objection is a

19 good one, but it's not being used for the truth of the matter

20 but merely for non-truth related purposes.

21      Propose that instruction, show it to Mr. Reczko, see if he

22 agrees with it.  Then give it to me, and I'll give whatever is

23 appropriate to the jury before any of that evidence comes in.

24 And if I don't remember it, remind me before you proffer that

25 evidence that there is a limiting instruction to be given.

1          Similarly, remind me there's a cautionary instruction to

2     be given before the first person who will be testifying in

3     Cebuano so I can give that cautionary instruction.

4          Mr. Reczko?

5               THE DEFENDANT:  Yes, Your Honor.  I had a question

6     to that ruling.  It seems that they're adding pictures of other

7     people to their listing.  For instance, they have Cristine Joy

8     Tolentino and a Genevieve Luna.  However, there is this

9     Maryanne photograph.  I have no idea what it's there for.

10    They're showing three pictures on --

11              THE COURT:  Let's go to the exhibit list.  Which

12    ones exactly by number do you expect to want to get in?  And

13    let's look at it so we'll see exactly what --

14              MS. BAEHR-JONES:  Your Honor --

15              THE COURT:  -- what we're talking about.

16              MS. BAEHR-JONES:  The photograph of Genevieve Luna

17    is Exhibit 50-A, and the photograph of -- these are copies of

18    the photographs that --

19              THE COURT:  First of all, that's 50-A?

20              MS. BAEHR-JONES:  50-A.  The original photographs

21    that were found collected in his luggage are 50.  Those are the

22    originals.  And the specific ones the Government will seek to

23    admit and publish to the jury will be 50-A, which is the front

24    and the back of the photograph of Genevieve Luna.  50-B, which

25    is the front and back of the photograph of Cristine Joy.

1          And then Exhibit 51 are the two sheets of loose-leaf paper

2     that were found in his luggage.  The first one will be

3     identified as his handwriting.  The agent will recognize that

4     as his handwriting.  It states on it Cristine Joy E. Tolentino,

5     and it appears to be her address and measurements.  The second

6     page is a loose-leaf page that's addressed to "Dear Dan," and

7     signed by Cristine Joy.  And both of these were produced in

8     discovery.

9               THE COURT:  That's it.  You're talking about 50-A,

10    -B, and 51.

11              MS. BAEHR-JONES:  Correct, Your Honor.

12              THE COURT:  So now you know.

13              THE DEFENDANT:  That's clear.  With the discovery I

14    got, it was six photos, so --

15              THE COURT:  That's all they're going to use.

16              THE DEFENDANT:  Thank you.

17              THE COURT:  Okay.  Anything else to take up?  I see

18    the jurors should be here in about 15 minutes.

19         Anything else from the Government?

20              MS. BLANCH:  Your Honor, did the Court want to allow

21    the defendant to cross-examine Special Agent Orate before --

22              THE COURT:  I thought we were going to do that at

23    the lunch break.

24              MS. BLANCH:  I wasn't sure.  That's why I --

25              THE COURT:  Let me ask.

1    Do you still want to cross-examine Mr. Orate on the motion

2    to suppress aspect?

3            THE DEFENDANT:  Yes, sir.

4            THE COURT:  Having to do only with what was produced

5    to you by the Government subsequent to the filing of the

6    motion; right?

7            THE DEFENDANT:  Correct.

8            THE COURT:  Okay.  So we'll do that at lunchtime.

9            MS. BLANCH:  Thank you.

10           MR. FISCHBACH:  Your Honor, I think I was actually

11   going to be here for the cross-exam- -- the questioning of

12   Dante Orate, not for jury selection.  I think I'm going to

13   switch with Ms. Caulfield.

14           THE COURT:  Caulfield.  Okay.  Let me make sure.

15   When do you expect to be here?  Because you, as the expert

16   witness, I don't think you need to sit around for the entire

17   trial, Mr. Fischbach.

18           MR. FISCHBACH:  Mr. Reczko just asked me to be here

19   to collect information basically from the witnesses that are

20   being questioned on direct, at least relative to various items,

21   chain of custody items.  I actually wouldn't have come as

22   early, but I was under the impression that Mr. Orate was coming

23   first.

24           THE COURT:  Well, Mr. Reczko, he's not your

25   paralegal.  He's not going to help you, like paralegal things.

```
 1              THE DEFENDANT:  No, sir.  I --
 2              THE COURT:  He's your expert.
 3              THE DEFENDANT:  Yes, sir.
 4              THE COURT:  He should only be here having something
 5    to do with his expertise, which is computer forensics.
 6              THE DEFENDANT:  That was the discussion with
 7    Mr. Orate, sir.  We were going to be discussing a lot of
 8    forensic material.
 9              THE COURT:  With Mr. Orate?
10              MR. FISCHBACH:  It's set up --
11              THE COURT:  I'm sorry.
12              MR. FISCHBACH:  It relates to chain of custody.  It
13    may go to some questions he may ask me on the stand later.
14              THE COURT:  That's not the purpose of this.  The
15    purpose of this proceeding as to Mr. Orate before the trial is
16    relating to the motion to suppress.  You remember, he filed a
17    declaration on the motion to suppress and he testified here.
18    Okay?  Then subsequent to that, the Government gave you a
19    disclosure along the lines of a Henthorn disclosure as to
20    something that happened previously.  You may question him on
21    that.  We're not talking about chain of custody at the time.
22        When he gets called as a witness during the trial, yes,
23    you can question him about chain of custody.  But the initial
24    opportunity I'm giving you to examine Mr. Orate does not have
25    anything to do with the chain of custody because he hasn't even
```

1    testified to that yet.

2        Remind me of the subject of his testimony at the motion to

3    suppress.

4            MS. BLANCH:  Go ahead.

5            MS. BAEHR-JONES:  Your Honor, his testimony was

6    solely about the evidence that he received from Julian Briola

7    and whether or not he was working as an -- in an agency

8    relationship with IJM.  That's -- that's it.

9            THE COURT:  That's the only part that he has already

10   testified about, and you declined to examine him at all.  But

11   because they came up with something new, I'm going to give you

12   an opportunity to examine him on that new stuff as it relates

13   to the motion to suppress as to the agency relationship between

14   IJM and the United States Government.  That's it.

15       Then during the course of the trial, if he's called by the

16   Government to testify as to chain of custody, of course you

17   examine him about that.  But this is not a preview of his chain

18   of custody testimony.

19       Do you understand what I'm saying to you?

20           THE DEFENDANT:  Well, I figured we had filed more

21   than one motion.  It was outrageous governmental misconduct.

22   There was -- there was two issues in this motion.  So we're --

23   we have him --

24           THE COURT:  The outrageous government misconduct

25   also relates in large part to the agency aspect and to some

1    extent whether or not he said anything to the social worker or

2    to any of the witnesses directly about whether they should talk

3    to your representatives.  That's relating to the motion.

4         That's not going to be rehashed in trial.  I told you

5    that, and you recognize that.  We're not going over the

6    pretrial motion stuff about whether or not there's an agency.

7    Once I make my ruling, that's that.  We're not going over the

8    material about government misconduct, alleged government

9    misconduct.  I've made my ruling.  That's the end of that.

10        In trial, when he testifies, whenever he is called by the

11   Government to testify, it will be relating to chain of custody,

12   and of course you can examine him during that time for that.

13   But it is not time to examine him about chain of custody

14   evidence that he hasn't even proffered during the course of

15   trial, yet.

16        During the pretrial phases, I'm only asking you if you

17   want to examine him about his testimony in light of the late

18   disclosure to you by the Government on the motion to suppress

19   and a motion for government misconduct.  That's it.  If you

20   don't want to examine on that additional issue and you're only

21   interested in examining him with respect to the chain of

22   custody, you should just wait until he's called as a witness,

23   and you can cross-examine him just like you can cross-examine

24   anybody.

25             THE DEFENDANT:  I'm not quite sure I'm clear on

1    that, being that he was suspended for some outrageous

2    misconduct.  And it seems to me now we would be able to renew

3    that motion.

4         THE COURT:  Well, you can -- like I said, I will

5    consider that evidence.  My only question, do you want to

6    examine him on it?  Even if you don't examine him on it, I'm

7    still going to take that into consideration in terms of his

8    credibility as I find the credibility in terms of that motion

9    to suppress.  And I told you that I would be reopening that,

10   and then I will make my new decision -- whether it's different

11   or not, I don't know -- and then that will be that.

12        THE DEFENDANT:  It just seems to me, Your Honor, if

13   that didn't come to light, which it may not have if I already

14   crossed him on the stand that particular day and I stayed

15   quiet, it may never have been brought to the Court's attention.

16   And now that I have spoke --

17        THE COURT:  It was brought to the Court's attention

18   independently.  You didn't bring it up.  The Government

19   voluntarily gave me the information.

20        THE DEFENDANT:  No, Your Honor.  I believe they

21   would not have if I had --

22        THE COURT:  Let's not speculate about what they

23   would have or would not have.

24        THE DEFENDANT:  Okay.

25        THE COURT:  We're only -- let's try to not keep

1    talking in circles.  It's not going to help.  My only question

2    to you is do you want to examine him with respect to his

3    testimony in light of this disclosure relating to the subject

4    matter of the motions only?

5                THE DEFENDANT:  I believe I will have that wait,

6    Your Honor, until we bring this into trial and -- and bring him

7    as a witness.

8                THE COURT:  Okay.  So you are -- you are -- you

9    don't want to separately examine him with respect to the motion

10   only.  If he's called as a witness, you will examine him as a

11   witness.

12               THE DEFENDANT:  Correct.

13               THE COURT:  Okay.  But only on the subject of the

14   testimony.  Okay.  That's fine.  I will then --

15               THE DEFENDANT:  How do I lay that foundation?

16   That's where I was going with this.  I was going to lay a

17   foundation today with him.  We were going to --

18               THE COURT:  Lay a foundation as to what?

19               THE DEFENDANT:  The way he mishandled the evidence

20   and the way the Government is going to bring in an expert where

21   I would be able to use that foundation later to cross him.

22               THE COURT:  You know, I guess I don't really

23   understand what you mean.  Foundation as to what?

24               THE DEFENDANT:  The -- the corrupted evidence.

25   There's tainted evidence in this case.  There's been

1  manipulated evidence.  I just got a recent e-mail just, as a

2  matter of fact, last night five o'clock, 200 additional pages

3  of discovery where Mr. Orate is speaking to Dan Saunders,

4  another attorney.  He should have gotten a warrant for the

5  evidence.  He's asking questions about a warrant, should he

6  have seized it, should he have put it back in my property

7  before I got on the plane.

8          THE COURT:  I have no idea what you're talking

9  about.  The easy way to look at this is, when he is called as a

10  witness, he will be called as a witness for certain reasons.

11  You may examine him on the subject of his testimony, not on

12  some other subject matter relating to agency or to government

13  misconduct.  Those are not coming in.  Those matters are not

14  going to be here.  You can examine him on his testimony, and

15  you can examine him on issues which would tend to show that he

16  is not credible.

17      You can test his credibility because every witness's

18  credibility is at issue.  So you certainly can test him on his

19  credibility, and you can examine him on the subject of his

20  testimony only.  You may not go beyond that because that will

21  be going beyond the scope of the direct examination.  And you

22  certainly are not going to be rehashing anything having to do

23  with the pretrial motion because the jury doesn't decide

24  pretrial motions.  I do.

25          So with that understanding then, are you telling me that,

because that material has been made known -- albeit to you by

the Government, albeit after the hearing, and that I will be

considering that material in my determination as to whether or

not any change in my previous order ought to be made in your

motion to suppress and your motion to dismiss for government

misconduct -- that on those subjects you do not believe you

need to examine Mr. Orate further but that you will reserve

your right to, of course, examine Mr. Orate when he is called

as a witness during the course of the trial on the matters that

he has testified to as well as to his credibility?

THE DEFENDANT:  I guess I would like to ask this

question, Your Honor:  Would I be able to relay -- relay

questions to him concerning Stella Pueblos from IJM, who he in

fact did ask to do tasks for the U.S. Government?

THE COURT:  Like what?  I mean --

THE DEFENDANT:  Collect evidence.  I have

documentation asking her to collect evidence.  I have

documentation asking her to do -- do other things for him.  I

have --

THE COURT:  What would that go to?  You tell me.

What would that go to?

THE DEFENDANT:  His credibility.

THE COURT:  Why would that go to his credibility?

THE DEFENDANT:  Because he's already stated on the

record he's never asked to bring in -- I mean, to -- he never

1    asked Stella Pueblos to do anything for him.  He's already

2    stated that in his declaration.  They didn't know each other.

3    They didn't know anyone.  He just used her for translating one

4    language to another.  I can bring it in for impeachment

5    purposes.

6                THE COURT:  Mr. Reczko, see, that's the problem.

7    You had an opportunity, but you threw a fit and decided not to

8    cooperate.  There are consequences to your actions, which means

9    you had an opportunity, you chose not to exercise that

10   opportunity, and there are consequences.  That's when you

11   should have asked those questions.

12               THE DEFENDANT:  Your Honor, you're well aware of the

13   fact about the medical issues I was on when I was on the Lyrica

14   and when I'm on it every day and the ups and the downs.  You're

15   well aware of it.

16               THE COURT:  I am aware --

17               THE DEFENDANT:  There's days I would rather just

18   stay quiet so I don't go into -- so I don't have a fit.

19               THE COURT:  Mr. Reczko, look, I'm not playing your

20   game.

21               THE DEFENDANT:  I'm not even playing a game.

22               THE COURT:  I'm not playing your game and --

23               THE DEFENDANT:  You're just plain fucking bullshit.

24               THE COURT:  Mr. Reczko --

25               THE DEFENDANT:  You know it.  This is all bullshit.

```
 1              THE COURT:  Don't you ever --
 2              THE DEFENDANT:  I came in here calm.
 3              THE COURT:  You'd better stay calm or else you
 4    will --
 5              THE DEFENDANT:  I don't give a fuck.
 6              THE COURT:  Then you will be removed.
 7              THE DEFENDANT:  You remove me then, you dick.
 8              THE COURT:  Okay.  Counsel, you are --
 9          I'm going to warn you one last --
10              THE DEFENDANT:  You're not going to warn shit.
11              THE COURT:  I'm going to warn you one last time.  If
12    you do this explosion, you --
13              THE DEFENDANT:  I'm not even going to be in this
14    fucking courtroom.  I'm not.
15              THE COURT:  Then you will be revoked.  You will be
16    revoked --
17              THE DEFENDANT:  Then revoke my ass.
18              THE COURT:  -- of your pro se status --
19              THE DEFENDANT:  Pull it.
20              THE COURT:  -- and then --
21              THE DEFENDANT:  Can't get worse than this in here.
22              THE COURT:  And then I'm going to have Mr. --
23              THE DEFENDANT:  You lied on the record.  You're
24    continually changing the score.  You blocked me from counsel.
25              THE COURT:  Mr. Reczko, you are out of control.
```

```
 1              THE DEFENDANT:  That's good.
 2              THE COURT:  You are totally disrupting the
 3    proceedings, not to mention the fact that you are showing great
 4    disorder and disrespect, and you --
 5              THE DEFENDANT:  I lost all my respect for your
 6    goddamn courtroom.  I've seen the game.
 7              THE COURT:  You're making this impossible to
 8    proceed.
 9              THE DEFENDANT:  You're going to bring in the monkeys
10    and the clowns.  They're coming soon.
11              THE COURT:  I'm going to ask you, are you going to
12    behave yourself?
13              THE DEFENDANT:  No, I'm not.
14              THE COURT:  Okay.  Then --
15              THE DEFENDANT:  Because I'm all riled up and all
16    pissed off.
17              THE COURT:  You just lost your opportunity to act as
18    your own counsel.
19              THE DEFENDANT:  Good.
20              THE COURT:  Your pro se status is now revoked.
21              THE DEFENDANT:  Good.
22              THE COURT:  And if you do not behave and you are to
23    have one more outburst --
24              THE DEFENDANT:  I'm not coming back in this
25    courtroom.
```

1          THE COURT:  One more outburst, you will be taken

2    out.

3          THE DEFENDANT:  For what reason do I need to come

4    into this courtroom anyway?

5          THE COURT:  One more outburst, and you will be taken

6    out.  Are you going to behave yourself?  If you don't, you will

7    be removed, and Mr. --

8          THE DEFENDANT:  I'm not going to fucking behave.  I

9    can't.  You got me so pissed off.

10         THE COURT:  You won't, is what you --

11         THE DEFENDANT:  How can I farther go on today?  I

12   can't.

13         THE COURT:  All right.  You are now --

14      Marshal, remove Mr. Reczko from the courtroom.  We have a

15   matter set up in the -- in the --

16         THE DEFENDANT:  Let me relax for a minute, please.

17         THE COURT:  Mr. Reczko --

18         THE DEFENDANT:  Are you going to be some tough guy

19   for a minute?  Hang on, let me relax.

20         THE COURT:  Mr. Reczko, there is a video set up for

21   you so you can watch the proceedings outside.

22         THE DEFENDANT:  I don't want to watch the dog and

23   pony show.  Take me down back to the cell.

24         THE COURT:  That's your choice.

25         THE DEFENDANT:  Please.  I don't want to watch the

1   show.

2                   THE COURT:  That's your decision.

3                   THE DEFENDANT:  I don't need it.  I don't need this

4   in my life, period.

5                   THE COURT:  Then you are removed from the courtroom.

6                   THE DEFENDANT:  Good.  Good.  Remove me.

7                   THE COURT:  You are removed.

8                   THE DEFENDANT:  I'm going to pick up my stuff.

9                   THE COURT:  Let him pick up his stuff.

10       Don't you think you should leave that for your lawyer?

11                   THE DEFENDANT:  Just leave it all here.  I can't

12   even think.

13                   THE COURT:  Okay.  All right.

14                   THE DEFENDANT:  Goddamn.  Just a minute, man.

15                   THE DEPUTY MARSHAL:  Put your hands back.  We're

16   going up.

17                   THE DEFENDANT:  Will you please bring my glasses.

18   I'm not fighting people.  Come on.  That's all you got this

19   year?  You ain't going to get a chance to get out on the

20   street?

21       Fucking bullshit hearing.  Can't even prepare a case.

22   This is a joke.  Just make the record be known that --

23                   THE COURT:  He wants his glasses.

24                   THE DEFENDANT:  Make sure the record states I wasn't

25   able to have my case file for almost two weeks.

**UNITED STATES DISTRICT COURT**

```
 1                    (The defendant exits the courtroom.)

 2              THE COURT:  Mr. Kaloyanides?

 3              MR. KALOYANIDES:  Yes, Your Honor.

 4              THE COURT:  Let the record reflect that Mr. Reczko

 5   has been totally belligerent, has been foulmouthed, has totally

 6   disrupted the proceedings so that no further proceedings can

 7   continue in any kind of a civil manner to allow justice to be

 8   done.  Mr. Reczko has refused to be quiet.  He spoke over the

 9   Court repeatedly, even when the Court was trying to warn him,

10   and the Court has warned him repeatedly, not just today but

11   repeatedly in the past.

12         He has chosen to be totally disruptive of the proceedings,

13   and he had to be removed from the courtroom.  The Court gave

14   him the opportunity to be back there to watch the proceedings,

15   which the Court has set up.  He has declined that request.  He

16   says he won't come back.  That's fine, but we will from time to

17   time ask him if he has changed his mind so that he will have an

18   opportunity to be here.

19         But obviously he has acted in such a way as to totally

20   derail or attempt to derail the proceedings, which we will not

21   permit to happen.  Therefore, we have on that basis revoked his

22   pro se status, and we are now appointing Mr. Kaloyanides,

23   stand-by counsel, to step in as stand-by counsel to conduct the

24   proceedings.

25         Mr. Kaloyanides, then you will henceforth be representing
```

1    Mr. Reczko.

2        How do you folks propose that we should let the jury know

3    that Mr. Reczko is not here?  Because obviously he won't be

4    here, and it will be difficult to -- to ignore that, nor should

5    we.  If you folks have a suggestion, I would like to hear from

6    you because I think we're almost ready to proceed with having

7    the jury here.

8            MR. KALOYANIDES:  Your Honor, I think, if a very

9    brief sanitized statement by the Court that indicates that

10   Mr. Reczko is unable to be present for today's proceedings,

11   that the jury should not take that into any consideration

12   regarding the evidence of the case, but that he is now

13   represent -- he is represented by counsel.

14           THE COURT:  We don't need to get into this thing

15   about stand-by or --

16           MR. KALOYANIDES:  No.

17           THE COURT:  You're just counsel.

18           MR. KALOYANIDES:  I'm just counsel, and we will be

19   proceeding.  And if at such time Mr. Reczko is able to be in

20   the courtroom, we'll let the jury know at that time, something

21   along those lines so that they don't know if he's ill or if

22   there's some other reason.

23           THE COURT:  So do not speculate as to any reason why

24   he is not here.  It should have no effect upon anything that

25   you may have to do as jurors.

1          Ms. Blanch?

2               MS. BLANCH:  Your Honor, I agree with defense

3     counsel.  The only thing I'm concerned about is the word

4     "unable."  I worry that that suggests somehow to the jury that

5     the defendant has become ill or something and --

6               THE COURT:  Is not here today.

7               MS. BLANCH:  "Is not here today" I like better.

8               THE COURT:  And you are not to speculate as to why

9     he is not here.

10              MS. BLANCH:  Thank you, Your Honor.  Yes.

11              MR. KALOYANIDES:  I think that's acceptable.

12              THE COURT:  I will do that when it's time to

13    introduce everybody.  I'll say the defendant is Stanley Dan

14    Reczko.  Mr. Reczko is not here today.  Please do not speculate

15    as to any reason why he is not here.  That is not of any

16    concern to you, nor should it have any effect upon your work as

17    jurors in this case.  He is represented by counsel, Mr. David

18    Kaloyanides, and we move on.

19              MR. KALOYANIDES:  I think that's fine.  Thank you,

20    Your Honor.

21              THE COURT:  And do you want any of the other

22    individuals at the counsel table to be of assistance to you as

23    you're trying the case as counsel?

24              MR. KALOYANIDES:  Your Honor, if I can have five

25    minutes to confer with the defense team to see what we need to

1  do, and then we can also kind of organize the table.  I will

2  probably have one, but I'm not sure yet.

3            THE COURT:  Okay.  And you already heard what I said

4  in terms of my way of selecting a jury, particularly in this

5  case, having just the 32 to begin with and so forth.

6            MR. KALOYANIDES:  Yes.  My one question on that,

7  Your Honor, though is now, in light of my appointment to take

8  over the case, is it the Court's intention still to do all

9  peremptories at once as opposed to the way we normally do it?

10            THE COURT:  I don't think we need to do it that way.

11  I think we can do it in the way I normally do it, which is

12  still you will write it on a piece of paper.

13            MR. KALOYANIDES:  Yes.

14            THE COURT:  You will walk it over and get approval

15  first, and then you will announce.  Same thing with the other

16  side.  We won't be using that lower sidebar mic at all.  We

17  will come to the sidebar as we normally do.

18            MR. KALOYANIDES:  Yes, Your Honor.  Thank you.

19            MS. BLANCH:  Your Honor, I have one concern, and I

20  should have come prepared today with the research -- and I did

21  not -- because I should have foreseen this, and I -- I -- I

22  didn't.  During the time period where the defendant was acting

23  out, I consulted with our appellate section regarding various

24  possibilities, and one of our appellate attorneys told me of

25  the existence of a case -- and I do not have the citation --

1    where a defendant was pro se, acted out in a manner that made

2    him uncapable of -- incapable of continuing to represent

3    himself, and stand-by counsel stepped in.

4         And the Court in this case, according to the appellate

5    attorney that I consulted with, suggested that once stand-by

6    counsel stepped in, the defendant should be given a second

7    opportunity to see whether he could behave at counsel table

8    when he was not acting as his own counsel.  And I wonder if the

9    Court should give him a second opportunity to see if he can

10   behave while Mr. Kaloyanides is sitting next to him.

11        THE COURT:  I think that would be an obviously

12   futile act in this case, given the attitude and the behavior of

13   Mr. Reczko today.  I actually told him that you will be

14   revoked, and all he said was go ahead and revoke me, or words

15   to that effect.  And I said Mr. Kaloyanides will be appointed

16   as your stand-by counsel.  And then I told him, you know, you

17   can go back there and watch it, and we'll give you opportunity

18   to come back.  He didn't want to do any of that.

19        So I think for purposes of the record, the record is

20   sufficiently made that he has declined to behave himself even

21   though Mr. Kaloyanides will be representing him.

22        However, as I said before, every day the Court is in

23   session, we will, through the marshal, ask him whether or not

24   he wants to come.  And if he does come, I will ask him here

25   whether he will be behaving, particularly since Mr. Kaloyanides

1    will be doing his case.

2         If he either declines to come, in which case the record is

3    very clear that he's been warned of the consequences, then

4    clearly it will be deemed his own waiver of his right to

5    appear.  Or if he does appear and remains disruptive and has to

6    be removed once again, that will be sufficient to establish

7    that we will continuously give him the opportunity to come

8    back.  And we will also give him the opportunity to watch it,

9    both of which he has at this point declined.  But we will

10   re-ask him on a daily basis to see what he wants, and we'll go

11   from there.  Okay?

12              MS. BLANCH:  Thank you, Your Honor.

13        I have one issue that just came up.  Perhaps we should

14   take it up after the jury, but I just wanted to raise it.

15   Mr. Fischbach mentioned that he would be testifying.  The

16   Government has received no expert notice from the defendant

17   regarding any expert testimony.  I don't know whether he

18   intends to use him as a consulting or testifying expert.  We've

19   received no reciprocal discovery, no expert notice, no reports,

20   and we would object to him being called as a witness.

21              THE COURT:  Maybe, Mr. Kaloyanides, now that you are

22   in the case, you can have a conversation with Mr. Fischbach,

23   and to the extent that you can also communicate with Government

24   counsel as to what the intentions are, and see if you folks can

25   work out some sort of reasonable accommodation under the

1    circumstances, given these rather evolving and unusual

2    circumstances.

3              MR. KALOYANIDES:  Thank you, Your Honor.

4              MS. BLANCH:  Thank you, Your Honor.

5              THE COURT:  Very good.  Thank you very much.

6              THE CLERK:  This court now stands in recess.

7                  (Recess taken.)

8                  (Jury in at 10:15 A.M.)

9                  (Prospective jurors sworn.)

10             THE CLERK:  Calling Item No. 1 on the Court's

11   calendar, Criminal 07-1221(B), United States of America versus

12   Stanley Dan Reczko III.  Counsel, would you please state your

13   appearances for the record.

14             MS. BLANCH:  Good morning, Your Honor.  Joey Blanch

15   and Vanessa Baehr-Jones representing the United States.  Also

16   present at counsel table is HSI agent Meghan Madden.

17             THE COURT:  Good morning.

18             MR. KALOYANIDES:  Good morning, Your Honor.

19   David Kaloyanides for Stanley Reczko.

20             THE COURT:  Good morning.

21        Please be seated.  Good morning, ladies and gentlemen of

22   the jury panel.  This morning we are selecting a jury for a

23   criminal case.  It is expected to last approximately three to

24   four days, excluding deliberations, of course.

25        Our regular court hours will be as follows:  Today we will

be in session until noon.  We will take a lunch break for one hour.  We will come back at one o'clock, and we will recess for the evening at 5:00 P.M.

However, starting tomorrow and for every day that the court is in session, the hours will be from 8:00 A.M. to 2:00 P.M.  We will not take a lunch break, but we will have two 15-minute breaks, one earlier in the morning, one closer to around noon.

I have found that jurors generally like that schedule even though we do have to be here promptly at eight o'clock so that we don't lose any time, but that you get to go home at two o'clock so that, if you have any other matters to take care of, if you have to go back to work, if you have other things to catch up on, you will be able to get a head start on it, and you don't have to worry about getting stuck in rush-hour traffic if you're leaving at five o'clock.  So that's our normal schedule going forward.

Now, I understand jury service is an imposition on your regular lives, and obviously it's always inconvenient, but that's in the nature of things because we do have a system of jury trials in our country.  So please do not ask to be excused unless you have some financial, business, or personal or medical problem that will make it simply impossible for you folks to accommodate a trial of this relative short length.

Understanding that's all I want to hear in terms of

```
 1    possible excuses, will any of you be so inconvenienced as to be
 2    unable to accommodate a trial of three to four days, not
 3    including deliberations?  Anyone?
 4         Okay.  Good.  Thank you.
 5              THE CLERK:  Your Honor.
 6              THE COURT:  Yes, I didn't see.  Yes.  Please state
 7    your name and tell us what your problem is.
 8         Is that Ms. Neva Sacapano?
 9              PROSPECTIVE JUROR NO. 1:  No.  My name is Justina
10    Yen.
11              THE COURT:  I'm sorry.  Okay.  Justina Yen.
12              PROSPECTIVE JUROR NO. 1:  I'm a full-time student at
13    UCLA.  I have midterms next week.
14              THE COURT:  You have midterms next week?
15              PROSPECTIVE JUROR NO. 1:  Yes.
16              THE COURT:  Starting what time?  Which day?
17              PROSPECTIVE JUROR NO. 1:  It's on a Monday from 9:00
18    to 11:50.
19              THE COURT:  And that's it, just that one time?
20              PROSPECTIVE JUROR NO. 1:  Yes.
21              THE COURT:  Monday, 9:00 to 11:00?
22              PROSPECTIVE JUROR NO. 1:  11:50.
23              THE COURT:  That's the only exam you have next week?
24              PROSPECTIVE JUROR NO. 1:  Yes.
25              THE COURT:  Okay.
```

1          PROSPECTIVE JUROR NO. 1:  I have class after 2:00;

2    so I have a class around 12:00 to 12:50 and one from 3:00 to

3    6:00.

4          THE COURT:  On Monday?

5          PROSPECTIVE JUROR NO. 1:  Yes.

6          THE COURT:  But not on any other days?

7          PROSPECTIVE JUROR NO. 1:  Tuesday through Thursday,

8    I go from class from 12:00 to 1:45.

9          THE COURT:  I think, very good chance that we're

10   going to have the trial concluded in three to four days.  So we

11   may be able to work out some accommodations for you, or you may

12   just have to skip a class here and there, which I'm sure has

13   been done by students in the past.  But we will try to

14   accommodate as much as we can.  Thank you very much.

15        Anybody else?

16        Okay.  Let's go on.  We'll be selecting 12 jurors and two

17   alternates.  The alternate jurors will sit with the jury, hear

18   all of the evidence, and have the same responsibilities,

19   duties, and obligations as the regular jurors.  But unless

20   substituted into the regular jury at some point during the

21   trial or during deliberations, the alternate jurors will not

22   deliberate with the regular jurors.

23        Let me just say a few words about the voir dire

24   examination which we're about to begin.  The parties -- that

25   is, the Government and the defendant in this case -- have a

1    right to have the case tried by qualified, fair, and impartial

2    jurors.  A qualified, impartial jury is one which is

3    responsible and capable and which will without fear, favor,

4    bias, prejudice, sympathy, or passion objectively hear and

5    decide the issues to be tried and render its verdict based

6    solely on the evidence presented at the trial and the law that

7    the Court will instruct you on.

8         A juror's qualifications and impartiality may not be

9    assumed without inquiry, and the inquiry which we are about to

10   make is known as the voir dire examination.  It is a

11   time-honored process by which the qualifications and

12   impartiality of the jurors may be determined.  Its purpose is

13   to develop the truth about the jurors' competency, his or her

14   frame of mind, and ability to do his or her sworn duty in

15   accordance with the jurors' oath.

16        Your answers to the questions which I will ask will enable

17   me to determine whether a juror should be excused for cause

18   either on my own motion or upon a motion by a party.  They will

19   also allow counsel to make intelligent use of their peremptory

20   challenges.

21        A peremptory challenge is a challenge which the law gives

22   to each side to use without having to state a reason for having

23   done so.  It is important, therefore, that your answers to the

24   questions that I will ask be complete and truthful.  Each of

25   you is under compulsion to disclose upon a general question any

1    and all matters which might tend to disqualify you for any

2    reason from sitting on this case.

3         While the sweep of the questions may be broad, it is your

4    affirmative duty to honestly and conscientiously answer the

5    real implications of the questions asked and to make your

6    answers as full and complete as possible under the

7    circumstances.

8         False or misleading answers may result in the seating of a

9    juror who might have been discharged by the Court for cause or

10   stricken through the exercise of a peremptory challenge.  That

11   could result in a miscarriage of justice.  So please consider

12   each question very carefully and don't wait until you have been

13   seated as a juror to disclose something that ought to be made

14   known to the Court at the time the question is first asked.

15        While the questions that I will ask will be addressed to

16   all of you collectively, they must be considered by you as

17   though directed to you individually.

18        Now, the questioning will be as follows:  I will ask you

19   some general questions, and then I will ask each of you to

20   stand up and answer those seven questions on that board.  Now,

21   I'm going to have my clerk move the board closer to you folks

22   when it's time to answer those questions.

23        Essentially, those questions are, one, your name.  Two,

24   your area of residence -- don't give us your address.  We just

25   want your area of residence such as San Gabriel Valley or the

West Side or whatever.  Your marital status, your education,
your occupation, and if you are married, the occupation of your
spouse.  Tell us if you have any children, and if your children
are adults, please tell us what kind of work do they do.

     And, finally, tell us about your prior jury service.  When
I say that, it's only limited to instances where you actually
sat on a deliberating jury.  If you were called to a courtroom
but you weren't selected, I don't need to know about that.  If
you were on a case but somehow the case stopped or settled or
went away in the middle or you were an alternate and you didn't
get to deliberate, I don't need to know about that.

     I just need to know on those cases that you actually
deliberated.  Tell me whether or not those were civil or
criminal cases, tell me whether they were here in federal court
or in state court, and tell me whether or not the jury reached
a verdict.

     Don't tell me what the verdict was.  I'm not interested
knowing in a criminal case whether you found the defendant
guilty or not guilty.  I'm not interested in a civil case
whether you found for the plaintiff or the defendant.  Just
want to know whether the jury returned a verdict or was unable
to return a verdict.

     Now, when I begin the general questions in a few moments,
they will be directed to all of you, not only those people in
the jury box, not only those to my right in the audience, but

1    literally to everybody who is a potential juror in the

2    courtroom.

3        But when it's time to follow up, initially I'm going to

4    only follow up with those of you in the jury box and those of

5    you to my right in the courtroom.  I will not follow up with

6    any of the rest of you.

7        However, as you can see, my clerk will in a few moments be

8    passing out to you a notepad -- for those of you who I will not

9    be following up initially -- and a pencil.  Please go ahead and

10   listen to every question, and if a question, if asked of you

11   individually, would cause you to want to follow up, please note

12   that question so that you will remember.

13       And in the event that, after I get done with the first

14   group I have to talk to some of you in the second group, I'm

15   not going to go through all of the general questions all over

16   again.  I'm going to say, "Okay.  Of all of those questions

17   that I have already asked all of you, do any of you have any

18   follow-up?"  And then I will go ahead and follow up with you

19   individually.  But because you have a paper and pencil to note

20   it, it will be easier for you to remember what questions you

21   may want to follow up with.

22       Go ahead and pass it out.

23       Okay.  So as I begin the questioning, I will only ask you

24   to raise your hand if there's something to follow up on, only

25   if you are in the jury box or in the audience to my right.

1        Can you all read, write, speak, and understand the English

2   language?  Can you folks all do that?

3        All in the affirmative.

4        Do any of you have any kind of a hearing or sight problem?

5        All in the negative.

6        The defendant is charged with using a minor to engage in

7   sexually explicit conduct outside the United States for the

8   purpose of producing any visual depiction of that conduct,

9   intending such visual depiction to be transported to the

10  United States, or actually transporting such visual depiction

11  to the United States.

12       For purposes of this charge, a minor is anybody who is

13  under the age of 18.

14       Sexually explicit conduct means, among other things,

15  actual or simulated sexual intercourse, including

16  genital-genital, oral-genital, anal-genital, or oral-anal,

17  whether between persons of the same or opposite sex.  It also

18  includes masturbation or lascivious exhibition of the genitals

19  or pubic area of any person.

20       The defendant has pleaded not guilty to this charge.  The

21  defendant is presumed innocent unless and until the Government

22  proves the defendant's guilt beyond a reasonable doubt.

23       Other than what you have just heard here in open court,

24  have any of you ever heard, seen, or read anything about this

25  case, anyone?

1       All in the negative.

2       During the course of this trial, you will be required to

3  view certain of these visual depictions of the alleged sexually

4  explicit conduct.  Is there anything about the nature of the

5  charges or this case or the need to view these depictions that

6  would cause you to have any difficulty in being able to serve

7  as a fair and impartial juror in this case?  Any problems?

8       All right.  Let's go to jury box, back row, and that's

9  Ms. Victoria Macias; is that right?

10              PROSPECTIVE JUROR NO. 9:  Yeah.

11              THE COURT:  Yes.

12              PROSPECTIVE JUROR NO. 9:  I don't know if it's

13  relevant, but I would feel really uncomfortable and very

14  anxious, like anxiety.  I don't know if that has anything --

15              THE COURT:  It may very well be, in viewing some of

16  these pictures, it's -- maybe you're uncomfortable.  You might

17  be anxious.  But, you know, in terms of a jury trial, that's

18  what the jury has to do because the jury makes the decision as

19  to the facts as to whether or not certain things are true or

20  not.  That's what informs our ability to have a jury system.

21      So my question to you is do you think you will be so

22  affected that you will not be able to be fair and impartial to

23  both sides in a case like this?

24              PROSPECTIVE JUROR NO. 9:  I don't -- I don't know.

25  I just feel like that would be too much.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Would you be able to set aside whatever
 2   personal feelings you may have about whatever you might see and
 3   decide the case only upon what the facts are, what the evidence
 4   is, and what the law that I will give to you?
 5              PROSPECTIVE JUROR NO. 9:  I don't -- I don't know.
 6   I don't know.
 7              THE COURT:  You're not certain?
 8              PROSPECTIVE JUROR NO. 9:  Uh-uh.
 9              THE COURT:  Okay.  All right.  All right.  I
10   think --
11              THE CLERK:  Your Honor --
12              THE COURT:  Okay.
13              PROSPECTIVE JUROR NO. 6:  I'm a family --
14              THE COURT:  Just a minute.
15              PROSPECTIVE JUROR NO. 6:  Oh, sorry.
16              THE COURT:  That's Stephanie De Leon.
17              PROSPECTIVE JUROR NO. 6:  Yes.  I'm a family
18   services coordinator where I provide a lot of child advocacy
19   resources, and I don't think I would be holding a fair standard
20   in watching that kind of material.
21              THE COURT:  So you think that, just in looking at
22   the material, the -- the question here is whether or not the
23   defendant is guilty or not guilty.  He's presumed innocent.
24   That's why we have a trial.
25              PROSPECTIVE JUROR NO. 6:  Yes.
```

1          THE COURT:  That's why jurors make the decision.

2     Without jurors able to do that or willing to do that, then

3     anybody who is subject to trial won't be able to have a jury

4     trial, and we certainly wouldn't want that in our country.

5          So my question to you is -- I know what you do.  Would you

6     be able to put aside whatever it is you personally feel?  This

7     is not about personal feelings.  This is about are you going to

8     be able to be a proper judge?  Because you will be a judge.

9     You will be a judge of the facts.  Every juror who is selected

10    is a judge of the facts.  I'm the judge of the law, but you

11    will be judge of the facts.

12         Because you're judges, you have in essence the same role I

13    do, which is you do not have the luxury of saying, oh, I like

14    this or I don't like this.  Oh, I prefer this or not prefer

15    this.  That's neither here nor there.  When you are a judge,

16    you don't get to say I like this or I don't like this.  When

17    you're a judge, you have to look at this soberly, and you have

18    to look at it fairly, intellectually, honestly, and say what

19    does the evidence say?  What does the law say?  And how do I

20    apply the facts to the law the judge has given me in deciding

21    whether the Government has proved its case or not?

22         Do you think you can do that?

23              PROSPECTIVE JUROR NO. 6:  I -- I guess so.

24              THE COURT:  Well --

25              PROSPECTIVE JUROR NO. 6:  I mean --

1          THE COURT:  I don't want you -- let me put it this

2     way.  I'm not trying to discourage anybody from telling me

3     anything because I appreciate your candor.  We need to know

4     your real feelings.

5          Now, sometimes some people might say I don't care what you

6     tell me.  I would want to, but I just can't.  I mean, that's

7     me.  I can't.  I understand that.  I want to know that.  I'm

8     not going to say, no, you're going to have to be able to do it.

9     Of course, that would be silly.

10          But on the other hand, you should also understand this is

11     not just a matter of convenience or preference.  If it's a

12     matter of convenience or preference, nobody would want to be a

13     juror.  Nobody would want to do anything that's uncomfortable,

14     so we can't have a jury system.

15          I'm trying to tell you the difference in my emphasis.  I'm

16     not telling you you have to be able to do it.  I'm just

17     explaining to you, doing it as a judge of the facts is

18     different from just saying you like this conduct or you dislike

19     this conduct.  That's not at issue.

20          So hearing what I have to say, do you think you can fairly

21     judge the facts according to the law that I will instruct you

22     on and then be -- in that process be fair to the Government and

23     in that process be fair to the defendant?

24          PROSPECTIVE JUROR NO. 6:  Yes.

25          THE COURT:  Let me put it another way which I will

1    ask you folks at the end as a wrap-up.  If you were one of the

2    parties in this case -- think of it that way -- if you were the

3    Government or you were the defendant, would you want to have a

4    juror with your state of mind judging your case?

5              PROSPECTIVE JUROR NO. 6:  Hmm, probably not.  I'm

6    just used to seeing things at a certain angle every day, 40

7    hours a week.  And I'm all for protecting children, and this is

8    dealing with a minor; so it's really going to be difficult for

9    me to not to biased.

10              THE COURT:  Okay.  I appreciate that, because I

11   think you're being very honest and frank, and I appreciate that

12   very much.  Thank you.

13        Now, I think that takes care of the jury box.

14        Front row, second row, third row?  I see a hand in the

15   third row.  Is that Mr. Michael Imamura?

16              PROSPECTIVE JUROR NO. 23:  Yes, sir.

17              THE COURT:  Mr. Imamura.

18              PROSPECTIVE JUROR NO. 23:  My nephew was molested

19   when he was young; so I can tell you already I'm biased about

20   it.

21              THE COURT:  Are you able to set aside whatever may

22   have happened to your nephew?  Because this has got nothing to

23   do with your nephew.

24              PROSPECTIVE JUROR NO. 23:  I understand that, but I

25   can be honest with you now.  My blood is boiling already, just

```
 1    the thought of this, so --

 2            THE COURT:  Thank you very much.

 3         Anybody in that row?

 4         And then the final row, is that Mr. Anthony Natalia?

 5            PROSPECTIVE JUROR NO. 29:  Yes, judge.  Before I try

 6    to answer or respond to what your question is, could I ask you

 7    to expound a little bit more on what we would be exposed to

 8    here?  Because I want to be fair as I can with you based on the

 9    duty that we all have.

10            THE COURT:  Okay.  I appreciate that.  Hang on one

11    second.

12         Counsel, I'll see you at sidebar at this time.

13              (Bench conference on the record:)

14            THE COURT:  Bea, did you press the button?

15            THE CLERK:  Yes, I did, Your Honor.

16            THE COURT:  All right.  I think it's a fair

17    question.  I tried to explain it in a way that I thought

18    perhaps would have been relevant.  I haven't seen all the

19    pictures.  I don't know what -- you folks are in a better

20    position.  So I think that we're just -- the actual pictures

21    are of oral sex?

22            MR. KALOYANIDES:  Yes.

23            THE COURT:  Any other -- anything else?

24            MR. KALOYANIDES:  There's no bestiality.

25            MS. BLANCH:  There's not close-up pictures of the
```

1    genitals while she's engaging in sexual intercourse and rough

2    sex.

3            THE COURT:  So there is pictures of sexual

4    intercourse between persons of the opposite sex.  There's no

5    pictures of people of the same sex?

6            MS. BLANCH:  No.

7            THE COURT:  There's oral pictures -- pictures of

8    oral sex?

9            MR. KALOYANIDES:  Correct.

10           THE COURT:  And then there are pictures of exposed

11   genitals?

12           MR. KALOYANIDES:  Yes.

13           MS. BLANCH:  Yes.

14           THE COURT:  Female genitals or male?

15           MR. KALOYANIDES:  Yeah.

16           MS. BLANCH:  Any pictures where -- I don't think

17   that we have any pictures of just the defendant's genitals

18   where I haven't blocked them out.

19           MR. KALOYANIDES:  Except in the pictures where a

20   minor is also in the picture.

21           MS. BLANCH:  Yeah.

22           THE COURT:  I'm sorry?

23           MR. KALOYANIDES:  So there are pictures of the minor

24   performing sex.

25           THE COURT:  So I should say --

1          MS. BLANCH:  Actually, there are a couple of

2    pictures where he is aroused with her, and we consider that to

3    be lascivious exhibition of the genitals.

4          THE COURT:  So I should just say there are pictures

5    of persons of the opposite sex only having sexual intercourse,

6    oral sex, and certain displays of the genitals?

7          MS. BLANCH:  Yes.

8          THE COURT:  That's it?

9          MR. KALOYANIDES:  Yes.

10          THE COURT:  Okay.

11          MS. BLANCH:  That's -- there's at least one -- there

12   are a couple -- there are a couple of pictures of him putting

13   his penis in between her breasts.  I don't know if you --

14          THE COURT:  I think that --

15          MR. KALOYANIDES:  I think, Judge, your proposed

16   statement covers that.

17          MS. BLANCH:  That was my question.  I was just

18   being --

19          THE COURT:  Pictures of --

20          MR. KALOYANIDES:  Male and female genitalia.

21          MS. BLANCH:  I think we're going to describe those.

22   I don't think we're going to show them.

23          THE COURT:  They are what?

24          MS. BLANCH:  The dildo pictures, I think we're going

25   to describe and not show.

1          THE COURT:  I don't think that matters.

2          MR. KALOYANIDES:  Your Honor, one thing.  When is

3   the Court going to make a statement about Mr. Reczko not being

4   present?

5          THE COURT:  Soon because, when I introduce

6   everybody, that's when I will say that.

7          MR. KALOYANIDES:  Okay.  Thank you.

8          THE COURT:  By the way, the record should also

9   reflect, since we're at sidebar, that Mr. Reczko is in the

10  holding cell behind here, and he is watching the proceedings.

11  That's what I've been advised.

12          MS. BLANCH:  Okay.

13          THE COURT:  So maybe during the recess you can

14  double-check that's what's happening, Mr. Kaloyanides.  But my

15  understanding is he is doing that.

16          MR. KALOYANIDES:  Okay.

17          THE COURT:  Okay.

18          MR. KALOYANIDES:  Thank you.

19          MS. BLANCH:  Thank you.

20              (The following proceedings were held in open

21               court, in the presence of the prospective

22               jurors:)

23          THE COURT:  All right.  Mr. Natalia, having

24  conferred with counsel as to the nature of the evidence, I'm

25  advised that there will be depictions of persons of the

1    opposite sex only engaged in sexual intercourse, oral sex, and

2    then there will be other displays of male and female genitalia.

3            PROSPECTIVE JUROR NO. 29:  And basically what the

4    person that's on trial is being accused of is utilizing a minor

5    to procure this kind of thing?  Is that --

6            THE COURT:  The charge, as I said to you, was -- he

7    is charged.  Charges are not evidence.  You have to understand

8    that.  There is no evidence in this case yet.  We have to have

9    a jury selected before there's presentation of any evidence.  A

10   charge is not evidence of any kind.  It is just something to

11   begin the process.

12       The charge is that the defendant used a minor to engage in

13   sexually explicit conduct outside of the United States for the

14   purpose of producing any visual depiction of that conduct,

15   intending such visual depiction to be transferred --

16   transported, I should say, to the United States or actually

17   transporting it to the United States.

18       Very clear, defendant has pleaded not guilty and he is

19   presumed not guilty unless and until the Government can prove

20   his guilt.

21           PROSPECTIVE JUROR NO. 29:  All right.  The -- I

22   appreciate everything that you're saying, and I want to do what

23   I can if you -- if you decide that I'd be good for this.  I'm

24   very passionate about something like this.  This is a form of

25   ugliness that, you know, gets my emotions going.  But I still

54

```
 1    would like to try to stand before you and say I'm willing to
 2    try to do my very best to do what's necessary with regard to
 3    the Court and the demands of the Court.
 4            THE COURT:  So do you think that you can, aside from
 5    your personal feelings, put that aside for purposes of being a
 6    judge of the facts on a jury and say that I'm going to look at
 7    the evidence, I'm going to fairly and impartially decide what
 8    the evidence shows, I'm going to listen to what the Court
 9    instructs me as to the law, and I will make my decision
10    according to the facts and the law.
11        Can you do that?
12            PROSPECTIVE JUROR NO. 29:  Yeah, yes.
13            THE COURT:  And you think you can be fair and
14    impartial to both sides?
15            PROSPECTIVE JUROR NO. 29:  Yes, I can.
16            THE COURT:  Thank you.
17        All right.  Let's move on.  Is there anything in your own
18    experience or those of your family members that might relate to
19    or touch upon the subject matter of this trial that would make
20    it difficult for you to be a fair and impartial juror for both
21    sides in this case, other than what you've already told me
22    about and you've already -- we've already discussed?
23        Anything else?  Anybody else?
24            PROSPECTIVE JUROR NO. 21:  I --
25            THE COURT:  Okay.  Let's go to -- let's see.  That
```

1    was row 2.  Is that Mr. Edward --

2              PROSPECTIVE JUROR NO. 21:  Bonyadi.

3              THE COURT:  Yes, Mr. Bonyadi.

4              PROSPECTIVE JUROR NO. 21:  Personal experience,

5    although nothing has happened, but on the street, for instance,

6    there's people who have driven next to me when I was younger

7    and rolled the window down and said, hey, do you want to take

8    part in a movie or something else?  So, yeah, I probably had

9    that experience.

10             THE COURT:  So when you're driving, somebody --

11             PROSPECTIVE JUROR NO. 21:  No, when I was a kid, I

12   was walking on the street.  Driver, for instance, pull up next

13   to me and said, do you want to -- there's a -- I don't

14   remember.  I was younger.

15             THE COURT:  Somebody tried to solicit you for

16   something?

17             PROSPECTIVE JUROR NO. 21:  Yes.  And that experience

18   I've had, I remember seeing that car later on maybe few months

19   later -- I was a kid.  I was scared.  I wish I would have

20   reported him.

21             THE COURT:  I'm sorry.  Did you report him?

22             PROSPECTIVE JUROR NO. 21:  I wish I had.

23             THE COURT:  Can you put aside that experience?

24   Because obviously that experience has got nothing to do with

25   the trial of this case.  You understand that; right?

1        PROSPECTIVE JUROR NO. 21:  I do.  My own philosophy

2   is I try in my own life to be -- know right or wrong, so I try

3   to judge things as much as I could, but still there is that.

4        THE COURT:  I guess I just want to make sure I

5   understand what you're saying.  Can you put aside that

6   experience and judge this case solely on the evidence that we

7   presented and the law that I will give you if you were a juror?

8   If you were a juror.

9        PROSPECTIVE JUROR NO. 21:  I would say yes, but what

10  my psyche will do is a different story.

11       THE COURT:  I'm sorry?

12       PROSPECTIVE JUROR NO. 21:  I would say yes, but what

13  I can do later is a different story.  I would say yes, I could

14  right now.  I should.  I think I could judge.

15       THE COURT:  But when you say --

16       PROSPECTIVE JUROR NO. 21:  Be fair.

17       THE COURT:  What was that qualification?  You're

18  saying, but what?

19       PROSPECTIVE JUROR NO. 21:  What happens later on --

20  the unconscious, the psyche, what it does to you -- that's a

21  different story.  But you asked me to share, and I'm sharing.

22  It is a sensitive -- it is a sensitive topic here.

23       THE COURT:  Okay.  Thank you.

24     Okay.  That's Mr. Gooden, is it?

25       PROSPECTIVE JUROR NO. 22:  Yes.  I think I could be

1   fair and objective, but just as a matter of background, I had a

2   cousin who served federal time for having a collection of young

3   boys' pictures on his computer.

4           THE COURT:  How long ago was that?

5           PROSPECTIVE JUROR NO. 22:  He did about ten years;

6   so it's been at least that.

7           THE COURT:  Ten years ago?

8           PROSPECTIVE JUROR NO. 22:  Yeah, or more.

9           THE COURT:  And his sentence was ten years?

10          PROSPECTIVE JUROR NO. 22:  It was a long sentence.

11  He's now living in the Northeast, separate from the rest of the

12  community, so to speak.

13          THE COURT:  And were you close to that cousin?

14          PROSPECTIVE JUROR NO. 22:  Not really.

15          THE COURT:  Did you follow his case at all to see

16  whether or not he was treated fairly or unfairly by the justice

17  system?

18          PROSPECTIVE JUROR NO. 22:  It was sort of shame

19  within the family.  So there wasn't a lot of talk.  His older

20  sister sort of kept us informed of what happened in a very

21  brief way.

22          THE COURT:  Do you have some personal opinion --

23  because your cousin had this experience and was incarcerated

24  for it, do you have any personal feelings about that, such that

25  it would interfere with your ability to be fair and impartial

1    to both sides in this case?

2            PROSPECTIVE JUROR NO. 22:  I don't think so, no.

3            THE COURT:  Do you come into this case already

4    holding a grudge, let's say against the Government, for having

5    been the prosecutor against your cousin so that, regardless of

6    what evidence is here, you say to yourself, well, this is my

7    chance to get back at the Government so I'm just going to vote

8    whatever it is against the Government?

9        Do you have that feeling?

10           PROSPECTIVE JUROR NO. 22:  No, not at all.

11           THE COURT:  And you feel you can be fair and

12   impartial to both sides?

13           PROSPECTIVE JUROR NO. 22:  Certainly.  I mean, I

14   think there's more emotion in watching a 60 Minutes program

15   about Thailand or something on this subject than there was with

16   respect to this family case.

17           THE COURT:  Okay.  Thank you.  Appreciate it.

18       Anybody else?  Second, third, fourth?  Okay.

19       The plaintiff in this case is the United States

20   government.  It is represented by Ms. Joey Blanch and

21   Ms. Vanessa Baehr-Jones, assistant United States attorneys.

22       Counsel, would you please stand once more and introduce

23   your case agent and tell us what HSI means.

24           MS. BLANCH:  Good morning, ladies and gentlemen.

25   I'm Joey Blanch.  This is Vanessa Baehr-Jones.

1          MS. BAEHR-JONES:  Good morning.

2          MS. BLANCH:  This is Special Agent Meghan Madden,

3    from HSI, which is the Homeland Security agency.

4          THE COURT:  Thank you very much.

5      The defendant in this case is Stanley Dan Reczko III.

6    Mr. Reczko is not here today.  You are not to speculate as to

7    why he's not here today, and you should not consider this fact

8    in any of your decisions as jurors in this case.  Mr. Reczko is

9    represented by David Kaloyanides, attorney at law.

10      Mr. Kaloyanides would you please stand.

11          MR. KALOYANIDES:  Good morning, ladies and

12    gentlemen.  I'm David Kaloyanides, and I represent Stanley Dan

13    Reczko.

14          THE COURT:  Thank you, Counsel.

15      Do any of you or your family members work with or have any

16    business connection with any of the parties or their

17    representatives in this case?  Anyone?

18      All in the negative.

19      Have any of you -- I'm sorry.  Ms. Yen?

20          PROSPECTIVE JUROR NO. 1:  Yes.  My dad works with

21    the Homeland Security.

22          THE COURT:  I'm sorry?

23          PROSPECTIVE JUROR NO. 1:  My dad works for Homeland

24    Security.

25          THE COURT:  Your dad works for Homeland Security.

1    Okay.  What does he do?

2              PROSPECTIVE JUROR NO. 1:  I'm not too sure.

3              THE COURT:  How long has he worked for Homeland

4    Security?

5              PROSPECTIVE JUROR NO. 1:  About 20 years.

6              THE COURT:  You don't know what he does for

7    Homeland Security?

8              PROSPECTIVE JUROR NO. 1:  I just know he's in that

9    building across the street, or around there.

10             THE COURT:  Is he like an agent or something like

11   that?

12             PROSPECTIVE JUROR NO. 1:  Don't think so.

13             THE COURT:  Do you live at home with your dad?

14             PROSPECTIVE JUROR NO. 1:  Yes.

15             THE COURT:  Do you talk about what he does with him?

16             PROSPECTIVE JUROR NO. 1:  Sometimes.

17             THE COURT:  Does he tell you cases that he's worked

18   on or specifics about his job duties?

19             PROSPECTIVE JUROR NO. 1:  No.

20             THE COURT:  As you can see, a Homeland Security

21   special agent is part of the Government's case.  She's the case

22   agent; so obviously Homeland Security is involved in part of

23   the investigation and presentation of this case.  Would the

24   fact that your dad works for Homeland Security cause you to

25   feel like you have some kind of a special allegiance to the

**UNITED STATES DISTRICT COURT**

1  Government or to Homeland Security so that you cannot be fair

2  and impartial to both sides?

3           PROSPECTIVE JUROR NO. 1:  No.

4           THE COURT:  So you can be fair and impartial to both

5  sides regardless of that?

6           PROSPECTIVE JUROR NO. 1:  Yes.

7           THE COURT:  Okay.  All right.  Thank you.

8      Anybody else?

9      That's -- let's see, is that Mr. Mayer Nudell?

10          PROSPECTIVE JUROR NO. 17:  Correct.  Yes, sir.  It's

11  hard for me to be certain at this point, but the direction of

12  this case could be such that I felt the need to mention to you

13  my long history with law enforcement of various types,

14  including some of the agencies that are now part of Homeland

15  Security.

16          THE COURT:  We will get to that in a few moments.

17          PROSPECTIVE JUROR NO. 17:  All right.

18          THE COURT:  Thank you.

19      Anybody else?

20      Okay.  Have any of you ever been represented in any legal

21  matters by any of these lawyers here in this case?

22      All in the negative.

23      To your knowledge, has the firm or the company that you

24  work for ever been represented by any of these lawyers in this

25  case?

1       Okay.  I'm going to read a list of potential witnesses.

2  Not all of them may necessarily be called, but these are

3  potential witnesses.  Some of them will be called.  Please

4  listen carefully.  After I'm done, I'm going to ask you whether

5  or not you know any of these people.

6       Mark Albo; Lisa Baldado; James Clemente; Elcita Del

7  Rosario, also known as Sheryl Del Rosario; Janice Del Rosario;

8  Jaype, spelled J-A-Y-P-E, Del Rosario; Lucia Del Rosario;

9  Wilfredo Del Rosario; Richelle, R-I-C-H-E-L-L-E, Reczko;

10  Dante Orate, O-R-A-T-E; Bruce Pixley, P-I-X-L-E-Y; Stella

11  Pueblos, P-U-E-B-L-O-S; Daryl Tait Purviance,

12  P-U-R-V-I-A-N-C-E; Olga Sagalovich, S-A-G-A-L-O-V-I-C-H; Anita

13  Suico, S-U-I-C-O; and Mitchell Worley, W-O-R-L-E-Y.

14       Do any of you know any of these people who might be a

15  witness in this case?

16       All right.  All in the negative.

17       Are any of you or your relatives law enforcement officers

18  or have been law enforcement officers?  And I mean it in a

19  broad sense, whether it's federal agents, FBI agents,

20  Department of Homeland Security agents, Immigration and Customs

21  Enforcement agents, or any local or state police agency like

22  police officers, sheriffs, state troopers, or highway patrol,

23  or anything of that kind.

24       Let's start here.  Front row in the jury box.

25       Ms. Yen.

1          PROSPECTIVE JUROR NO. 1:  Like I said, my dad works

2    with Homeland Security.

3          THE COURT:  Okay.  Anybody else?

4          PROSPECTIVE JUROR NO. 1:  No.

5          THE COURT:  Okay.  Thank you.

6      Anybody in the front row?

7      Second row of the box?

8      Okay.  Front row of -- to my right in the -- and that's

9    Mr. Nudell.

10         PROSPECTIVE JUROR NO. 17:  Yes, sir.

11         THE COURT:  This is where we talk about that.

12         PROSPECTIVE JUROR NO. 17:  Okay.  In chronological

13   order, I am a former consular officer for the United States in

14   Central America.  I am a former member of the Washington

15   Metropolitan Police Department reserve.  I am a retired reserve

16   deputy sheriff in Falls Church, Virginia.  I am currently a

17   civilian volunteer for the Los Angeles Sheriff's Department.

18         THE COURT:  Over all of this time, if we put all of

19   this together, how much time are we talking about?  How many

20   years have you been in this law enforcement business?

21         PROSPECTIVE JUROR NO. 17:  In excess of 25 years, 25

22   to 30 years.

23         THE COURT:  You obviously have a lot of friends or

24   acquaintances or associates who are also in law enforcement

25   over this long period of time; right?

1        PROSPECTIVE JUROR NO. 17:  Yes.

2        THE COURT:  And when you say you volunteer for the

3   LASD, you volunteer in what capacity?

4        PROSPECTIVE JUROR NO. 17:  I am both a subject

5   matter expert for them and a member of their open source

6   intelligence operation.

7        THE COURT:  You're not a patrol deputy?

8        PROSPECTIVE JUROR NO. 17:  Not currently, no.

9        THE COURT:  Okay.  When you say "subject matter

10  expert," what kind of subject matter?

11       PROSPECTIVE JUROR NO. 17:  Mostly terrorism and

12  related matters.

13       THE COURT:  When you say "open source intelligence,"

14  what does that mean?  Does that relate to -- to the computer?

15       PROSPECTIVE JUROR NO. 17:  Primarily.

16       THE COURT:  Do you consider yourself a computer

17  forensic expert?

18       PROSPECTIVE JUROR NO. 17:  No, sir.

19       THE COURT:  Do you think that, because of all of

20  these associations over a long period of time, over 25 years,

21  that you have grown a special attachment to law enforcement or

22  that you feel a special allegiance to law enforcement such that

23  it would make it difficult for you to be fair and impartial to

24  the parties in this case?

25       PROSPECTIVE JUROR NO. 17:  Possibly.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  When you say "possibly," meaning what?

2          PROSPECTIVE JUROR NO. 17:  Meaning I have great

3   confidence in my objectivity, but I can see the possibility

4   that, when in doubt, I would lean toward the law enforcement or

5   Government view.

6          THE COURT:  So you haven't heard any testimony yet.

7   You haven't heard any witnesses.  You don't -- you haven't

8   heard from law enforcement witness.  You haven't heard from

9   non-law enforcement witness.  Without knowing any of that, you

10  think that you automatically would tend to believe whatever a

11  law enforcement officer says?

12         PROSPECTIVE JUROR NO. 17:  Not automatically, no.

13         THE COURT:  It would depend on what they say, how

14  they say it, whether it's believable --

15         PROSPECTIVE JUROR NO. 17:  Yes, sir.

16         THE COURT:  -- of its own, or in connection with all

17  of the evidence that's introduced?

18         PROSPECTIVE JUROR NO. 17:  Yes, sir.

19         THE COURT:  So in that way, do you think you can be

20  fair and impartial to both sides?

21         PROSPECTIVE JUROR NO. 17:  Yes, sir.  I bring this

22  up mainly just for the record, background sense.

23         THE COURT:  Thank you.

24      Anybody else in the front row, second row to my right,

25  third row?

**UNITED STATES DISTRICT COURT**

1          Third row.  Okay.  I see a hand.  Let's see.  Was that

2     Ms. Kathleen Scrivner?

3               PROSPECTIVE JUROR NO. 25:  Yes.

4               THE COURT:  Okay.  Ms. Scrivner.

5               PROSPECTIVE JUROR NO. 25:  Just in disclosure, my

6     cousin was an FBI agent.  She is no longer -- she's now a

7     medical doctor.  I don't think it would affect me in any way.

8               THE COURT:  Okay.  How long ago was your cousin --

9     excuse me -- an FBI agent?

10              PROSPECTIVE JUROR NO. 25:  I'm guessing around ten.

11              THE COURT:  Ten years ago?

12              PROSPECTIVE JUROR NO. 25:  Yeah, a while ago.

13              THE COURT:  Okay.  So what kind of assignment did

14    she have as an FBI agent -- do you know? -- when she was with

15    the FBI?

16              PROSPECTIVE JUROR NO. 25:  I know she did some

17    surveillance.  She talked about surveillance and being up all

18    night and how frustrating it was.

19              THE COURT:  Okay.

20              PROSPECTIVE JUROR NO. 25:  But not, you know --

21    nothing specific, particularly.

22              THE COURT:  How long ago did she leave the FBI?

23              PROSPECTIVE JUROR NO. 25:  Probably ten years.

24    She's been working for quite a while as a doctor.

25              THE COURT:  As a doctor.  Okay.  In fact, did she

**UNITED STATES DISTRICT COURT**

1    then leave the FBI and then go to medical school and so forth?

2           PROSPECTIVE JUROR NO. 25:  Yes.

3           THE COURT:  Okay.  Is there anything about the fact

4    that your cousin used to be an FBI agent that will cause you

5    any difficulty to be fair and impartial here?

6           PROSPECTIVE JUROR NO. 25:  I don't think so.

7           THE COURT:  Okay.  Thank you.

8        I think we got somebody in the back row who raised his

9    hand.  Is that Mr. Rick Dalton?

10          PROSPECTIVE JUROR NO. 30:  Yes, it is, Your Honor.

11          THE COURT:  Yes, Mr. Dalton?

12          PROSPECTIVE JUROR NO. 30:  Before I became a court

13   security officer, I was a member of the L.A. County Sheriff's

14   Department.  I was a member for 32 years.  That includes 12

15   years in patrol at East L.A. station, but it also included 12

16   years as a sex investigator for the juvenile investigations

17   bureau, which was originally downtown in the Hall of Justice

18   and subsequently moved to Whittier.  And following that, I

19   became a bailiff, and then I retired in '97 and work for

20   another agency now.

21          THE COURT:  You say you're a court security officer?

22          PROSPECTIVE JUROR NO. 30:  I am, sir.  I am assigned

23   to the Woodland Hills bankruptcy court.

24          THE COURT:  During that time -- of course, you know,

25   when you were investigating sex offenses and so forth as a

1    deputy sheriff, that's got nothing to do with what we're

2    talking about here today.

3              PROSPECTIVE JUROR NO. 30:  No.  The reason I'm

4    answering this is because you're asking these questions.

5              THE COURT:  Absolutely.  And I appreciate you

6    bringing it up.  Would your prior experience in law enforcement

7    cause you to have difficulty being fair and impartial to the

8    parties in this trial?

9              PROSPECTIVE JUROR NO. 30:  Not at all.

10             THE COURT:  Do you think you can set -- do you

11   somehow feel that, because you're so connected with law

12   enforcement, that somehow you owe it to law enforcement to rule

13   in their favor no matter what the evidence might show?

14             PROSPECTIVE JUROR NO. 30:  I owe it to weigh the

15   facts as they're presented and make my judgments from there.

16             THE COURT:  Okay.  All right.  Thank you.

17             PROSPECTIVE JUROR NO. 30:  You're welcome.

18             THE COURT:  I think that's --

19             THE CLERK:  One more, Your Honor.

20             THE COURT:  Row 2, is that Mr. Gooden?

21             PROSPECTIVE JUROR NO. 22:  Yes.

22             THE COURT:  Mr. Gooden?

23             PROSPECTIVE JUROR NO. 22:  Wasn't sure if this

24   should be now or when you ask employment.  My son-in-law is in

25   law enforcement, lives in Santa Monica, and prior to coming to

1    the U.S. was in the Sao Paulo Police Department.

2          THE COURT:  Oh, I see.  He was -- he was on the

3    Sao Paulo Police Department.  Is he on the Santa Monica Police

4    Department too?

5          PROSPECTIVE JUROR NO. 22:  No, no.  He finished

6    sheriff's training in custody, and so he's pending appointment

7    now.

8          THE COURT:  So --

9          PROSPECTIVE JUROR NO. 22:  He's interviewing.

10         THE COURT:  Interviewing for the sheriff's position?

11         PROSPECTIVE JUROR NO. 22:  Yes.

12         THE COURT:  In Orange County?

13         PROSPECTIVE JUROR NO. 22:  No.  Hopefully closer to

14   home.

15         THE COURT:  Okay.  All right.  And does he live with

16   you in your household or no?

17         PROSPECTIVE JUROR NO. 22:  No.  About five miles

18   away.

19         THE COURT:  And how long have you known him?

20         PROSPECTIVE JUROR NO. 22:  About nine years, ten

21   years.

22         THE COURT:  And during that time, was he -- was some

23   of that time when he was a police officer with Sao Paulo?

24         PROSPECTIVE JUROR NO. 22:  That was prior to coming

25   to the United States.

1          THE COURT:  And you've only known him since he's

2     been here in the U.S.?

3          PROSPECTIVE JUROR NO. 22:  Yes.

4          THE COURT:  Have you talked to him about his prior

5     experience with the Sao Paulo Police Department and/or whatever

6     he's going through, trying to get his law enforcement position

7     here?

8          PROSPECTIVE JUROR NO. 22:  Not a great deal.  But,

9     you know, when we see news about what's going on in Brazil,

10    we'll talk about what the press has to say.

11         THE COURT:  Is there anything about that experience,

12    that relationship with your son-in-law, that would cause you

13    difficulty to be fair and impartial in this case?

14         PROSPECTIVE JUROR NO. 22:  Not at all.

15         THE COURT:  All right.  Thank you.

16      Have any of you or your relatives or close friends ever

17    had any particularly favorable or unfavorable dealings or

18    contacts or hold particularly favorable or unfavorable views of

19    the United States government, any of its agencies, including

20    Homeland Security and Immigration and Customs Enforcement, or

21    for that matter any law enforcement agency that would make it

22    difficult for you to be fair and impartial in this case?

23    Anyone?

24      All right.  All in the negative.

25      Do any of you feel that a law enforcement officer witness

1    is automatically entitled to any greater or lesser

2    believability just because they are law enforcement?  Anybody

3    feel that way?

4         All right.  Let's see.  Mr. Nudell?

5              PROSPECTIVE JUROR NO. 17:  Yes, sir.

6              THE COURT:  Do you feel that way?  Do you feel that

7    just because -- I thought we had talked about this and you

8    said --

9              PROSPECTIVE JUROR NO. 17:  Right.  But not being

10   certain exactly what you wanted with this question, my belief

11   is that, at the beginning of any testimony from a law

12   enforcement officer, because of their training and background,

13   that I would begin believing, and I would need to hear things

14   that would cause me to doubt.

15             THE COURT:  I'm not saying that a law enforcement

16   witness is not necessarily different from another witness.  In

17   terms of training and all of that, to the extent that's

18   relevant to what they say -- of course, that's something you

19   would consider -- all I'm saying is basically would you apply

20   the same set of criteria for judging a law enforcement witness

21   as any other witness?  Or would you say, you know what, if a

22   law enforcement witness said this and somebody else said the

23   same thing, I'm just going to believe the law enforcement and

24   I'm not going to believe the other person just because that's a

25   law enforcement person?  Not because of any factors that you

1   would have already taken into consideration.

2            PROSPECTIVE JUROR NO. 17:  At that point I would be

3   judging the testimony in the same way, manner, regardless of

4   the witness.

5            THE COURT:  Thank you.

6        Have any of you ever worked for or had any contact with

7   so-called non-governmental organizations, sometimes called

8   NGOs, including an NGO called the International Justice

9   Mission, IJM?  Anybody know anything?

10       Okay.  Nobody here.

11       Mr. Nudell, let's talk about that.  Do you know about --

12            PROSPECTIVE JUROR NO. 17:  Maybe I should just keep

13   standing.  I do not know the particular organization, but in

14   the course of my career, I've dealt both while I was with the

15   State Department and since with many non-governmental

16   organizations, some of which are groups like Save the Children,

17   for example.

18            THE COURT:  Okay.  So you don't personally have

19   any -- have you ever heard of the International Justice

20   Mission?

21            PROSPECTIVE JUROR NO. 17:  I do not believe so.

22            THE COURT:  So you certainly don't know anything

23   about it.

24            PROSPECTIVE JUROR NO. 17:  Yes, sir.  That's

25   correct.

1          THE COURT:  But you have dealt with other NGOs?

2          PROSPECTIVE JUROR NO. 17:  That is correct.

3          THE COURT:  Is there anything about any of your

4    contact with or association with any NGOs that would cause you

5    to have difficulty being fair and impartial in this case,

6    knowing that an NGO, IJM, will come up in testimony in this

7    case?

8          PROSPECTIVE JUROR NO. 17:  No, sir.

9          THE COURT:  Okay.  Now, let me ask -- I think that's

10   it; right?  Nobody else knows any?

11       All right.  Okay.  Let me now ask everybody.  Everybody,

12   you folks take notes if you need to follow up.  Some NGOs may

13   be a faith-based organization.  If a witness from some

14   organization purports to be a faith-based organization, would

15   you automatically, without hearing anything, give that person

16   more or less credibility than you would judge any witness?

17   Anybody would do that?

18       All in the negative.

19       Do any of you hold any strong feelings either in favor of

20   or against NGOs such that it would make it difficult for you to

21   be fair and impartial in this case?

22       All in the negative.

23       Do you belong to or have you been employed by any groups

24   or organizations that purports to advocate for alleged victims

25   of crime generally or specifically with respect to alleged

1    victims of sexual or physical abuse either here in the

2    United States or abroad?  Anyone?

3         All in the negative.

4         There will be evidence from witnesses relating to certain

5    aspects of computers or computer forensics.  Do any of you feel

6    that your knowledge of computers is so limited or your

7    capability to understand such testimony is so limited that you

8    would not be able to understand that type of testimony?

9         All in the negative.

10        Have you or any member of your -- all right.  The next two

11   questions, I'm going to ask two questions at the same time.

12   I'm going to tell you why I'm going to do that.  The first

13   question is whether or not you or your family members have ever

14   been convicted, subject to criminal investigation, been

15   arrested, convicted, or sentenced for any criminal offense

16   other than a minor traffic offense.  And the second question is

17   whether or not you have ever been a victim of crime.

18        And some of -- I'm going to leave it to you as to whether

19   or not you want to come to sidebar and talk about it because it

20   may be a sensitive thing or it may be something you can talk

21   about openly because, if somebody broke into your car and stole

22   your radio or something or somebody broke into your house or

23   whatever, may be something that you feel comfortable enough to

24   talk about even though that's a victim of crime.

25        But if you are the victim of some criminal offense that

 1    was a lot more personal, maybe you don't care to share it with

 2    everybody in the room, but you just want to talk to the lawyers

 3    and to me at sidebar.  Same thing with if you or members of

 4    your family have been convicted of any offenses or been

 5    arrested or charged.  Sometimes it may be, you know, some

 6    distant cousin or something you don't mind talking about, or it

 7    may be something much more private.

 8         That decision is yours, not mine.  I want you to be

 9    comfortable in your own decision as to what you can say.  If

10    you feel comfortable in discussing it openly, we will do so.

11    If you think you want to come to sidebar and share it with us

12    at sidebar, we'll do that.  I just want to make sure that

13    you're comfortable.  I have no preference.  It's up to you.

14         And I ask these two questions together so that, if you do

15    want to come to sidebar and want to keep it private, everybody

16    else won't know which question you're answering.  They don't

17    know whether you're answering Question 1 or 2 or maybe both.

18    Okay?

19         All right.  So here are the questions:  Have you or any

20    member of your family ever been subject to a criminal

21    investigation, been arrested, convicted, or sentenced in a

22    criminal offense other than minor traffic offenses?  Question

23    No. 2, have you ever been the victim of any crime?

24         Now let's go to those that I'm going to follow up.  Write

25    it down on your piece of paper.  We'll follow up as necessary.

**UNITED STATES DISTRICT COURT**

1        In the jury box, let's start with Ms. Yen.

2              PROSPECTIVE JUROR NO. 1:  Is it okay if we talk over

3    there?

4              THE COURT:  Yes, yes.

5              (Bench conference on the record:)

6              THE COURT:  Okay.  Yes.  You folks don't shuffle the

7    paper because that will make it difficult for the court

8    reporter.  Try to speak in a lower tone but speak into the

9    microphone.

10       Okay, Ms. Yen.

11             PROSPECTIVE JUROR NO. 1:  So my uncle was, I think,

12   convicted or arrested or something like that when I was younger

13   for domestic violence for my cousin.

14             THE COURT:  For what?

15             PROSPECTIVE JUROR NO. 1:  Domestic violence.

16             THE COURT:  How long ago was that?

17             PROSPECTIVE JUROR NO. 1:  Probably 10, 15 years or

18   so.

19             THE COURT:  So were you very young at that time?

20             PROSPECTIVE JUROR NO. 1:  Yes.  But I hear about it

21   sometimes during, like, family dinners and such.

22             THE COURT:  I'm sorry.  You have to speak up a

23   little bit.

24             PROSPECTIVE JUROR NO. 1:  I hear it during, like,

25   family dinners.

1          THE COURT:  Did you ever see any of that yourself?

2          PROSPECTIVE JUROR NO. 1:  No.

3          THE COURT:  Did you ever talk to your uncle about

4     this?

5          PROSPECTIVE JUROR NO. 1:  Not particularly for this,

6     like, subject but --

7          THE COURT:  Okay.  Do you know what happened to him?

8          PROSPECTIVE JUROR NO. 1:  I think -- I think he just

9     does community service for what he did, or I'm not sure what

10    happened.

11         THE COURT:  Was it only a one-time deal, or was it

12    multiple times?

13         PROSPECTIVE JUROR NO. 1:  I think it was multiple.

14         THE COURT:  And is there anything about the

15    experience that your uncle has either been arrested and/or

16    charged with domestic violence that will affect your ability to

17    be fair and impartial in this case?

18         PROSPECTIVE JUROR NO. 1:  No.

19         THE COURT:  Okay.  All right.  Anything else?

20         PROSPECTIVE JUROR NO. 1:  That's all.

21         THE COURT:  Thank you.

22             (Prospective juror returns to her seat.)

23         THE COURT:  Stand by for a second in case there's

24    somebody else.  If they're okay, then you can go back to your

25    seat.

**UNITED STATES DISTRICT COURT**

```
 1                    (The following proceedings were held in open

 2               court:)

 3               THE COURT:  Who else had a hand up?

 4          Mr. Robert Berman; is that right?

 5               PROSPECTIVE JUROR NO. 2:  That's correct.

 6               THE COURT:  Do you need to come to sidebar, or you

 7     can speak?

 8               PROSPECTIVE JUROR NO. 2:  That's fine.  Okay.  So

 9     first question, I've had my apartment broken into.  This is

10     probably 15, 20 years ago, a lot of stuff taken out.  Second

11     question is my sister was arrested several times.  I won't say

12     many times, but several times for drug -- drugs in Las Vegas.

13     Subsequently she passed away from drugs, as a matter of fact.

14               THE COURT:  Okay.  Let's talk about the apartment.

15     That was 10 to 20 years ago?

16               PROSPECTIVE JUROR NO. 2:  Right.

17               THE COURT:  Did you report it to the authorities?

18               PROSPECTIVE JUROR NO. 2:  Yes.  The police came by

19     and looked at it and made a report.

20               THE COURT:  I'm sorry?

21               PROSPECTIVE JUROR NO. 2:  Yeah.  They came by and

22     looked at it and made a report.

23               THE COURT:  Did they find whoever did it?

24               PROSPECTIVE JUROR NO. 2:  Nothing came of it.

25               THE COURT:  Where was this?
```

```
 1              PROSPECTIVE JUROR NO. 2:  In Burbank.
 2              THE COURT:  Now, your sister had been arrested
 3    several times for drugs.  How long ago was that?
 4              PROSPECTIVE JUROR NO. 2:  I was -- like, pretty much
 5    all my life, so as far back as I can remember.  She's been
 6    getting arrested, and she -- she actually turned State's
 7    evidence against some people at one time, I believe.  I was a
 8    little kid at the time.
 9              THE COURT:  She's older than you?
10              PROSPECTIVE JUROR NO. 2:  She was much older than
11    me, yes.
12              THE COURT:  Is there anything about either of these
13    experiences that would cause you to have any difficulty to be
14    fair and impartial to the parties in this case?
15              PROSPECTIVE JUROR NO. 2:  No, I don't believe so.
16    If it was a drug case, I might say something different.  But,
17    no, I don't think so.
18              THE COURT:  Okay.  All right.  Thank you.
19         Anybody else in the front row?  I think there are some
20    hands.  Pass the microphone then over to -- is that Mr. Amar
21    Vanmali?
22              PROSPECTIVE JUROR NO. 4:  That's correct.
23              THE COURT:  Okay, Mr. Vanmali.
24              PROSPECTIVE JUROR NO. 4:  So I had my backpack
25    stolen from me while traveling abroad in Argentina.
```

```
 1              THE COURT:  Okay.  Anything else?
 2              PROSPECTIVE JUROR NO. 4:  That's all.
 3              THE COURT:  Anything about that that will cause you
 4    any difficulty to be fair and impartial in this case?
 5              PROSPECTIVE JUROR NO. 4:  None.
 6              THE COURT:  Was there another hand?  Ms. Lashawn
 7    Vaughn?
 8              PROSPECTIVE JUROR NO. 5:  Yes.
 9              THE COURT:  Ms. Vaughn.
10              PROSPECTIVE JUROR NO. 5:  I had my sister arrested
11    for prostitution and my brother for, I believe, some kind of
12    burglary charges, but I'm not 100 percent sure.
13              THE COURT:  How long ago were those arrests?
14              PROSPECTIVE JUROR NO. 5:  My brother, probably about
15    five to seven years ago.  And my sister, as far as I know,
16    maybe a couple years.
17              THE COURT:  I may have misheard.  Did you say you
18    had your sister arrested, or you have a sister who was
19    arrested?
20              PROSPECTIVE JUROR NO. 5:  I have a sister.
21              THE COURT:  Okay.  And did you talk to them about
22    what it is they got arrested for?
23              PROSPECTIVE JUROR NO. 5:  My sister, prostitution.
24              THE COURT:  I mean, did you talk to her about it?
25              PROSPECTIVE JUROR NO. 5:  Somewhat, yes.
```

```
 1          THE COURT:  Did you form any opinions as to whether
 2  or not these arrests were fair or unfair?
 3          PROSPECTIVE JUROR NO. 5:  Yes.
 4          THE COURT:  And what is that opinion?
 5          PROSPECTIVE JUROR NO. 5:  That it was fair.
 6          THE COURT:  In both instances?
 7          PROSPECTIVE JUROR NO. 5:  Yes.
 8          THE COURT:  Anything about that experience, that
 9  relationship with these two siblings who have been arrested for
10  these respective charges, that cause you any difficulty to be
11  fair and impartial in this case?
12          PROSPECTIVE JUROR NO. 5:  Absolutely not.
13          THE COURT:  Thank you.
14      Second row, okay.  Let's go over to Ms. Neva Sacapano.
15          PROSPECTIVE JUROR NO. 7:  Can I have the sidebar?
16          THE COURT:  Of course, but you have to tell me how
17  to say the last name.
18          PROSPECTIVE JUROR NO. 7:  Sacapano.
19          THE COURT:  Sacapano.  Okay.
20              (Bench conference on the record:)
21          THE COURT:  Okay.  Come on closer and speak somewhat
22  in the microphone so we can all hear.
23          PROSPECTIVE JUROR NO. 7:  I was the victim of crime.
24  Child molestation.
25          THE COURT:  But keep it down a little bit.
```

```
1              PROSPECTIVE JUROR NO. 7:  Child molestation.

2              THE COURT:  You're the victim of child molestation.

3    How long ago was that?

4              PROSPECTIVE JUROR NO. 7:  Probably like 38 years

5    ago.

6              THE COURT:  Was the person a relative or a stranger?

7              PROSPECTIVE JUROR NO. 7:  It was McMartin Preschool.

8              THE COURT:  You were a student at McMartin?

9              PROSPECTIVE JUROR NO. 7:  Uh-huh.

10             THE COURT:  Okay.  Anything about that experience

11   will cause you any difficulty to be fair and impartial in this

12   case?

13             PROSPECTIVE JUROR NO. 7:  Yes.

14             THE COURT:  Tell me how.

15             PROSPECTIVE JUROR NO. 7:  Just being a victim

16   myself, I don't think I could.  I would already have judgment.

17             THE COURT:  So you don't think you can set aside

18   those feelings and decide this case?

19             PROSPECTIVE JUROR NO. 7:  I was thinking I could,

20   but I don't think I can.

21             THE COURT:  Thank you very much.

22                 (Prospective juror returns to her seat.)

23                 (The following proceedings were held in open

24                 court:)

25             THE COURT:  All right.  Who else in the back row?
```

**UNITED STATES DISTRICT COURT**

1    That's Ms. Emma Aguilar DeLaMora; is that right?

2              PROSPECTIVE JUROR NO. 8:  Yes.

3              THE COURT:  Come on up.

4                  (Bench conference on the record:)

5              THE COURT:  Yes.

6              PROSPECTIVE JUROR NO. 8:  So my -- my uncle and my

7    dad were arrested for drug trafficking.

8              THE COURT:  Your uncle and?

9              PROSPECTIVE JUROR NO. 8:  My dad.

10             THE COURT:  Your dad.  How long ago was that?

11             PROSPECTIVE JUROR NO. 8:  Ten years ago.

12             THE COURT:  And where was that?  Where was that?

13             PROSPECTIVE JUROR NO. 8:  In Long Beach, California.

14             THE COURT:  In where?

15             PROSPECTIVE JUROR NO. 8:  Long Beach, California.

16   My house got raided.

17             THE COURT:  Was it raided by the local authorities

18   or by the federal government?

19             PROSPECTIVE JUROR NO. 8:  Our local authorities.

20             THE COURT:  And then what happened to your uncle and

21   dad?

22             PROSPECTIVE JUROR NO. 8:  My dad just got -- well,

23   he just got out of prison, and my uncle got deported to Mexico.

24   So he's currently living in TJ.

25             THE COURT:  How many years was your dad sentenced to

1  prison?

2          PROSPECTIVE JUROR NO. 8:  Like around six.

3          THE COURT:  And then your uncle was just deported.

4  He wasn't --

5          PROSPECTIVE JUROR NO. 8:  He was sentenced, and he

6  got -- about a year ago.  He's currently living in Tijuana.

7          THE COURT:  So he did have to go to jail?

8          PROSPECTIVE JUROR NO. 8:  Yes.

9          THE COURT:  And when he got out --

10         PROSPECTIVE JUROR NO. 8:  He was deported.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR NO. 8:  There was another case.  I

13 didn't want to talk about it in front of everyone.  My second

14 cousin, she got abducted and she was hold captured for a month

15 with her two other friends.

16         THE COURT:  Okay.  Take your time.  I know this is

17 very emotional for you.  Take your time to compose yourself.

18 You have a second cousin.  I didn't hear all of it.  So if you

19 can just tell me again, you have a second cousin who was what?

20         PROSPECTIVE JUROR NO. 8:  Abducted and hold capture

21 and raped.

22         THE COURT:  And when was that?

23         PROSPECTIVE JUROR NO. 8:  A year ago in Fresno,

24 California.

25         THE COURT:  And did they -- was she released?

1          PROSPECTIVE JUROR NO. 8:  Yes.  She -- she was hold

2    captured, drugged up for a month --

3          THE COURT:  Take your time.

4          PROSPECTIVE JUROR NO. 8:  She was able to -- one of

5    her friends was able to escape even though she was -- the drugs

6    were coming off her system, and she was able to get someone to

7    go help them and rescue her other friends.

8          THE COURT:  So she was rescued.  And you said there

9    was some drugs coming out of her system?  I don't understand.

10          PROSPECTIVE JUROR NO. 8:  Yes.  So they were

11    constantly getting injected with drugs.

12          THE COURT:  Oh.  The people who abducted --

13          PROSPECTIVE JUROR NO. 8:  The abductors.

14          THE COURT:  -- injected your second cousin and this

15    other person with drugs?

16          PROSPECTIVE JUROR NO. 8:  Yes.

17          THE COURT:  And was this person or these people

18    caught?

19          PROSPECTIVE JUROR NO. 8:  Yes.

20          THE COURT:  Have they been charged?

21          PROSPECTIVE JUROR NO. 8:  Yes.

22          THE COURT:  Have they been sentenced to prison?

23          PROSPECTIVE JUROR NO. 8:  I'm not quite sure.  She

24    hasn't -- my uncles don't want to talk about it.

25          THE COURT:  Have you personally talked to your

**UNITED STATES DISTRICT COURT**

1    second cousin about this?

2              PROSPECTIVE JUROR NO. 8:  I don't -- I don't mention

3    it to her.

4              THE COURT:  Anything about these instances that you

5    have related to us, relating to your uncle and dad and this

6    incident involving your second cousin, that will cause you to

7    have difficulty to be fair and impartial in our trial?

8              PROSPECTIVE JUROR NO. 8:  Yes.

9              THE COURT:  Okay.

10             PROSPECTIVE JUROR NO. 8:  Because I feel like she

11   was -- she was constantly raped with her friends, and now it

12   has turned her against men.

13             THE COURT:  Turned her --

14             PROSPECTIVE JUROR NO. 8:  Yes.  She was -- she was

15   only 16 at the time in high school.

16             THE COURT:  Tell me, why would that cause you to

17   have difficulty to be fair and impartial in this case?

18             PROSPECTIVE JUROR NO. 8:  Because if it's pertaining

19   a minor and sexual activities, I feel like I wouldn't be able

20   to be fair against it.

21             THE COURT:  Just because of --

22             PROSPECTIVE JUROR NO. 8:  My cousin.

23             THE COURT:  -- of your experience --

24             PROSPECTIVE JUROR NO. 8:  Yes.

25             THE COURT:  -- with your cousin and the strong

```
 1   emotional effect it has --
 2              PROSPECTIVE JUROR NO. 8:  Yes.
 3              THE COURT:  -- on you?
 4              PROSPECTIVE JUROR NO. 8:  Yes.
 5              THE COURT:  Okay.
 6              PROSPECTIVE JUROR NO. 8:  And just the fact that she
 7   was only 16.
 8              THE COURT:  Thank you very much.
 9              PROSPECTIVE JUROR NO. 8:  Thank you.  Can I go to
10   the bathroom?
11              THE COURT:  Not right now.  Do you have to?
12              PROSPECTIVE JUROR NO. 8:  No.
13              THE COURT:  We'll try to finish.
14              PROSPECTIVE JUROR NO. 8:  Thank you.
15              THE COURT:  No.  That's okay.
16                  (Prospective juror returns to her seat.)
17                  (The following proceedings were held in open
18                  court:)
19              THE COURT:  Next, let's see, anybody else in that
20   back row?
21              THE CLERK:  She wants a sidebar, Your Honor.
22              THE COURT:  Okay.  Ms. Macias; is that right?
23              PROSPECTIVE JUROR NO. 9:  Yes.
24                  (Bench conference on the record:)
25              THE COURT:  Ms. Macias.
```

```
 1                    PROSPECTIVE JUROR NO. 9:  My sister (inaudible) --
 2                    THE REPORTER:  Your Honor, I can't hear her.
 3                    PROSPECTIVE JUROR NO. 9:  My sister and I were
 4     molested when we were younger.
 5                    THE COURT:  Okay.  How old were you?
 6                    JUROR NO. 9:  She was probably 13.  I was like 7.
 7                    THE COURT:  7?
 8                    PROSPECTIVE JUROR NO. 9:  Uh-huh.
 9                    THE COURT:  And was it by somebody that you knew or
10     a stranger?
11                    PROSPECTIVE JUROR NO. 9:  Uh-huh.
12                    THE COURT:  Somebody you knew?
13                    PROSPECTIVE JUROR NO. 9:  Yeah.
14                    THE COURT:  Who was that?
15                    PROSPECTIVE JUROR NO. 9:  It was an uncle.
16                    THE COURT:  And did this molestation happen one time
17     or multiple times?
18                    PROSPECTIVE JUROR NO. 9:  One.
19                    THE COURT:  One time?
20                    PROSPECTIVE JUROR NO. 9:  Uh-huh.
21                    THE COURT:  And did you folks tell people about
22     this?
23                    PROSPECTIVE JUROR NO. 9:  Yes.
24                    THE COURT:  And was he arrested?
25                    PROSPECTIVE JUROR NO. 9:  No, but we moved away from
```

1    there.

2              THE COURT:  He wasn't charged?

3              PROSPECTIVE JUROR NO. 9:  Uh-uh.

4              THE COURT:  And you moved away?

5              PROSPECTIVE JUROR NO. 9:  Uh-huh.

6              THE COURT:  Have you had any contact with this uncle

7    since?

8              PROSPECTIVE JUROR NO. 9:  Uh-uh.

9              THE COURT:  Anything about that experience which

10   would cause you any difficulty to be fair and impartial here?

11             PROSPECTIVE JUROR NO. 9:  Yes.  I just feel really

12   uncomfortable.

13             THE COURT:  Uncomfortable about --

14             PROSPECTIVE JUROR NO. 9:  This whole situation, what

15   the case is about.

16             THE COURT:  And you think, because of this, your own

17   experience, you can't be fair and impartial?

18             PROSPECTIVE JUROR NO. 9:  Yes.  I feel like I

19   wouldn't.

20             THE COURT:  Thank you.

21             PROSPECTIVE JUROR NO. 9:  Uh-huh.

22                 (Prospective juror returns to her seat.)

23                 (The following proceedings were held in open

24                 court:)

25             THE COURT:  Anybody else in the back row?

1    Ms. Cisneros.

2                PROSPECTIVE JUROR NO. 10:  Yes.

3                THE COURT:  You want to speak there or come back

4    here?

5                PROSPECTIVE JUROR NO. 10:  No, I'm okay.

6                THE COURT:  Okay.  Okay.

7                PROSPECTIVE JUROR NO. 10:  My father has been in and

8    out of federal, state prison pretty much my whole life.  But he

9    has since been deported back to Mexico and for him not to

10   return because of drugs.

11               THE COURT:  Okay.  So when you say he's been in and

12   out of federal, state prison, it's all because of drugs?

13               PROSPECTIVE JUROR NO. 10:  Yes.

14               THE COURT:  He's now been deported?

15               PROSPECTIVE JUROR NO. 10:  Yes.

16               THE COURT:  Anything about that experience which

17   will cause you any difficulty to be fair and impartial in this

18   case?

19               PROSPECTIVE JUROR NO. 10:  No.  That's his life, not

20   mine.

21               THE COURT:  Okay.  Do you think that somehow he was

22   treated unfairly by either the federal or the state

23   authorities?

24               PROSPECTIVE JUROR NO. 10:  Not to my knowledge, no.

25               THE COURT:  Okay.  Thank you.

1          Anybody else?  Okay.  And that's Ms. Samantha Sciortino.

2               PROSPECTIVE JUROR NO. 11:  Yes.  About three weeks

3     ago my house was robbed.  You know, ton of jewelry taken, my

4     grandparents' safe, laptops -- anything worth value.

5               THE COURT:  Okay.  So when you say it was robbed,

6     you weren't there?

7               PROSPECTIVE JUROR NO. 11:  No.  They smashed the

8     sliding door.

9               THE COURT:  They went in there when nobody was

10    there, I take it.

11              PROSPECTIVE JUROR NO. 11:  Correct.

12              THE COURT:  They took some jewelry items and other

13    things?

14              PROSPECTIVE JUROR NO. 11:  Uh-huh.

15              THE COURT:  And I take it this was, of course,

16    reported to the local authorities?

17              PROSPECTIVE JUROR NO. 11:  Yes.  And fingerprints

18    were taken also.

19              THE COURT:  But at this point, because it was only

20    three weeks ago, I take it you don't have any results yet.

21              PROSPECTIVE JUROR NO. 11:  No, nothing.

22              THE COURT:  Anything about that experience which

23    will cause you any difficulty to be fair and impartial to the

24    parties in our trial?

25              PROSPECTIVE JUROR NO. 11:  No, not at all.

```
 1                    THE COURT:  Thank you very much.
 2          Anybody else in the back row?  That's Mr. Anthony
 3   Piganelli.
 4                    PROSPECTIVE JUROR NO. 12:  My son is currently
 5   incarcerated in the state of Utah, pending trial for a weapons
 6   violation.
 7                    THE COURT:  And is that the federal government,
 8   federal authorities, or the state?
 9                    PROSPECTIVE JUROR NO. 12:  I believe it's the state.
10                    THE COURT:  And he's still currently in custody?
11                    PROSPECTIVE JUROR NO. 12:  He is in custody, pending
12   his trial.
13                    THE COURT:  Pending.  Okay.  Have you talked to your
14   son about these charges?
15                    PROSPECTIVE JUROR NO. 12:  No.
16                    THE COURT:  Do you have any opinion as to whether or
17   not your son currently, from what you know, is being treated
18   fairly or unfairly?
19                    PROSPECTIVE JUROR NO. 12:  He has been treated more
20   than fairly, yes.
21                    THE COURT:  Anything about the fact that your son is
22   under these circumstances that will cause you any difficulty to
23   be fair and impartial to the parties in this case?
24                    PROSPECTIVE JUROR NO. 12:  Not at all.
25                    THE COURT:  Thank you.  All right.
```

1          To my right in the audience, front row, Ms. Leann Tunzi.

2               PROSPECTIVE JUROR NO. 13:  Sidebar, Your Honor.

3               THE COURT:  Okay.

4                    (Bench conference on the record:)

5               THE COURT:  All right, Ms. Tunzi.

6               PROSPECTIVE JUROR NO. 13:  Yes.  My cousin was in

7     prison for I think about ten years, supposedly a drug-related

8     charge.  He thought it was completely trumped up and bogus.  I

9     don't know the real story there.

10         The most recent thing, because I've had break-ins and that

11    sort of thing as well, but when my daughter was little -- she

12    was about three -- there was an attempt at kidnapping her.  So

13    I'm real sensitive to that sort of thing.

14         And most recently an ex-boyfriend, turned stalker, has

15    been terrorizing our family.

16              THE COURT:  Ex-boyfriend of your daughter?

17              PROSPECTIVE JUROR NO. 13:  He threatened to kill

18    her.  He threatened all kinds of things.  So I tend to be real,

19    real biased to this date because it is so fresh for the victim.

20              THE COURT:  But you understand that --

21              PROSPECTIVE JUROR NO. 13:  I understand.

22              THE COURT:  -- as terrorized as you are, it has

23    nothing to do with this trial?

24              PROSPECTIVE JUROR NO. 13:  I got that.  It's just

25    that -- I can be perfectly honest with you.  If I were sitting

1    at the defense table, I wouldn't want me, just so you know.

2           THE COURT:  You don't think you can set aside

3    whatever experience that you have gone through in your own life

4    and objectively judge this case?

5           PROSPECTIVE JUROR NO. 13:  On every case I've been

6    in up to this point in life, I've always been able to say I'll

7    be totally impartial and unbiased.  I don't think I can tell

8    you that in all honesty right now, to be honest.

9           THE COURT:  All right.  Thank you.

10           PROSPECTIVE JUROR NO. 13:  Thanks.

11              (Prospective juror returns to her seat.)

12              (The following proceedings were held in open

13              court:)

14           THE COURT:  Anybody else in the front row?

15           THE CLERK:  Another sidebar, Your Honor.

16           THE COURT:  That's Ms. Deborah Bjornberg?

17           PROSPECTIVE JUROR NO. 15:  Uh-huh.

18              (Bench conference on the record:)

19           PROSPECTIVE JUROR NO. 15:  In answer to the first

20    question, I had a cousin who was -- cousin who was in the

21    military.  He was tried and convicted of embezzlement, a

22    U.S. Marine dishonorably discharged, and he served time.

23           THE COURT:  Okay.

24           PROSPECTIVE JUROR NO. 15:  To the second question, I

25    was raped when I was 12.

UNITED STATES DISTRICT COURT

1              THE COURT:  Let's talk about the first one.

2              PROSPECTIVE JUROR NO. 15:  Okay.

3              THE COURT:  Your cousin, how close are you to your

4       cousin?

5              PROSPECTIVE JUROR NO. 15:  Very.  I mean, growing up

6       we were.

7              THE COURT:  Okay.  Do you still keep in contact with

8       him?

9              PROSPECTIVE JUROR NO. 15:  Uh-huh.

10             THE COURT:  And did you talk to him about --

11             PROSPECTIVE JUROR NO. 15:  No.

12             THE COURT:  -- this?

13             PROSPECTIVE JUROR NO. 15:  Not sin- -- it's been

14      some time ago.

15             THE COURT:  How long?

16             PROSPECTIVE JUROR NO. 15:  Probably 20 years, 25.

17             THE COURT:  Anything about that experience cause you

18      any difficulty to be fair and impartial?

19             PROSPECTIVE JUROR NO. 15:  No.

20             THE COURT:  You also said you were raped at age 12.

21             PROSPECTIVE JUROR NO. 15:  Uh-huh.

22             THE COURT:  Was the person who raped you a stranger

23      or somebody known to you?

24             PROSPECTIVE JUROR NO. 15:  It was a stranger.

25             THE COURT:  And did you tell adults?

1          PROSPECTIVE JUROR NO. 15:  No, I did not.

2          THE COURT:  Anything about that experience which

3    will cause you difficulty to be fair and impartial here?

4          PROSPECTIVE JUROR NO. 15:  I think so.  Because of

5    the nature of my age, I was not really aware of the situation

6    and the danger that I put myself into, and so that was kind of

7    how it resulted.  I was at a dance and, anyway, I think that I

8    would have tendency to be hard to consider because the nature

9    of this case being minors.  And I have a heart for children

10   because I don't think they really understand, you know, and I

11   don't know that -- I got into a similar case like four or five

12   years ago, and I just felt checked in my spirit that I wouldn't

13   be able to be partial.  I feel I probably could be partial

14   about weighing the facts.

15         THE COURT:  You mean could be impartial.

16         PROSPECTIVE JUROR NO. 15:  Could be impartial in

17   this case, weighing the facts, but I have to tell you this.

18   You need to know this because of the nature of the case.

19   That's, you know, my background.

20         THE COURT:  Okay.  But I guess I'm trying to

21   understand, if you think you can be impartial, what part of

22   that then causes you to have doubt as to your own impartiality?

23         PROSPECTIVE JUROR NO. 15:  I don't know.  You know,

24   you can't be certain that, once you see something, that it may

25   not trigger something in you that -- that you would feel I

1    would identify with or something.

2        I think that was -- in the other case that I kind of came

3    to the judge and told him I couldn't serve.  The person was in

4    the courtroom, and that really -- I don't know -- affected me

5    because it was a male.  And in this case, I don't -- you know,

6    there's no one here physically in the courtroom; so I'm not --

7    I don't feel that same kind of feeling here.  I feel like it's

8    more judging the facts, that I could do that.

9            THE COURT:  First of all, the fact that the

10   defendant is not here today does not necessarily mean that he

11   will never be here.

12           PROSPECTIVE JUROR NO. 15:  Yeah.

13           THE COURT:  And that's something that's just

14   totally --

15           PROSPECTIVE JUROR NO. 15:  Right.

16           THE COURT:  -- besides the point.

17       I guess my question is, as you are here today talking with

18   me right now and the lawyers, do you think your state of mind

19   is such that you can look at the evidence and objectively say

20   the Government has proved its case or not proved its case?

21           PROSPECTIVE JUROR NO. 15:  Yes, I could.

22           THE COURT:  Okay.  All right.  Thank you.

23           PROSPECTIVE JUROR NO. 15:  Okay.

24               (Prospective juror returns to her seat.)

25               (The following proceedings were held in open

**UNITED STATES DISTRICT COURT**

1              court:)

2              THE COURT:  Anybody else in the front row?

3         Mr. Nudell, you can speak from there, or you need to come

4    up?

5              PROSPECTIVE JUROR NO. 17:  I'm fine here.

6              THE COURT:  All right, Mr. Nudell.

7              PROSPECTIVE JUROR NO. 17:  Nothing recently, but

8    over the course of my life, I've been the victim of a number of

9    burglaries and robberies and some time ago both a

10   hostage-taking and a home invasion, but nothing at all related

11   to what sounds like the subject matter of this trial.

12             THE COURT:  When you say "hostage-taking" and "home

13   invasion," how long ago was that?

14             PROSPECTIVE JUROR NO. 17:  Back in the late 1970s,

15   both -- both of those took place in Nicaragua.

16             THE COURT:  I see.

17             PROSPECTIVE JUROR NO. 17:  Most of the crime that I

18   have experienced on the wrong end has been internationally with

19   a couple of incidents here in the United States but a long time

20   ago.

21             THE COURT:  Anything about any of that experience

22   which would cause you any difficulty to be fair and impartial

23   to both sides in this case?

24             PROSPECTIVE JUROR NO. 17:  No, sir.

25             THE COURT:  Thank you.

UNITED STATES DISTRICT COURT

1        Second row.  Is that -- that's Mr. Bonyadi.

2              PROSPECTIVE JUROR NO. 21:  Yes.  I have a wet and

3   reckless driving charge.

4              THE COURT:  You have a what?

5              PROSPECTIVE JUROR NO. 21:  Wet reckless.

6              THE COURT:  Wet reckless, okay.

7              PROSPECTIVE JUROR NO. 21:  November 2nd, 2012.  It

8   was actually a reduced DUI charge but my first offense ever.

9   And I was at a checkpoint, and I guess they gave me the better

10  part deal.  I did go to the DMV hearing, however.  I won that.

11  L.A.P.D., Los Angeles P.D., expert witness was present.  And I

12  proved that my blood alcohol level wasn't at .08 at the time.

13  And I did win the DMV case.

14       But the court case just takes too much effort, and I

15  didn't want to go through that effort.

16              THE COURT:  Anything about that experience which

17  would cause you difficulty to be fair and impartial in this

18  case?

19              PROSPECTIVE JUROR NO. 21:  Not in this case but in

20  my case, yes.

21              THE COURT:  But are you going to bring your --

22              PROSPECTIVE JUROR NO. 21:  No.

23              THE COURT:  -- sentiments about your case --

24              PROSPECTIVE JUROR NO. 21:  No.

25              THE COURT:  -- so that whatever dissatisfaction you

```
 1   may have had, are you going to somehow say, well, now is my
 2   time to get even --
 3              PROSPECTIVE JUROR NO. 21:  No.
 4              THE COURT:  -- either against the Government or
 5   against the defendant?  Would you be doing that?
 6              PROSPECTIVE JUROR NO. 21:  No.  Just clarifying.
 7              THE COURT:  Okay.  Thank you.
 8        Second row?  Third row now, anybody in the third row?  I
 9   see -- let's see.  That's Ms. Scrivner; right?
10              PROSPECTIVE JUROR NO. 25:  Yes.  Our home was
11   burglarized probably about 30 years ago, and I don't think it
12   would affect me in any way that has to do with this.
13              THE COURT:  All right.  Thank you.
14        I think I saw another hand somewhere.
15              PROSPECTIVE JUROR NO. 26:  Your Honor, yes.
16              THE COURT:  That's -- hold on.  That's Mr. Kagan, is
17   it?
18              PROSPECTIVE JUROR NO. 26:  Yes, sir.
19              THE COURT:  Mr. Richard Kagan.
20              PROSPECTIVE JUROR NO. 26:  That's correct.  My home
21   was burglarized also about 30 years ago.  Maybe it was the same
22   people, but it won't affect.
23              THE COURT:  Thank you.
24        Third row, anybody else?
25        Fourth row?  And that's Mr. Dalton.
```

1          PROSPECTIVE JUROR NO. 30:  Yes, sir.  It's just

2    mostly job related.  I was injured in the East L.A. riots, as

3    we were outnumbered.  There's been a few other incidents where,

4    doing my job as a deputy, I got hurt.  But nothing else.

5          THE COURT:  Anything about that experience,

6    Mr. Dalton, that will cause you any difficulty to be fair and

7    impartial in this case?

8          PROSPECTIVE JUROR NO. 30:  Not at all, Your Honor.

9          THE COURT:  Thank you.

10      Anybody else in the fourth row?  There is one more hand

11   there I see.  Is that Sean Ingalla?

12         PROSPECTIVE JUROR NO. 31:  Yes, that is correct.

13   Last year my car was broken into, and certain valuables were

14   taken from the car.  And the year before that, my brother was

15   robbed during his commute to school.  The assaulters had

16   weapons, and it's kind of iffy.  Aside from that, that's it.

17         THE COURT:  Okay.  So your car was broken into.

18   This was last year, and some valuables were taken.

19         PROSPECTIVE JUROR NO. 31:  Yes.

20         THE COURT:  And did you report that to the

21   authorities?

22         PROSPECTIVE JUROR NO. 31:  Yes, I did.

23         THE COURT:  Did they find anything?

24         PROSPECTIVE JUROR NO. 31:  They haven't replied to

25   me ever since.

1          THE COURT:  And which agency did you report this to?

2          PROSPECTIVE JUROR NO. 31:  I believe it was for the

3    Walnut Police station.  I tried to go to the nearby one, but

4    they were closed.  What ended up happening was I waved the

5    police officer down, and he took the -- the -- I don't know how

6    to explain it.

7          THE COURT:  He took a police report?

8          PROSPECTIVE JUROR NO. 31:  Yes, he took the report.

9          THE COURT:  And this was a local police officer?

10         PROSPECTIVE JUROR NO. 31:  Yes.  But he was

11   stationed at Walnut, I believe.

12         THE COURT:  And what about with respect to your

13   brother being robbed?  When was that?

14         PROSPECTIVE JUROR NO. 31:  That was a year in

15   advance to the last one, so two years ago.

16         THE COURT:  Two years ago.  Where did that take

17   place?

18         PROSPECTIVE JUROR NO. 31:  Oakland, I believe it

19   was.

20         THE COURT:  Was your brother physically hurt?

21         PROSPECTIVE JUROR NO. 31:  Well, he was shocked.

22   That's for sure.

23         THE COURT:  Right.

24         PROSPECTIVE JUROR NO. 31:  They basically -- from

25   the start, they drove up in a motorcycle next to his bicycle

1    and jumped off and basically pointed weapons at him.  And he

2    had to hand over his backpack full of all of his expensive

3    school supplies, like hard drives, books.

4              THE COURT:  Okay.

5              PROSPECTIVE JUROR NO. 31:  Yeah.

6              THE COURT:  Was that reported to the police?

7              PROSPECTIVE JUROR NO. 31:  I believe it was, but we

8    never got anything back from that either.

9              THE COURT:  Okay.  Anything about either of these

10   incidents that would cause you to be -- cause you any

11   difficulty to be fair and impartial to the parties in our case?

12             PROSPECTIVE JUROR NO. 31:  I do not believe so, sir.

13             THE COURT:  Thank you.

14       Anybody else in the fourth row?

15       Okay.  Have any of you ever filed a complaint or a claim

16   or a lawsuit against either the United States Government or any

17   of its agencies or any law enforcement agency?  Have any of you

18   ever done that?

19       All in the negative.

20       Some of the witnesses in this case do not speak English

21   and will require the services of an interpreter.  Will any of

22   you be prejudiced against such a witness such that you will

23   have difficulty being fair and impartial to the parties in this

24   case?  Anyone?

25       All in the negative.

1  Do any of you speak the Cebuano language, which is a form

2 of the Filipino language?  Anybody?

3  All in the negative.

4  You realize from time to time there may be objections

5 which the Court will have to rule upon.  Will any of you be

6 prejudiced against any of the parties because an objection was

7 made and either overruled or sustained by the Court?  Anyone?

8  All in the negative.

9  If you receive an instruction regarding the law and you

10 believe the law to be unfair or you simply disagree with it,

11 will you be able to put aside your personal feelings and apply

12 the law to the evidence which has been presented to you?  Will

13 you be able to do that?

14  All in the affirmative.

15  If you're selected as a juror in this case, you will be

16 required to put aside any feelings of passion or prejudice and

17 decide this case solely on the evidence introduced during the

18 trial and the instructions that the Court will give you

19 concerning the law.  Will you all be able to do that?

20  All in the affirmative.

21  Do any of you know any reason why you think that you could

22 not sit in this case and render a just, fair, and honest and

23 impartial verdict other than whatever you may have already told

24 me at sidebar or at other times?

25  Okay.  None other than that.

1    If you were a party to this lawsuit, would you be willing

2    to have your case tried by a juror in the same frame of mind as

3    yourself?  Again, other than what you have already told me at

4    sidebar or other times.

5    Okay.  No further -- all right.  Then let's go to those

6    questions on the board.

7    All right.  Make sure everybody can see that.  Maybe you

8    can bring it a little bit closer still, Bea.

9    We're going to start with proposed Juror No. 1, Ms. Yen.

10   Would you please stand and tell us the answers to those seven

11   questions on the board.

12       PROSPECTIVE JUROR NO. 1:  My name is Justina Yen.  I

13   live in Westwood.  I am not married.  I'm a full-time student,

14   or for education-wise, I graduate in spring.  I have no

15   children.  And I have not done prior jury service.

16       THE COURT:  Okay.  All right.  Thank you.  Pass the

17   microphone over to Mr. Berman.

18       PROSPECTIVE JUROR NO. 2:  Yes.  My name is Robert

19   Berman.  I live in San Pedro.  I am married.  High school, no

20   college.  Occupation, I run Mayer Theater for Loyola Marymount

21   University.  My wife is semiretired.  No children.  And, yes, I

22   have served on juries before.

23       THE COURT:  State or federal court?

24       PROSPECTIVE JUROR NO. 2:  State.  Long Beach.

25       THE COURT:  And was it criminal or civil?

```
 1              PROSPECTIVE JUROR NO. 2:  Criminal.

 2              THE COURT:  Did you reach a verdict?

 3              PROSPECTIVE JUROR NO. 2:  Yes, we did.

 4              THE COURT:  You say your wife was semiretired.  What

 5    does she do?

 6              PROSPECTIVE JUROR NO. 2:  She does catering, some

 7    catering on the side.

 8              THE COURT:  All right.  Thank you.

 9         Next, Mr. Lowell Gutknecht.

10              PROSPECTIVE JUROR NO. 3:  Yeah.  So my name is

11    Lowell Gutknecht.  I live in Torrance.  Engaged.  I have an AA

12    degree in general studies.  My occupation is I am a PLC

13    engineer and maintenance technician, which means I program

14    industrial computers and turn a wrench every now and then.  I

15    have no children.  And I have never served on a jury.

16              THE COURT:  All right.  Thank you.

17         Mr. Vanmali.

18              PROSPECTIVE JUROR NO. 4:  My name is Amar Vanmali.

19    I am from Los Angeles.  I'm single.  I have a four-year degree.

20    Occupation, I'm a financial analyst.  I have no children.  And

21    I've never served on a prior jury.

22              THE COURT:  All right.  Thank you.

23         Ms. Vaughn.

24              PROSPECTIVE JUROR NO. 5:  Lashawn Vaughn.  I live in

25    Long Beach.  I am married.  I'm a part-time college student.  I
```

1    am an intermediate typist-clerk for general mental health.  My

2    husband is a teacher.  I have three children.  And no prior

3    jury service.

4                THE COURT:  Ms. De Leon.

5                PROSPECTIVE JUROR NO. 6:  I'm Stephanie De Leon.  I

6    live in Koreatown.  I'm single.  I have a master's in child and

7    family studies.  I work for --

8                THE REPORTER:  Too fast, Your Honor.

9                THE COURT:  You've got to slow down so she can write

10   it all down.  Let's go back.  You say your occupation is?

11               PROSPECTIVE JUROR NO. 6:  Family services for an

12   autism organization.  No children.  And no prior jury service.

13               THE COURT:  Great.  Thank you.

14        Let's pass the microphone over to Ms. Sacapano.

15               PROSPECTIVE JUROR NO. 7:  I'm Neva Sacapano.  I live

16   in Long Beach.  I'm married.  I have a doctorate.  I'm a

17   psychologist, and my husband is a claims adjuster.  No

18   children.  And no jury service.

19               THE COURT:  Okay.  Pass the microphone then.

20        Ms. DeLaMora?

21               PROSPECTIVE JUROR NO. 8:  My name is Emma Aguilar.

22   I live in Long Beach.  I'm currently engaged.  I am a part-time

23   student.  I work for Molina Healthcare.  I have a

24   four-year-old.  And I have never served as a jury duty.

25               THE COURT:  You have not served as a juror.

```
 1                    PROSPECTIVE JUROR NO. 8:  No.

 2                    THE COURT:  Ms. Macias.

 3                    PROSPECTIVE JUROR NO. 9:  Victoria Macias.  I live

 4      in Arleta, California.  I'm married.  I have some college.  I

 5      work as an inventory control specialist for dot-coms.  My

 6      husband is unemployed, but he is in the Marine Corps; so that

 7      is his occupation.  We have no children.  And no prior jury

 8      service.

 9                    THE COURT:  Okay.  Ms. Cisneros.

10                    PROSPECTIVE JUROR NO. 10:  My name is Victoria

11      Cisneros.  I live in Whittier.  I'm single.  I have a few --

12      couple years of college.  I am a senior office technician for

13      the L.A. School District.  I have two children.  And, yes, I

14      have prior jury service.

15                    THE COURT:  Was that in state or federal court?

16                    PROSPECTIVE JUROR NO. 10:  State.

17                    THE COURT:  Was that civil or criminal?

18                    PROSPECTIVE JUROR NO. 10:  Criminal.

19                    THE COURT:  Did you folks reach verdicts?

20                    PROSPECTIVE JUROR NO. 10:  Yes.

21                    THE COURT:  Thank you.

22           Ms. Sciortino.

23                    PROSPECTIVE JUROR NO. 11:  My name is Samantha

24      Sciortino.  I live in Granada Hills.  I'm newly engaged.  I

25      have a Bachelor of Arts in psychology.  I work for Tarzana
```

```
 1   Treatment Centers as a bookkeeper.  No children.  No prior jury
 2   service.
 3              THE COURT:  All right.  Thank you.
 4        Mr. Piganelli.
 5              PROSPECTIVE JUROR NO. 12:  My name is Anthony
 6   Piganelli.  I live in Lakewood.  I am married.  I have two
 7   years of college.  Occupation, during the '70s I was an
 8   aerospace engineer, and then I got into structural steel.  I
 9   have two children.  A daughter that recently, or shortly left
10   the NSA and is currently living in Pennsylvania and had a
11   child; so she's not working.  My son is a boilermaker.  And I
12   have, yes, prior jury duty, civil and criminal.  And, yes, we
13   came to conclusions on both.
14              THE COURT:  Was that in state or federal court?
15              PROSPECTIVE JUROR NO. 12:  State.
16              THE COURT:  And you say you are married?
17              PROSPECTIVE JUROR NO. 12:  Yes.
18              THE COURT:  What does your wife do?
19              PROSPECTIVE JUROR NO. 12:  She's a home economical
20   engineer.  She's a housewife.
21              THE COURT:  Let's pass the microphone over to
22   Ms. Tunzi.
23              PROSPECTIVE JUROR NO. 13:  Leann Tunzi.  I live in
24   Glendale.  I'm married.  I have a BA in psychology.  And I'm an
25   I.T. manager.  My husband is a builder.  We have two kids.  And
```

1    I have prior jury service, state, both criminal and civil.

2              THE COURT:  And did you reach verdicts?

3              PROSPECTIVE JUROR NO. 13:  Yes.

4              THE COURT:  Okay.  Thank you.

5         Ms. Takenouchi.

6              PROSPECTIVE JUROR NO. 14:  I'm Jant Takenouchi.  I

7    live in Culver City.  I'm married.  I have a psychology

8    bachelor's degree and a JD.  I currently substitute teach

9    after-school programs.  My husband is an aerospace engineer.

10   No children.  And prior jury duty service, L.A. Superior Court.

11             THE COURT:  Civil or criminal?

12             PROSPECTIVE JUROR NO. 14:  Criminal.  And we didn't

13   reach the deliberation stage.  I guess it just --

14             THE COURT:  Okay.  Ms. Bjornberg.

15             PROSPECTIVE JUROR NO. 15:  Deborah Bjornberg.  I

16   live in Ventura.  I'm married.  I have a Bachelor of Science.

17   I'm currently retired.  I was a manager for the County of

18   Riverside for 32 years.  I have two children.  One is a

19   student, and the other is an attorney.  And I have two prior

20   jury services where I was on a jury for criminal that came to a

21   decision.

22             THE COURT:  Okay.  Mr. Ramos.

23             PROSPECTIVE JUROR NO. 16:  My name is Jesus Ramos.

24   I live in Los Angeles area.  I'm a -- I'm single.  Sorry.

25   Education, I'm part-time college.  Occupation, I work at the

 1   LAX as a bag runner.  No children.  And I have no prior jury

 2   service.

 3            THE COURT:  Thank you.

 4       Mr. Nudell.

 5            PROSPECTIVE JUROR NO. 17:  Yes, sir.  My name is

 6   Mayer Nudell.  I live in North Hollywood.  I'm divorced.  I

 7   have a master's degree and a number of certificates from

 8   various governmental training organizations as well as a

 9   professional certification.  I am a security consultant and

10   trainer and also an adjunct professor of security management at

11   Webster University.  No children.  No prior jury service.

12            THE COURT:  All right.  Thank you.

13       Mr. Calderon.

14            PROSPECTIVE JUROR NO. 18:  My name is Carlos

15   Calderon.  Area of residence will be Sherman Oaks.  Divorced.

16   Education, some college.  Occupation, property management.

17   Children, three of 'em.  And no prior jury service.

18            THE COURT:  Any of your children adults?

19            PROSPECTIVE JUROR NO. 18:  All of them, they are.

20            THE COURT:  What do they do for a living?

21            PROSPECTIVE JUROR NO. 18:  One is in the property

22   management.  The other one is an artist.  And the other one is

23   in the banking industry.

24            THE COURT:  Thank you.

25       Mr. Frederick.

1          PROSPECTIVE JUROR NO. 19:  Yes.  My name is Kenneth

2   Frederick.  I live in West L.A.  I'm single.  Bachelor of

3   Science in accounting.  Self-employed in the printing business.

4   No children.  And no jury service that went to trial, to

5   deliberations.

6          THE COURT:  Thank you.

7       Ms. Gonzalez.

8          PROSPECTIVE JUROR NO. 20:  My name is Erica

9   Gonzalez.  I live in Covina.  I'm married.  I have some

10  college.  I'm a mail carrier.  And I have a one-year-old boy.

11  My husband, he's a supervisor at Office Depot.  And I don't --

12  I have no prior jury service.

13         THE COURT:  All right.  Thank you.

14      Mr. Bonyadi.

15         PROSPECTIVE JUROR NO. 21:  My name is Edward

16  Bonyadi.  I live in the Burbank area.  I'm single.  I have a

17  Bachelor of Science in computer science, and I have a Master of

18  Science in systems architect and engineering from U.S.C.  And

19  I'm a project engineer at an aerospace company.  No children.

20  No prior jury service.

21         THE COURT:  I'm sorry.  Did you say whether you were

22  married or not?

23         PROSPECTIVE JUROR NO. 21:  I'm single.

24         THE COURT:  Okay.  And, Mr. Gooden.

25         PROSPECTIVE JUROR NO. 22:  Richard Gooden.  Live in

```
 1  Century City.  Married.  Master's in business.  Been in
 2  banking, both international and domestic.  My wife is a
 3  grandmother full time.  Daughter, schoolteacher.  And I've had
 4  two jury duty assignments, criminal, municipal -- or state.
 5           THE COURT:  And did you folks reach verdicts?
 6           PROSPECTIVE JUROR NO. 22:  Yes.
 7           THE COURT:  Let's go to Mr. Imamura.
 8           PROSPECTIVE JUROR NO. 23:  My name is Michael
 9  Imamura.  I live in the L.A. area.  I'm divorced.  I have an
10  eight-year-old son.  I'm a baker.  And I do have a degree, a
11  BFA.  And no prior jury service.
12           THE COURT:  Thank you.
13      Mr. Mross.
14           PROSPECTIVE JUROR NO. 24:  Name is Christopher
15  Mross.  I live in Torrance.  I'm married.  I have a bachelor's
16  in music and a master's in teaching.  I work as a
17  schoolteacher, teaching music and special ed.  My wife works
18  with the -- with a contractor for the Air Force, with financial
19  software.  And I have two kids.  They're both really young,
20  four and six years old.  No prior jury service.
21           THE COURT:  All right.  Thank you.
22      Ms. Scrivner.
23           PROSPECTIVE JUROR NO. 25:  Kathleen Scrivner.  I
24  live in West L.A. area.  I'm married.  Bachelor's degree.  I am
25  retired.  My husband is also retired.  And I have two adult
```

children.  They are both release coordinators in the

entertainment business.  I have prior jury service, once as an

alternate and once in federal court on a civil case, and we did

come to a conclusion.

THE COURT:  All right.  Thank you.

Mr. Kagan.

PROSPECTIVE JUROR NO. 26:  Richard Kagan.  I live in

West Los Angeles.  I'm married.  College degree plus the --

plus professional designation.  I am an insurance executive.

My wife is an actress.  I have two children.  My daughter is an

educator, and my son is in private equity.  And other than

being an alternate, I have no prior jury service.

THE COURT:  Thank you.

Mr. Pham.

PROSPECTIVE JUROR NO. 27:  My name is Andrew Pham.

I live in Long Beach.  I'm single.  I have a bachelor's in

biology.  I work in environmental consulting.  I have no kids

and no prior jury service.

THE COURT:  Thank you.

Ms. Christensen.

PROSPECTIVE JUROR NO. 28:  Hi my name is Kristine

Christensen, and I live in West L.A.  I am married.  And I have

some college.  I am not employed at the moment.  And my husband

is a software developer manager.  My children, I have two.  One

is an adult and a full-time college student.  And I have never

```
 1   served on a jury.
 2              THE COURT:  Thank you.
 3         Mr. Natalia.
 4              PROSPECTIVE JUROR NO. 29:  Name is Anthony Natalia.
 5   Area of residence is Ventura county.  Married.  Some college.
 6   Retired.  Two children.  Never had any jury experience.
 7              THE COURT:  And your children, are they adults?
 8              PROSPECTIVE JUROR NO. 29:  One is.  She's in
 9   college.
10              THE COURT:  Okay.  Mr. Dalton.
11              PROSPECTIVE JUROR NO. 30:  Yes, Your Honor.  Rick
12   Dalton.  I live in the Santa Clarita area.  I'm married.  I
13   have a degree in police science.  I do security work for a
14   government contractor, Intercon.  My wife is a retired computer
15   analyst from Farmers Insurance.  I have one adult daughter who
16   teaches college in Roy, Utah.  And I have no prior jury
17   service.
18              THE COURT:  Mr. Ingalla.
19              PROSPECTIVE JUROR NO. 31:  Sean Ingalla,
20   "Ingalla" -- well, you can call me either.  Area of residence
21   is Rowland Heights.  I am not married.  I'm currently attending
22   Fullerton College part-time.  I work with an organization that
23   promotes and preserves gaming in Japanese subculture.  No
24   children.  And no prior jury service.
25              THE COURT:  Thank you.
```

```
 1        And, Ms. Stewart.
 2             PROSPECTIVE JUROR NO. 32:  I'm Kristin Stewart.  I
 3   live in Thousand Oaks.  I'm single.  My husband just passed
 4   away last year.  We both have a bachelor's degree.  My
 5   occupation was mostly to raise the four children, the four
 6   girls.  They are now all married with their own families.  And
 7   so their husbands are accountants, two accountants, one
 8   physician's assistant, and one computer -- works on computers
 9   at IBM.  I don't know what he does.  And one prior jury
10   service, and it was just a malpractice one, and they did come
11   to a conclusion.
12             THE COURT:  Okay.  Thank you.
13        All right.  Counsel, let me see you at sidebar at this
14   time.
15             (Bench conference on the record:)
16             THE COURT:  Okay.  Any other questions?
17             MR. KALOYANIDES:  Your Honor, Ms. Takenouchi is -- I
18   thought she said she had a JD degree.
19             THE COURT:  She did.
20             MR. KALOYANIDES:  I'm not sure if she --
21             THE COURT:  She practiced as a lawyer; right?
22             MR. KALOYANIDES:  Not currently.  I don't know if
23   she's had any involvements or any follow-up questions of where.
24        And I believe Ms. Bjornberg said one of her children is a
25   lawyer, and maybe a follow-up with her whether or not it's
```

```
 1    criminal, civil.
 2                THE COURT:  Okay.
 3                MR. KALOYANIDES:  A follow-up on that, otherwise
 4    nothing more for me.
 5                THE COURT:  Okay.  Government?
 6                MS. BLANCH:  I have one question.  I don't know
 7    (inaudible) --
 8                THE REPORTER:  I can't hear.
 9                MS. BLANCH:  I have one question.  I don't know if
10    you want to follow up or not, but Ms. Yen, she said that she
11    has a midterm on Monday.  Does that mean she's going to need to
12    be studying over the next week?  I'm concerned about that.  I
13    don't want to make her fail her classes.
14                THE COURT:  We can excuse her if that's what you
15    want.  Do you have any objection to that?
16                MR. KALOYANIDES:  I have no objection to excusing
17    her.
18                THE COURT:  We'll just put her as part of the cause
19    even though that's not really cause.
20                MS. BLANCH:  I know.
21                THE COURT:  Stand by.
22                    (The following proceedings were held in open
23                    court:)
24                THE COURT:  Ms. Takenouchi, you said you have a JD
25    degree?
```

UNITED STATES DISTRICT COURT

```
 1              PROSPECTIVE JUROR NO. 14:  Yes.
 2              THE COURT:  Give her a microphone.
 3              THE CLERK:  Yes, Your Honor.
 4              THE COURT:  Are you a lawyer?
 5              PROSPECTIVE JUROR NO. 14:  Yes, I am, but I'm
 6    inactive.
 7              THE COURT:  Did you practice law at some point?
 8              PROSPECTIVE JUROR NO. 14:  Yes, I did.  Civil.
 9              THE COURT:  What kind of law did you practice?
10              PROSPECTIVE JUROR NO. 14:  Civil litigation.
11              THE COURT:  With a firm or on your own?
12              PROSPECTIVE JUROR NO. 14:  With a small firm.
13              THE COURT:  How long ago did you go inactive?
14              PROSPECTIVE JUROR NO. 14:  I think it was in two
15    thousand -- trying to remember -- twelve or just recently.  But
16    I haven't been practicing long before that.  I just don't want
17    to pay the Bar dues anymore.
18              THE COURT:  Okay.  And did you ever practice
19    criminal law?
20              PROSPECTIVE JUROR NO. 14:  No.
21              THE COURT:  Thank you.  Pass the microphone to
22    Ms. Bjornberg next to you.
23         Ms. Bjornberg, I think you said one of your children is a
24    lawyer; right?
25              PROSPECTIVE JUROR NO. 15:  Yes.
```

1          THE COURT:  Is that a son or daughter?

2          PROSPECTIVE JUROR NO. 15:  Daughter.

3          THE COURT:  Does she practice law here in

4    California?

5          PROSPECTIVE JUROR NO. 15:  No.  She's passed the

6    California Bar, but she practices in Chicago, Illinois, along

7    with her husband who practices there.

8          THE COURT:  Do you know what kind of law they

9    practice?

10          PROSPECTIVE JUROR NO. 15:  Mostly business, mergers,

11    acquisitions, that kind of thing.

12          THE COURT:  How long have they been doing that?

13          PROSPECTIVE JUROR NO. 15:  Since they graduated from

14    law school, about five years.

15          THE COURT:  Do they do any criminal law?

16          PROSPECTIVE JUROR NO. 15:  Not to my knowledge.

17          THE COURT:  Anything about the fact that your

18    children, or at least your daughter and son-in-law, are lawyers

19    make it difficult for you to be fair and impartial in this

20    case?

21          PROSPECTIVE JUROR NO. 15:  No.

22          THE COURT:  Ms. Takenouchi, does the fact that you

23    have a JD, would that cause you difficulty in terms of

24    following the instructions of the Court as to the law?

25          PROSPECTIVE JUROR NO. 14:  No.

1        THE COURT:  So you will put aside whatever you know

2   of the law and only judge this case based on the evidence

3   received and the law that I will instruct you on?

4        PROSPECTIVE JUROR NO. 14:  Yes.

5        THE COURT:  Can you do that?

6        PROSPECTIVE JUROR NO. 14:  Yes.

7        THE COURT:  Thank you.

8            (Bench conference on the record:)

9        MS. BLANCH:  I have one other follow-up question.

10  Mr. Bonyadi at some point --

11       THE COURT:  I can't hear you.

12       MS. BLANCH:  At some point I thought he said his

13  personal philosophy was that there was no right and wrong, and

14  could the Court follow up if that would make it difficult for

15  him to stand in judgment or reach verdict?

16       THE COURT:  I think he said something about that he

17  thinks he can be fair and impartial but the subconscious may be

18  another story as to what the subconscious -- so I think people

19  are just being honest in terms of right now I think I can.

20  But, you know, how can we ultimately at the end of the day

21  anybody going to assure anything because we're all subject to

22  subconsciousness.  Whatever.  I don't know.  Do you want me to

23  follow up on that?

24       MS. BLANCH:  I'm just a little concerned where he

25  says that he tries to -- if his personal philosophy is that

1    there is no right or wrong --

2          MR. KALOYANIDES:  Your Honor, I did hear something

3    about that, but I think he maybe inarticulately stated that

4    he's not -- he's not a moralist and he tries to be open about

5    things.  But if the Court wants to inquire --

6          MS. BLANCH:  If he tries not to be judgmental,

7    that's fine.  Just if he's trying to say that there's --

8          THE COURT:  There's no right --

9          MS. BLANCH:  -- if he doesn't believe in the laws.

10          (The following proceedings were held in open

11          court:)

12          THE COURT:  Mr. Bonyadi, I seem to recall, when we

13    were having the dialogue some time ago, you said something

14    about -- you said something there was no right or wrong or

15    something?  I'm not quite sure what you were getting at on

16    that.  Maybe you can help me out here.  Do you literally mean

17    that you feel that there is just simply no right and wrong in

18    the world and whatever happens happens?

19          PROSPECTIVE JUROR NO. 21:  No.  It's a more

20    philosophical thing.  What I meant by that is more I like to

21    view myself as objective.

22          THE COURT:  As objective.

23          PROSPECTIVE JUROR NO. 21:  Yes.  In lieu of that,

24    and that's -- that's all.

25          THE COURT:  So when you said no right or wrong, does

1    that mean that you believe that there's just no right and wrong

2    in the world?

3                  PROSPECTIVE JUROR NO. 21:  It's -- it's hard to

4    explain.  There is, of course.  But it's human -- human value.

5    It gets a little bit --

6                  THE COURT:  It's what?

7                  PROSPECTIVE JUROR NO. 21:  It gets a little more

8    deeper.  It's more of a philosophical thing.  There is right or

9    wrong.  Let's put it that way, but on the bigger scheme of

10   things, that's my view.

11                 THE COURT:  In a bigger scheme of things, your view

12   is what?

13                 PROSPECTIVE JUROR NO. 21:  Typically, for instance,

14   the whole thing about duality, or right or wrong, is one of my

15   favorite topics to talk about.  It took me years to get to this

16   point.  I don't know if I can explain it in one sentence.

17                 THE COURT:  I guess my question is going to come to

18   ultimately whether or not that belief is such that it will

19   interfere with your ability to make a fair and impartial

20   decision in this case based on --

21                 PROSPECTIVE JUROR NO. 21:  No.

22                 THE COURT:  -- the evidence and the law that I give

23   you to use.

24                 PROSPECTIVE JUROR NO. 21:  No, Your Honor.

25                 (Bench conference on the record:)

1            THE COURT:  Challenges for cause to just this panel.

2      Government?

3            MS. BLANCH:  Mr. -- Ms. Sacapano.  Sacapano.

4            MR. KALOYANIDES:  I'll stipulate.

5            THE COURT:  Ms. --

6            MR. KALOYANIDES:  Number 7.

7            THE COURT:  Number 7, Sacapano.  What's the reason

8      for challenge for cause to Sacapano?

9            MS. BLANCH:  She said, based on the subject matter

10     and her personal experience, she did not believe she could be

11     fair.

12            THE COURT:  That was at the sidebar.  Okay.  Any

13     objection to --

14            MR. KALOYANIDES:  Stipulate.

15            THE COURT:  Okay.  Anybody else, Ms. Blanch?

16            MS. BLANCH:  Ms. DeLaMora I think also said she

17     didn't think she could be fair in a case dealing with --

18            THE COURT:  Ms. DeLaMora.

19            MS. BLANCH:  -- crimes against children.  She was

20     the one at sidebar was weeping.

21            MR. KALOYANIDES:  And her second cousin was abducted

22     and raped over a course of a month.

23            THE COURT:  Okay.  Any objection?

24            MR. KALOYANIDES:  Stipulate.

25            THE COURT:  What number is she?

1           MR. KALOYANIDES:  Number 8.

2       Anybody else?

3           MS. BLANCH:  I think Number 9 also said she couldn't

4   be fair.  She said she was molested as a child and did not

5   think she could be fair.

6           THE COURT:  Any objection?

7           MR. KALOYANIDES:  No objection.

8           THE COURT:  Okay.  Anybody else?

9           MS. BLANCH:  Number 13, she's the one with the

10  daughter who is being stalked and said right now at this moment

11  she doesn't believe she can be fair.

12          THE COURT:  Okay.  Any objection to that?

13          MR. KALOYANIDES:  No objection.

14          THE COURT:  Anybody else?

15          MS. BLANCH:  I don't have anyone else, no.

16          THE COURT:  Mr. Kaloyanides?

17          MR. KALOYANIDES:  Well, Your Honor, I'm going to

18  challenge for cause Ms. Bjornberg, Number 15.  Now, she went

19  off a little bit about how she can be impartial.  She was raped

20  when she was 12, and she thinks that, while generally she can

21  be a fair and impartial person, the one thing that concerns me

22  is she made a qualification based on the fact that Mr. Reczko

23  is not in the courtroom and that, if he was here, it might make

24  a difference.

25      She alluded to a prior case that she was either involved

```
 1   in maybe as a juror -- it was as a juror, I believe -- where
 2   when the defendant came into the room, it brought back some
 3   sort of either recollection or some emotional feeling that
 4   really affected her, that she had to go and talk to the judge
 5   about not being on that jury.
 6        My concern is that, if Mr. Reczko decides to eventually
 7   participate and is present, and if she's impaneled, it might
 8   come to where she's in the same boat that was in her prior
 9   experience.
10             THE COURT:  Ms. Blanch?
11             MS. BLANCH:  No objection.  I'll stipulate.
12             THE COURT:  Okay.  That's Ms. Bjornberg.
13        Anybody else, Mr. Kaloyanides?
14             MR. KALOYANIDES:  Yes.  Number 6, Ms. De Leon.  I
15   think also she -- she equivocated.  The Court inquired as to it
16   and explained how the evidence should be considered and that
17   she thought she would be fair.  But when the Court asked
18   whether or not she would want someone of her frame of mind to
19   sit as a juror, she said very clearly absolutely not.  She
20   didn't think she would be fair because of her involvement with
21   children's issues and as well as her very deep concern about
22   anything regarding children.
23        And so I think she's said, because it's a minor that's
24   involved in this case, that's the linchpin of her inability to
25   be fair.
```

UNITED STATES DISTRICT COURT

1          MS. BLANCH:  The Court followed up, and she actually

2    said --

3          THE COURT:  I didn't hear.

4          MS. BLANCH:  I'm sorry.  It's a -- based on my

5    notes, after follow-up questions by the Court, she said she

6    could be fair.

7          MR. KALOYANIDES:  I agree, but then the Court asked

8    the follow-up question, would you want your type of personality

9    or mind frame on a jury where you were involved as a party?

10   And she said no.

11         THE COURT:  I think she did say that.

12         MS. BLANCH:  She did, yeah.  I think you're right.

13   Okay.  I'll stipulate.  That's fine.

14         THE COURT:  Anybody else?

15         MS. BLANCH:  Can we let Ms. Yen go?

16         MR. KALOYANIDES:  I assumed we were stipping about

17   Ms. Yen.

18         THE COURT:  Anybody else?

19         MR. KALOYANIDES:  Not from the defense.  Thank you,

20   Your Honor.

21         THE COURT:  What about Mr. Imamura?  He was the

22   first one to say that he had a nephew who was molested and he

23   couldn't be fair and impartial.

24         MR. KALOYANIDES:  Oh.

25         MS. BLANCH:  Yeah.  Right.

1          MR. KALOYANIDES:  Okay.

2          MS. BLANCH:  I have that in my notes as well.  I

3   missed that one.  Yeah, I'll stipulate.

4          MR. KALOYANIDES:  I'll stipulate.

5          THE COURT:  Okay.  This is what we have.  I have

6   one, two, three, four, five, six, seven, eight.  We have eight.

7   Okay.  That would be Number 1 Yen, Number 6 De Leon, Number 7

8   Sacapano, Number 8 Aguilar, Number 9 Macias, Number 13 Tunzi,

9   Number 15 Bjornberg, Number 23 Imamura.

10         Now, let's talk about whether or not we should take the

11  lunch break.  This is taking a lot longer than I had

12  anticipated.  Whether we take a lunch break, come back, and

13  then we put in -- I was going to double it, but I don't want to

14  double 8 to 16.  Is there a likelihood you folks may use all

15  your challenges?  Because if you're not going to use all your

16  challenges, we won't need as many.  I can put in ten.

17         But then we don't want to keep going through this process

18  over and over again because we do need to have -- if you're

19  going to go through your challenges, then we need 32.  That's

20  the bottom line, and we're going to be eight short of 32 right

21  now.

22         If I put in -- let's take a one-hour lunch recess, and

23  when we come back, we will have the -- I'll put ten people in

24  the -- well, first of all, I'll fill in the gaps.  I'll have

25  whoever it is go and sit where these gaps are, and then what

 1   I'll do is I will add to your -- among the eight or ten, there

 2   may be a couple of causes in there.  I don't want to keep going

 3   through this process, but maybe I'll put -- I don't know.

 4   Maybe I'll put 10 or 12 so we have a little leeway, and I'll

 5   just ask them, do you have any follow-up, answer the questions

 6   on the board.

 7       We'll come back here again.  Only challenge for cause, if

 8   you may have.  If you have some cause, we'll take care of it.

 9   If not, then I think we should have enough to start the

10   peremptory challenge process, and we're off and running.

11           MS. BLANCH:  Okay.

12           THE COURT:  In the meantime what I also want you to

13   do is, your client is in the lockup right here just on the

14   other side of this door, and he is watching and listening to

15   this on TV.  So what I want you to do is tell him, you know, if

16   he wants to come back, he's going to behave, I will let him

17   come back.  But you're still going to be his lawyer.  He's not

18   getting his pro se back.

19       If he comes back, the problem is we're still going to

20   have -- the problem is this:  After his display this morning, I

21   think there is a real question about the security.  He was not

22   only belligerent to the Court but he was not cooperative with

23   the marshal several times when the marshals told him to get up

24   and he wasn't getting up.  And they actually had to physically

25   put a hand on him to get him to get up and do that.

1    I also saw the marshal, one of the marshals, unholster his

2    Taser.  I do not want anything that would require the marshals

3    to act like that in front of the jury.  But that's all up to

4    Mr. Reczko, and if he behaves himself, everything will go

5    smoothly.  But the problem that I have is, if he's out here, I

6    don't think the marshals would feel comfortable, and I think

7    the record here is sufficiently clear, that there's going to be

8    a problem with him not restrained.

9         MR. KALOYANIDES:  Your Honor, maybe after we remove

10   the challenges for cause, if we move the jurors from the

11   extreme left into the middle --

12        THE COURT:  Yes.

13        MR. KALOYANIDES:  I don't know if the marshals are

14   intending to have him restrained on both ankles and hands --

15        THE COURT:  No.  The marshals do not need to

16   restrain him with his ankles so that the feet -- you know,

17   nobody will see him, but what they're going to do is keep his

18   hands free so he can help you.  They're going to have a belly

19   chain around his waist, and the waist belly chain will then be

20   hooked onto that blue chair because that blue chair has a

21   couple of things in the back where they can then cuff the belly

22   chain on either side to the chair so that, if he's going to

23   move, that chair is going to be inextricably coming with him,

24   which would hamper his ability to create a disturbance before

25   the marshals can deal with it.

1          So I think that may be a good idea.  We'll try to have

2     everybody in the middle of the courtroom.  Okay?  Everybody in

3     the middle of the courtroom, nobody on that side.

4               MR. KALOYANIDES:  Now, I believe it might -- I'm

5     going to let the Court know.  I was intending to have one of

6     the team at counsel table with me, either Mr. Filipiak or

7     Ms. Caulfield.  I believe it would be helpful especially if

8     Mr. Reczko is at the table because they have a much longer

9     relationship with him and can help try to quaff him if he is

10    feeling upset.

11              THE COURT:  That's fine.  The other thing is I do

12    want him out here in advance and seated, but logistically he's

13    made this very difficult for us.  The elevator there behind the

14    door does not work.  The elevator that does work is between

15    Judge Wistrich and Judge Wohrle.  So at some point they're

16    going to have to take him from Judge Wistrich's courtroom,

17    cross the hallway into Judge Collins' court, and then put him

18    back there.  Okay?

19         So what we can do is I will instruct the marshals to hold

20    him there until Bea -- well, no.  We can't do that because he

21    can't come in.

22              MR. KALOYANIDES:  It would have to be -- everybody

23    would have to be out of the room.  He would have to be brought

24    in first, and the jury would have to be down the hall.

25              THE COURT:  The problem is how does he get --

```
 1              MS. BLANCH:  Then he's going to cross the hallway.
 2    They would not be able to be on this floor.
 3              THE COURT:  That's the problem.
 4              THE REPORTER:  I can't hear, Your Honor.
 5              THE COURT:  What I will do --
 6              MR. KALOYANIDES:  Perhaps we tell the jury to come
 7    back 15 minutes later than the rest of us.
 8              THE COURT:  There will still be people coming
 9    around.  Maybe what we'll tell the jury is to come back and --
10    an hour or so after.  So it's 12:30.  We'll tell them to come
11    back at 2:00, and we will gather here at 1:30, and I will tell
12    them do not be on this floor before 2:00.  That's all we can
13    do.  Do not come up before 2:00, and if that means you're a
14    little bit late after 2:00, that's fine.  But under no
15    circumstances are you to come up to this floor before 2:00.
16              MS. BLANCH:  Okay.
17              THE COURT:  Okay?  And then we'll get back here at
18    1:30.  Then we can have him put in here, and then we can -- I
19    can address him.  But you should talk to him already before I
20    can address him.  If he says, no, I'm not going to behave or
21    whatever it is that he says, then we're just going to have him
22    taken out, and that's the end of it.
23              MR. KALOYANIDES:  Will I be able to just go through
24    this door?
25              THE COURT:  Just check with the marshal and make
```

**UNITED STATES DISTRICT COURT**

1   sure they're okay with it.  I'm sure you can go through the

2   door because he's in his lockup.

3          THE CLERK:  Okay.  I -- Your Honor, what we can do

4   is before 2:00 I can have the relief clerk make sure she stands

5   next to the elevators and makes sure there's nobody coming up

6   and down.  That way it clears the floor, and we don't have a

7   problem with that.

8          THE COURT:  Do not be on this floor until 2:00.

9          THE CLERK:  Exactly, yes.

10          THE COURT:  Let's excuse these people.  Let's fill

11   it in, and then we'll go from there.

12          MR. FILIPIAK:  Thank you.

13             (The following proceedings were held in open

14             court:)

15          THE COURT:  Ladies and gentlemen of the jury panel,

16   thank you very much for bearing with us.  I know we're

17   returning late.  It's past 12:30.  It's past the normal time we

18   have lunch.  We're going to do a couple of things and come back

19   for lunch.

20      At this point the following individuals are excused to

21   report to the jury commissioner for further instructions:

22      Juror No. 1, Ms. Yen.  Thank you.  You are excused.  You

23   may get up and leave.

24      Juror No. 6, Ms. De Leon, thank you very much.  You are

25   excused.

```
1        Juror No. 7, Ms. Sacapano, thank you.
2        Juror No. 8, Ms. Aguilar, thank you.  You are excused.
3        Juror No. 9, Ms. Macias, thank you.  You are excused.
4        Juror No. 13, Ms. Tunzi, thank you.  You are excused.
5        Juror No. 15, Ms. Bjornberg, you are excused.
6        And Juror No. 23, Mr. Imamura, you are excused.
7        Counsel, did I get all those?
8             MR. KALOYANIDES:  Yes, Your Honor.
9             MS. BLANCH:  Yes, Your Honor.
10            THE COURT:  Okay.  All right.  Now what we're going
11   to do is as follows:
12       Ms. Takenouchi, would you please come over and take the
13   first seat open.  Front row, first seat.
14       Mr. Ramos, come on up, take the open seat in the front
15   row, please.
16       Mr. Nudell, please take the first seat in the back.
17       Mr. Calderon, come on up, take the next seat next to
18   Mr. Nudell.
19       Mr. Frederick, please come on up and take the seat next to
20   Mr. Calderon.
21       Okay.  Now, what we're going to do is now we're going to
22   take a recess, but we're not done yet.  So everybody, not just
23   those to my right, but everybody in the courtroom, please come
24   back at 2:00.  Okay?
25       Now, before you go, I have to tell you a couple of things.
```

**UNITED STATES DISTRICT COURT**

1    Number 1, do not discuss this case or anything that has

2    anything to do with it with anyone or among yourselves during

3    the recess.  You have heard no evidence.  You have heard no

4    arguments.  You have heard no statement of the law.  You have

5    heard no opening statements.  Do not discuss whatsoever.

6         You can tell your family or your employer that you are

7    still in the jury selection process in the case, but that's it.

8    Don't even describe the nature of the case, do not engage in

9    any conversation.

10        I know nowadays people are all over the social media.

11   Please do not go on social media whether it's Facebook,

12   Twitter, or whatever the new thing is and say anything about

13   this case whatsoever because we want to make sure that we do

14   not have any improper communication with any of you who might

15   be a juror in this case.  So please keep that in mind strictly.

16   That will be the order of the Court.

17        Number 2, even though I asked you to come back at 2:00, do

18   not come back earlier than 2:00.  Please do not be on this

19   floor whatsoever, the sixth floor, before 2:00.  Don't come up

20   the elevator until it's already 2:00.

21        And once you do come up at 2:00, come directly into the

22   courtroom.  Look around where you are seated.  I want you to be

23   in exactly the same position you are as we speak because, when

24   we continue, we're going to pick up from where we are, in the

25   positions that you are in.  Okay?

1        So with that in mind then, thank you very much for your

2   attention and your patience.  Go and have a nice lunch, and

3   then we'll see you folks back here a little bit after 2:00.

4        Thank you.  You're excused.

5            PROSPECTIVE JUROR NO. 17:  Your Honor, may I ask you

6   one more question.  May I approach before you leave and you

7   leave.  I have one question I would like to ask you.  It

8   affects my own scheduling.

9            THE COURT:  Well, can't --

10           PROSPECTIVE JUROR NO. 17:  I can do it in public if

11  you want.  I'm at the vital stages of the course I'm teaching,

12  and it greatly disadvantage the students.  So my question is --

13  this involves Monday.  Should -- should we be in a deliberative

14  status, does that end at 2:00?  End of day still apply?

15           THE COURT:  No.  When you are in deliberation, you

16  can come in as early as 8:00, and you can stay until 5:00 so

17  that you can have a full day of deliberation.  That will not be

18  that schedule.

19           PROSPECTIVE JUROR NO. 17:  Okay.

20           THE COURT:  If you choose to leave at 2:00 because

21  all the other jurors have otherwise made plans, then you can

22  leave at 2:00.  But sometimes jurors say, no, we want to stay

23  longer because we want to complete our work.  That's up to you

24  also.

25           PROSPECTIVE JUROR NO. 17:  I apologize for not

```
1    raising this before, but I didn't think it was going to matter.
2    But that raises a complication for me in a professional sense
3    because of a course where I'm supposed to be there at
4    five o'clock and that's at L.A. Air Force base.
5              THE COURT:  On Monday?
6              PROSPECTIVE JUROR NO. 17:  Monday is the only day
7    this applies, and I'm worried, if your timetable is correct, we
8    might be deliberating on Monday.
9              THE COURT:  If you folks are deliberating on
10   Monday -- and we certainly think that it would be that
11   situation -- of course you can leave at 2:00 if need be to go
12   to your class at 5:00, because that's the regular time.
13             PROSPECTIVE JUROR NO. 17:  That wouldn't unduly
14   adversely affect the jury deliberations?
15             THE COURT:  No, you just come back the next day.
16             PROSPECTIVE JUROR NO. 17:  Okay.  If it's no
17   problem, then I have no problem.
18             THE COURT:  Thank you very much.  Have a nice lunch.
19   We'll see you a little after 2:00.
20                  (Jury out at 12:40 P.M.)
21                  (The following proceedings were held out of the
22                  presence of the prospective jurors:)
23             THE COURT:  You folks know who that gentleman is?
24   Is he part of the jury?
25             PERSON IN AUDIENCE:  No, he's not.
```

UNITED STATES DISTRICT COURT

1          MS. BLANCH:  No.  I think he's from another law

2     firm.  He's been here before.

3          THE COURT:  Who is the gentleman in back there?

4          PERSON IN AUDIENCE:  I don't believe he's part of

5     the --

6          MR. KALOYANIDES:  It's Tom Stout from the

7     U.S. Attorney's office.

8          PERSON IN AUDIENCE:  I'm just here to observe,

9     Your Honor.

10          THE COURT:  That's fine.

11       We are now outside the presence and hearing of the jury

12     panel.

13          THE CLERK:  He's here.

14          THE COURT:  Counsel, what I'm going to do is I'm

15     going to have the marshals bring Mr. Reczko out here at this

16     time.  I'm going to address him and ask him whether or not he's

17     going to behave and does he want to come back for the afternoon

18     session.  If he tells me he's behaved, then we'll take it from

19     there.

20       Bea, make sure the door is secure so nobody comes back.  I

21     don't know who that is looking in.  I don't really want that

22     person -- I don't know who that is.

23          MS. BLANCH:  That's not a juror, Your Honor.

24          THE COURT:  Is he a witness?

25          MS. BLANCH:  No.

```
 1                (Defendant enters the courtroom.)

 2           THE COURT:  Go ahead, have a seat.

 3       We're now in the presence and hearing of Mr. Reczko.

 4       Mr. Reczko, I want to let you know that, even though you

 5   have disrupted the Court previously and we had to have the

 6   marshals remove you, I do want to from time to time ask you

 7   whether or not you're going to change your mind and want to be

 8   part of the proceedings.

 9       You are not going to be your lawyer.  That is revoked.

10   Mr. Kaloyanides has been substituted in as your lawyer as

11   stand-by counsel, and he will be your -- he will be your lawyer

12   for the remainder of these proceedings.

13       I want to make sure that you have every opportunity to be

14   here during these proceedings.  It is, of course, in your best

15   interest that you are here.  You can then talk to

16   Mr. Kaloyanides, but you're not running the defense.  He is.

17   He is your lawyer.  He will act as your lawyer.  But, of

18   course, he will consult with you and you can consult with him.

19   That is to be expected, and that is what you should do.

20       Moreover, if you're going to testify, you're going to have

21   to be here to testify.  You can't be someplace else and absent

22   yourself and be able to testify.

23       So there are many advantages for you to be here even

24   though you will not be running your own defense, even though

25   you're not your own lawyer.  Still there are many, many
```

**UNITED STATES DISTRICT COURT**

1    advantages to being here in court.  But I cannot emphasize more

2    strongly that your fits of behavior simply cannot continue.

3    We're not going to tolerate it.  You have done that multiple

4    times throughout the proceedings and the pendency of this case.

5    Without a jury here, I have been very patient with you, and I

6    have still tried to deal with you on a civil basis.

7         So my question to you -- and you have to understand the

8    consequences.  If you do not behave yourself, I will have the

9    jury taken out.  I will address you, and you will be removed.

10   You can go back there and listen to the proceedings as you did

11   today on the monitor, but that's not optimal.  That's not in

12   your best interest.  That's not the best way to go about it.

13   You are much better off having an opportunity to sit here and

14   talk to Mr. Kaloyanides as he represents you in this case.

15        But that's ultimately going to be up to you and your

16   behavior.  You are not going to be able to derail this case.

17   You are not going to be able to derail the trial.  If you have

18   another explosive episode, you will just be removed, and we'll

19   just go on.

20        But I do want you to understand that there are these

21   advantages among others of being here, being able to observe

22   the witnesses, to help your lawyer, give him questions that you

23   care to ask that he may or may not ask, here to assist him,

24   here to observe, here to consult with him, here to testify.

25   All of these things, I certainly want you to have those, but

 1   you cannot have them if you're going to disrupt the

 2   proceedings.

 3        And quite separate and apart from anything else, you

 4   should know that a little episode and explosion like what you

 5   had recently, in front of the jury, can result in nothing but

 6   bad result for you.  So you're doing nothing but to hurt

 7   yourself if you have another display like that in front of the

 8   jury.  That would be the worst possible thing you can do.

 9        So my question to you, Number 1, is do you want to return

10   to the courtroom this afternoon when we continue this jury

11   selection process, which we're not done yet?  And then we will

12   of course proceed immediately to trial once we are done.

13        Do you want to return?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Are you going to behave yourself when

16   you are here?

17             THE DEFENDANT:  I will.

18             THE COURT:  Because of your behavior, because it's

19   an alarming type of aggressive behavior and you have been not

20   cooperative with the marshal when they've told you to get up to

21   go, that you sat there and you did not listen to them a couple

22   of times until the marshal had to put his hand on you to tell

23   you to do that, you will be restrained during the course while

24   you're here.  But you will be restrained in a way that nobody

25   will be able to tell that you're restrained.  Your hands will

1    not be restrained.  Your feet will not be restrained, but you

2    will have what they call a belly chain across your midsection,

3    which chain will then be handcuffed to a chair, not the chair

4    you are on but this blue chair so that it can be -- you can be

5    secured to the chair in the event you become uncooperative

6    again or otherwise engage in threatening behavior.

7         Nobody is going to call any of that to the jurors'

8    attention.  We're taking extraordinary steps to ensure that

9    these folks never see you while you're in custody, that they do

10   not know that you are restrained.  That's why you are being

11   brought in at times when the jurors are not around.  That's why

12   we told jurors, do not be on this floor before 2:00.  Before

13   2:00 you will be brought back here by the marshal.  You will

14   already be seated.  When the jurors come in, they will not be

15   seated to my left so that they can see anything.  They will all

16   be seated to the right and to the middle right so that there

17   will be no opportunity to see that.

18        Moreover, you have a jacket which will be covering also

19   your chain.  Nobody is going to call that to the attention of

20   the jurors unless you choose to do something that makes it

21   obvious.  Again, that's up to you.  Nobody wants the jurors to

22   see it.  We're taking steps to ensure against it, consistent

23   with security and safety in the courtroom.

24        Do you understand that?

25             THE DEFENDANT:  I do.

1          THE COURT:  And everything else I said about you,

2    because you're no longer your lawyer, you will not move around

3    freely.  We will not have a sidebar over there, but counsel

4    will come up with the normal sidebars.

5          So we will do that.  I hope you're going to be good to

6    your word, Mr. Reczko, because certainly your repeated behavior

7    in the past caused me to question that.  But nevertheless, I am

8    going to accept your word for now.  Don't disappoint me, and

9    let's have these proceedings go along as smoothly as possible.

10   Okay?

11          THE DEFENDANT:  Yes.

12          THE COURT:  All right.

13        So, marshals, what I want you to do is bring him up, come

14   across, have him seated there before 2:00 because otherwise the

15   jurors are going to be on the floor -- before the jurors get on

16   the floor, by 1:45 or so.

17          THE DEPUTY MARSHAL:  He just had lunch.  We're going

18   to keep him back here until the end of the day.

19          THE COURT:  Okay.  And put him in the kind of

20   restraints that you described to me that I described to

21   Mr. Reczko.

22        Have a seat there.  Mr. Kaloyanides, you will be sitting

23   on that side of him.

24        And, Bea?

25          THE CLERK:  Yes, Your Honor.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  When the jurors come in, make sure

2    nobody goes anywhere on that side.  Everybody will be on this

3    side of the courtroom --

4          THE CLERK:  Yes, Your Honor.

5          THE COURT:  -- and the middle, and that's it.

6          THE CLERK:  Yes, Your Honor.

7          THE COURT:  Anything else we need to take up before

8    we take our --

9          THE CLERK:  I'm sorry, Your Honor.  Let me

10   interrupt.  Do you want me to fill in the spaces that have been

11   left, the spaces on the right side?  Do you want me to fill in

12   the spaces and fill in everybody?

13         THE COURT:  No.  I'm going to go ahead and read off

14   the names -- oh, I see, yes.  Move everybody up to fill in the

15   space so that, when I go to number -- where is Number 33?  I

16   see.  When I go to Number 33, they will just take seats back

17   there.  Bring everybody up and then fill them through here.

18         THE CLERK:  Understood.

19         THE COURT:  But everybody -- and I think I need --

20   how many did we excuse, Counsel?

21         THE CLERK:  Eight.

22         MS. BAEHR-JONES:  Eight.

23         THE COURT:  We excused eight.  Let's have 12.  Okay?

24   Let's have 12 as being part of the next group.

25         THE CLERK:  So 12 to fit in there, because you

```
 1    moved -- you've got one, two, three, four, five that you
 2    moved --
 3                   THE COURT:  Right.
 4                   THE CLERK:  -- from the jury box, Your Honor.  So
 5    you've got five extra, which means you've got only one row
 6    extra if you're going to move them all up.  You've got one row
 7    to fill in the back of five; so you've got the first five in
 8    the next row behind the double doors, which would be the next
 9    five.  That's ten.
10                   THE COURT:  Move everybody up and put 12 more on
11    that side.
12                   THE CLERK:  You can't put 12 because you can't fit
13    more than that.
14                   THE COURT:  Okay.  So then have them be in the
15    middle because I want to voir dire the next wave.  I want 12,
16    not just 8.
17                   THE CLERK:  Okay.
18                   THE COURT:  Okay?
19                   THE CLERK:  Okay.
20                   THE COURT:  All right.  Anything else?
21                   MR. KALOYANIDES:  No.  Thank you, Your Honor.
22                   MS. BLANCH:  Just one thing, Your Honor.  If the
23    defendant is going to be here belly-chained, perhaps we should
24    all agree amongst ourselves that no one stands when the jury
25    comes in.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Yes.  Nobody needs to stand so that it

2   doesn't look like somehow Mr. Reczko is being disrespectful by

3   not standing for the jury.  Everybody remain seated.

4          MR. KALOYANIDES:  And, Your Honor --

5          THE COURT:  When I come in, the clerk will say

6   "Remain seated."

7          MR. KALOYANIDES:  And I think it would be

8   appropriate to let the jury know Mr. Reczko is here.

9          THE COURT:  I will say the same thing.  Mr. Reczko

10  is here, but you are not to speculate about anything.  Okay?

11          MR. KALOYANIDES:  Thank you.

12          MS. BLANCH:  Thank you, Your Honor.

13          THE COURT:  All right.  So we will reconvene at

14  about 1:45 so everybody is here, and we can see if everything

15  is okay.  And as soon as all the jurors are in their seats, I

16  will retake the bench.  Thank you very much.

17          MR. KALOYANIDES:  Thank you very much.

18          THE CLERK:  This court now stands in recess.

19          THE COURT:  Just a minute.  Mr. Kaloyanides,

20  inasmuch as you are now counsel in this case, I do want to sort

21  of close the loop on this, which is what I started to talk to

22  Mr. Reczko about, about Mr. Orate.  And, that is, there was

23  some late disclosure of a Henthorn matter relating to

24  Mr. Orate, relating to the motions to suppress and for

25  dismissal due to alleged misconduct.

1          I kept it open in terms of whether Mr. Orate should be

2    examined on that subject only.  You are now the lawyer.  Do you

3    want this opportunity to examine him on that limited area

4    created by the new disclosure before I reclose the record

5    and -- and issue my decision on the motion to suppress and the

6    motion, or do you not?

7               MR. KALOYANIDES:  No, Your Honor.  As far as the

8    motion is concerned, I'm not going to inquire of Mr. Orate any

9    more.  I will be crossing --

10              THE COURT:  You'll be cross-examining him when he

11   testifies?

12              MR. KALOYANIDES:  Based on the substance of the

13   case, yes.

14              THE COURT:  Very good.  Thank you.

15              THE CLERK:  This court now stands in recess.

16                  (Noon recess at 12:56 P.M.)

17                  (Jury in at 2:13 P.M.)

18                  (The following proceedings were held in the

19                  presence of the prospective jurors:)

20              THE CLERK:  Please remain seated and come to order.

21   This United States District Court is now in session.  The

22   Honorable George H. King, Chief Judge presiding.

23              THE COURT:  We're back on the record in the matter

24   of United States versus Reczko.  Counsel are present, and

25   Mr. Reczko is also present.

1      Ladies and gentlemen of the jury panel, as I indicated to

2  you previously, the defendant's presence or absence should not

3  be a matter of a concern to you whatsoever, and you are not to

4  speculate whatsoever about that nor should that enter any

5  decision that you might have to make in your capacity as

6  jurors.

7      Okay.  So what we left off -- by the way, thank you all

8  for coming back here.  What we have done is we have taken 12

9  jurors who previously had been seated in the left of the

10 courtroom and what we have done is then added these 12 jurors

11 to those remaining in the original jury pool after we excused

12 the eight jurors.

13     So these new jurors, I want to call your attention

14 specifically because my questions now will be directed to you

15 12 and only you 12.  So those of you who have been previously

16 questioned, this will not concern you again.  We've already

17 talked to you.  And those of you who are not part of the 12, I

18 want you to -- you can listen, but I won't be calling on you to

19 respond to me.

20     The 12 new jurors are Camilo Cruz, Allan Samonte, Allean

21 Cleveland, Carlos Araujo-Huerta, Russell Hanlon, Bernice Shaw,

22 Margo Pasquale, Paul Monette, Jennifer Kimura, Kelly Ryan

23 Rubio, Jillian Fisher, and Cheryl Wong.  So these are the 12

24 people that I will be following up right now.

25     Ladies and gentlemen, among the 12 of you, you no doubt

1    were here and heard all of the general questions that I had

2    asked of the previous panel.  So at this time what I want to do

3    is start with the individuals in the third row to my right.

4    That would be Camilo Cruz, Allan Samonte, and Allean Cleveland.

5         Do you folks have any follow-up that I need to do with you

6    as to any of the questions that I had previously asked?  If you

7    do, raise your hand.  I will address each of you separately.

8    Tell me which question and what your follow-up is.  So as to

9    those three, any follow-up that's needed with respect to any of

10   the questions that I had previously asked at all?

11             PROSPECTIVE JUROR NO. 25:  No, Your Honor.

12             THE COURT:  Okay.  None as to your three?  Is there

13   a hand?  Go ahead, raise your hand.  Don't be shy.

14             PROSPECTIVE JUROR NO. 27:  Your Honor, it is not so

15   much a question.  Regarding the last two questions --

16             THE COURT:  I'm sorry.

17             PROSPECTIVE JUROR NO. 27:  Number 7, the last two,

18   Question No. 7.

19             THE COURT:  Question No. 7.  Hold on.  This is

20   Ms. Allean Cleveland; right?

21             PROSPECTIVE JUROR NO. 27:  Right, yes.

22             THE COURT:  So let's go back to the questions.

23             THE CLERK:  She wants sidebar, Your Honor.

24             THE COURT:  Okay.  All right.

25                  (Bench conference on the record:)

**UNITED STATES DISTRICT COURT**

```
 1                THE CLERK:  Ms. Cleveland, come this way.  Follow
 2    me.
 3                (Bench conference on the record:)
 4                THE COURT:  Which question?  Number 7?
 5                PROSPECTIVE JUROR NO. 27:  It's the last two
 6    questions.  I've been a victim of a crime, and my family been
 7    the victim of a crime.
 8                THE COURT:  Oh, yes.  Okay.  Come a little closer
 9    Ms. Cleveland, speak into the microphone so that my court
10    reporter can hear you but not so loud as everybody can hear
11    you.
12                PROSPECTIVE JUROR NO. 27:  Okay.  I'll start with
13    this.  I had two brothers that killed -- that killed somebody.
14                THE COURT:  How long ago was that?
15                PROSPECTIVE JUROR NO. 27:  That probably about 20
16    years ago.
17                THE COURT:  And were your brothers prosecuted for
18    this?
19                PROSPECTIVE JUROR NO. 27:  Right.  They both spent
20    time.
21                THE COURT:  They --
22                PROSPECTIVE JUROR NO. 27:  They both spent time in
23    jail.
24                THE COURT:  They did?
25                PROSPECTIVE JUROR NO. 27:  Yeah.  15 year, 20 year,
```

```
 1    something.
 2             THE COURT:  Where was that?
 3             PROSPECTIVE JUROR NO. 27:  In Chicago, both in
 4    Chicago.
 5             THE COURT:  Okay.
 6             PROSPECTIVE JUROR NO. 27:  And me, I've been raped.
 7    I'm sorry.
 8             THE COURT:  Just take it easy.  Take your time.
 9    Collect yourself.  Okay?  Don't be nervous.  I know you -- this
10    may be upsetting to you to recall this.  Just take your time if
11    you need to.  If you need a Kleenex --
12             PROSPECTIVE JUROR NO. 27:  I was the victim of rape
13    at gunpoint.
14             THE COURT:  You were the victim of --
15             PROSPECTIVE JUROR NO. 27:  Rape at gunpoint.
16             THE COURT:  Rape at gunpoint.
17             PROSPECTIVE JUROR NO. 27:  Uh-huh, and it was in
18    Chicago.
19             THE COURT:  In Chicago.  How long ago was that?
20             PROSPECTIVE JUROR NO. 27:  That was 1997.
21             THE COURT:  Did you know the person or did you not
22    know the person?
23             PROSPECTIVE JUROR NO. 27:  No, did not know.
24             THE COURT:  Did you report this to the police?
25             PROSPECTIVE JUROR NO. 27:  No, because they
```

```
1    threatened to kill me and I was afraid to.
2            THE COURT:  They said they were going to kill you --
3            PROSPECTIVE JUROR NO. 27:  Right.
4            THE COURT:  -- if you reported it?
5            PROSPECTIVE JUROR NO. 27:  Right.
6            THE COURT:  So you never reported it?
7            PROSPECTIVE JUROR NO. 27:  Right.  I was afraid to.
8            THE COURT:  And were these -- you said they were
9    strangers to you?
10            PROSPECTIVE JUROR NO. 27:  Right.  It was a
11   stranger, right.
12            THE COURT:  Okay.  Let me ask you then about your --
13   the situation with your brothers.  Anything -- did you talk to
14   them about whether or not -- what happened?
15            PROSPECTIVE JUROR NO. 27:  Right.
16            THE COURT:  You did?
17            PROSPECTIVE JUROR NO. 27:  Yes.
18            THE COURT:  And did you follow their -- did they
19   have a trial?  Did they plead guilty?
20            PROSPECTIVE JUROR NO. 27:  No.  They had a trial,
21   trial.
22            THE COURT:  Huh?
23            PROSPECTIVE JUROR NO. 27:  They had a trial.
24            THE COURT:  They --
25            PROSPECTIVE JUROR NO. 27:  They had to go to court,
```

1    had a trial.

2              THE COURT:  They had a trial?

3              PROSPECTIVE JUROR NO. 27:  Uh-huh.

4              THE COURT:  Did you follow the trial and everything?

5              PROSPECTIVE JUROR NO. 27:  No, not really.

6              THE COURT:  Is there anything about that incident

7    that causes you difficulty to be fair and impartial in our

8    case?

9              PROSPECTIVE JUROR NO. 27:  Well, you can just say

10   that it's difficult.  I believe they were guilty.  And what

11   happened to me, so everything I believe they guilty.

12             THE COURT:  I'm sorry.  I can't hear you.  You

13   say --

14             PROSPECTIVE JUROR NO. 27:  I believe they were

15   guilty, both of them.

16             THE COURT:  So does that have any influence on you

17   in your ability to be fair and impartial in this case?

18             PROSPECTIVE JUROR NO. 27:  It did because, after --

19   you know, I observed them before.  I observed them before the

20   jury, the man that thought they did it.

21             THE COURT:  I'm sorry.  I did not understand that.

22             PROSPECTIVE JUROR NO. 27:  Before they went to

23   court.

24             THE COURT:  Before it went to court --

25             PROSPECTIVE JUROR NO. 27:  I told my sister and

 1    everything they were guilty.

 2              THE COURT:  Okay.  So my question is will that

 3    affect your ability to be fair in this case?

 4              PROSPECTIVE JUROR NO. 27:  I don't think so.

 5              THE COURT:  You know, that's something totally

 6    different from this case.

 7              PROSPECTIVE JUROR NO. 27:  Right.  I don't think so.

 8              THE COURT:  And that's what happened with them.

 9              PROSPECTIVE JUROR NO. 27:  Right.

10              THE COURT:  This is totally different.

11              PROSPECTIVE JUROR NO. 27:  Right.

12              THE COURT:  Okay.  What about this instance where

13    you were raped at gunpoint, do you think that will affect your

14    ability to be fair in this case?

15              PROSPECTIVE JUROR NO. 27:  I think so because it

16    happened twice.  One in Chicago, one here.

17              THE COURT:  There was a second instance?

18              PROSPECTIVE JUROR NO. 27:  Right.  And then I

19    thought everything was guilty, people say it didn't happen.

20              THE COURT:  Hold on.  Let's go back.  When did the

21    second -- you were raped a second time?

22              PROSPECTIVE JUROR NO. 27:  Right, in 2003, attempted

23    rape.

24              THE COURT:  2003?

25              PROSPECTIVE JUROR NO. 27:  Attempted rape.

1          THE COURT:  Attempted.  And that's here in L.A.?

2          PROSPECTIVE JUROR NO. 27:  Right.

3          THE COURT:  Was it somebody you knew or a stranger?

4          PROSPECTIVE JUROR NO. 27:  I was in the hospital.

5          THE COURT:  Huh?

6          PROSPECTIVE JUROR NO. 27:  I was in the hospital.

7     2003, I was in the hospital.

8          THE COURT:  You were in the hospital?

9          PROSPECTIVE JUROR NO. 27:  It happened in the

10    hospital.

11          THE COURT:  Did you know the person?

12          PROSPECTIVE JUROR NO. 27:  It was my nurse.

13          THE COURT:  It was the nurse?

14          PROSPECTIVE JUROR NO. 27:  Uh-huh.

15          THE COURT:  Did you report that?

16          PROSPECTIVE JUROR NO. 27:  No, because I blame

17    myself.

18          THE COURT:  You blame yourself?

19          PROSPECTIVE JUROR NO. 27:  Uh-huh.

20          THE COURT:  So do you think this will make it

21    difficult for you to be fair and impartial to -- to everybody

22    in this trial?

23          PROSPECTIVE JUROR NO. 27:  Really do.

24          THE COURT:  You do?

25          PROSPECTIVE JUROR NO. 27:  Right.

1          THE COURT:  Why is that?

2          PROSPECTIVE JUROR NO. 27:  Because I look at it, if

3    something happened to them, the other person, other time -- I

4    said, if it didn't happen to them, why would the person say it

5    and put it on somebody?

6          THE COURT:  So you don't -- you don't think you can

7    just wait for all of the evidence to see how the evidence shows

8    up?

9          PROSPECTIVE JUROR NO. 27:  No.  Because it already

10   in my mind, and I haven't got it -- I haven't already gone

11   through the crime and it already been true.

12         THE COURT:  All right.

13         PROSPECTIVE JUROR NO. 27:  I'm sorry.

14         THE COURT:  All right.  Why don't you go ahead and

15   return to your seat.

16              (Returns to seat.)

17         THE COURT:  Just stand by.

18              (The following proceedings were held in open

19              court:)

20         THE COURT:  All right.  Anybody else of the three?

21   Anyone else?

22      Let's talk to the folks in the last row to my right.  Any

23   of you folks have any questions to which you want to follow up

24   at all?  Not just limited to -- any of my questions that I

25   previously asked.  Okay.  So let's see, who raised a hand?

1      Mr. Russell Hanlon, tell me which question.

2           PROSPECTIVE JUROR NO. 29:  I'm not sure the number,

3    one about crime.  Have you ever had a crime committed against

4    you?

5           THE COURT:  Yes.

6           PROSPECTIVE JUROR NO. 29:  My mom got mugged at

7    knifepoint a few years ago.

8           THE COURT:  I'm sorry?

9           PROSPECTIVE JUROR NO. 29:  My mom got mugged at

10   knifepoint.

11          THE COURT:  And how long ago was that?

12          PROSPECTIVE JUROR NO. 29:  '87, '88, late '80s, in

13   Spain.

14          THE COURT:  Late '80s in Spain?

15          PROSPECTIVE JUROR NO. 29:  Yeah, in Spain.

16          THE COURT:  Any other questions you want to follow

17   up on?

18          PROSPECTIVE JUROR NO. 29:  No.  I just thought I

19   should let you know.

20          THE COURT:  Anything of this incident of this having

21   happened to your mother would make it difficult for you to be

22   fair and impartial in this case?

23          PROSPECTIVE JUROR NO. 29:  Not at all.

24          THE COURT:  Anybody else?

25      Is that Bernice Shaw?

```
 1              PROSPECTIVE JUROR NO. 30:  Correct.
 2              THE COURT:  Ms. Shaw, which question?
 3              PROSPECTIVE JUROR NO. 30:  This is in regard to the
 4    viewing that you asked, that we be --
 5              THE COURT:  Yes.
 6              PROSPECTIVE JUROR NO. 30:  -- exposed to.
 7              THE COURT:  Yes.
 8              PROSPECTIVE JUROR NO. 30:  I cannot and I will not
 9    view any of those things.  I don't know.  I feel it would make
10    a difference, but that's the only issue I have.
11              THE COURT:  So you don't think that you can look at
12    it?
13              PROSPECTIVE JUROR NO. 30:  I will not look at it.  I
14    can't.
15              THE COURT:  Okay.  Thank you.
16         Anybody else in the third row -- fourth row?  I'm sorry.
17         And that's Ms. Margo Pasquale.
18              PROSPECTIVE JUROR NO. 31:  May I have a sidebar.
19              THE COURT:  Yes.
20                 (Bench conference on the record:)
21              THE COURT:  Yes.
22              PROSPECTIVE JUROR NO. 31:  This has to do with
23    crime.
24              THE COURT:  Okay.
25              PROSPECTIVE JUROR NO. 31:  My brother was convicted
```

```
 1   of rape.  He was also convicted of improper conduct with a
 2   child.  I have not spoken to him since.  I have my own issue
 3   with child pornography.  I'm being very honest.
 4             THE COURT:  When you say you have your own issue
 5   with child pornography, what does that mean?
 6             PROSPECTIVE JUROR NO. 31:  Because of my brother, I
 7   have issue.
 8             THE COURT:  I see.
 9             PROSPECTIVE JUROR NO. 31:  Okay?
10             THE COURT:  I see.
11             PROSPECTIVE JUROR NO. 31:  And if the defendant does
12   not testify, I would have a real issue.  I'm being honest.
13             THE COURT:  Okay.  So when was your brother
14   convicted of this?
15             PROSPECTIVE JUROR NO. 31:  I -- let's see.  15 years
16   ago for the rape, about seven years ago for the child.
17             THE COURT:  Okay.  So these are two different
18   incidents?
19             PROSPECTIVE JUROR NO. 31:  Yes.
20             THE COURT:  Was he sent to jail?
21             PROSPECTIVE JUROR NO. 31:  Yes.  He served time in
22   both cases.
23             THE COURT:  Did you make -- inform yourself about
24   what happened, what the facts are in those cases?
25             PROSPECTIVE JUROR NO. 31:  Yes, I did.
```

 1              THE COURT:  Did you feel your brother was treated

 2      fairly or unfairly by the system?

 3              PROSPECTIVE JUROR NO. 31:  Oh, he was treated

 4      fairly.  Absolutely.  But I didn't want any part of that.  It

 5      brings up too much bad --

 6              THE COURT:  So you think that, if defendant doesn't

 7      take the stand, you're going to hold that against him?

 8              PROSPECTIVE JUROR NO. 31:  Yes.

 9              THE COURT:  Even though the law says you cannot do

10      that?

11              PROSPECTIVE JUROR NO. 31:  Yes.

12              THE COURT:  You don't think you can follow that?

13              PROSPECTIVE JUROR NO. 31:  No.  I'm sorry.  I'm

14      being very honest.

15              THE COURT:  Okay.  Thank you.

16              PROSPECTIVE JUROR NO. 31:  Thanks.

17                  (Prospective juror returns to her seat.)

18                  (The following proceedings were held in open

19                  court:)

20              THE COURT:  Anybody else in the fourth row?  Any

21      follow-up?

22          Mr. Monette, you're the only one left.

23              PROSPECTIVE JUROR NO. 32:  There's no follow-up,

24      sir.

25              THE COURT:  Now, let me address the four of you

**UNITED STATES DISTRICT COURT**

1    seated in the front row in the center.  Any follow-up I need

2    from any of you as to any of the questions I have asked?

3    Anybody?

4         Okay.  So let's start with Ms. Rubio.  Do you have a --

5              THE CLERK:  Sidebar, Your Honor.

6              THE COURT:  You want a sidebar?

7              PROSPECTIVE JUROR NO. 34:  Yes.

8                   (Bench conference on the record:)

9              PROSPECTIVE JUROR NO. 34:  It was about whether you

10   were a victim of a crime.  I was sexually assaulted and

11   molested when I was a child, which I believe will not allow me

12   to be impartial in this case.

13             THE COURT:  How long ago was that?

14             PROSPECTIVE JUROR NO. 34:  Probably 30 -- probably

15   30 years ago.  So I'm very partial on anything sexual involving

16   minors.  Regardless, I know this case is not regarding --

17             THE COURT:  And you are certain that you cannot put

18   those feelings aside --

19             PROSPECTIVE JUROR NO. 34:  No.

20             THE COURT:  -- and just decide the case?

21             PROSPECTIVE JUROR NO. 34:  I'd rather the person

22   have a fair trial, and I will not be able to give it to him.

23             THE COURT:  Thank you.

24             PROSPECTIVE JUROR NO. 34:  Uh-huh.

25                  (The following proceedings were held in open

```
 1              court:)

 2              THE COURT:  I think then they have Ms. Fisher.  Do

 3    you have any follow-up?

 4              THE CLERK:  She would like sidebar, Your Honor.

 5              THE COURT:  Okay.

 6              (Bench conference on the record:)

 7              THE COURT:  Ms. Fisher, yes.

 8              PROSPECTIVE JUROR NO. 35:  In regards to the

 9    impartiality and having a crime committed against you, when I

10    was seven, I was physically assaulted for the entertainment of

11    others.  When I reported it to my parents, they didn't believe

12    me.  It went unpunished.

13              THE COURT:  Hold on.  Take a deep breath.  Take your

14    time.  Okay?  I know this is very troubling.  You don't have to

15    go back and rethink this.  I'm very sorry we have to go through

16    this.  I want you to take your time, compose yourself.  Don't

17    be in a hurry.  Okay?

18              PROSPECTIVE JUROR NO. 35:  Okay.

19              THE COURT:  Take your time.  Would you like a

20    Kleenex?

21              PROSPECTIVE JUROR NO. 35:  Sure.

22              THE COURT:  It's okay.

23              PROSPECTIVE JUROR NO. 35:  Okay.

24              THE COURT:  Just collect yourself.  Okay.  So at

25    seven years old, you were assaulted, sexually assaulted?
```

1          PROSPECTIVE JUROR NO. 35:  Physically.  I was

2    sexually assaulted in college.  When I was seven, my friend's

3    older brother who was 17 at the time locked me in a room and

4    whipped me in front of his friends.

5          THE COURT:  And raped you?

6          PROSPECTIVE JUROR NO. 35:  No.  Just whipped me.

7          THE COURT:  Whipped you.  Oh, okay.

8          PROSPECTIVE JUROR NO. 35:  They thought it would be

9    funny.

10          THE COURT:  And did you -- you report it to your

11    parents?

12          PROSPECTIVE JUROR NO. 35:  I told his parents.

13          THE COURT:  His parents.

14          PROSPECTIVE JUROR NO. 35:  And my parents, and no

15    one believed me.

16          THE COURT:  Okay.  And then you said later --

17          PROSPECTIVE JUROR NO. 35:  When I was in college, I

18    was sexually assaulted.  It was an attempted rape.  I managed

19    to get away.

20          THE COURT:  How long ago was that?

21          PROSPECTIVE JUROR NO. 35:  I guess eight years.

22          THE COURT:  And was that reported to the

23    authorities?

24          PROSPECTIVE JUROR NO. 35:  I managed to get away.

25    It was a stranger.  I didn't know who it was.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  You didn't report that?

2          PROSPECTIVE JUROR NO. 35:  I -- I reported it to --

3   I mean, I was living in New York at the time.  It was in a

4   club.  Someone tried to shove me in the bathroom, and I managed

5   to get away.  I reported it to the club, to the manager of the

6   club, but the man had left by that time.

7          THE COURT:  Anything else?

8          PROSPECTIVE JUROR NO. 35:  (No audible response.)

9          THE COURT:  Do you believe that either or both of

10  these incidents will cause you difficulty to be fair and

11  impartial here?  And tell me why.

12         PROSPECTIVE JUROR NO. 35:  I think the vast majority

13  of these type of assaults go unreported and unpunished, and I

14  can't help but feel that, if someone reported it, a person is

15  guilty.

16         THE COURT:  Even before you looked at any evidence?

17  Do you think that's the fair thing to do?

18         PROSPECTIVE JUROR NO. 35:  No, but that's what my

19  gut says.

20         THE COURT:  Okay.  Thank you.

21             (Prospective juror returns to her seat.)

22             (The following proceedings were held in open

23             court:)

24         THE COURT:  And then, finally, we have Ms. Wong.

25         PROSPECTIVE JUROR NO. 36:  Yes.

```
 1              THE COURT:  Do you have a follow-up?
 2              PROSPECTIVE JUROR NO. 36:  I just have one thing,
 3  one thing about a relative in law enforcement.
 4              THE COURT:  Yes.
 5              PROSPECTIVE JUROR NO. 36:  My brother-in-law, he
 6  works for the L.A.P.D.
 7              THE COURT:  Brother-in-law for L.A.P.D.  Okay.  What
 8  kind of job does he have?
 9              PROSPECTIVE JUROR NO. 36:  Detective.
10              THE COURT:  How long has he been a detective for the
11  L.A.P.D.?
12              PROSPECTIVE JUROR NO. 36:  Probably over 20 years.
13              THE COURT:  Do you talk to him frequently about his
14  work?
15              PROSPECTIVE JUROR NO. 36:  No, not about his work.
16              THE COURT:  Is there anything about the fact that
17  your brother-in-law works for the L.A.P.D. that would cause you
18  to have any difficulty being fair and impartial --
19              PROSPECTIVE JUROR NO. 36:  No.
20              THE COURT:  -- in our case?
21              PROSPECTIVE JUROR NO. 36:  No.
22              THE COURT:  Okay.  Thank you.
23                  (Bench conference on the record:)
24              THE COURT:  Any other questions you want to ask?
25              MR. KALOYANIDES:  No.  Thank you, Your Honor.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  For-cause challenges -- I'll tell you

2     what I'm thinking about.  I think probably -- it's probably

3     consistent with what you are thinking.  Ms. Cleveland,

4     Ms. Shaw, Ms. Pasquale, Ms. Rubio, and Ms. Fisher.

5          Mr. Kaloyanides?

6          MR. KALOYANIDES:  Stipulated.

7          THE COURT:  That's five out of twelve, and that

8     means we have seven ready to -- oh, you know what?  They didn't

9     answer the questions on the board.  Why don't we have them

10    answer that, and then we'll come back.

11               (The following proceedings were held in open

12               court:)

13          THE COURT:  All right.  At this time then, Mr. Cruz,

14    you see those seven questions on the board?  Would you please

15    answer those for me.

16          PROSPECTIVE JUROR NO. 25:  My name is Camilo Cruz.

17    I live in Koreatown.  Divorced.  I have several years in

18    college.  I'm not employed at present.  No children.  I had a

19    prior jury service in state, criminal case.

20          THE COURT:  And did the jury reach a verdict?

21          PROSPECTIVE JUROR NO. 25:  Yes, Your Honor.

22          THE COURT:  And you say you're not employed at the

23    present time.  What do you normally do?

24          PROSPECTIVE JUROR NO. 25:  I'm a technical

25    illustrator.

```
 1              THE COURT:  You're an illustrator?

 2              PROSPECTIVE JUROR NO. 25:  Technical illustrator.

 3              THE COURT:  Technical illustrator.  Okay.  Thank

 4    you.

 5         Mr. Samonte.

 6              PROSPECTIVE JUROR NO. 26:  My name is Allan Samonte

 7    from Porter Ranch.  I'm married.  Bachelor of Science in

 8    nursing and currently employed at a hospital.  And I have two

 9    teenagers, girls.  And I got no prior.

10              THE COURT:  Jury service?

11              PROSPECTIVE JUROR NO. 26:  None.

12              THE COURT:  And you say you are married.  What does

13    your wife do?

14              PROSPECTIVE JUROR NO. 26:  My wife also is a nurse.

15              THE COURT:  Okay.  Thank you.

16         Ms. Cleveland.

17              PROSPECTIVE JUROR NO. 27:  My name is Allean.  I

18    working at -- I live in Los Angeles.  I'm a widow.  I had a

19    couple years of college education.  I work at UCLA.  I'm a

20    (unintelligible) --

21              THE REPORTER:  I didn't understand her.

22              THE COURT:  You work at UCLA as a what?

23              PROSPECTIVE JUROR NO. 27:  Admitting worker.  I

24    admit people to the hospital.

25              THE COURT:  Oh, admitting.  Okay.  You admit people
```

```
 1    to the UCLA hospital?

 2            PROSPECTIVE JUROR NO. 27:  Correct.

 3            THE COURT:  Okay.

 4            PROSPECTIVE JUROR NO. 27:  And I have three

 5    children.  One work at UCLA.  She's a supervisor.  One work at

 6    nights in university.  My son works (unintelligible) --

 7            THE REPORTER:  Your Honor, I didn't understand that.

 8            THE COURT:  I'm sorry.  I'm sorry.  You have one,

 9    she's a supervisor at UCLA; right?

10            PROSPECTIVE JUROR NO. 27:  And the other work at

11    nights in the university.

12            THE COURT:  At nights?

13            PROSPECTIVE JUROR NO. 27:  Nights in the university.

14            THE COURT:  What does he do?

15            PROSPECTIVE JUROR NO. 27:  He's a secretary.

16            THE COURT:  Secretary.  Okay.  And then your third

17    child?

18            PROSPECTIVE JUROR NO. 27:  He work for the sheriff

19    department.

20            THE COURT:  He works for the sheriff's department?

21            PROSPECTIVE JUROR NO. 27:  Sheriff department.

22            THE COURT:  Is he a deputy sheriff?

23            PROSPECTIVE JUROR NO. 27:  No, but he going to the

24    academy to be.  He will be the sheriff.  He going to the

25    academy this month.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Okay.  And I'm sorry.  Were you ever on

2   a jury?

3          PROSPECTIVE JUROR NO. 27:  Never.

4          THE COURT:  Okay.  Thank you.

5      Mr. Araujo Huerta.

6          PROSPECTIVE JUROR NO. 28:  My name is Carlos

7   Araujo-Huerta.  I live in the area of La Puente.  I'm married.

8   My level of education is, like, high school in Mexico.  I work

9   for a brick company.  My wife, she works in warehouse

10  distribution.  We got two kids.  And I'm not serving any jury

11  duty.

12         THE COURT:  And your kids, are they adults or

13  minors?

14         PROSPECTIVE JUROR NO. 28:  Adults.  One 25, the

15  other one 23.

16         THE COURT:  What kind of work do they do?

17         PROSPECTIVE JUROR NO. 28:  My daughter, she works at

18  the company.  They call it transporter.  She take the kids to

19  the family members on United States where they are.  And my

20  son, he's a direct marketing seller.

21         THE COURT:  Okay.  So she's a transporter, and he's

22  a direct marketing seller?

23         PROSPECTIVE JUROR NO. 28:  No.  My daughter, she

24  works as a transporter.

25         THE COURT:  Transporter.

```
 1              PROSPECTIVE JUROR NO. 28:  And my son, he works for

 2    the direct marketing seller.

 3              THE COURT:  Okay.  Very good.  Thank you.

 4         Mr. Hanlon.

 5              PROSPECTIVE JUROR NO. 29:  My name is Russell

 6    Hanlon.  I live in Hermosa Beach.  Single.  I've got a

 7    bachelor's degree.  Occupation, self-employed, financial

 8    recruitment.  No children.  And no prior jury service.

 9              THE COURT:  Thank you.

10         Ms. Shaw.

11              PROSPECTIVE JUROR NO. 30:  My name is Bernice Shaw.

12    I live in the Highland Park area of Los Angeles.  I am

13    currently married.  And I have a couple of years of college

14    education.  I am a retired office worker, and my husband is a

15    retired physician.  I have three adult children, married.  My

16    daughter is a biochemical engineer.  Her spouse is an

17    electrical engineer.  My son is an aeronautical engineer.  His

18    wife is an electronic engineer.  My son is an education -- in

19    education, and his wife is a lawyer in Washington -- Seattle,

20    Washington.  I have been on three juries, two -- all state.

21    Two -- one criminal, we reached a decision.  Two other -- we

22    reached a decision.

23              THE COURT:  And those two others, were they civil

24    cases?

25              PROSPECTIVE JUROR NO. 30:  Civil cases, yes.
```

1          THE COURT:  But you reached decisions in all the

2     cases?

3          PROSPECTIVE JUROR NO. 30:  On all.

4          THE COURT:  Ms. Pasquale.

5          PROSPECTIVE JUROR NO. 31:  Margo Pasquale.  I live

6     in Lomita.  I am a widow.  High school education.  I work in

7     the aerospace industry.  I have no children.  And I served in

8     three state courts, on two criminal -- one criminal trial and

9     two civil trials.

10          THE COURT:  And were verdicts reached in all of

11     these?

12          PROSPECTIVE JUROR NO. 31:  The criminal trial was a

13     hung jury.

14          THE COURT:  Okay.  But the civil trials, a verdict

15     was --

16          PROSPECTIVE JUROR NO. 31:  Yes.

17          THE COURT:  -- reached?

18          PROSPECTIVE JUROR NO. 31:  Uh-huh.

19          THE COURT:  And those were in state court?

20          PROSPECTIVE JUROR NO. 31:  Yes.

21          THE COURT:  All right.  Thank you.

22       Mr. Monette.

23          PROSPECTIVE JUROR NO. 32:  My name is Paul Monette.

24     I live in Santa Fe Springs.  I'm single.  I have a bachelor

25     degree in management and information systems.  I'm a project

1   manager at Southern California Edison.  I have one child, a

2   three-year-old daughter.  And I served on one jury trial.  It

3   was a -- in the state court, a civil trial, and we did reach a

4   decision.

5          THE COURT:  All right.  Thank you.

6     Let's pass the microphone over then to Ms. Kimura.

7          PROSPECTIVE JUROR NO. 33:  My name is Jennifer

8   Kimura.  I live in Monterey Park.  Single.  Bachelor's degree

9   in accounting.  Occupation is human resource analyst.  And no

10   children.  And no prior jury service.

11          THE COURT:  All right.  Thank you.

12     Ms. Rubio.

13          PROSPECTIVE JUROR NO. 34:  Hello.  My name is Kelly

14   Ryan Rubio, and I live in Silver Lake.  I'm married.  I have an

15   AA degree.  And I work at L.A. City College as an accounting

16   assistant.  And my husband is self-employed and does I.T. work.

17   I'm currently pregnant.  And I have no prior jury service.

18          THE COURT:  All right.  Thank you.

19     Ms. Fisher.

20          PROSPECTIVE JUROR NO. 35:  My name is Jillian

21   Fisher.  I split my time between Long Beach and West Hollywood.

22   I am single.  I have a double bachelor's in literature and

23   music.  I am a singer.  I have no children.  And I have never

24   served on a jury.

25          THE COURT:  All right.  Thank you.

```
 1        Ms. Sayrizi-Wong.

 2              PROSPECTIVE JUROR NO. 36:  My name is Cheryl

 3   Sayrizi-Wong, and I live in Arcadia, California.  I am married.

 4   I have an early childhood -- early childhood education degree.

 5   And I'm married.  I have three kids.  And I have served on one

 6   jury.

 7              THE COURT:  Okay.  What do you do?  What's your

 8   occupation?

 9              PROSPECTIVE JUROR NO. 36:  Oh, I'm a stay-at-home

10   mom.

11              THE COURT:  And what does your husband --

12              PROSPECTIVE JUROR NO. 36:  My husband is a real

13   estate appraiser.

14              THE COURT:  You have minor children?

15              PROSPECTIVE JUROR NO. 36:  Yes, minor children.

16              THE COURT:  And no prior jury service?

17              PROSPECTIVE JUROR NO. 36:  One.

18              THE COURT:  One?

19              PROSPECTIVE JUROR NO. 36:  Yes.

20              THE COURT:  State or federal court?

21              PROSPECTIVE JUROR NO. 36:  State.

22              THE COURT:  Civil or criminal?

23              PROSPECTIVE JUROR NO. 36:  Civil.

24              THE COURT:  And did you reach a verdict?

25              PROSPECTIVE JUROR NO. 36:  Yes.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Thank you very much.

2      Now I'll see counsel at sidebar.

3              (Bench conference on the record:)

4          THE COURT:  Okay.  Picking up from where we left

5  off, I think we're on the same page.  I've identified five that

6  we should excuse for cause, and I think the Government is in

7  agreement with those five as is the defendant.

8      Is that right, Mr. Kaloyanides?

9          MR. KALOYANIDES:  That's correct.

10         THE COURT:  So no other cause challenges as to these

11 12; is that correct, Ms. Blanch?

12         MS. BLANCH:  Yes, sir.

13         THE COURT:  Mr. Kaloyanides?

14         MR. KALOYANIDES:  No challenge for cause.

15         THE COURT:  Beyond that?

16         MR. KALOYANIDES:  Beyond what we agreed on.

17         THE COURT:  So what this comes down to is twelve

18 minus five, if my math still serves me, is seven.  And we will

19 need eight to be totally mathematically bulletproof.  Okay.  So

20 what I might do is, if somebody tells me they might not use

21 every last available challenge, we can go ahead and proceed

22 with this and have some confidence that we will be okay.  If

23 you don't do that, then I think maybe at this point we should

24 talk to maybe two more and see if we can get one more out of

25 it.

**UNITED STATES DISTRICT COURT**

 1                MS. BLANCH:  I think it's possible the Government

 2    will use all of theirs.

 3                THE COURT:  Okay.  Well, then let's talk to two

 4    more.

 5                MS. BLANCH:  I think let's just talk to two more.

 6                THE COURT:  And then we'll see.

 7                MS. BLANCH:  Okay.

 8                (The following proceedings were held in open

 9                court:)

10                THE COURT:  All right.  Now, Mr. Stephen Goto, how

11    do you say that?

12                PROSPECTIVE JUROR NO. 38:  "Goto" is correct.

13                THE COURT:  And Ms. Carolyn Jung; is that right?

14                PROSPECTIVE JUROR NO. 39:  Yes.

15                THE COURT:  Okay.  As to the two of you, let me

16    address you now.

17          Mr. Goto, of all the questions that I have already asked

18    of everybody, do you have any you wish to follow up with me at

19    this time?

20                PROSPECTIVE JUROR NO. 38:  No.

21                THE COURT:  Okay.  Ms. Jung, do you have anything to

22    follow up with me at this time?

23                PROSPECTIVE JUROR NO. 39:  No.

24                THE COURT:  All right.  The answer is no.  Then,

25    Mr. Goto, would you please answer the seven questions on the

1    board, please.  Here's the --

2              PROSPECTIVE JUROR NO. 38:  Steve Goto.  I'm from

3    San Luis Obispo County.  Married.  I have a couple years of

4    college.  I'm a buyer with Pacific Gas and Electric Company.

5    My wife's a hairdresser.  Have no children.  I did serve on

6    federal jury and state.

7              THE COURT:  Let's talk about the federal.  Did you

8    do it once or more than once?

9              PROSPECTIVE JUROR NO. 38:  Once.

10             THE COURT:  And was that in a civil or criminal

11   case?

12             PROSPECTIVE JUROR NO. 38:  It was a criminal case.

13             THE COURT:  And did the jury reach a verdict?

14             PROSPECTIVE JUROR NO. 38:  Yes.

15             THE COURT:  Now, on the state court case, was that

16   once or more than once?

17             PROSPECTIVE JUROR NO. 38:  More than once.

18             THE COURT:  Were they civil, criminal, or some of

19   each?

20             PROSPECTIVE JUROR NO. 38:  I think one was civil,

21   and that one was settled out of court.  And a criminal case, we

22   did come to a decision.

23             THE COURT:  You did reach a verdict?

24             PROSPECTIVE JUROR NO. 38:  Yes.

25             THE COURT:  All right.  Thank you.

1          Ms. Jung, would you please answer those questions.

2               PROSPECTIVE JUROR NO. 39:  My name is Carolyn Jung.

3     I live in Stevenson Ranch.  I'm married.  I have an AA degree,

4     basically retired at this time.  I have two children and prior

5     jury service.

6               THE COURT:  Okay.  Let me make sure, you have two

7     children.  They adult or --

8               PROSPECTIVE JUROR NO. 39:  They are adult.

9               THE COURT:  What do they do for a living?

10              PROSPECTIVE JUROR NO. 39:  My daughter, stay at

11    home, and her husband is an airline pilot.  My son is a

12    computer something or other.  I'm not sure.

13              THE COURT:  And --

14              PROSPECTIVE JUROR NO. 39:  My jury service was

15    state, and it was both criminal, and both came to a decision.

16              THE COURT:  And what does your husband do?

17              PROSPECTIVE JUROR NO. 39:  We own some real estate

18    properties; so we take care of the properties we own and manage

19    them.

20              THE COURT:  Both of you do that?

21              PROSPECTIVE JUROR NO. 39:  Yes.

22              THE COURT:  Okay.  All right.  Thank you.

23         Counsel, let me see you at sidebar.

24              (Bench conference on the record:)

25              THE COURT:  Any further questions of these two or

```
 1    any challenges for cause?
 2               MS. BLANCH:  No.
 3               MR. KALOYANIDES:  Can we ask Mr. Goto what his
 4    federal jury service -- was it here in L.A. and how long ago it
 5    was?  The reason I ask was, when I looked at him, I thought he
 6    might look familiar, but I could be conflating jury faces.
 7               THE COURT:  Stand by.
 8                  (The following proceedings were held in open
 9                  court:)
10               THE COURT:  Mr. Goto, on your federal jury service,
11    was that here in our federal court or somewhere else?
12               PROSPECTIVE JUROR NO. 38:  It was here.
13               THE COURT:  Was it in the Roybal building?
14               PROSPECTIVE JUROR NO. 38:  Yes.
15               THE COURT:  How long ago was that?
16               PROSPECTIVE JUROR NO. 38:  About 20 years ago.
17               THE COURT:  You don't remember the lawyers on that
18    case?
19               PROSPECTIVE JUROR NO. 38:  No.
20                  (Bench conference on the record:)
21               THE COURT:  Were you here 20 years ago?
22               MR. KALOYANIDES:  Yes, but not doing what I'm doing
23    right now.
24               THE COURT:  Okay.  If the Government has no
25    additional questions --
```

**UNITED STATES DISTRICT COURT**

1          MS. BLANCH:  No, Your Honor.

2          THE COURT:  -- or challenges for cause, what about

3  you?

4          MR. KALOYANIDES:  No challenge for cause as to these

5  two.

6          THE COURT:  No further questions as to these two?

7          MR. KALOYANIDES:  Correct.

8          THE COURT:  I think let's go ahead and excuse

9  Ms. Cleveland.  Let's go head and excuse Ms. Shaw, excuse

10  Ms. Pasquale, excuse Ms. Rubio and Ms. Fisher.  That should

11  give us nine plus what we have remaining.  That will give us

12  33.  So even if everybody were to exercise every conceivable

13  possible last minute, last possible challenge, we will still be

14  okay.

15      But I'm not going to, just in case -- something crazy can

16  happen.  I'm not going to dismiss the remainder.  I'm going to

17  make them sit through the peremptory challenge process.  Let's

18  try and get the peremptory challenge done as quickly as

19  possible so we can release them as soon as possible.

20          MR. KALOYANIDES:  Your Honor, do we want to do it in

21  the traditional one, two, one --

22          THE COURT:  Yes.  Government, defendant, government,

23  two defendant, government, two defendant, government, two

24  defendant, government, two defendant, government, defendant.

25  I'll remind you.  Each time I will say, the next two

```
 1   peremptories are with the defendant.  So you should come up
 2   with two names, walk it over there.
 3           MR. KALOYANIDES:  And if it's a pass, acceptance?
 4           THE COURT:  Pass is a use.
 5           MR. KALOYANIDES:  Okay.
 6           THE COURT:  Pass is a use.  So let's say you say, I
 7   have two.  I challenge X for one, and I pass the other.  Okay.
 8   Now the next one is yours.  If they say we pass, that's the end
 9   of it.  But if they use their one, I come back and say you've
10   got two more, but you've already used two.  Okay?
11           MR. KALOYANIDES:  Very good.
12           THE COURT:  Okay.  Ready?
13           MR. KALOYANIDES:  Yes.
14           THE COURT:  I'm going to go ahead and excuse the
15   five, and we'll proceed with the challenges.
16           MR. KALOYANIDES:  Yes.
17               (The following proceedings were held in open
18               court:)
19           THE COURT:  All right.  At this time then, the
20   following jurors are excused to return to the jury commissioner
21   for further assignment:
22       Ms. Cleveland, thank you.  You are excused.
23       Ms. Shaw, you are excused.
24       Ms. Pasquale, you are excused.
25       Mr. Huerta, Araujo-Huerta, would you move up one row and
```

1   take the position that's been vacated by Ms. Cleveland.

2        Mr. Hanlon, would you slide over to where Mr. Huerta was.

3        Mr. Monette, would you slide over to where Mr. Hanlon was.

4        Ms. Kim, would you have a seat back there next to

5   Mr. Monette.

6        Ms. Rubio, you are excused.

7        And, Ms. Fisher, you're excused.  Thank you very much.

8        Ms. Sayrizi-Wong, would you please then take the seat next

9   to Ms. Kimura.

10        And, Mr. Goto and Ms. Jung, move up one row.  Just the two

11   of you, move up one row.

12        All right.  Now we'll begin the process of peremptory

13   challenges.  The Government by law is authorized six peremptory

14   challenges.  The defendant is authorized by law to make ten

15   peremptory challenges.

16        We'll begin with the Government.  The first challenge is

17   with the United States, Ms. Blanch.

18             MS. BAEHR-JONES:  The Government would like to thank

19   and excuse Juror No. 4.

20             THE COURT:  Juror No. 4, and that's Mr. Vanmali; is

21   that right?

22             MS. BAEHR-JONES:  Yes, Your Honor.

23             THE COURT:  Mr. Vanmali, thank you very much.

24   You're excused.

25        Ms. Gonzalez, please come on up and have the seat vacated

1    by Mr. Vanmali.

2         The next peremptory is with the defendant,

3    Mr. Kaloyanides.

4              MR. KALOYANIDES:  Your Honor, the defense would like

5    to thank and excuse Juror No. 9, Mr. Frederick.

6              THE COURT:  Juror No. 9, Mr. Frederick, thank you

7    very much.  You are excused.

8         Mr. Bonyadi, please come on up and take that spot.

9              MS. BAEHR-JONES:  Your Honor, the Government would

10   like to thank and excuse juror in Seat No. 9, Mr. Bonyadi.

11             THE COURT:  All right.  Mr. Bonyadi, thank you.

12        Mr. Gooden, please come on up and take that empty seat.

13        The next two peremptories are with the defendant,

14   Mr. Kaloyanides.

15             MR. KALOYANIDES:  Your Honor, the defense would ask

16   the Court to thank and excuse -- the names, I'm sorry -- juror

17   seated in Seat No. 2, Mr. Berman.

18             THE COURT:  Mr. Berman, thank you very much.  You

19   are excused.

20             MR. KALOYANIDES:  And in Seat No. 8, Mr. Calderon.

21             THE COURT:  Mr. Calderon, thank you very much.  You

22   are excused.

23        Mr. Mross, please come on up and take the open seat in the

24   front row.

25             And, Ms. Scrivner, please come on up and take the seat in

1     the back row.

2         The next peremptory is with the United States.

3             MS. BAEHR-JONES:  Your Honor, the Government would

4     like to thank and excuse the juror in Seat No. 3,

5     Mr. Gutknecht.

6             THE COURT:  Mr. Gutknecht, thank you very much.  You

7     are excused.

8         Mr. Kagan, please come on up and have a seat in that

9     space.

10        The next two peremptories are with the defendant,

11    Mr. Kaloyanides.

12            MR. KALOYANIDES:  Your Honor, defense would ask the

13    Court to thank and excuse juror seated in Seat No. 3,

14    Mr. Kagan.

15            THE COURT:  All right.  Mr. Kagan, thank you.  You

16    are excused.

17            MR. KALOYANIDES:  And we'd also ask the Court to

18    thank and excuse the juror seated in Seat 4, Ms. Gonzalez.

19            THE COURT:  All right.  Ms. Gonzalez, thank you.

20        Mr. Pham, please come up and take the seat vacated by

21    Mr. Kagan.

22        Ms. Christensen, please come on up and take the other open

23    seat.

24        The next peremptory is with the United States.

25            MR. KALOYANIDES:  Your Honor, may we approach.

1          THE COURT:  Yes.

2              (Bench conference on the record:)

3          THE COURT:  Mr. Kaloyanides, do you have an

4     objection to the proposed challenge?

5          MR. KALOYANIDES:  I do.

6          THE COURT:  Who is the proposed --

7          MR. KALOYANIDES:  Number 6.

8          THE COURT:  Number 6.  Mr. Ramos.  Okay.  And what

9     is the nature of the objection?

10         MR. KALOYANIDES:  We would make a Batson challenge,

11    Your Honor.  We've had now three men --

12         THE COURT:  Three what?  I'm sorry.

13         MR. KALOYANIDES:  Three men of either Hispanic,

14    Middle Eastern, Indian descent -- all nonwhite males, who have

15    been young, who have now been struck by the Government.

16         THE COURT:  Okay.  What is your reasoning for having

17    made the challenge?

18         MS. BLANCH:  Your Honor --

19         MS. BAEHR-JONES:  This is Ms. Baehr-Jones.  He has

20    no children.  He's single, has less ties to the community as a

21    result, and has no jury experience.

22         And this one, we're concerned about and also that he works

23    at LAX in the baggage claim area.  And our agent alerts us that

24    people who work in the baggage area, sometimes HSI conducts

25    sweeps of those sorts of people.  So the concern is he might

1   have some kind of prejudice against HSI or federal agencies as

2   a result of being in that position.

3            THE COURT:  Okay.  The burden is yours, of course,

4   Mr. Kaloyanides, to make a showing that the reason given by

5   counsel is really pretextual and that the showing is for an

6   improper purpose.

7            MR. KALOYANIDES:  Your Honor, Mr. Ramos has not in

8   any of the questions the Court asked ever indicated

9   (inaudible) --

10            THE REPORTER:  Your Honor, I can't hear.  The papers

11   are rustling.

12            MR. KALOYANIDES:  Granted, he did not provide a

13   whole wealth of information in response to the Court's

14   questions, but he gave very simple answers indicating there was

15   no issue that would support the Government's view that he is

16   going to be potentially biased against HSI.

17        What we do have, there was a pattern of three young,

18   single men who are of nonwhite background have been struck by

19   the Government, who might -- who -- young, nonwhite men who may

20   be more sympathetic to issues in this case, particularly

21   involving the computer aspects that are critical in this case.

22   And he would be, in my view, perhaps better able to

23   compartmentalize the substance of the photographs that are

24   going to be at issue, which relate to whether or not these

25   images were transported or intended to be transported.

1      THE COURT:  Okay.  First of all, counsel does not

2   have to justify her position to a standard that meets a cause

3   challenge.  This is not the purpose.  The purpose is only to

4   see whether or not she has some non-improper purpose.  She has

5   clearly articulated a non-improper purpose.

6      She does not have to, in discharging her burden going

7   forward, prove somehow this is appropriate under a cause

8   standard.  It is fine if she determines that, because of the

9   kind of activity, interaction that HSI has with people who work

10  in this baggage area as this gentleman does, that if the

11  Government is uncomfortable with taking the chance that there

12  may have been some interaction between this person, or even

13  between his friends and HSI, which would bias him against the

14  Government.  Your burden is to show that that's not true and

15  that the real reason is that it's all because of something

16  that's improper, like race, gender, or other immutable thing

17  such as he ethnicity.

18     Nothing you said supports your burden to show that

19  she's -- that this strike is made on any of those improper

20  purposes.  If it were something where you say, well, you know,

21  somebody like that may be more able to compartmentalize or may

22  be even more able to understand computer, even if the reason

23  were that they don't want somebody who could compartmentalize

24  for purposes of computer, that itself is not an improper

25  purpose and does not support your burden of showing by

```
 1   preponderance of the evidence that this is based upon race,

 2   ethnicity, gender, or other prohibited -- so your objection is

 3   overruled.

 4              MR. KALOYANIDES:  Thank you, Your Honor.

 5                  (The following proceedings were held in open

 6                  court:)

 7              MS. BAEHR-JONES:  Government would like to thank and

 8   excuse the juror in Seat No. 6, Mr. Ramos.

 9              THE COURT:  All right.  Mr. Ramos, thank you very

10   much.  You may be excused.

11         Mr. Natalia, please come on up and take Seat No. 6.

12         The next two peremptories are with the defendant,

13   Mr. Kaloyanides.

14              MR. KALOYANIDES:  Your Honor, the defense would ask

15   the Court to thank and excuse juror seated in Seat 4,

16   Ms. Christensen.

17              THE COURT:  Ms. Christensen, thank you very much.

18   You are excused.

19         And?

20              MR. KALOYANIDES:  And we pass.

21              THE COURT:  Mr. Dalton, go ahead and take

22   Ms. Christensen's place.

23         The next peremptory is with the United States.

24              MS. BAEHR-JONES:  Your Honor, the Government will

25   pass.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  All right.  Then the next two,

2    Mr. Ingalla and Ms. Stewart, please come on up.  Mr. Ingalla,

3    you take the seat that's closest to Mr. Piganelli.

4          And, Ms. Stewart, you take the next seat.

5          All right.  At this time, Mr. Ingalla, you are Alternate

6    No. 1.

7          And, Ms. Stewart, you are Alternate No 2.

8          The law permits the parties to have one challenge each

9    directed only as to these two alternates.  The first challenge

10   is with the United States.

11         MS. BAEHR-JONES:  Your Honor, the Government would

12   like to thank and excuse Mr. Ingalla.

13         THE COURT:  Mr. Ingalla, thank you very much.

14         Ms. Stewart, would you please move to Mr. Ingalla's seat.

15         And, Mr. Cruz, please come on up and take that final seat.

16         And the final peremptory directed only as to the

17   alternates is with the defendant, Mr. Kaloyanides.

18         MR. KALOYANIDES:  Thank you, Your Honor.  The

19   defense accepts the panel.

20         THE COURT:  Thank you very much.

21         All right.  Ladies and gentlemen of the jury panel who are

22   still remaining, thank you very much for helping us in this

23   process.  We have now selected our jury.  We appreciate the

24   time that you have spent with us this morning and this

25   afternoon, and you are now free to return to the jury

1    commissioner for further instruction.

2        As to the notebook and the pen, just go ahead and leave it

3    where you are sitting, and we'll pick it up later after you

4    leave.

5        Thank you once again.  You are now all excused.

6        All right.  Bea, would you now please swear the panel.

7            THE CLERK:  Yes, Your Honor.  Thank you.

8        Would the jurors please stand and raise your right hand to

9    be sworn.

10       Do you and each of you solemnly swear that you will well

11   and truly try the cause now pending before the Court and render

12   a true verdict therein according to the evidence, so help you

13   God?

14                (The jurors responded collectively in the

15                affirmative.)

16            THE CLERK:  Thank you.  You may be seated.

17            THE COURT:  Ladies and gentlemen of the jury, you

18   are now the jury in this case.  So what I want to do is take a

19   few minutes to read to you some preliminary instructions, and

20   these instructions will tell you something about your duties as

21   jurors.  At the end of the trial, I will give you more detailed

22   written instructions that will control your deliberations.

23       When you deliberate, it will be your duty to weigh and to

24   evaluate all of the evidence received in the case and in that

25   process decide the facts.  To the facts as you find them, you

1   will apply the law as I give it to you, whether you agree with

2   the law or not.

3        You must decide the case solely on the evidence and the

4   law before you and must not be influenced by personal likes or

5   dislikes, opinions, prejudices, or sympathy.

6        Please do not take anything I may say or do during the

7   course of the trial as indicating what I think of the evidence

8   or what your verdict should be.  That is entirely up to you.

9        This is a criminal case brought by the United States

10  Government.  The charges against the defendant -- the charge

11  against the defendant is contained in the Indictment, and I

12  have already told you what the charge is.  The Indictment is

13  simply a description of the charge the Government brings

14  against the defendant.  The Indictment is not evidence and does

15  not prove anything.

16       The defendant has pleaded not guilty to the charge and is

17  presumed innocent unless and until the Government proves the

18  defendant guilty beyond a reasonable doubt.

19       In addition, the defendant has the right to remain silent

20  and never has to prove innocence or present any evidence.

21       The evidence you are to consider in deciding what the

22  facts are consists of, one, the sworn testimony of any witness;

23  and, two, the exhibits which are received in evidence; and,

24  three, any facts to which the parties agree.

25       The following things are not evidence, and you must not

consider them as evidence in deciding the facts of this case:
One, statements and arguments of the lawyers; two, questions or
objections of the lawyers; three, testimony that I instruct you
to disregard; and, four, anything you may see or hear when the
court is not in session, even if what you see or hear is done
or said by one of the parties or by one of the witnesses.

Some evidence may be admitted for a limited purpose only.
When I instruct you that an item of evidence has been admitted
for a limited purpose, you must consider it only for that
limited purpose and for no other.

Evidence may be direct or circumstantial.  Direct evidence
is direct proof of a fact such as testimony by a witness about
what that witness personally saw or heard or did.
Circumstantial evidence is indirect evidence.  That is, it is
proof of one or more facts from which you can find another
fact.

You are to consider both direct and circumstantial
evidence.  Either can be used to prove any fact.  The law makes
no distinction between the weight to be given to either direct
or circumstantial evidence.  It is for you to decide how much
weight to give to any evidence.

There are rules of evidence that control what can be
received in evidence.  When a lawyer asks a question or offers
an exhibit into evidence and a lawyer on the other side thinks
that it is not permitted by the rules of evidence, that lawyer

may object.  If I overrule the objection, the question may be
answered or the exhibit received.  If I sustain the objection,
the question cannot be answered or the exhibit cannot be
received.  Whenever I sustain an objection to a question, you
must ignore that question and must not guess what the answer
would have been.

Sometimes I may order that evidence be stricken from the
record and that you disregard or ignore the evidence.  That
means that, when you are deciding the case, you must not
consider the evidence that I told you to disregard.

In deciding the facts in this case, you may have to decide
which testimony to believe and which testimony not to believe.
You may believe everything a witness says or a part of it or
none of it.

In considering the testimony of any witness, you may take
into account, one, the witness's opportunity and ability to see
or hear or know the things testified to; two, the witness's
memory; three, the witness's manner while testifying; four, the
witness's interest in the outcome of the case, if any; five,
the witness's bias or prejudice, if any; six, whether other
evidence contradicted the witness's testimony; seven, the
reasonableness of the witness's testimony in light of all of
the evidence; and, eight, any other factors that bear on
believability.

The weight of the evidence as to a fact does not

1    necessarily depend on the number of witnesses who testify about

2    it.

3         At the end of the trial, you will have to make your

4    decision based on what you recall of the evidence.  You will

5    not have a written transcript of the trial.  I urge you to pay

6    close attention to the testimony as it is given.

7         If you wish, you may take notes to help you remember the

8    evidence.  If you do take notes, please keep them to yourself

9    until you and your fellow jurors go to the jury room to decide

10   the case.  Do not let note-taking distract you from being

11   attentive.  When you leave the court for recesses, your notes

12   should be left here in the courtroom.  No one will read your

13   notes.  Whether you take notes or not, you should rely on your

14   own memory of the evidence.  Notes are only there to assist

15   your memory.  You should not be overly influenced by your notes

16   or those of your fellow jurors.

17        A language other than English will be used for some

18   evidence during the trial.  When a witness testifies in another

19   language, the witness will do so through an official court

20   interpreter.  The evidence you are to consider and on which you

21   must base your decision is only the English language

22   interpretation provided through the official court

23   interpreters.  Although some of you may know the non-English

24   language used, you must disregard any meaning of the

25   non-English words that differs from the official

1    interpretation.

2         You must not make any assumption about a witness or a

3    party based solely upon the use of an interpreter to assist

4    that witness or party.

5         From time to time during the trial, it may become

6    necessary for me to take up legal matters with the attorneys

7    privately either by having a conference at the bench or, when

8    necessary, by calling a recess.  We will do what we can to keep

9    the number and length of these conferences to a minimum.  I may

10   not always grant an attorney's request for a conference.

11        The next phase of the trial will now begin.  First, each

12   side may make an opening statement.  An opening statement is

13   not evidence.  It is simply an outline to help you understand

14   what that party expects the evidence will show.  A party is not

15   required to make an opening statement.

16        The Government will then present evidence, and counsel for

17   the defendant may cross-examine.  Then, if the defendant

18   chooses to offer evidence, counsel for the Government may

19   cross-examine.  After the evidence has been presented, I will

20   instruct you on the law that applies to the case, and then the

21   attorneys will make their closing arguments.  After that, you

22   will go to the jury room to deliberate on your verdict.

23        Let me now just say a few words about your conduct as

24   jurors.  First, keep an open mind throughout the trial and do

25   not decide what the verdict should be until you and your fellow

1    jurors have completed your deliberations at the end of the

2    case.

3          Second, because you must decide this case based only on

4    the evidence received in the case and on my instructions as to

5    the law that applies, you must not be exposed to any other

6    information about the case or to the issues it involves during

7    the course of your jury duty.

8          Thus, until the end of the case or until I tell you

9    otherwise, do not communicate with anyone in any way and do not

10   let anyone else communicate with you in any way about the

11   merits of the case or anything to do with it.  This includes

12   discussing the case in person, in writing, by phone, or by

13   electronic means via e-mail, text messaging, or any Internet

14   chat room, blog, Web site, or other feature.  This applies to

15   communicating with your fellow jurors until I give you the case

16   for deliberations, and it applies to communicating with

17   everyone else, including your family members, your employer,

18   the media or press, and the people involved in the trial,

19   although you may notify your family and your employer that you

20   have been seated as a juror in this case.  But if you are asked

21   or approached in any way about your jury service or anything

22   about this case, you must respond that you have been ordered

23   not to discuss this matter and to report that contact to me.

24         Because you will receive all of the evidence and legal

25   instructions you properly may consider to return a verdict, do

1   not read, watch, or listen to any news or media accounts or

2   commentary about the case or anything to do with it.  Do not do

3   any research such as consulting dictionaries, searching the

4   Internet, or using other reference materials.  And do not make

5   any investigation or in any other way try to learn about the

6   case on your own.

7        The law requires these restrictions to ensure the parties

8   have a fair trial based upon the same evidence that each party

9   has had an opportunity to address.  A juror who violates these

10  restrictions jeopardizes the fairness of these proceedings, and

11  a mistrial could result that would require the entire trial

12  process to start over.

13       If any juror is exposed to any outside information, please

14  notify the Court immediately.

15            I'll see counsel at sidebar at this time.

16            (Bench conference on the record:)

17            THE COURT:  Any objection to the Court's reading of

18  the preliminary instructions on behalf of the United States?

19            MS. BAEHR-JONES:  No, no.

20            THE COURT:  On behalf of the United States.

21            MS. BAEHR-JONES:  No.  Sorry.

22            THE COURT:  On behalf of defendant?

23            MR. KALOYANIDES:  No.

24            THE COURT:  Okay.  Why don't we take a 15-minute

25  recess at this time and let the jurors have a chance to stretch

**UNITED STATES DISTRICT COURT**

```
 1   their legs.  I'll remind them not to discuss anything, and when
 2   we come back, we'll make sure that the jurors are in the room
 3   before Mr. Reczko is brought back, and then we'll bring the
 4   jury out, and then opening statements.
 5        How long do you --
 6             MS. BAEHR-JONES:  Probably no longer than 15 to 20
 7   minutes.
 8             THE COURT:  Are you going to give or reserve?
 9        You have your witness ready to go?
10             MS. BAEHR-JONES:  We do.
11             THE COURT:  Who is your first witness?
12             MS. BAEHR-JONES:  Anita Suico.
13             THE COURT:  How long is she going to be?
14             MS. BAEHR-JONES:  Twenty minutes at most, probably.
15   It depends on --
16             THE COURT:  If it turns out we still have time until
17   five o'clock, who's your second witness?
18             MS. BAEHR-JONES:  We have another witness, Daryl
19   Purviance.
20             THE COURT:  Okay.
21                  (The following proceedings were held in open
22                   court, in the presence of the jury:)
23             THE COURT:  Ladies and gentlemen of the jury, we'll
24   take a brief 15-minute recess at this time.  Please keep in
25   mind the admonition of the Court not to discuss this matter
```

1    among yourselves or with anyone else, until it is finally given

2    to you for your deliberations.  Please follow my clerk out.

3    She will show you the room, and then we'll see you in 15

4    minutes.  We'll be ready to begin with the opening statement by

5    the Government.

6         Thank you very much.  We'll be in recess.

7              (Recess taken.)

8              (Jury in at 3:58 P.M.)

9         THE CLERK:  Please remain seated.

10             (The following proceedings were held in the

11             presence of the jury:)

12        THE CLERK:  Please remain seated and come to order.

13   This Court is once again in session.  The Honorable George H.

14   King, Chief Judge presiding.

15        THE COURT:  Back on the record in the matter of

16   United States versus Reczko.  Counsel are present.  Mr. Reczko

17   is present.

18        Mr. Kaloyanides, I believe that at this point you are also

19   being assisted at the counsel table by Ms. Kathleen Caulfield;

20   is that right?

21        MR. KALOYANIDES:  That's correct, Your Honor.  Thank

22   you.

23        THE COURT:  All right.  Very good.

24        Good afternoon, ladies and gentlemen of the jury.  We are

25   now ready to begin.  We'll start with opening statements by the

UNITED STATES DISTRICT COURT

1    Government.

2         And will that be Ms. Baehr-Jones?

3              MS. BAEHR-JONES:  Yes, Your Honor.

4              THE COURT:  All right.  You may proceed then,

5    Ms. Baehr-Jones.

6              MS. BAEHR-JONES:  Thank you.

7         Ladies and gentlemen, this is a case about power, poverty,

8    and control.  It's about the power that the defendant had over

9    a minor girl when he groomed her to engage in sexual acts to

10   produce child pornography.  It's about the relative poverty

11   that the victim and her family lived in, in the Philippines, a

12   country in Southeast Asia.  And it's about the control that the

13   defendant yielded over a 15-year-old when he used her to

14   produce child pornography.

15        Elcita Del Rosario, or Sheryl as her friends and family

16   called her, was just 13 years old when the defendant began

17   seducing her over the telephone from the United States.  Up

18   until then, her life was much like that of any 13-year-old.

19   She had a best friend.  She went to school.  She lived with her

20   siblings and her parents at the family home.  They didn't have

21   much.  This is a picture of their neighborhood in the

22   Philippines, and this is a picture of their one-room family

23   home.

24        The defendant told her to call him "Uncle" and asked her

25   about her schoolwork, but he soon turned the conversation to

1   much more adult topics.  In exchange for sending her school

2   supplies, he instructed her to masturbate while he listened and

3   masturbated himself.

4        This is Sheryl Del Rosario when she was 15 years old.

5   When she was 15 and the defendant was 41, he traveled to the

6   Philippines and began romancing her in person.  He bought her

7   clothes.  He took her out on a date.  He showed her an

8   engagement ring.  He also initiated physical contact.  He began

9   touching her over her clothing, and he bought her lingerie.

10       After taking her virginity, he even purported to marry her

11   in a pretend marriage ceremony.  This marriage wasn't legal, as

12   the defendant was married to a wife and had a daughter with her

13   in the United States.  These are pictures of that marriage

14   ceremony when Ms. Del Rosario was 15.

15       When Sheryl Del Rosario was 15 years old, the defendant

16   began taking sexually explicit photographs of her.  And by the

17   time she was 16 years old, he was taking photographs of them

18   having sex, and he was taking close-up photographs of her

19   genitals.

20       In one two-week session in November of 2006, the defendant

21   took eight sessions of child pornography with the victim.  The

22   evidence will show that the defendant produced child

23   pornography with Ms. Del Rosario in the Philippines and then

24   took those photographs back with him to the United States,

25   where he copied them, burned them onto a CD.  For that conduct,

1    the defendant is charged with the sexual exploitation of a

2    child.

3         When the defendant returned to the Philippines, he brought

4    with him this CD, the CD of child pornography.  He labeled the

5    CD "Baby Girl Wow Hot 2006."  He showed it to Ms. Del Rosario

6    and then he hid it in their apartment in the Philippines.

7         In May of 2007 Ms. Del Rosario sought help.  She went to a

8    social worker and told the social worker what had happened, and

9    the social worker referred her to a non-governmental

10   organization called the International Justice Mission, or IJM.

11   IJM worked to protect and save and rescue and seek justice for

12   victims of child sexual exploitation and human trafficking.

13        The social worker also got from Ms. Del Rosario the CD of

14   child pornography, and she gave it to IJM, who began

15   investigating the defendant.  IJM also took Ms. Del Rosario and

16   put her in a safe house to protect her.

17        During trial you will see some of the child pornography

18   briefly.  You will also hear from Sheryl Del Rosario, who will

19   tell you in her own words what happened.  And you will hear and

20   see evidence that the defendant brought the photographs back

21   with him to the United States that he took of the victim and

22   that he copied those, burned them onto a CD while he was in

23   Los Angeles.

24        You will see travel records that show when the defendant

25   came back and forth between Los Angeles and the Philippines.

1    And you will hear from a forensic expert who looked at the CDs.

2    He reviewed the CDs as well as a CD that was recovered from the

3    defendant's suitcase when he was detained by the Philippine

4    authorities, and camera cards that also contained photographs

5    that were recovered from the luggage.

6         You will also hear from witnesses who helped rescue

7    Sheryl Del Rosario.  You will hear from the social worker, the

8    social worker who took the CD of child pornography, and who

9    turned it over to IJM and who helped Sheryl Del Rosario leave

10   the defendant.

11        And you will then hear from the director of investigations

12   in Cebu, Philippines, for IJM.  He took custody of the child

13   pornography CD, and he made a working copy of it which he kept

14   in the IJM evidence vault in the Philippines.  You will hear

15   from him that he turned over the CD to U.S. law enforcement

16   agents working in the Philippines and that he kept a copy, a

17   working copy with him in the IJM vault.

18        You will then hear from two U.S. law enforcement agents

19   who investigated this case.  You will hear that they took the

20   CD of child pornography into custody and that, when it was

21   labeled, it was damaged and that it was transported with all

22   the evidence to the United States.  You will also hear that

23   they were able to obtain the undamaged copy that was kept by

24   IJM.

25        You will then hear from Sheryl Del Rosario, the victim,

who will tell you that it was the defendant who took those
photographs of her, that it's her that's represented on this
CD, and the child pornography is of her.

You will also hear from the woman who was the defendant's
legal wife at the time the child pornography was produced.  And
the entire time that the defendant was romancing the victim and
traveling back and forth to the Philippines, he was married to
his legal wife, Richelle Ebay.  She will explain that the
photographs that were found on defendant's CD and camera cards
show pictures of them celebrating Christmas in 2006 when he had
returned to Los Angeles to be with his family.  And she will
tell you that he, in fact, was in Los Angeles at the same time
that he burned the CD of child pornography.

Finally, the Government will put on an expert witness to
testify, a forensic expert who has reviewed all of the CDs, the
camera cards in this case.  The forensic evidence will show you
three things.  It will show you that the eight sessions of the
child pornography that the defendant took with the victim took
place in November of 2006.  It will then show you that the
image of the Baby Girl CD, the CD of child pornography, was
burned approximately December 25, 2006.  And it will also show
you that the images that the defendant took of his family
members in Los Angeles celebrating Christmas in 2006 were taken
around that time.

Ladies and gentlemen, this is a case about power, poverty

1    and control.  The defendant used his power and his relative

2    wealth as an American citizen to seduce 15-year-old Sheryl Del

3    Rosario, and he then exercised his unfettered control over her

4    to engage in sexual acts and make many sessions of child

5    pornography with her.  He took those photographs back with him

6    to the United States, and he burned them onto this CD.  Based

7    on all of these images, the Government has charged defendant

8    with sexually exploiting a child by using her to produce child

9    pornography.

10        After you hear all the testimony from the witnesses and

11   see all the evidence in this case, my colleague Joey Blanch

12   will ask you to return the only verdict consistent with the

13   evidence, a verdict of guilty.

14        Thank you.

15            THE COURT:  All right.  Thank you very much.

16        Mr. Kaloyanides, would you like to give your opening

17   statement, or would you be reserving your opportunity?

18            MR. KALOYANIDES:  I will reserve.  Thank you,

19   Your Honor.

20            THE COURT:  All right.  Ms. Baehr-Jones, then, the

21   Government may call its first witness.

22            MS. BAEHR-JONES:  The Government calls Anita Suico.

23   Your Honor, this first person -- this first witness will be

24   using a stand-by interpreter.

25            THE COURT:  All right.

1       THE CLERK:  Please come forward.  Wait right here

2   and raise your right hand to be sworn, please.

3       Do you solemnly swear the testimony you shall give in the

4   cause now pending before the Court shall be the truth, the

5   whole truth, and nothing but the truth so help you God?

6       THE WITNESS:  Yes.

7       THE CLERK:  We can't hear you.

8       THE COURT:  You have to speak up, ma'am.

9       THE WITNESS:  Yes.  I swear the truth.

10      THE COURT:  Thank you.

11      THE CLERK:  You may go around, ma'am, and take a

12  seat, please.  Please adjust the microphone, speak directly

13  into it.  Would you please state your full name for the record,

14  spell both your first and your last name, please.

15      THE COURT:  Wait.  Just a minute.  Don't do that.

16  First of all, you haven't been sworn.  Secondly, I understand

17  that this is only stand-by.

18      MS. BAEHR-JONES:  Yes, Your Honor.

19      THE COURT:  Go have a seat out there until we need

20  you.

21      Proceed.

22      THE WITNESS:  I am Anecita F. Suico, A-n-e-c-i-t-a

23  S-u-i-c-o.

24      THE COURT:  Ms. Suico, I understand that you believe

25  you can testify in English but you would like to have an

1    interpreter standing by just in case you need that person; is

2    that right?

3              THE WITNESS:  Yes, Your Honor.

4              THE COURT:  Okay.  That's fine.

5         Anytime you think you need an interpreter, simply say so,

6    and then we'll swear the interpreter, and then we'll have him

7    assist you.  Okay?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  Very good.  You may proceed.

10

11                    ANECITA F. SUICO,

12   called as a witness by the Government, was sworn and testified

13   as follows:

14                   DIRECT EXAMINATION

15   BY MS. BAEHR-JONES:

16   Q    Good afternoon, Ms. Suico.

17   A    Good afternoon, ma'am.

18   Q    Ms. Suico, what do you do for a living?

19   A    I am a registered social worker, connected with the

20   Department of Social Welfare Services of the Cebu City,

21   Philippines.

22   Q    Do you have a specialty as a social worker for that

23   department?

24   A    Yes.

25   Q    And what specific specialty or area do you work in?

1   A    I am a team leader.  I am the team leader of the child

2   protection unit, and at the same time I'm also a social worker

3   handling cases of abused children.

4   Q    And how long have you been in that team leader position of

5   handling cases of abused children?

6   A    I have been connected with the department for 26 years.

7   Q    And how long as a team supervisor?

8   A    For 26 years also.

9   Q    And do you have any kind of specific training in working

10  with children and minors as -- that you've had as part of that

11  position?

12  A    Yes, ma'am.

13  Q    And can you explain that a bit.

14  A    I have undergone training on laws protecting children,

15  specifically the anti-child abuse law.  It's the Republic

16  Act 7610 in the Philippines.  I have undergone trainings on

17  child trafficking, child pornography, and also case management

18  of cases of abused children.

19  Q    And over the course of your more than 20-year career as a

20  supervisor in that department, how many cases of abused

21  children have you worked on?

22  A    As far as I can remember, I have handled more than a

23  thousand cases in our office.

24  Q    In 2007 did you become involved in a case involving a girl

25  named Elcita Del Rosario?

```
 1   A      Yes, ma'am.

 2   Q      And how did you become involved in that case?

 3   A      It was in May 9, 2007, when Elcita Del Rosario -- or

 4   "Sheryl" she is fondly called -- together with her mother,

 5   Lucia Del Rosario, came to our office and reported to me the

 6   incident that Sheryl, who had a live-in partner, an American

 7   national in the name of Mr. Reczko, had been abusing her --

 8              MR. KALOYANIDES:  Objection.  Hearsay.

 9              THE COURT:  It's not admitted for the truth of the

10   matter asserted but only to explain why she did what she did

11   next.

12        Ladies and gentlemen, what this witness is testifying as

13   to what Ms. Del Rosario may have told her may not be used by

14   you to establish that it is true what was said.  That would be

15   hearsay.  All it is, is to explain why she did next what she

16   did.  That's all.  All right?  With that limited -- for that

17   limited purpose only, you may consider this evidence.

18        All right.  Proceed.

19   Q      BY MS. BAEHR-JONES:  When Sheryl Del Rosario and her

20   mother came to meet with you, did you find out how old Sheryl

21   Del Rosario was?

22   A      Yes, ma'am.  She -- she was 17 years old.

23   Q      And when you just testified that she was with a live-in

24   partner, what do you mean by the words "live-in partner"?

25   A      They were not married because she is a minor.
```

1   Q    Okay.  Do you have training on the laws regarding the

2   marriage age, the legal marriage age in the Philippines?

3   A    Yes, ma'am.

4   Q    And do you discuss the legal marriage age with -- with

5   minors or with children who come into your office?

6   A    Yes, ma'am.

7   Q    What did -- what, if anything, did Lucia Del Rosario and

8   Sheryl Del Rosario bring with them when they came to meet you

9   that day?

10  A    They brought with them copies of hard photos, shows --

11           MR. KALOYANIDES:  Objection.  Hearsay.

12           THE COURT:  Well, they just -- there's no hearsay

13  here.  She just said that they brought certain photos.  That's

14  all that she's saying so far.

15       Objection is overruled.

16  Q    BY MS. BAEHR-JONES:  So please continue, Ms. Suico.  If

17  you could just describe what they brought with them.

18  A    They brought with them some of the hard copies of photos,

19  showing Elcita naked and having sexual --

20           MR. KALOYANIDES:  Objection.  Foundation.

21           THE WITNESS:  -- intercourse.

22           THE COURT:  Lay a foundation whether she saw those

23  photos and so forth.

24  Q    BY MS. BAEHR-JONES:  Ms. Suico, when she brought those

25  photographs to you, did you have a chance to look at them?

1   A      Yes, ma'am.

2   Q      Did you recognize Sheryl Del Rosario?

3   A      Yes, ma'am.

4   Q      What did you do once -- once you'd seen these photographs

5   and heard from Sheryl Del Rosario and her mother, what did you

6   do next?

7   A      I -- we immediately went to the nearest police station.

8   Q      Why did you do that?  Why did you go to a police station?

9   A      It is our protocol in the office that we have to

10  coordinate with the women's desk officer to go with me and to

11  the minor, especially during rescue or to gather evidences.

12  Q      And what were your plans at that point when you went to --

13  to get the police officer?

14  A      Since Elcita and the mother told me that there were still

15  evidences in rented apartment, hard copies and CDs, so we and

16  the police -- I and the policewomen's desk officer, together

17  with Elcita and her mother, went to the rented apartment.

18  Q      I'm going to ask you to look at what's been marked as

19  Government's Exhibit 9.

20         And can -- can she look at the original copy?  Thank you,

21  Ms. Herrera.

22         So if you can just take that out of the plastic case and

23  look at it without going through every photo, and then let me

24  know if you've reviewed those photos before today.  So have you

25  looked through those photos before?

1    A      Yes, ma'am.

2    Q      Do you recognize them?

3    A      Yes, ma'am.

4    Q      What are they?

5    A      These are the photos that we get from the rented

6    apartment, and Sheryl handed it over to me.

7    Q      Can you now look at what's been marked as Government's

8    Exhibit 9-B, if you can place those back in and then flip over

9    to 9-B.  Have you gone through exhibit -- Government's

10   Exhibit 9-B and looked at those pages before today's hearing?

11   Starting with that first page, yes, have you looked through

12   those before today?

13   A      Yes.  Because these are the same photos that we got from

14   the rented apartment that Sheryl handed it over to me.

15   Q      So those are copies?

16   A      Yes, ma'am.

17   Q      Are there any differences on those copies than on the

18   original photographs?

19   A      These are the same photographs.

20   Q      Are there any differences in what is depicted of Sheryl

21   Del Rosario's private areas on those photographs?

22   A      These are still the same.  Only the private parts here are

23   covered.

24   Q      Okay.  So are those redacted or covered photographs, but

25   otherwise they're the same as the photographs in the --

```
 1   A    Yes, ma'am.

 2        MS. BAEHR-JONES:  The Government would move -- seek

 3   to move those into evidence, Government's Exhibit 9-B.

 4        THE COURT:  Just 9-B at this time?

 5        MS. BAEHR-JONES:  Just 9-B at this time.

 6        THE COURT:  Any objection?

 7        MR. KALOYANIDES:  May I consult with counsel.

 8        THE COURT:  Of course.

 9        (Counsel confer sotto voce.)

10        MR. KALOYANIDES:  No objection, Your Honor.

11        THE COURT:  9-B received.

12        (Exhibit 9-B received into evidence.)

13   Q    BY MS. BAEHR-JONES:  Ms. Suico, can you turn to what's

14   been marked as Government's Exhibit 10.  It should be right

15   after that.  And can you take that bag out and just look at the

16   items that are inside.

17        Do you recognize those two -- two items?

18   A    Yes, ma'am.

19   Q    What are they?

20   A    These are the same CDs that Sheryl handed it over to me

21   when we went to the rented apartment.

22   Q    And can you look at the -- is one of them broken?

23   A    Yes.

24   Q    Can you look at the unbroken CD?  And what is written on

25   the top of that?
```

1   A    Baby Girl 2006, Philippines.

2   Q    When you received these items from Sheryl Del Rosario and

3   Lucia Del Rosario at Sheryl Del Rosario's apartment, what did

4   you do with them?

5   A    I bring this -- I brought these CDs and the

6   pornographic -- the hard copies of the photos to my office and

7   place it in my lock- -- I locked it in my cabinet.

8   Q    What kind of cabinet is that, Ms. Suico?

9   A    It is a steel cabinet that we use in the office.

10  Q    And what did you do after you placed the evidence that you

11  received into the steel cabinet?

12  A    I called the -- the -- I called the office of IJM.  It's

13  International Justice Mission.

14  Q    What is International Justice Mission, IJM, to your

15  knowledge?

16  A    IJM is an non-government organization helping with --

17  helping children who are victims of abuse and exploitation.

18  Q    Who did you speak with at IJM?

19  A    It was Mark Albo, whom I was able to talk to when I called

20  IJM.

21  Q    And what did you ultimately do with the evidence that you

22  locked in your steel cabinet?

23  A    I told Mark that I got the evidences, and Mark told me

24  that -- to keep it in my office because it was already late in

25  the afternoon.  And he told me that he will get it early the

1    next day.

2    Q    And the following day did he come to your office?

3    A    Yes.  Mark Albo came to our office early in the morning.

4    Q    And what did you give to him, if anything?

5    A    I get the hard copy of the photo and the CD from my steel

6    cabinet, and I handed it over to Mark Albo.

7            MS. BAEHR-JONES:  Thank you.

8        No further questions, Your Honor.

9            THE COURT:  All right.  Mr. Kaloyanides, anything?

10           MR. KALOYANIDES:  Yes.  Thank you, Your Honor.

11           THE COURT:  You do not intend to offer 10 at this

12   time?

13           MS. BAEHR-JONES:  No, Your Honor.

14           THE COURT:  Thank you.

15                    CROSS-EXAMINATION

16   BY MR. KALOYANIDES:

17   Q    Ms. Suico, you testified you were trained in various

18   aspects of cases involving child abuse in the Philippines;

19   correct?

20   A    Yes, sir.

21   Q    And you're familiar with various aspects of Philippine

22   law; right?

23   A    Yes, sir.

24   Q    Do you have any training in United States federal law?

25   A    No, sir, because I'm from the Philippines.

1  Q    Now, you testified you went with Ms. Del Rosario to her

2  apartment, the rented apartment.  That was an apartment that

3  she was renting; correct?

4  A    It was the apartment where Sheryl and Mr. Reczko was

5  renting.

6  Q    And how did you get into the apartment?

7  A    When Sheryl told me that she still has the copies of the

8  photos and the CD, I -- we went there together with the women's

9  police officer and together with Sheryl and her mother.

10  Q    Okay.  Well, was the apartment locked?  Was it open?  How

11  did you get in?

12  A    It was Sheryl who opened the -- the apartment, the door.

13  Q    She had a key?

14  A    She has.  Sheryl.

15  Q    And you went into the apartment.  You said that she said

16  she had copies of the photos and the CDs; is that right?  She

17  had copies?

18  A    She had still copies of it, she told me, inside apartment.

19  Q    Now, were these copies of just the photos, or were they

20  copies of the CDs as well?

21  A    Copies of the hard photos and the CDs.

22  Q    Now, when you went into the apartment, did you actually go

23  into the apartment with Ms. Del Rosario?

24  A    I went to the apartment with the women's desk officer,

25  Sheryl, and her mother.

```
1   Q     Did you go -- did you yourself go inside the apartment?
2   A     It was Sheryl who go inside the apartment.
3   Q     You did not go in yourself?
4   A     No.  The photo -- yes, we go inside together with the
5   women's desk officer and the mother.  We escorted Sheryl.
6   Q     All right.  So four of you went into the apartment?
7   A     Yes, sir.
8   Q     All right.  And where did Ms. Del Rosario go first to
9   retrieve these items?
10  A     I can't remember where she got it, but it is -- still can
11  remember that it is inside the apartment.
12  Q     So at some point she comes to you with these items; right?
13  A     Yes.  She handed it over to me.
14  Q     And you were still in the apartment when she handed them
15  over to you; right?
16  A     Yes, sir.
17  Q     But you didn't see where she got them, did you?
18  A     I didn't know where she got it, but it is inside
19  apartment.  I can't remember where in the apartment.
20  Q     You did not see her go to a closet and take these items
21  out; right?
22  A     It was inside the apartment.
23  Q     Did you see her take them out of a closet?
24  A     I can't remember, but it is inside -- I can remember it's
25  inside the apartment.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q     All right.  So she doesn't have anything with her --
 2    strike that.
 3          Did she have anything with her purse, bag, anything, when
 4    she went into the apartment?
 5    A     There's none, sir.
 6    Q     I'm sorry.  I didn't understand that.
 7    A     She was not bringing any purse when we went there to the
 8    apartment.
 9    Q     Okay.  So she goes into the apartment and goes somewhere
10    in the apartment and then comes back to you with these items;
11    right?
12    A     The apartment, it is just a one-room affair apartment,
13    just one room.  So we were just there, and I -- she got it
14    within there.  I just can't remember where.
15    Q     Okay.  All right.  So she never leaves your sight?
16    A     No.  It's just like a one room.
17    Q     I understand.  I understand.
18          All right.  So after you got these items and you took them
19    back to your office and locked them up, you said you called
20    IJM.  Why didn't you call the police?
21    A     Please state your question again, sir.
22    Q     You got these items from Ms. Del Rosario.  You went back
23    to your office; right?
24    A     Yes, sir.
25    Q     You locked them in a -- I think you described it as a
```

1   steel cabinet, yes?

2   A    Yes, sir.

3   Q    Lock and key?

4   A    Yes.

5   Q    All right.  And then you said you called IJM; is that

6   correct?

7   A    Yes, sir.

8   Q    Why didn't you call the police?

9   A    It is our -- also our -- we have been partners with IJM in

10  working with cases of those abused and exploited children.

11  Q    Why didn't you also call the police?

12  A    The police knew already because I was together with the

13  women's desk officer.  And in my capacity, the IJM being our

14  partner agency, is also helping giving justice to cases of this

15  children.

16  Q    Well, let me be clear about who this women's desk officer

17  is.  Where -- where is the women's desk officer located?

18  A    She is -- she is Police Officer 3, Dina Ante del Iriarte

19  (phonetic).  She is assigned at Station 10 of Punta Princesa

20  Police Station near our office.

21  Q    Okay.  So she's an actual police officer in the village;

22  right?

23  A    Yes, sir.  She's a women's desk officer.

24  Q    Why didn't you give these items to her?

25  A    She already knew and --

1          MR. KALOYANIDES:  Objection.  Lacks foundation,

2    Your Honor.

3          THE COURT:  Stricken.

4       Just answer the question.  The question is why didn't you

5    give it to her?

6          THE WITNESS:  I believe that IJM can handle best on

7    this cases of -- in these cases of child pornography.

8    Q    BY MR. KALOYANIDES:  Is there some reason you didn't trust

9    the women's officer, the police officer?

10   A    Not that I don't trust them, but this is not the first

11   time that I've been working with IJM on these cases.

12   Q    Do you -- on all the cases that you've worked involving

13   child abuse, do you usually give evidence to IJM instead of the

14   police?

15   A    The police are always involved but not all -- not all of

16   our cases are given to IJM.  Only those cases involving

17   trafficking and child pornography.

18   Q    Do you share your office space with anybody else?

19   A    No, sir.  Our office is only our own office, the

20   Department of Social Welfare Services.

21   Q    Within the department, though, are there other people who

22   are employed by the department who share your particular office

23   space?

24   A    No, sir, because we have different -- other programs in

25   our office have different -- the different spaces.

```
1    Q    So you have an office that's just yours, you personally?

2    A    Yeah, no -- the different office, the child protection

3    unit, there's another office for the women welfare program.

4    There's another office for the senior citizens.  There's

5    another office for solo parent.

6    Q    And you're in the child protection office?

7    A    Yes, sir.

8    Q    How many people are in that office?

9    A    During that time, since it was in 2007, we were only four

10   of us.

11   Q    And is it -- and you all share one office space, the four

12   of you?

13   A    One office space but different tables.

14   Q    Different tables.  Is there one steel cabinet that you all

15   use for evidence or other securing purposes?

16   A    No.  Each of us has our own steel cabinet.

17   Q    And are you the only one with the key to that cabinet?

18   A    Yes, sir.

19            MR. KALOYANIDES:  Nothing further, Your Honor.

20            THE COURT:  Ms. Baehr-Jones, any redirect?

21            MS. BAEHR-JONES:  One moment, Your Honor.

22       Nothing further, Your Honor.

23            THE COURT:  All right.  Ms. Suico, thank you very

24   much.  You may step down.

25       Government may call its next witness.
```

**UNITED STATES DISTRICT COURT**

1          MS. BAEHR-JONES:  The Government calls Daryl

2     Purviance.

3          THE COURT:  All right.

4          THE CLERK:  Please come forward, sir.  Wait right

5     here, raise your right hand to be sworn, please.  Do you

6     solemnly swear the testimony you shall give in the cause now

7     pending before the Court shall be the truth, the whole truth,

8     and nothing but the truth so help you God?

9          THE WITNESS:  I do.

10         THE CLERK:  Thank you, sir.  You may go around and

11    take a seat, please.  Please adjust the microphone and speak

12    directly into it.  Would you please state your full name for

13    the record and spell both your first name and last name,

14    please.

15         THE WITNESS:  My name is Daryl, D-a-r-y-l,

16    Purviance, P-u-r-v-i-a-n-c-e.

17                         DARYL PURVIANCE,

18    called as a witness by the Government, was sworn and testified

19    as follows:

20                         DIRECT EXAMINATION

21    BY MS. BAEHR-JONES:

22    Q    Good afternoon, Mr. Purviance.  What organization do you

23    work for?

24    A    I work for the International Justice Mission.

25    Q    And what is the International Justice Mission?

221

1  A     The International Justice Mission is a nonprofit,

2  non-government organization.  Our mission is to secure the

3  rescue and the restoration of victims of violence and injustice

4  around the world.

5  Q     When you say "restoration," what do you mean by that?

6  A     The term that we use for -- for that is aftercare.  So

7  this would be social workers who provide counseling,

8  trauma-based counseling for the victims who we rescue.

9  Q     And what kind of crimes does IJM look to seek justice for,

10 to prosecute or investigate?

11 A     A wide variety of crimes from bonded labor to human

12 trafficking to sex trafficking.

13 Q     And let me ask you this:  Why does IJM investigate a crime

14 if it's occurred in another country that might have their own

15 local law enforcement?

16 A     We work in areas where the local law enforcement may not

17 know how to investigate a crime or might not be willing, for

18 whatever reason, to investigate a crime.  So we actually come

19 in, and we conduct those investigations and deliver that

20 information to local law enforcement.

21 Q     And what is the ultimate goal when you are investigating

22 in, say, another country that does have a local law

23 enforcement?

24 A     The ultimate goal is to support local law enforcement to

25 conduct their own investigation into the crime and -- but

1    ultimately it's to ensure that the victim sees some sort of

2    justice after suffering whatever violence he or she might have

3    suffered.

4    Q    And what is your background?  Before you worked for IJM,

5    what did you do?

6    A    I was a police officer in the state of Washington for 16

7    years.

8    Q    And during that time, did you work on cases that involved

9    child sex crimes?

10   A    Yes, I did.

11   Q    And what kind of cases and for how long?

12   A    So three years of my investigations career was spent in

13   the juvenile crimes division.  We handled major crimes of all

14   types, but a majority of my cases during that three-year period

15   were child sexual assault cases.

16   Q    And did you get -- receive training on how to handle child

17   sexual exploitation cases while you were working in that

18   position?

19   A    Yes, I did.

20   Q    And what kind of trainings, just -- did you receive?

21   A    A variety of training.  So everything from basic crime

22   scene investigation, to criminal investigations, to child

23   sexual assault and child exploitation training, interviewing

24   techniques, and child victim interview techniques.

25   Q    Going back to your time working with IJM, in 2007 did you

1    work with IJM?

2    A    Yes, I did.

3    Q    And what office were you working out of?

4    A    I worked in our Cebu, Philippines office.

5    Q    And what was your position there?

6    A    I was the director of investigations.

7    Q    What was the mission of the IJM Cebu office in 2007?

8    A    The focus of the Cebu field office was to rescue and

9    restore victims of child sex trafficking.

10   Q    In 2007 did you become involved in an investigation into

11   an American named Stanley Dan Reczko?

12   A    Yes, I did.

13   Q    How did you become involved in that case?

14   A    On May 10, 2007, one of my investigators came to me with a

15   case referral.  So information had been referred to him about

16   this case, and that's how I came to learn of it.

17   Q    And what did you do once you learned about that

18   information about the case?

19   A    So I called the director of our field office, and that's

20   my -- my direct supervisor.  And I asked -- I explained what I

21   knew of the case, and I asked if we could pursue an

22   investigation.  And he said that we could.

23   Q    Did you ultimately receive evidence that had been

24   collected from Sheryl Del Rosario, the victim in that case --

25   in this case?

```
 1   A     Yes, I did.

 2   Q     Can I ask you to look at what's been marked as

 3   Government's Exhibit 9, 9-A, and 9-B.  Without looking through

 4   all of those, do you recognize what's in there?

 5   A     Yes, I do.

 6   Q     And what kind of bag is that in?  It looks like a -- what

 7   kind of bag are the photographs inside of?

 8   A     This exterior bag?

 9   Q     Yes.

10   A     This is an evidence package.

11   Q     Okay.  And is that an IJM evidence packet?

12   A     Yes, it is.

13   Q     And does it have a number or a label associated with it?

14   A     It does.  This is evidence Item No. 1.

15   Q     And have you looked at those pictures?

16   A     Yes, I have.

17   Q     And what do they depict?

18   A     This is approximately 19 color photographs that --

19         THE COURT:  Wait just a moment.  You say "this."  Is

20   that 9, 9-A, or 9-B, Mr. Purviance?

21         THE WITNESS:  This --

22   Q     BY MS. BAEHR-JONES:  Let me ask that question better.

23   Looking at Government's Exhibit 9 that you have in front of

24   you, what are those -- what is -- what is that?

25   A     This is a package containing approximately 19 color
```

**UNITED STATES DISTRICT COURT**

1    photographs.

2    Q    Okay.  And when did you collect or receive into evidence

3    those photographs?

4    A    I received these on May 10th, 2007.

5    Q    What did you do when you received those items?

6    A    I locked these into an evidence vault.

7    Q    Can you look at what's been marked as Government's

8    Exhibit 9-A.  What is that, and how do you recognize it?

9    A    This is a photograph of Exhibit 9, and it's all of the --

10   all of the photos, all 19 of the photos spread out on a table

11   with evidence Item No. 1, a placard, in the photograph.

12   Q    Were you there when that photograph was taken?

13   A    Yes, I was.

14   Q    And why was that photograph taken?

15   A    That's our standard procedure, when we collect a piece of

16   evidence, to photograph it as it was given to us or as we found

17   it.

18   Q    And looking closely at 9-A, are there any differences

19   between 9-A and the original photograph that was taken?

20   A    Yes.  The -- the photos have been redacted.

21   Q    Okay.

22           MS. BAEHR-JONES:  Your Honor, Government would seek

23   to move in Exhibit 9-A.

24           THE COURT:  All right.  Any objection to 9-A?

25           MR. KALOYANIDES:  No objection.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Received.

2              (Exhibit 9-A received into evidence.)

3  Q    BY MS. BAEHR-JONES:  When you say "redacted," what do you

4  mean by that?

5  A    The body parts have been covered.  The naked body parts

6  have been covered.

7  Q    Okay.  Can you now turn to Government's Exhibit 10, and

8  what is that?

9  A    This is IJM Evidence No. 2.

10  Q    Okay.

11  A    It's an evidence package that contains two CDs.

12  Q    And do you recognize it?

13  A    Yes, I do.

14  Q    Okay.  And how do you recognize it?

15  A    I received these from one of my investigators on May 10.

16  Q    Who did you receive it from?

17  A    Investigator Albo.

18  Q    What is Mr. Albo's full name?

19  A    It's investigator Mark V. Albo.

20  Q    And looking at the CDs that are in front of you, and if

21  you could open up one of the cases, what are the -- what

22  markings or labels do you see on the CDs?

23  A    On the jewel case label it says Baby Girl 2006,

24  Philippines, Sasi.  Would you like me to read all of it?

25  Q    That's -- that's it.  That's fine.  Thank you.

1          What did you do once you got these CDs?

2     A     Once I received this and the other evidence items on

3     May 10, 2007, I locked them in a vault.

4          MS. BAEHR-JONES:  Government would seek to move in

5     Government Exhibit 10 at this time.

6          THE COURT:  Any objection?

7          MR. KALOYANIDES:  No objection.

8          THE COURT:  10, received.

9          (Exhibit 10 received into evidence.)

10    Q     BY MS. BAEHR-JONES:  Now let's look at what's been marked

11    as Government's Exhibit 10-A.  What is that?

12    A     This is a photograph of Exhibit 10.  It's -- so it's a

13    photograph of the two CDs.  One of the CDs is broken; one of

14    them is not.  And it has an evidence Item No. 2 placard in the

15    photograph.

16    Q     Were you there when this photo was taken?

17    A     Yes, I was.

18          MS. BAEHR-JONES:  Your Honor, Government seeks to

19    move in Exhibit 10-A and show it to the jury.

20          MR. KALOYANIDES:  No objection.

21          THE COURT:  Any objection?

22          MR. KALOYANIDES:  No objection.

23          THE COURT:  Received.

24          (Exhibit 10-A received into evidence.)

25    Q     BY MS. BAEHR-JONES:  Is that how it looked when you took

1    the photograph in May of 2007?

2    A    I did not take the photograph but --

3    Q    I apologize.  Yes?

4    A    Yes.  That's what it looked like when I took receipt of

5    this item.

6    Q    Okay.  When you received that CD, did you make a copy of

7    it?

8    A    Yes, we did.

9    Q    How did you do that?

10   A    Would you like to know the process?

11   Q    Yes, please.

12             THE COURT:  You're talking about the Baby Wow CD,

13   not the broken one?

14             MS. BAEHR-JONES:  Yes.  Yes, Your Honor.  I

15   apologize.

16   Q    BY MS. BAEHR-JONES:  The CD that says Baby Girl, Wow, Hot,

17   2006, did you make a copy of that CD?

18   A    Yes, we did.

19   Q    And how did that process work?

20   A    We used a standalone desktop computer that had two drives.

21   One was a CD or DVD burner, and the other one was just a

22   read-only drive.  I placed the Baby Wow CD, if I may call it

23   that, into the read-only drive, and then we burned the copy on

24   the -- the -- the other drive.  We used a program called Nero

25   CD Copy.

1   Q     And did you keep that working copy?

2   A     Yes, I did.

3   Q     And what did you do with it?

4   A     It was placed in the vault, the evidence vault.

5   Q     I'm actually going to put up again what's been marked as

6   Government's Exhibit 10-A.  And can you read just the words

7   that are on the CD case that I'm pointing to with my pen, the

8   CD case -- and this is the case of the Baby Girl, Wow, Hot,

9   2006?

10  A     Yes.  It reads Baby Girl 2006, Philippines, Sasi, U.S.

11  Hot Mami, Barangay Cap, Dan, Sheryl, Our Marriage, Papa.  I

12  can't read the next word.  Birthday, Papa Birthday, Sasi, Sexy

13  Sheryl.

14        MS. BAEHR-JONES:  Government would seek to move into

15  evidence Exhibit 10-A.

16        THE COURT:  That's already received.

17        MS. BAEHR-JONES:  Okay.  Thank you.

18  Q     BY MS. BAEHR-JONES:  Okay.  Turning to what's been marked

19  as Government's Exhibit 10-B, do you recognize that?

20  A     Yes, I do.

21  Q     And what is it?

22  A     This is the working copy of the Baby Wow CD.

23  Q     Okay.

24  A     That would be evidence Item No. 2.  This is the copy that

25  I made on May 10 --

```
 1  Q    Okay.

 2  A    -- 2007.

 3       MS. BAEHR-JONES:  The Government would seek to move

 4  into evidence Government's Exhibit 10-B.

 5       MR. KALOYANIDES:  Your Honor, may I see it before

 6  I --

 7       THE COURT:  Yes, of course.  Why don't you go ahead.

 8       MR. KALOYANIDES:  Thank you.

 9       THE COURT:  Can everyone on the jury hear

10  Mr. Purviance okay?

11            (The jurors responded collectively in the

12            affirmative.)

13       THE COURT:  All right.

14  Q    BY MS. BAEHR-JONES:  Is anything written on that --

15       THE COURT:  Just a second.

16       MS. BAEHR-JONES:  I apologize.

17       THE COURT:  Any objection to receiving 10-B,

18  Mr. Kaloyanides?

19       MR. KALOYANIDES:  No objection, Your Honor.

20       THE COURT:  10-B, received.

21            (Exhibit 10-B received into evidence.)

22       THE COURT:  Go ahead.

23       MS. BAEHR-JONES:  Thank you.

24  Q    BY MS. BAEHR-JONES:  Is anything written on that CD?

25  A    Yes.
```

```
1    Q     And can you read that aloud?

2    A     CD is checked.  Copy is checked.  It's Disc 1 of 1,

3    evidence Item No. 2, working copy, 5/10/07, Investigator Albo,

4    and then a case number of 07-PHC003.

5    Q     Thank you.

6          Now, the original Baby Girl, Wow, Hot, 2006 CD, what did

7    you do with that ultimately, the original CD?

8    A     Ultimately that was turned over to an HSI.  It's Homeland

9    Security investigations agent.

10   Q     And what did you do with the working copy, Exhibit 10,

11   Government's Exhibit 10-B?

12   A     That was retained -- this -- this copy here was retained

13   in the evidence vault.

14   Q     And who was in charge of the evidence vault?

15   A     I was.

16   Q     Okay.  How long -- for what period of time were you in

17   charge of that vault?

18   A     From the beginning of the year 2000 until late 2011.

19   Q     And was anyone else -- did anyone else have access to that

20   evidence vault?

21   A     No one else had access.

22   Q     How would you go about accessing or getting into the vault

23   where you kept those CDs?

24   A     The evidence vault is accessed by a combination of keys

25   and a number combination.  The copy of the combination and the
```

```
 1   keys were locked inside of a safe in my office to which I
 2   only -- I was the only person who had the code to access that
 3   safe.  So no one had access to that vault except for me.
 4   Q    To your knowledge, was a copy, a working copy that you
 5   kept in the vault -- was that copy ultimately turned over to
 6   the U.S. law enforcement agency HSI?
 7   A    Yes, it was.
 8   Q    Did you also collect evidence or items from the
 9   defendant's suitcase after his arrest by Philippine
10   authorities?
11   A    Yes, I did.
12   Q    Can you turn to what's been marked as Government's --
13   actually, I apologize.  Can you --
14            MS. BAEHR-JONES:  Your Honor, at this time the
15   Government would like to display an original item to the
16   witness.
17            THE COURT:  All right.
18   Q    BY MS. BAEHR-JONES:  Look over in this direction.  Can you
19   see -- it's been marked as Government's Exhibit 14, and it's
20   the large black object on the -- to that side.  Can you see
21   that?
22   A    Yes, I can.
23   Q    What is that?
24   A    It appears to be the suitcase of Mr. Reczko, the same
25   suitcase that I searched.
```

1   Q    And you recognize it from -- from that search?

2   A    Yes.

3   Q    And what's next to it?

4   A    A duffel bag that I also assisted in the search --

5   Q    Okay.

6   A    -- of.

7   Q    Okay.  And can you turn to what's been marked as

8   Government's Exhibit 16.  And I apologize.  When you were

9   looking at the small duffel bag that's been identified as

10  Government's Exhibit 15, is that the duffel bag you recognize

11  from the search of the defendant's luggage?

12  A    Yes.

13  Q    Okay.  Thank you.  Can you turn to Government's

14  Exhibit 16.

15       Do you recognize that?

16  A    Yes.

17  Q    And what is it?

18  A    Appears to be a photo of that suitcase and the duffel bag.

19            MS. BAEHR-JONES:  Okay.  Government would seek to

20  admit Government's Exhibit 16 and show it to the jury.

21            THE COURT:  Any objections to Government 16, the

22  photograph?

23            MR. KALOYANIDES:  Yes, Your Honor.  Lacks

24  foundation.

25            THE COURT:  Well, did you take this photo,

```
 1    Mr. Purviance?

 2              THE WITNESS:  I did not, Your Honor.

 3              THE COURT:  Were you present when the photo was

 4    taken?

 5              THE WITNESS:  I was not.

 6              THE COURT:  By looking at the photo, do you know

 7    what these two bags are that's supposed to be depicted in it?

 8              THE WITNESS:  No.  They appear to be those bags.

 9              THE COURT:  Okay.  That's sufficient foundation.

10    Overruled.  Received.

11              MS. BAEHR-JONES:  May I show it to the jury.

12              THE COURT:  Yes.

13              MS. BAEHR-JONES:  Thank you.

14                   (Exhibit 16 received into evidence.)

15    Q    BY MS. BAEHR-JONES:  Can you turn to Government's

16    Exhibit 17.  What are those items and how do you recognize

17    them?

18    A    These are three compact discs, and I recognize them

19    because, during the search of Mr. Reczko's luggage, these were

20    located inside the black suitcase.

21    Q    Do those have a corresponding IJM item number as well?

22    A    Yes, they do.  We called it evidence Item No. 47.

23    Q    Okay.  Looking at what's been marked as Government's

24    Exhibit 17-A, what is that, and how do you recognize it?

25    A    That's a photograph of the three CDs, our evidence Item
```

**UNITED STATES DISTRICT COURT**

1    No. 47.

2    Q    Were you there when that photograph was taken?

3    A    Yes, I was.

4         MS. BAEHR-JONES:  Your Honor, Government would seek

5    to move into evidence Government's Exhibit 17-A and show it to

6    the jury.

7         MR. KALOYANIDES:  No objection.

8         THE COURT:  Received.

9         (Exhibit 17-A received into evidence.)

10   Q    BY MS. BAEHR-JONES:  Turning to Government's Exhibit 18,

11   what are those and how do you recognize them?

12   A    This is an evidence item that we labeled as Item No. 48.

13   This is an orange zippered bag, Cathay Pacific Airlines bag,

14   and inside there are four compact flash cards.

15   Q    And if you could just turn to Government's Exhibit 18-A --

16   I apologize.  Do those also have a corresponding IJM item

17   number?

18   A    Yes.  They're IJM evidence Item No. 48.

19   Q    Thank you.

20        So looking at Government's Exhibit 18-A, what is that?

21   A    That's a photograph of the four compact flash cards and

22   the zippered orange bag.

23   Q    And were you there when that photograph was taken?

24   A    Yes, I was.

25        MS. BAEHR-JONES:  Seek to move it into evidence and

```
 1    show it to the jury.
 2              MR. KALOYANIDES:  No objection.
 3              THE COURT:  Received.
 4                 (Exhibit 18-A received into evidence.)
 5              MS. BAEHR-JONES:  Thank you.
 6              THE COURT:  Did you obtain this bag and its contents
 7    somewhere?
 8              THE WITNESS:  Yes, I did, Your Honor.
 9              THE COURT:  From where?
10              THE WITNESS:  From Mr. Reczko's luggage.
11              THE COURT:  Which one?
12              THE WITNESS:  This particular item, I believe I
13    found it inside a separate bag.  It's a zippered bag that we
14    had labeled as evidence Item No. 46.
15              THE COURT:  But where were those bags?  Which --
16    we've seen a black bag and what you describe as a duffel bag.
17    Which one?
18              THE WITNESS:  It was the black -- everything was
19    found in the black suitcase, the big black suitcase.
20              THE COURT:  Okay.  Go ahead.
21              MS. BAEHR-JONES:  Thank you.
22    Q    BY MS. BAEHR-JONES:  Okay.  Looking at what's been marked
23    Government's Exhibit 19, 19-A, and 19-B, do you recognize those
24    items, and what are they?
25    A    Yes, I do recognize both items.
```

```
1   Q    So first looking at Government's Exhibit 19, what is that?

2   A    This is a stack of approximately 58 color photographs.

3   Q    And how do you recognize them?

4   A    I recognize them because, when we searched Mr. Reczko's

5   luggage, the black suitcase in particular, we found these

6   photos.

7              MS. BAEHR-JONES:  Okay.  Government would seek to

8   move in Government's Exhibit 19 into evidence.

9              THE COURT:  Any objection to 19?

10             MR. KALOYANIDES:  No objection, Your Honor.

11             THE COURT:  Received.

12                  (Exhibit 19 received into evidence.)

13  Q    BY MS. BAEHR-JONES:  Looking at 19-A, what is that?

14  A    19-A is a photo of those 58 photos that are spread out

15  with an evidence item number on it.

16  Q    And what's the evidence item?

17  A    Evidence item 44.

18  Q    Were you there when that picture was taken?

19  A    Yes.

20             MS. BAEHR-JONES:  Your Honor, Government would seek

21  to move into evidence Government's Exhibit 19-A and show it to

22  the jury.

23             THE COURT:  Any objection?

24             MR. KALOYANIDES:  No objection.

25             THE COURT:  Received.
```

238

```
1              MS. BAEHR-JONES:  Thank you.

2                 (Exhibit 19-A received into evidence.)

3    Q     BY MS. BAEHR-JONES:  Finally, can you turn to Government's

4    Exhibit 20.  Actually, can you go back and look at 19-B.  What

5    are those and how do you recognize them?

6    A     These are individual prints of the 58 photos, our evidence

7    Item No. 44 on Exhibit 19, I believe.

8              MS. BAEHR-JONES:  Okay.  Your Honor, the Government

9    would seek to move into evidence Item 19-B.

10             MR. KALOYANIDES:  No objection.

11             THE COURT:  Received.

12                (Exhibit 19-B received into evidence.)

13   Q     BY MS. BAEHR-JONES:  Okay.  Now, can you look at

14   Government's Exhibit 20.  What is that?

15   A     This -- this is a typed inventory of the items that we

16   located during the search Mr. Reczko's luggage.

17   Q     Is that an inventory that you created?

18   A     Yes, it is.

19   Q     Why did you create that inventory?

20   A     That was done at the request of the Philippine Bureau of

21   Immigrations.  They asked for a copy of this.  Since I'd asked

22   if I could retain the items we found in his luggage, so they

23   asked if I would provide an inventory.  So the following

24   morning I provided them with this inventory.

25   Q     And looking at Government's Exhibit 21, what is that?
```

**UNITED STATES DISTRICT COURT**

```
1    A      That is my evidence form that I filled out with a complete
2    list of all the items that we found during the search of
3    Mr. Reczko's luggage.
4    Q      And are there any differences between what was in the
5    receipt that you gave to immigration authorities and in the
6    evidence form that IJM kept?
7    A      Yes, there is.
8    Q      And what is that?
9    A      Evidence Item No. 48, which is the four compact flash
10   cards, I failed to put that on the inventory that I sent to
11   immigrations.
12   Q      Was that an inadvertent mistake?
13   A      Yes, it was.
14   Q      Okay.  What did you do with all of the evidence that you
15   seized from the defendant's suitcase?
16   A      I locked it in the evidence vault.
17   Q      Did you ultimately turn these items of evidence over to
18   someone else?
19   A      Yes, I did.
20   Q      And who was that?
21   A      These items I turned over to HSI, Homeland Security
22   Investigations Agent Dante Orate.
23              MS. BAEHR-JONES:  No further questions, Your Honor,
24   at this time.  Actually, may I have one moment with counsel.
25              THE COURT:  Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1              MS. BAEHR-JONES:  Thank you.
 2                  (Counsel confer sotto voce.)
 3    Q    BY MS. BAEHR-JONES:  After you stopped being the evidence
 4    custodian -- custodian of the vault, in charge of the vault in
 5    Cebu, Philippines, in 2011, who took over from you?
 6    A    That would be a Mr. Andy Grove.
 7    Q    And how long was he the custodian or -- or the person who
 8    had control over the evidence vault?
 9    A    That would be from late 2011 -- I can't remember the exact
10    dates, but late 2011 until July of 2014.
11              MS. BAEHR-JONES:  Okay.  Nothing further,
12    Your Honor, at this time.
13              THE COURT:  All right.  Thank you.
14         Mr. Kaloyanides, do you expect cross-examination?
15              MR. KALOYANIDES:  I do, Your Honor.  May I confer.
16              THE COURT:  Yes.
17                  (Counsel confer sotto voce.)
18              MR. KALOYANIDES:  Thank you, Your Honor.
19              THE COURT:  All right.  Ladies and gentlemen, it's
20    past five o'clock; so we're going to take our evening recess at
21    this time.  Please keep in mind the admonition of the Court not
22    to discuss this matter among yourselves or with anybody else
23    until it is finally given to you for your deliberations.
24    Please do not look at anything on the Internet or elsewhere
25    about anything that may have been said or may be said or may be
```

1    reported about the proceedings or anything about this case.

2         And tomorrow morning, don't forget.  We're starting

3    promptly at 8:00 A.M.  So if you're coming from a distance or

4    whatever, please make all the necessary preplanning, because

5    there's always going to be traffic.  This is Southern

6    California.  We don't live without traffic.  So make sure that

7    you have taken that into consideration and that you are here in

8    plenty of time so that we can start at 8:00 so that we can end

9    promptly at 2:00 P.M.

10        With that in mind, thank you for your attention.  You are

11   now excused.  We'll remain in session.

12        Oh, let me just say one thing about how important it is

13   for you folks all to be here at 8:00.  If one of you is not

14   here, we can't do anything.  Everybody has to be here for us to

15   do anything.  So please keep that in mind.  We don't want to be

16   sitting around just waiting for any one or two people.

17        Thank you very much.

18             (Jury out at 5:09 P.M.)

19             (The following proceedings were held out of the

20             presence of the jury:)

21        THE COURT:  We're outside the presence and hearing

22   of the jury.  Mr. Kaloyanides, do you have any idea how long

23   you might be with Mr. Purviance tomorrow morning?

24        MR. KALOYANIDES:  I'm going to say 20 minutes on the

25   outside.

1            THE COURT:  Okay.  All right.  Marshals, why don't

2    you not bring Mr. Reczko across the way yet.  Make sure all the

3    jurors have cleared the hallway before you do that.

4        We'll see you folks tomorrow promptly by 8:00 so that, if

5    they're here, we can get going.

6        Thank you very much.  Have a nice afternoon.

7              (Matter adjourned at 5:10 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5            I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15            DATED THIS 26TH DAY OF OCTOBER, 2015.

16

17

18            /S/ KHOWOONSUN CHONG

19            KHOWOONSUN CHONG, CSR NO. 12907, CRR
              FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**