1               **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3     **HONORABLE GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**         )
                               )

6               **PLAINTIFF,**     ) **CASE NO.**
                              ) **2:07-cr-01221-GHK**

7       **VS.**                   )
                              )

8   **STANLEY DAN RECZKO III,**          )
                              )

9             **DEFENDANT.**     )
   _____)

10

11

12

13

14               **REPORTER'S TRANSCRIPT OF**
                **JURY TRIAL - DAY 3**

15          **THURSDAY, FEBRUARY 19, 2015**
                  **8:11 A.M.**

16          **LOS ANGELES, CALIFORNIA**

17

18

19

20

21

22   _____

23      **KHOWOONSUN CHONG, CSR 12907, CRR, RMR**
        F E D E R A L  O F F I C I A L  C O U R T  R E P O R T E R

24     2 5 5  E A S T  T E M P L E  S T R E E T ,  R O O M  1 8 1 - G
       L O S  A N G E L E S ,  C A L I F O R N I A  9 0 0 1 2

25            k c h o n g 1 2 9 0 7 @ y a h o o . c o m

**APPEARANCES OF COUNSEL:**

1

2

3   **FOR THE PLAINTIFF:**

4       STEPHANIE YONEKURA
         UNITED STATES ATTORNEY
5       BY:   JOEY L. BLANCH
               VANESSA BAEHR-JONES
6       Assistants United States Attorney
         United States Courthouse
7       312 North Spring Street
         Los Angeles, California 90012

8

9   **FOR THE DEFENDANT:**

10      DAVID J.P. KALOYANIDES LAW OFFICES
         BY:  DAVID KALOYANIDES
11      Attorney At Law
         15538 Central Avenue
12      Chino, California 91710

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1

**I N D E X**

2

**Thursday, February 19, 2015**

3

------------------------------------------------------------

4

<u>**CHRONOLOGICAL INDEX OF WITNESSES**</u>

5

6

WITNESSES                                                    PAGE

7

ELCITA DEL ROSARIO
          CROSS-EXAMINATION                                    7
8         REDIRECT EXAMINATION BY MS. BLANCH                   44
          RECROSS-EXAMINATION                                  46
9

OLGA SAGALOVICH
10         DIRECT EXAMINATION BY MS. BAEHR-JONES               57
           CROSS-EXAMINATION                                   77
11

RICHELLE RECZKO
12         DIRECT EXAMINATION BY MS. BAEHR-JONES               98
           CROSS-EXAMINATION                                  122
13         REDIRECT EXAMINATION BY MS. BAEHR-JONES            123
           RECROSS-EXAMINATION                                124
14

BRUCE PIXLEY
15         DIRECT EXAMINATION BY MS. BLANCH                   126
           CROSS-EXAMINATION                                  179
16         REDIRECT EXAMINATION BY MS. BLANCH                 209

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## INDEX OF EXHIBITS

MARKED FOR IDENTIFICATION

| EXHIBIT NUMBER | PAGE |
|---|---|
| 279 AND 280  STIPULATIONS | 222 |
| DEFENSE 402  PHOTOGRAPH | 42 |
| DEFENSE 403  PHOTOGRAPH | 30 |
| GOVERNMENT'S 406  RECEIPT | 39 |

**UNITED STATES DISTRICT COURT**

RECEIVED INTO EVIDENCE

| EXHIBIT NUMBER | PAGE |
|---|---|
| 1 THROUGH 8 | 151 |
| 10-C | 144 |
| 19 | 33 |
| 22 | 169 |
| 25 | 133 |
| 26 | 210 |
| 29 THROUGH 35 | 158 |
| 31, PAGE 12 | 105 |
| 32, PAGE 30 | 106 |
| 32, PAGE 29 | 108 |
| 34, PAGE 7 | 114 |
| 36 AND 36-A | 101 |
| 42-A | 116 |
| 50 | 64 |
| 50-A AND 50-B | 63 |
| 51 | 68 |
| 53-A | 74 |
| 61, 62, AND 63 | 99 |
| 66 | 111 |
| 67 | 112 |
| 402 | 42 |
| 403 | 31 |
| 406 | 40 |

 1              **LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 19, 2015**

 2                            **8:11 A.M.**

 3                              -oOo-

 4

 5              (The following proceedings were held in the

 6              presence of the jury:)

 7              THE CLERK:  Please remain seated and come to order.

 8    This United States District Court is now in session, the

 9    Honorable George H. King, Chief Judge presiding.

10              THE COURT:  We're back on the record in the matter

11    of United States versus Reczko.  Counsel are present.

12    Mr. Reczko is present.  Jury is here in their seats.

13        Good morning, ladies and gentlemen of the jury.  Thank you

14    very much for being timely today.  We're ready to proceed with

15    cross-examination.

16        Ms. Del Rosario is still on the stand.  You're reminded

17    that you are still under oath.  Do you understand that?

18              THE WITNESS:  Yes.

19              THE COURT:  Cross-examination by Mr. Kaloyanides.

20              MR. KALOYANIDES:  Good morning, Your Honor.  Thank

21    you.

22        Before I begin, may I have Government counsel retrieve

23    Exhibit 41 --

24              MS. BAEHR-JONES:  42.

25              MR. KALOYANIDES:  -- 42 from the witness.

```
 1              THE COURT:  Yes.
 2              MR. KALOYANIDES:  Thank you.
 3                      ELCITA DEL ROSARIO,
 4  called as a witness by the Government, having been previously
 5  duly sworn, resumed the stand and testified further as follows:
 6                      CROSS-EXAMINATION
 7  BY MR. KALOYANIDES:
 8  Q    Ms. Del Rosario, good morning.
 9  A    Good morning.
10  Q    Is this your first trip to the United States?
11  A    Yes.
12  Q    And when did you arrive?
13  A    January -- February 27.
14  Q    This year?
15  A    Yes.
16  Q    And who came with you?
17  A    My family.
18  Q    And that would be your mother and father?
19  A    Yes.
20  Q    And your older sister?
21  A    Yes.
22  Q    Brother?
23  A    Yes.
24  Q    Your younger sister?
25  A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
1    Q    And your child as well?

2    A    Yes.

3    Q    Anybody else from your family?

4    A    Yes.

5    Q    And everybody traveled by air?

6    A    Yes.

7    Q    Who paid for the air tickets?

8    A    I don't know.

9    Q    You didn't.

10   A    (No audible response.)

11             THE REPORTER:  I didn't hear her.

12             THE COURT:  You have to answer out loud, please.

13   Q    BY MR. KALOYANIDES:  You didn't pay for your airline

14   ticket; right?

15   A    No.

16   Q    Now, you had to have a passport to come to the

17   United States.  You had a passport; right?

18   A    Yes.

19   Q    But at the time that you were asked to come and testify,

20   your passport had expired; is that correct?

21   A    Yes.

22   Q    And you had to pay a fee to get a new passport?

23   A    Yes.

24   Q    And you asked somebody to help you out with that money;

25   right?
```

```
 1  A    Yes.

 2  Q    Who paid for your passport application?

 3  A    We borrowed some money.

 4  Q    And did anybody reimburse that borrowing?

 5  A    I don't know.

 6  Q    You don't know.  That was for your passport?

 7  A    Yes.

 8  Q    What about your younger sister's passport?

 9  A    Yes.  And also my child.

10  Q    And your child.

11       You're staying in the area hotel.  I don't need to know

12  where, but you're here at a hotel; right?

13  A    Yes.

14  Q    With your family?

15  A    Yes.

16  Q    And do you know who is paying for the hotel?

17  A    Yes.

18  Q    Who's that?

19  A    The Government.

20  Q    Okay.  And do you each have your own room or you all in

21  one room?

22  A    Pardon, please?

23  Q    Do you have your own room in the hotel?

24  A    Yes.

25  Q    Is it with all the family, or do your parents have their
```

```
1   own room and you have your own room?
2   A    I have with my brothers and sisters, and then my parents
3   is in the other room.
4   Q    Okay.  So two rooms for the family?
5   A    Yes.
6   Q    Now, while you've been here since late January, you've had
7   several meetings with Government counsel to talk about the
8   case; right?
9   A    Yes.
10  Q    And you've met with some law enforcement officers, U.S.
11  law enforcement officers, to talk about the case?
12  A    Yes.
13  Q    Have you met with anybody from IJM since you've been here?
14  A    Yes.
15  Q    And who's that?
16  A    Kuya Tait, Ate Stella, Ate Lisa, and Kuya Albo, Kuya Mark.
17  Q    And when you met with people from IJM, was that in the
18  same meeting as with Government counsel?
19  A    No.  I'm not sure.
20  Q    So you met with Mr. Purviance?
21  A    Yes.
22  Q    And that was a meeting that Government counsel was not
23  present at?
24  A    No, because we are one plane with Ate Stella and Kuya
25  Mark.
```

```
1    Q    And Stella, what's her last name?

2    A    Pueblos.

3    Q    So Ms. Pueblos works for IJM; right?

4    A    Yes.

5    Q    And she came over with you?

6    A    Yes.

7    Q    And then, when you got here to the United States, did you

8    meet with Mr. Purviance?

9    A    Yes.

10   Q    Did you talk about the case with Mr. Purviance?

11   A    No.

12   Q    You didn't talk about your testimony?

13   A    I shared.

14   Q    What do you -- I'm sorry.  Go ahead.

15   A    Only what I feel here being in the witness stand.

16   Q    And was that before you testified yesterday?

17   A    No, yesterday.

18   Q    Who did you meet with after court yesterday?

19   A    My family.

20   Q    Anybody from IJM?

21   A    No.

22   Q    So just talking about the times you talked to

23   Mr. Purviance since you've been here in the United States, did

24   you talk about the case with Mr. Purviance?

25   A    Yes.  I only shared about what it was, what gonna be the
```

```
 1   feelings to be in the witness stand.
 2   Q     Did he talk to you about the kinds of questions that were
 3   going to be asked?
 4   A     No.
 5   Q     Now, what about Ms. Pueblos, did you talk to her about the
 6   case?
 7   A     Yes.
 8   Q     And did you -- did you talk about what kind of questions
 9   might be asked of you in court?
10   A     No.  He just -- she just told me to be calm and pray.  She
11   just give me the encouragement to be in the witness stand.
12   Q     Did she ever tell you how to say anything or what you
13   might want to say on the stand?
14   A     No.
15   Q     Okay.  Anybody else from IJM that you have met with other
16   than Ms. Pueblos and Mr. Purviance?
17   A     Ate Lisa and Kuya Mark Albo.
18   Q     And Lisa is who?
19   A     From the IJM, Lisa Young.
20   Q     Was that -- what was her last name?
21   A     Young.
22   Q     And she's married now; right?
23   A     Yes.
24   Q     Before she was married, what was her last name?
25   A     I don't know.
```

```
1   Q    Okay.  All right.  But she's from IJM?

2   A    Yes.

3   Q    And you've -- she was part of the investigation in this

4   case; right?

5   A    Yes.

6   Q    And you talked to her -- did you talk to her about coming

7   into court?

8   A    No.

9   Q    Okay.  Last night you got back from your hotel.  What did

10  you do last evening?

11  A    I just chat with my family and my partner.

12  Q    Your partner?

13  A    Yes.

14  Q    Who's your partner?

15  A    Jedi Optina.

16  Q    Is that the father of your child?

17  A    Yes.

18  Q    Is he here?

19  A    No.

20  Q    So when you were talking just to your family, did you talk

21  about your testimony?

22  A    Yes.

23  Q    Did they ask you what was asked of you?

24  A    I don't remember.

25  Q    Did they suggest what you should say on the stand?
```

1  A    No.  They just told me to tell the truth.

2  Q    Good.  Okay.

3       Now, you've been here for several weeks; right?

4  A    Yes.

5  Q    And have you met with the Government every day?

6  A    No.  I'm not sure.  I don't remember.

7  Q    You've met more than one time?

8  A    Yes.

9  Q    What have you been doing when you haven't been meeting

10 with the Government?

11 A    Briefing.

12 Q    I'm sorry?

13 A    We were doing briefing.

14 Q    What do you mean by "briefing"?

15 A    Like, I was questioned about the case, what I remember,

16 and then I just tell what I remember.

17 Q    That was your meeting with the Government?

18 A    Yes.

19 Q    Other than when you've met with the Government -- I'm not

20 talking about these meetings.  When you haven't been working on

21 the case, what have you been doing?

22 A    No.  I just stayed at home -- the hotel.

23 Q    You haven't gone sightseeing?

24 A    Yes, we went.

25 Q    Who's taken you sightseeing?

```
 1   A      Ate Margie.

 2   Q      And who is Margie?

 3   A      One of non-government.

 4   Q      Do you know what organization Margie works with?

 5   A      I forget.

 6   Q      Is it IJM?

 7   A      No.

 8   Q      Some other non-government organization?

 9   A      Yes.

10   Q      Where have they taken you?

11   A      To the Walk of Fame.

12   Q      Anywhere else?

13   A      At the zoo.

14   Q      The L.A. Zoo?

15   A      Yes.

16   Q      The Walk of Fame, is that the Hollywood --

17   A      Yes.

18   Q      Where the stars are?

19   A      Yes.

20   Q      Okay.  Other than the Hollywood trip and the L.A. Zoo,

21   where else have you gone?

22   A      No.

23   Q      Just those two places?

24   A      Yes.

25   Q      Everybody went?
```

1   A      Yes.

2   Q      All your family?

3   A      Yes.

4   Q      You live in the Philippines; right?

5   A      Yes.

6   Q      Do you have a job?

7   A      No.

8   Q      Does your partner have a job?

9   A      Yes.

10  Q      What does your partner do?

11  A      He is a work -- this -- in the Leer, he's working as an

12  engineer.

13  Q      Engineer?

14  A      Yes.

15  Q      And do you know how much per month he makes?

16  A      The -- right now it's 15 pesos.

17  Q      15 pesos?

18  A      15,000 pesos.

19  Q      Per month?

20  A      Yes.

21  Q      Is your father still employed?

22  A      Yes.

23  Q      What does he do?

24  A      Barangay Tanod.

25  Q      What does he do there?

```
 1   A      Like, he's working at the government, like under the
 2   police, the -- they will catch people who are troubled in the
 3   streets where my place are.
 4   Q      So he works for the government but the police office in
 5   some capacity?
 6   A      Yes.
 7   Q      Is he a police officer?
 8   A      No, not really.
 9   Q      What about your mother, does she work?
10   A      Yes.
11   Q      Where does she work?
12   A      Alpa City Suites.
13   Q      What does she do?
14   A      Housekeeping.
15   Q      How much per month -- do you know how much your father
16   makes every month?
17   A      No.
18   Q      What about your mother?
19   A      No.
20   Q      Your sister works, your elder sister?
21   A      Yes.
22   Q      What about your brother?
23   A      No.
24   Q      What does your older sister do?
25   A      Mean, he's work -- she's working in the Dubai.
```

```
 1   Q      She doesn't work in the Philippines?

 2   A      No.

 3   Q      Do you know how much she makes in --

 4   A      No.

 5   Q      -- Dubai?

 6          Now, you've been here.  You're getting some sort of

 7   payment as a witness from the Government?

 8   A      Yes.

 9   Q      Yes?  Do you know how much you're getting?

10   A      40 for the witness and for the meal is 71.

11   Q      Is that every day?

12   A      Yes.

13   Q      And your parents are also getting that same amount per

14   day?

15   A      Yes.

16   Q      What about your older sister?

17   A      Yes.

18   Q      And your brother?

19   A      Yes.

20   Q      Now, your younger sister, she's getting just a meal

21   payment?

22   A      Yes.

23   Q      And it's the same amount, 40 per day as a witness, and 71

24   for meal?

25   A      Yes.
```

UNITED STATES DISTRICT COURT

```
 1   Q     Have you received anything else from anybody since you've
 2   been here in the United States?
 3   A     No.
 4   Q     Haven't received any gifts from anybody?
 5   A     No.
 6   Q     Family get a rice cooker from one of the NGOs?
 7   A     Oh, yes.
 8   Q     Have you been going out to eat or making meals in your
 9   hotel room?
10   A     Making meals in the hotel.
11   Q     I want to go back over a few points of what you testified
12   about yesterday.  I want to start with some of the travel
13   Mr. Reczko did from the United States to the Philippines and
14   back.  You testified that you recalled Mr. Reczko traveled back
15   to the United States sometime in November of 2006; is that
16   correct?
17   A     Yes.
18   Q     Do you remember when in November of 2006 he left?
19   A     No.
20   Q     Now, when he would come and visit, stay with you, did he
21   take trips to other islands in the Philippines at times?
22   A     Yes.
23   Q     So there were times that you knew he was in the
24   Philippines but he wasn't at your apartment; right?
25   A     Yes.
```

1    Q    Do you know, when he went back to the United States in

2    November of 2006, did he fly directly out of the Philippines to

3    the United States, or did he first stop off at other islands in

4    the Philippines?

5    A    I don't know.

6    Q    Now, you testified about some of the items that he took

7    with him back to the United States on that trip.  So just that

8    trip alone, can you tell me again what items you remember he

9    took with him.

10   A    His camera.

11   Q    Let's talk about the camera.  Do you know what kind of

12   camera it was?

13   A    Nikon.

14   Q    Do you know the model?

15   A    No.

16   Q    Do you know where he packed it?

17   A    No.

18   Q    Did you pack his suitcase for him?

19   A    No.

20   Q    Were you with him while he was packing his suitcase?

21   A    Yes.

22   Q    You saw him put the camera in the suitcase?

23   A    Yes.

24   Q    How many cameras did he take?

25   A    I don't remember.

```
1    Q    But you do remember that he had a Nikon?

2    A    Yes.

3    Q    And you remember seeing a camera go into the suitcase?

4    A    Yes.

5    Q    Okay.  What else do you remember seeing him pack in his

6    suitcase?

7    A    No, I don't remember.

8    Q    Now, you testified yesterday that you thought -- well, I

9    don't want to put words in your mouth.

10        You testified yesterday that he took a laptop computer

11   with him on that trip.  Did you say that yesterday?

12   A    Yes.

13   Q    Where did he pack the laptop?

14   A    In his bag.

15   Q    Which bag?

16   A    I don't remember.

17   Q    Do you know what kind of laptop it was?

18   A    No.

19   Q    Did you ever use the laptop while he was at your

20   apartment?

21   A    Yes.  But I don't usually before look the brand and what

22   the specs are.

23   Q    You did use that laptop; you just didn't pay attention to

24   what kind it was?

25   A    Yes.
```

1    Q      You saw him pack that laptop?

2    A      Yes.

3    Q      Now, you also testified yesterday that he returned

4    sometime in March of 2007; is that right?

5    A      Can you repeat the question, please.

6    Q      Yesterday you testified about when he came back --

7    A      Yes.

8    Q      -- from the United States.

9    A      Yes.

10   Q      That was sometime in March of 2007?

11   A      Can you repeat the question, please.

12   Q      Do you remember when he came back from his trip?

13   A      To the United States?

14   Q      Yeah.  He went to the United States November, sometime in

15   November of 2006; right?

16   A      Yes.

17   Q      And he came back sometime later to the Philippines?

18   A      Yes.

19   Q      Do you remember when he came back to the Philippines?

20   A      March.

21   Q      2007?

22   A      Yes.

23   Q      Do you remember when in March 2007?

24   A      No.

25   Q      Do you know if he flew directly from the United States to

 1    Cebu, or did he stop at another island first?  Do you know how

 2    he came in?

 3    A     No.

 4    Q     Do you know if he had been in the Philippines for a while

 5    before coming back to your apartment?

 6    A     No.

 7    Q     Do you remember if it was early or late March that he came

 8    back?

 9    A     Somewhere in middle.

10    Q     Middle.

11          Is it difficult to remember the dates of all these events

12    that both the Government and I have been asking about?

13    A     Yes.

14    Q     You're approximating to the best of your recollection;

15    right?

16    A     Yes.

17    Q     But you don't remember precisely which day or which week

18    that Mr. Reczko was traveling; right?

19    A     Yes.

20    Q     That's yes, you do not remember?

21    A     Yes, I do not.

22    Q     Now, you also testified that, after the problems you were

23    having with Mr. Reczko, you decided to leave him in May of

24    2007; right?

25    A     Yes.

1  Q    And if I'm correct, you said it was sometime around

2  May 10th?

3  A    Yes.

4  Q    But around that time you are -- did you say you were kind

5  of seeing him and then not seeing him on and off?

6  A    Yes.

7  Q    How long of a period, to the best of your recollection,

8  was this on and off seeing him, not seeing him, going on?

9  A    Like, weeks.

10  Q    Weeks?

11  A    Yes.

12  Q    More than two weeks?

13  A    I don't remember.

14  Q    Do you remember the last day you saw him?

15  A    No.

16  Q    But it was sometime around May 10?

17  A    No.  May 10th is the day that I went to the safe house.

18  Q    May 10th?

19  A    Yes.

20  Q    Are you sure?

21  A    Yes.

22  Q    Okay.  But May 10th you had already been in contact with

23  IJM, yes?

24  A    Yes.

25  Q    And you testified that you went back to your apartment to

1    gather some items that IJM wanted; right?

2    A    Yes.

3    Q    IJM asked you to go retrieve certain things for them?

4    A    No.  I offered them that I have a evidence.

5    Q    And they asked you to get it?

6    A    No.  I get the evidence to give it to them.

7    Q    Okay.  And Ms. Suico went with you?

8    A    Yes.

9    Q    And your mother?

10   A    Yes.

11   Q    You still had a key to the apartment, yes?

12   A    Yes.

13   Q    Mr. Reczko was not there at the time?

14   A    No.

15   Q    Now, you testified that you gave some discs and photos to

16   Ms. Suico; right?

17   A    Yes.

18   Q    When you first arrived at the apartment -- well, strike

19   that.  Let me start it this way.

20        Can you describe what your apartment looked like at that

21   time.  How many rooms were there?

22   A    One room.

23   Q    One big room?

24   A    Yes.

25   Q    Was there a separate bathroom?

```
 1  A     Yes, there is.
 2  Q     And what about the kitchen?  Was it separated from the
 3  main room?
 4  A     Yes.
 5  Q     So it's one big room, but there are sort of partitions to
 6  divide the bathroom off of the main room?
 7  A     Yes.
 8  Q     And the kitchen off of the main room?
 9  A     Yes.
10  Q     Okay.  Where do you remember going to get the CDs?
11  A     In the cabinet.
12  Q     Which cabinet?
13  A     Our cabinet.
14  Q     Was it in the main part of the room or a kitchen cabinet
15  or a bathroom cabinet?
16  A     In the -- in the room cabinet.
17  Q     The main room there was a cabinet?
18  A     Yes.
19  Q     What about the photos?
20  A     Same.
21  Q     Same place?
22  A     Yes.
23  Q     So the CD and the photos were together?
24  A     Yes.
25  Q     Now, does this cabinet have a lock on it?
```

| | |
|---|---|
| 1 | A     No. |
| 2 | Q     Do you -- did you put the CD and the photos in that |
| 3 | cabinet? |
| 4 | A     Reczko did. |
| 5 | Q     You saw him put it there? |
| 6 | A     Yes. |
| 7 | Q     When was that? |
| 8 | A     Before we got fight. |
| 9 | Q     Was there anything else in the cabinet? |
| 10 | A     There is lot in the cabinet, like clothes, Teddy bear. |
| 11 | Q     Was it -- was it primarily to store clothing? |
| 12 | A     Yes. |
| 13 | Q     Were there any cameras in the cabinet? |
| 14 | A     Yes.  There is, but that's the one that he gave me. |
| 15 | Q     He gave you a camera? |
| 16 | A     Yes. |
| 17 | Q     Do you remember what kind of a camera? |
| 18 | A     I forget. |
| 19 | Q     Was it a -- do you know if it was a digital camera? |
| 20 | A     Yes. |
| 21 | Q     It was a new kind of camera at the time? |
| 22 | A     Yes. |
| 23 | Q     In that cabinet were there any computer items?  Let me be |
| 24 | more specific.  I'm sorry.  Was there a laptop? |
| 25 | A     I don't remember. |

```
 1   Q     Do you know what a computer hard drive is?

 2   A     Yes.

 3   Q     Was there a computer hard drive in there?

 4   A     I don't know.

 5   Q     Now, when you went into your apartment to get these items

 6   for IJM, how long do you remember being in the apartment?

 7   A     Can you repeat the question, please.

 8   Q     When you went into the apartment on that day that we're

 9   talking about, how long do you think you were in the apartment,

10   gathering these items?

11   A     I don't remember but were so (inaudible).

12             THE REPORTER:  I'm sorry?

13             THE WITNESS:  We were so quickly.

14   Q     BY MR. KALOYANIDES:  So it was a short period of time?

15   A     Yes.

16   Q     Did you notice if Mr. Reczko -- strike that.

17             Do you remember if you saw any luggage in the apartment?

18   A     No, I don't remember.

19             MR. KALOYANIDES:  One moment, Your Honor.

20             THE COURT:  All right.

21             THE WITNESS:  Excuse me, sir.  Can I pour some

22   water.

23             THE COURT:  Yes, of course.

24             THE WITNESS:  Thank you.

25   Q     BY MR. KALOYANIDES:  Ms. Del Rosario, if you would take
```

1    the binder that has Exhibit 41 -- actually, I believe I can

2    just put it on.  I believe it's in evidence.

3              THE COURT:  41 is in evidence.

4              MR. KALOYANIDES:  Thank you, Your Honor.

5    Q    BY MR. KALOYANIDES:  Now, you -- you testified yesterday

6    that Exhibit 41 contains pictures related to your wedding

7    ceremony; right?

8    A    Yes.

9    Q    Now, this first picture, this is the location of where it

10   took place, or at least the building; right?

11   A    Yes.

12   Q    Do you know who took this picture?

13   A    No.

14   Q    Do you know when it was taken?

15   A    No.

16   Q    This is a picture of the name of the presiding judge.  Do

17   you know this judge, Soliver Peras?

18   A    No.

19   Q    Is that the judge or the judge's room where you had your

20   ceremony?

21   A    Yes.

22   Q    Did you take this picture?

23   A    No.

24   Q    Do you know who did?

25   A    No.

1    Q    Do you know when it was taken?

2    A    No.

3    Q    You also testified that this looked like the room where

4    the ceremony took place; right?

5    A    Yes.

6    Q    And you don't know who took this picture?

7    A    No.

8    Q    You don't know when it was taken, no?

9    A    No.

10   Q    Now, a few pages in on Exhibit 41, I think you were shown

11   this picture.  That's you signing some documents relating to

12   the marriage ceremony?

13   A    Yes.

14        MR. KALOYANIDES:  Your Honor, at this time I'd like

15   to mark Defendant's Exhibit 403.  May I approach.

16        THE COURT:  Yes.  Defendant's 403.

17        (Exhibit marked for identification.)

18        THE COURT:  Do you have a copy for counsel?

19        MR. KALOYANIDES:  I do, Your Honor.

20   Q    BY MR. KALOYANIDES:  Ms. Del Rosario, Defense Exhibit 403,

21   it's a photograph.  Are you looking at it?

22   A    Yes.

23   Q    Do you recognize this picture of a document?

24   A    Yes.

25   Q    Is that the document that you signed at the marriage

1    ceremony?

2    A      Yes.

3    Q      And is that your hand with the pen in the photo?

4    A      Yes.

5             MR. KALOYANIDES:  Your Honor, I move 403 in.

6             THE COURT:  Any objections?

7             MS. BLANCH:  No, Your Honor.

8             THE COURT:  Received.

9               (Exhibit 403 received into evidence.)

10   Q      BY MR. KALOYANIDES:  Here it shows you signed, and next to

11   your signature is Mr. Reczko's typed name?

12   A      Yes.

13   Q      And that's his signature below?

14   A      Yes.

15   Q      Do you see the name Gil R. Acosta there?

16   A      Yes.

17   Q      And underneath it it says "Judge"?

18   A      Yes.

19   Q      Do you remember if actually Gil Acosta was the judge who

20   performed the ceremony?

21   A      Pardon, please?

22   Q      Do you remember if it was actually Gil Acosta who

23   performed the marriage ceremony?

24   A      Right now, no.

25   Q      Okay.  Now, do you see, underneath both your signature and

1    Mr. Reczko's signature, this printed next that starts, "This is

2    to certify"?

3    A    Yes.

4    Q    You can read English; right?

5    A    Yes.

6    Q    You remember reading this before you signed it?

7    A    No.

8    Q    You see where it says that "Before me on the date and

9    place above written" and then there's some blocked text?

10        Do you see that?

11   A    Yes.

12   Q    And right underneath.  It says "With their mutual consent,

13   lawfully joined together in marriage"?

14   A    Yes.

15   Q    And below that it says "All of legal age"?

16   A    Yes.

17   Q    That wasn't true; right?

18   A    Pardon, please?

19   Q    That's not true.  You were not of legal age at that time;

20   right?

21   A    Pardon, please?

22   Q    Okay.  You see where it says "All of legal age" on the

23   document?

24   A    Yes.

25   Q    You signed the document?

1    A     Yes.

2    Q     You see -- and do you understand what to be of legal age

3    means?

4    A     Legal age?

5    Q     Legal age.

6    A     Yes.

7    Q     You had to be at least 18 to get married; right?

8    A     Yes.

9    Q     And you were not 18 at that time?

10   A     Yes.

11   Q     And you signed it?

12   A     Yes.

13   Q     Now, Ms. Del Rosario, if you could take the binder that

14   has Exhibit 19 in it, please.

15         I believe, Your Honor, 19 is also in evidence.

16              THE COURT:  I believe so.

17              MR. KALOYANIDES:  Thank you.

18              THE CLERK:  Yes, Your Honor.

19              THE COURT:  Yes.  Received.

20              (Exhibit 19 received into evidence.)

21   Q     BY MR. KALOYANIDES:  So if it's easier to look at the

22   binder, please do.  Otherwise, I'll just be showing it on the

23   screen.

24   A     Okay.

25   Q     You testified that several of the pictures -- there are

1    many pictures in 19, and some of them are of you.  And here is

2    one that you testified is of you, yes?  This is you?

3    A    Yes.

4    Q    I believe you said you were 13 at the time?

5    A    13, yes.

6    Q    Do you know who took this picture?

7    A    My brother.

8    Q    Mr. Reczko was not there?

9    A    No.

10           MR. KALOYANIDES:  For the record, Your Honor, that

11   was page 1 of Exhibit 19.

12           THE COURT:  All right.

13           MR. KALOYANIDES:  19-B, I'm sorry.

14           THE COURT:  19-B.

15   Q    BY MR. KALOYANIDES:  Referring to page 2, that's also you?

16   A    Yes.

17   Q    How old were you here?

18   A    Same, 13.

19   Q    Your brother take that?

20   A    Yes.

21   Q    Now, at the first time you met Mr. Reczko, you said that

22   he was there for a few days; right?  The first time you met

23   him?

24   A    Yes.

25   Q    And on one of the days, you all went out to eat at a

1    Pizza Hut?

2    A    Yes.

3    Q    There are couple different Pizza Huts near where you lived

4    at the time; right?

5    A    Yes.

6    Q    There's, like, two different malls that you can go to?

7    A    Yes.

8    Q    Do you remember which one you went to?

9    A    SM Mall.

10   Q    Now, who all went -- do you remember who all went to

11   dinner that time at the Pizza Hut, that first time you met with

12   Mr. Reczko?

13   A    Just Reczko and I.

14   Q    Just the two of you?

15   A    Yes.

16   Q    Referring to Government's Exhibit 19-B, page 5, you

17   testified that this was a picture of you at the Pizza Hut;

18   right?

19   A    Yes.

20   Q    Do you know who took this picture?

21   A    Reczko.

22   Q    Do you notice that there's only one plate of food?

23   A    Yes.

24   Q    There's only one drink?

25   A    Yes.

1   Q      There's a receipt for payment?

2   A      Yes.

3   Q      Are you sure this was the same time that you went to

4   dinner with Mr. Reczko?

5   A      Yes.

6   Q      This wasn't another time that you had someone take a

7   picture of you for him later?

8   A      No.

9   Q      You sure?

10  A      Yes.

11  Q      This was back in 2005?

12  A      Yes, yes.

13  Q      It was a long time ago?

14  A      Yes.

15  Q      Now, you've taken lots of pictures with Mr. Reczko on your

16  trips, yes?

17  A      Yes.

18  Q      You've taken -- had a lot of pictures taken of you by

19  other people, yes?

20  A      Yes.

21  Q      Some you would send to Mr. Reczko or give to him?

22  A      Yes.

23  Q      And others just -- you had pictures of the family just for

24  yourself; right?

25  A      Yes.

1    Q    Do you have a friend named My-My or Mei-Mei?

2    A    Mai-Mai?

3    Q    Do you have a friend whose name is that?  I might not be

4    pronouncing it correctly.

5    A    Yes, I have.

6    Q    And she's a -- been a friend of yours for a while?

7    A    Yes.

8    Q    Did she take pictures of you at times?

9    A    No, I don't remember.

10   Q    Did you spend a lot of time with her?

11   A    No.

12   Q    She a close friend?

13   A    No.

14   Q    Was she a close friend when you were younger?

15   A    Pardon, please?

16   Q    When you were younger, 14 years old or so, was she a close

17   friend then?

18   A    No.

19   Q    But you don't remember if you and she took pictures of

20   each other?

21   A    No.

22   Q    Okay.  Now, referring to Government's Exhibit 42, which

23   you've identified as the rings from your marriage ceremony, you

24   gave these to IJM at some time; right?

25   A    Yes.

```
 1   Q    Do you remember when?
 2   A    No.
 3   Q    Do you remember who you gave it to?
 4   A    No.
 5   Q    Do you remember if they asked you to give it to them?
 6   A    No.  They were asking if I have more evidence, if I have
 7   more from -- given by Reczko.
 8   Q    Okay.
 9   A    So I just remembered that I have a ring.
10   Q    Okay.  And you gave it to them?
11   A    Yes.
12   Q    And they reimbursed you for it; right?
13   A    I don't remember.
14   Q    You don't remember if they paid you 5,000 pesos for the
15   rings?
16   A    No, I don't remember.
17             MR. KALOYANIDES:  Your Honor, I have for
18   identification only Defense Exhibit 406.  I only have one, the
19   one copy.  I've shown it to Government counsel, but I don't
20   have a copy for the Court.  I'm sorry.
21             THE COURT:  All right.  I'll take a look.
22             MR. KALOYANIDES:  It's just the one side.
23             THE COURT:  Just the one side.  The other side has
24   no significance?
25             MR. KALOYANIDES:  Has no significance.
```

1              THE COURT:  All right.

2              MR. KALOYANIDES:  And later I can get a redacted

3    copy so it's a clean copy for the record.

4              THE COURT:  Fine.

5              MR. KALOYANIDES:  Thank you.

6              (Exhibit marked for identification.)

7    Q    BY MR. KALOYANIDES:  Ms. Del Rosario, looking at

8    Exhibit 406, have you ever seen that document?

9    A    Yes.

10   Q    Can you describe what that document is.

11   A    A receipt.

12   Q    It's a receipt from IJM?

13   A    Yes.

14   Q    For 5,000 pesos?

15   A    Yes.

16   Q    And it says Item 41?

17   A    Yes.

18   Q    Do you know what Item 41 is?

19   A    The ring.

20   Q    Is that your recollection?

21   A    Yes.

22   Q    Does this refresh your recollection that IJM paid you

23   5,000 pesos for the ring?

24   A    I don't.

25   Q    Still don't remember?

```
 1   A     No.

 2              MR. KALOYANIDES:  Your Honor, I'd move the exhibit

 3   into evidence.

 4              THE COURT:  Any objection to just that side of the

 5   exhibit?

 6              MS. BLANCH:  No, Your Honor.

 7              MR. KALOYANIDES:  Just that side, just the front.

 8              THE COURT:  Any objections?

 9              MS. BLANCH:  No, Your Honor.

10              THE COURT:  All right.  Received.  406.

11              MR. KALOYANIDES:  Thank you, Your Honor.

12              (Exhibit 406 received into evidence.)

13   Q    BY MR. KALOYANIDES:  At some time do you remember if you

14   and Mr. Reczko talked about getting some tattoos?

15   A    Yes.

16   Q    Now, Mr. Reczko has some tattoos, yes?

17   A    Yes.

18   Q    Do you remember going with him when he got a tattoo of

19   your name on his shoulder?

20   A    No.  I only remember the chest tattoo.  It was Chinese.

21   Q    Do you remember if he ever got a tattoo --

22   A    No.

23   Q    -- of your name?

24        Your Honor, I'm marking Defense 401.

25              THE COURT:  All right.
```

**UNITED STATES DISTRICT COURT**

```
 1                MR. KALOYANIDES:  Oh, I'm sorry, Your Honor.  This
 2   is also in evidence under Government's 19-B.
 3                THE COURT:  Why don't we retract that, then.
 4                MR. KALOYANIDES:  My apologies.  We already have it
 5   in evidence.
 6                THE COURT:  19-B?
 7                MR. KALOYANIDES:  Yes.
 8                THE COURT:  What page would that be?
 9                MR. KALOYANIDES:  Fifty -- 55, Your Honor.
10                THE COURT:  All right.
11   Q   BY MR. KALOYANIDES:  Ms. Del Rosario, that's Mr. Reczko?
12   A   Yes.
13   Q   Do you see what's tattooed on his upper arm?
14   A   Yes.
15   Q   It says "Sheryl"; right?
16   A   Yes.
17   Q   "Sheryl forever"?
18   A   Yes.
19   Q   Is that how you spell your name?
20   A   Yes.
21   Q   Do you remember ever seeing that?
22   A   No.
23   Q   So you don't remember if you were with him when he got it?
24   A   No.
25   Q   But that is him?
```

```
1    A    Yes.

2              MR. KALOYANIDES:  Your Honor, I'm going to mark for

3    identification Defense Exhibit 402.

4              (Exhibit marked for identification.)

5    Q    BY MR. KALOYANIDES:  Do you recognize what's pictured in

6    402?

7    A    Yes.

8    Q    That's the wedding -- at the wedding ceremony, and that's

9    you and Mr. Reczko kissing?

10   A    Yes.

11             MR. KALOYANIDES:  Your Honor, I move Defense 402

12   into evidence.

13             THE COURT:  Any objection?

14             MS. BLANCH:  No, Your Honor.

15             THE COURT:  Received.

16             (Exhibit 402 received into evidence.)

17   Q    BY MR. KALOYANIDES:  Who's the lady on the side?

18   A    My mom.

19   Q    She was present; right?

20   A    Yes.

21   Q    Throughout most of the ceremony, I think you testified?

22   A    No.  Only half of the ceremony.

23   Q    She came halfway through; right?

24   A    Yes.

25   Q    And she was there for the rest of it?
```

```
 1   A     Yes.

 2   Q     After the ceremony did you all go out and have a meal or

 3   something?

 4   A     I don't remember.

 5   Q     Your dad was there too; right?  He's not in the picture,

 6   but he was there?

 7   A     Yes.

 8              MR. KALOYANIDES:  One moment, Your Honor.

 9   Q     BY MR. KALOYANIDES:  Ms. Del Rosario, one additional

10   question.  The camera that -- strike that.

11         Do you know how many cameras Mr. Reczko had while you two

12   were in a relationship?

13   A     I don't remember.

14   Q     Do you know if the camera that he packed in his bag --

15   whether or not he ever sold it?

16   A     I don't remember.

17   Q     You just remember seeing him pack a camera in the bag, and

18   that's the last you know anything about it; right?

19   A     Yes.

20              MR. KALOYANIDES:  Nothing further, Your Honor.

21              THE COURT:  Thank you.

22         Any redirect examination, Ms. Blanch?

23              MS. BLANCH:  Briefly, Your Honor.

24   ///

25   ///
```

**UNITED STATES DISTRICT COURT**

```
 1                    REDIRECT EXAMINATION

 2   BY MS. BLANCH:

 3   Q    Ms. Del Rosario, you testified that you're getting $41 as

 4   a witness fee every day; isn't that correct?

 5   A    Yes.  40.

 6   Q    40?  $40 as a witness fee?

 7   A    Yes.

 8   Q    And you get $70 for meals?  Is that --

 9   A    71, yes.

10   Q    71?

11   A    Yes.

12   Q    Every day you're in the United States?

13   A    Yes.

14   Q    While you're in the United States, do you know if your mom

15   and dad are getting paid by their jobs?

16   A    No.

17   Q    Do you know why you get the $41 as a witness fee and the

18   70 -- or the $40 and the $71 while you're in the United States?

19   A    Yes.  Because we don't have money here and we are far from

20   our country.

21   Q    Did you ask to come to the United States, or did the

22   Government ask you to come?

23   A    The Government ask.

24   Q    You ready to go home?

25   A    Yes.
```

1    Q    In May of 2007, when you left the defendant, do you

2    remember if the defendant was in Cebu, living in the apartment,

3    or if he was traveling somewhere else?

4    A    I don't remember.

5    Q    When you went back to the apartment to get the CDs and the

6    pictures, was that after you spoke to Annie Suico from -- the

7    social worker?

8    A    Yes.

9    Q    Was it before or after you spoke to IJM?

10   A    Before.

11   Q    When you were together with the defendant, did he have the

12   tattoo of your name on his arm?

13   A    No.

14   Q    Did you ever hear that he got it?

15   A    Yes.

16   Q    Was it after you went into the safe house?

17   A    Yes.

18   Q    You said that you had a camera.  Did you ever take selfies

19   of yourself?

20   A    Yes.

21   Q    You like taking selfies?

22   A    Yes.

23   Q    When you took pictures of yourself, did you ever take

24   naked pictures or sexy pictures of yourself?

25   A    No, only when he asked.

```
 1    Q     Who is "he"?

 2    A     Reczko.

 3          MS. BLANCH:  Thank you.  I have no further

 4    questions, Your Honor.

 5          THE COURT:  Mr. Kaloyanides, any recross?

 6          MR. KALOYANIDES:  Very brief.

 7          THE COURT:  Okay.

 8                     RECROSS-EXAMINATION

 9    BY MR. KALOYANIDES:

10    Q     Ms. Del Rosario, I just want to clarify something.

11          Does Ms. -- to your knowledge, does Ms. Suico work for

12    IJM?

13    A     No.

14    Q     So she's the social worker who went with you to the

15    apartment?

16    A     Yes.

17    Q     It wasn't an IJM person?

18    A     No.

19          MR. KALOYANIDES:  All right.  Nothing further,

20    Your Honor.

21          THE COURT:  All right.  Ms. Del Rosario, thank you

22    very much.  You may step down.

23          THE WITNESS:  Thank you.

24          THE COURT:  Ms. Blanch, Government my call its next

25    witness.
```

**UNITED STATES DISTRICT COURT**

1          MS. BLANCH:  Your Honor, if we can have just a

2    moment, we want to confer with counsel.

3          THE COURT:  Of course.

4              (Counsel confer sotto voce.)

5          MR. KALOYANIDES:  Your Honor, may we approach.

6          THE COURT:  Yes.

7              (Bench conference on the record:)

8          MR. KALOYANIDES:  Your Honor, the next witness is

9    going to involve some of the photographs that were the subject

10   of the Government's 404(b) motion.

11         MS. BAEHR-JONES:  We did not make a motion on this.

12         MR. KALOYANIDES:  Oh.

13         MS. BAEHR-JONES:  We gave notice to defense.

14   Defense did not move to exclude it, and we have raised this

15   with the Court.

16         THE COURT:  Which ones?

17         MS. BAEHR-JONES:  These are the two pictures of the

18   other minor females which were in his luggage when he arrived

19   at LAX.  And we've merely raised it with defense counsel

20   because he'd indicated he might want to talk to the Court.

21         THE COURT:  Show me the pictures.  Tell me, what's

22   the exhibit number?

23         MS. BAEHR-JONES:  These are Exhibit 50-A and -B.

24         THE COURT:  Didn't we talk about this?

25         MS. BAEHR-JONES:  We did talk about this already,

1    but I wanted to give him a --

2              MR. KALOYANIDES:  This was the subject.  It was not

3    a motion, but it was briefed in the trial brief.  And there

4    wasn't a hearing on it.  I wanted to raise the issue because

5    there were certain objections to particular photos that were

6    not raised by Mr. Reczko; so I do want to put on the record --

7              THE COURT:  Mr. Reczko did object in the case on

8    hearsay, as I recall, and I ruled I would give a limiting

9    instruction that it is not for the truth of the matter asserted

10   by anything stated in there but for the effect upon his

11   knowledge.  That's it.

12       You're making a further objection?

13             MR. KALOYANIDES:  Yes, Your Honor.

14             THE COURT:  Go ahead.

15             MR. KALOYANIDES:  Authentication, there's no

16   foundation for these documents.  Yes, agent can testify they

17   were found wherever they were found.  I mean, I believe it was

18   his luggage or in his constructive possession.

19             THE COURT:  Hold on one second.

20       Is your next witness a person who is going to say where

21   those pictures were found?

22             MS. BAEHR-JONES:  Yes, Your Honor.

23             THE COURT:  And where were they found?

24             MS. BAEHR-JONES:  They were found in his luggage, in

25   his duffel bag.

UNITED STATES DISTRICT COURT

1           THE COURT:  In that hand-looking bag --

2           MS. BAEHR-JONES:  Yes, Your Honor.

3           THE COURT:  -- that we've seen?

4           MS. BAEHR-JONES:  Yes, Your Honor.

5           THE COURT:  Who is going to testify to this?

6           MS. BAEHR-JONES:  The special agent who searched

7    that.

8           THE COURT:  Who is that?

9           MS. BAEHR-JONES:  Olga Sagalovich.

10          THE COURT:  That's all -- she's going to testify

11   only as to that?

12          MS. BAEHR-JONES:  She's also going to testify about

13   there is a human right petition to the human rights commission

14   that the defendant wrote that was also in his luggage.  And we

15   have a redacted copy of that.  And those are his admissions.

16   They state a timeline, his version of the timeline events.

17          THE COURT:  What events?

18          MS. BAEHR-JONES:  Of him traveling to and from the

19   Philippines to meet with EDR.  He submitted a petition to the

20   human rights commission when he was in Philippine custody

21   laying out a timeline, in his luggage.  There was both a typed

22   timeline that he submitted as well as a handwritten timeline

23   that was clearly the -- for that petition in his luggage.  We

24   have redacted copy of the timeline that we'd like to move in as

25   his admissions.  They match his travel records, and they --

1          THE COURT:  It's for purpose of his admissions or

2   purpose of demonstrating that this was his bag or that his

3   things were found in the bag so as to raise at least an

4   inference that these items were his?

5          MS. BAEHR-JONES:  Yes.  And also, one of the -- in

6   41-B, there are two pages of loose-leaf that were found in his

7   bags.  One of those pages has the name and address of one of

8   the young girls, the girls in the picture, in defendant's

9   handwriting --

10          THE COURT:  Okay.

11          MS. BAEHR-JONES:  -- which is -- is plenty of

12   evidence that he knew or -- or at least had knowledge of this

13   person's name and her measurements.

14          THE COURT:  Okay.  Go ahead.  I didn't mean to --

15          MR. KALOYANIDES:  As far as -- I'm not talking about

16   the timeline or the petition.

17          THE COURT:  You have no objection to that?

18          MR. KALOYANIDES:  No.  If they can be authenticated,

19   I'm sure they'll be shown.  It was his luggage.  I'm not

20   addressing that.

21      So the two photos with the handwriting on the back of the

22   photograph are of the girls.  I'm not objecting to the

23   handwritten note by Mr. Reczko that indicates a name of

24   somebody and an address of somebody and three numbers, whether

25   their measurements, whatever they are.

1          But on the back of these photographs are purported to be

2     handwriting of the people in the photograph.

3               MS. BAEHR-JONES:  That --

4               THE COURT:  Just a minute.  Let him finish.

5               MR. KALOYANIDES:  We have no evidence as to who

6     wrote that.  We have no evidence as to how these photographs

7     were created.  We have no evidence, no foundation to support

8     that, in fact, these girls are the names on the back or that

9     the name and address in Mr. Reczko's handwriting relates to

10    either one of them.

11         And so my objection, Your Honor, on a foundation level --

12    and I fully understand this is a late objection because of the

13    nature of our situation.

14              THE COURT:  No, no.  I understand.  I'm going to

15    entertain the objection.

16              MR. KALOYANIDES:  But so, in addition, these are

17    cumulative at this point.  I think the Court sees where I'm

18    going in this case.  We are not disputing the age issues.

19    We're not even disputing the abuse of Ms. Del Rosario.  So

20    it's -- it's really 403 at this point as well as cumulative

21    because it doesn't make a difference whether or not he has

22    photos of other girls.

23         There's no allegation here that he was making child

24    pornography of anyone else, and it doesn't show anything to the

25    main issue of whether or not the child pornography that

```
 1    traveled to the United States was intended to travel to the
 2    United States.
 3              THE COURT:  Go ahead.
 4              MS. BAEHR-JONES:  Thank you.  Actually, I think this
 5    is still highly relevant because I would -- I believe defense
 6    counsel seems to be challenging here the jurisdictional element
 7    that the defendant brought, in fact brought the child
 8    pornography pictures back to the United States.
 9         Defendant's luggage that was seized at LAX is the only
10    physical evidence on defendant that the Government obtained
11    when he had come back into the country.  And these photographs
12    of other minor females is evidence that he offered engagement
13    to another minor female and sufficient evidence that that
14    potentially is her pic- -- that that is her picture, Cristine
15    Joy's picture.
16         And these are evidence that defendant was bringing
17    photographs of minor females with him when he traveled to the
18    United States.  It -- it --
19              THE COURT:  I understand where you're going.
20              MR. KALOYANIDES:  One last point.
21              THE COURT:  One last point.
22              MR. KALOYANIDES:  Yes.  There's no evidence in
23    Mr. Reczko's handwriting of an offer of engagement.  The
24    statement that counsel is referring to is purported to be
25    written by the girl about the engagement with the defendant.
```

1         THE COURT:  I understand.

2         MR. KALOYANIDES:  It's not necessary.

3         THE COURT:  I think this is necessary on the issue

4    of the jurisdiction issue, whether or not he did or did not

5    transport the relevant documents in this case, and this has a

6    tendency to show a certain modus operandi that he undertook in

7    similar type circumstances.

8         You can cross-examine on the fact that these are not his

9    handwriting and so forth.  It may go to the weight.  You can

10   question what inferences ought to be drawn.

11        But she can argue the opposite, and it goes to the weight.

12   And under even a 403 analysis, I think the prejudicial effect

13   of the -- the probative value is not substantially outweighed

14   by the prejudicial effect or any of the countervailing

15   considerations.

16        If you want me to give a limiting instruction as to the

17   photograph, I can do that, which will be just that these are

18   not being admitted for the truth of the matter asserted.  These

19   are only being admitted for the purposes of showing what

20   effect, if any, it had upon him and/or his knowledge or his --

21   well, it's really more than his knowledge.  It also goes to his

22   modus operandi.

23        MR. KALOYANIDES:  And I don't object to the limiting

24   instruction proposed.  I would --

25        THE COURT:  Let me -- modus operandi may be

1    something we throw around.  I don't know that it's going to be

2    meaningful to the jury.  Do you have any suggestion other than

3    modus operandi?

4         MR. KALOYANIDES:  Well, I think, if we point out

5    that this is not being offered for the truth, that these

6    photographs are, in fact, these girls or the handwriting is

7    theirs or something to that line as opposed to modus operandi,

8    just for the fact that these were found in the luggage and can

9    go to Mr. Reczko's knowledge or intent as opposed to modus

10   operandi.

11        MS. BAEHR-JONES:  I think the Government submitted a

12   proposal in the instruction, but I think given defense

13   counsel's -- we didn't -- at the time we wrote that, we didn't

14   know where defense counsel was going.

15        I think -- I think -- I think purpose -- I actually think

16   including modus operandi in an instruction might be helpful

17   because, although they may not understand it now, it certainly

18   allows us to argue and explain it in closing.  And that's

19   because I wrote this before yesterday, and it became clear

20   yesterday.  So maybe knowledge or intent -- intent, purpose.

21        THE COURT:  Purpose or mode of operation.

22        MS. BAEHR-JONES:  Or mode of operation.

23        THE COURT:  Is that satisfactory with you,

24   Mr. Kaloyanides, as modified?

25        MR. KALOYANIDES:  Yes, it is.  And just for the

**UNITED STATES DISTRICT COURT**

1    record, is that in light of the fact that you are overruling my

2    objection?

3              THE COURT:  It is.

4              MS. BAEHR-JONES:  Okay.

5              THE COURT:  So you can put on --

6              MS. BAEHR-JONES:  I will.

7              THE COURT:  I take it she's not going to be long.

8              MS. BAEHR-JONES:  No.

9              THE COURT:  Who else are you going to put on?

10             MS. BAEHR-JONES:  We are putting on Ms. Richelle

11   Reczko, and that is for the purpose of authenticating

12   photographs that were on the media, the camera cards, and

13   Averie's CD.  She can say those were taken in the

14   United States.

15             THE COURT:  She's going to say certain pictures

16   taken from where?

17             MS. BAEHR-JONES:  So the camera cards that were

18   taken from when the defendant was in the Philippines and his

19   luggage was searched, and those items were taken by IJM.

20             THE COURT:  Right.

21             MS. BAEHR-JONES:  The media cards, the camera cards

22   and the CD that had pictures on it, the -- the Averie CD.  And

23   those have pictures of Averie from Halloween, and those have

24   pictures on the media cards from December of 2006 which were

25   taken in Los Angeles, and there's a picture -- and this will

1    become very clear from the forensic testimony which will follow

2    Ms. Reczko.

3              THE COURT:  Okay.

4              MS. BAEHR-JONES:  There was a picture taken on

5    December 20 -- 25th --

6              THE COURT:  And then you're going to have

7    Mr. Pixley?

8              MS. BAEHR-JONES:  Right.

9              THE COURT:  And that's it?

10             MS. BAEHR-JONES:  Your Honor, the Government,

11   we've -- we've raised the grooming expert in the trial, in the

12   trial Indictment, and I believe the Government would like an

13   opportunity to -- to talk to defense counsel and talk to the

14   Court after we have the testimony come in.

15             THE COURT:  Okay.  But you're not going to call

16   anybody else?

17             MS. BAEHR-JONES:  No.

18             THE COURT:  Okay.  Let's get going.

19                  (The following proceedings were held in open

20                  court, in the presence of the jury:)

21             MS. BAEHR-JONES:  The Government calls Ms. Olga

22   Sagalovich.

23             THE CLERK:  Please come forward.  Wait right here.

24   Raise your right hand to be sworn, please.  Do you solemnly

25   swear the testimony that you shall give in the cause now

1  pending before the Court shall be the shall, the whole truth,

2  and nothing but the truth so help you God?

3           THE WITNESS:  I do.

4           THE CLERK:  Thank you, ma'am.  You may go around and

5  take a seat, please.

6           THE WITNESS:  Thank you.

7           THE CLERK:  Please adjust the microphone and speak

8  directly into it.  Would you please state your full name for

9  the record, spell both your first and your last name, please.

10          THE WITNESS:  Okay.  First name is Olga, O-l-g-a.

11  Last name is Sagalovich, S-a-g-a-l-o-v-i-c-h.

12          THE COURT:  All right.  Ms. Baehr-Jones.

13                      OLGA SAGALOVICH,

14  called as a witness by the Government, was sworn and testified

15  as follows:

16

17                    DIRECT EXAMINATION

18  BY MS. BAEHR-JONES:

19  Q    Good morning, Ms. Sagalovich.

20  A    Good morning.

21  Q    What agency do you work for?

22  A    I work for the Department of Homeland Security, Homeland

23  Security Investigations.

24  Q    And what do you do for Homeland Security Investigations?

25  A    I'm a special agent.

1   Q     And as a special agent, what are some of your

2   responsibilities and roles?

3   A     I investigate various crimes involving customs violations

4   as well as immigration violations.  That -- that expands to sex

5   trafficking, child pornography, various child exploitation

6   cases, as well as drug smuggling and immigration violations.

7   Q     How long have you been a special agent for Homeland

8   Security Investigations?

9   A     For approximately ten years.

10  Q     And during that time, where have you been assigned?

11  A     I've been assigned to two offices.  My first assignment

12  was at the Los Angeles International Airport.  I'm currently

13  assigned to the Orange County office.

14  Q     And as part of your job as a special agent for Homeland

15  Security Investigations, have you received training in the

16  collection of evidence?

17  A     Yes, I have.

18  Q     What kind of training have you had?

19  A     Well, I attended our academy, which was in the federal law

20  enforcement center in Glynco, Georgia, as well as I've had

21  various other trainings, on-the-job trainings as well as

22  extended trainings at our cyber crimes center.

23  Q     And at the cyber crimes center, what kind of crimes do you

24  learn how to investigate?

25  A     We -- we learn to investigate crimes involving children,

```
 1   from child exploitation to simple possession of child
 2   pornography, as well as transportation and distribution.
 3   Q    In 2007 where were you assigned?
 4   A    In 2007 I was assigned to HSI's office in the Los Angeles
 5   International Airport.
 6   Q    Did you ever work on cases involving American citizens
 7   who'd committed crimes abroad while you were working at the
 8   Los Angeles Airport office?
 9   A    Yes.
10   Q    And what kinds of cases were those?
11   A    Well, specifically I worked a lot of cases involving
12   people possessing child pornography as well as transporting
13   child pornography.  In one case I worked a case where the
14   individual traveled to a different country.
15   Q    And -- and who would you coordinate with on those sorts of
16   cases?
17   A    Cases involving overseas we would coordinate with our
18   attaché offices in whatever locations those individuals were
19   at.
20   Q    In 2007 did you become involved in a case against an
21   American named Stanley Dan Reczko?
22   A    Yes, I did.
23   Q    And as part of the investigation of that case, did you
24   participate in the search and seizure of the defendant's
25   luggage when he arrived at the Los Angeles Airport?
```

1    A      Yes, I did.

2    Q      Okay.  I'm going to show you what's been previously

3    admitted and marked as Government's Exhibit 16.

4          Permission to show.

5                THE COURT:  Yes.

6    Q      BY MS. BAEHR-JONES:  Do you recognize the bags that are in

7    in this photograph?

8    A      Yes, I do.

9    Q      What are those bags?

10   A      Those are the two bags that were in the possession of the

11   defendant when he arrived at the airport on -- in September of

12   2007.

13   Q      And you searched both of them?

14   A      Correct.

15   Q      Can you look at the binder, the binder to your left.  Can

16   you look at what's been marked as Government's Exhibit 50.  And

17   could you just take out Government's Exhibit 50 and look at it,

18   and then can I ask you to turn to Government's Exhibit 50-A.

19          And, first of all, what -- what are those -- those items

20   that you're holding in your hand?  Government's Exhibit 50,

21   what are those items?

22   A      They're photographs.

23   Q      Okay.  And did you find those photographs?

24   A      Yes, I did.

25   Q      Where did you find them?

1    A    I found them in the defendant's luggage.

2    Q    Okay.  And can you look at what's been marked as

3    Government's Exhibit 50-A.  Do you recognize that?

4    A    Yes, I do.

5    Q    And what is that?

6    A    It's a photograph and the writing that's on the

7    photograph.

8    Q    Okay.  Is it a photograph that's in Government's

9    Exhibit 50?

10   A    Yes.  That's correct.

11   Q    And when you say it's a photograph, is it a photocopy of

12   one of those photographs that's in Government's Exhibit 50?

13   A    Correct.  It's a copy of a photograph depicting a young

14   woman.

15   Q    Okay.  And is it a photocopy of both the front of the

16   photograph and the back of the photograph next to each other?

17   A    Yes, it is.

18   Q    Okay.  And that is one of the -- the photographs in

19   Government's Exhibit 50, that was found in the defendant's

20   luggage?

21   A    That is correct.

22            MS. BAEHR-JONES:  Your Honor, the Government moves

23   into evidence --

24            THE COURT:  Why don't you lay the foundation for

25   50-B also, and then we'll do it together.

```
 1              MS. BAEHR-JONES:  Okay.  Thank you.
 2   Q    BY MS. BAEHR-JONES:  Can you take a look at Government's
 3   Exhibit 50-B?
 4   A    Yes.
 5   Q    And what is that?
 6   A    That's another photocopy of a picture that's -- that was
 7   found in the defendant's luggage.  It's a picture of a young
 8   girl.  She's sliding down a staircase, as well --
 9   Q    And is it --
10   A    Sorry.
11   Q    Is it a photocopy of both the front of the picture and the
12   back of the picture that you saw in Government's Exhibit 50?
13   A    Yes.
14   Q    And it's from the defendant's luggage?
15   A    Correct.
16              MS. BAEHR-JONES:  Your Honor, the Government would
17   move 50-A and -B into evidence.
18              THE COURT:  Mr. Kaloyanides, any further objection
19   other than that which we've ruled on?
20              MR. KALOYANIDES:  Nothing other than what I've
21   already indicated.
22              THE COURT:  Are you moving for the admission as to
23   50-A and -B?
24              MS. BAEHR-JONES:  50-A and -B, Your Honor.
25              THE COURT:  Both are received.
```

```
 1                    (Exhibits 50-A and 50-B received into evidence.)
 2             THE COURT:  Ladies and gentlemen, let me give you a
 3    limiting instruction with respect to these exhibits.  You're
 4    about to see certain exhibits that have been now admitted into
 5    evidence.  This evidence is being admitted only to show the
 6    defendant's knowledge, intent, purpose, or mode of operation
 7    and not for the truth of the matter asserted on those pages.  I
 8    instruct you this evidence is admitted only for those limited
 9    purposes, and therefore you must consider it only for those
10    limited purposes and for no other purpose.
11             MS. BAEHR-JONES:  Your Honor, the Government also
12    moves in Exhibit 50, although we will not publish those to the
13    jury.
14             THE COURT:  Any objection as to 50?
15             MR. KALOYANIDES:  Nothing in addition to what we've
16    already discussed, Your Honor.  Some of the photographs are the
17    same.
18             MS. BAEHR-JONES:  It's the original -- it's the
19    original copies.
20             MR. KALOYANIDES:  Yes.  So nothing other than what
21    we've already objected to.
22             THE COURT:  Did you say 50-A and 50-B, those two
23    photos are part of 50?
24             MS. BAEHR-JONES:  Yes, Your Honor.  50 is a clump of
25    items that were found together.  They include the original
```

 1   photographs.  If I --

 2             THE COURT:  I certainly don't see that in my copy of

 3   50 collection.  I don't see 50-A or 50-B as part of 50.

 4             MS. BAEHR-JONES:  I apologize.  The photocopies have

 5   been broken out.  The originals are the clump of photographs

 6   together.  I apologize about that, Your Honor.

 7             THE COURT:  Then 50 will be received subject to the

 8   same limiting instruction, ladies and gentlemen.

 9             (Exhibit 50 received into evidence.)

10             THE COURT:  50, 50-A, 50-B, all received.

11             MS. BAEHR-JONES:  Thank you.

12   Q    BY MS. BAEHR-JONES:  Looking at what's been marked as

13   50-A, Ms. Sagalovich, can you just read what's next to the word

14   "name" in 50 -- Government's Exhibit 50-A?

15   A    Yes.  Genevieve Luna.

16   Q    And what's written next to the word "age"?

17   A    17.

18   Q    And there are some other information on here.  Can you

19   just briefly explain what's on there.

20   A    Yes.  For complexion, it's light brown.  For birthday,

21   January 1st of 1990.  Occupation, college student.  Spare time,

22   occupation, writing letters.

23   Q    Okay.  That's, that's fine.  Thank you.

24        And above that is height, weight, and age all listed?

25   A    Yes.

1    Q    Okay.  I'm showing what's been marked as Government's

2    Exhibit 50-B.  Looking at this picture, what does it depict?

3    A    It depicts a young girl, smiling, holding up a -- what

4    appears to be a peace sign.  She's sliding down a staircase.

5    Q    And on the back of the photograph, which is copied next to

6    it, what's written?

7    A    It appears her information is written.  Her name is

8    Cristine Joy E. Tolentino.  The next date appears to be most

9    likely her date of birth, March 25, 1991.

10            MR. KALOYANIDES:  Objection.  Lacks foundation,

11   speculation.

12            THE COURT:  Sustained.

13   Q    BY MS. BAEHR-JONES:  Just please read the -- what's

14   written there.

15   A    Okay.  It's 32-29-32, 5-3, love you, exclamation marks.

16   Q    Thank you.

17        Looking at what's been marked, can you turn to what's been

18   marked as Government's Exhibit 51.  What are those -- what are

19   the items that are in Government's Exhibit 51?

20   A    Loose pieces of paper.  One appears to be a letter, and

21   other one just has writing.

22   Q    Okay.  And where did you find -- did you find these --

23   these loose-leaf pieces of paper?

24   A    Yes, I did.  I found those -- these papers in the

25   defendant's luggage.

```
 1  Q    And looking at the first -- what's page 1 of Government's

 2  Exhibit 51, do you recognize the handwriting on that loose-leaf

 3  piece of paper?

 4        MR. KALOYANIDES:  Objection.  Calls for speculation.

 5  Lacks foundation.

 6        THE COURT:  Why don't you lay a foundation then.

 7  Q    BY MS. BAEHR-JONES:  Have you -- in -- in your work in

 8  investigating this case, have you reviewed letters that the

 9  defendant, Mr. Reczko, has written?

10  A    Yeah.

11        MR. KALOYANIDES:  Objection.  Calls for speculation.

12  Lacks foundation.

13        THE COURT:  Sustained.

14  Q    BY MS. BAEHR-JONES:  Have you reviewed items that the --

15  that Ms. Del Rosario and her family members turned over which

16  were addressed to --

17        MR. KALOYANIDES:  Objection.  Leading.

18        THE COURT:  Overruled.

19  Q    BY MS. BAEHR-JONES:  That were addressed to the Del

20  Rosario family and had a return address that listed the

21  defendant's name on them?

22  A    Yes, I have.  The letters had the defendant's name --

23        MR. KALOYANIDES:  Objection.  Nonresponsive.

24        THE COURT:  Sustained.  The answer is "yes."

25        You may ask your next question.
```

1          MS. BAEHR-JONES:  Thank you, Your Honor.

2    Q    BY MS. BAEHR-JONES:  When you reviewed those letters, did

3    you have a chance to read the letters, the -- the actual

4    letters inside those envelopes that were marked to Del Rosario

5    family members and had a return address with the defendant's

6    name on it?

7    A    Yes.

8    Q    And you read through those letters?

9    A    Yes, I did.

10   Q    Were those handwritten letters?

11   A    Yes, they were.

12   Q    And did they have the defendant's name at the end of the

13   letter?

14   A    Yes.

15   Q    And you were able to look at multiple letters where his

16   name was at the end of them?

17          MR. KALOYANIDES:  Objection.  Leading.

18          THE COURT:  Sustained.

19   Q    BY MS. BAEHR-JONES:  Do you remember that handwriting?

20   A    Yes, I do.

21   Q    Looking at the first page of Government's Exhibit 51 and

22   looking at that handwriting, do you recognize it from anywhere?

23   A    Yes.  It appears to be the defendant's writing.

24          MR. KALOYANIDES:  Objection.  Lacks foundation.

25   Speculation.  Move to strike.

1           THE COURT:  Overruled.

2           MS. BAEHR-JONES:  Thank you.

3    Q    BY MS. BAEHR-JONES:  Looking at page 2 of Government's

4    Exhibit 51, does that appear to be the same handwriting or

5    different handwriting?

6    A    It appears to be different.

7    Q    And, again, where did you find the loose-leaf page that's

8    page 2 of Government's Exhibit 51?

9    A    I found it in the defendant's luggage.

10          MS. BAEHR-JONES:  Your Honor, the Government moves

11   in Government's Exhibit 51 and would seek to show it to the

12   jury.

13          THE COURT:  Any objections?  I take it, with respect

14   to page 2, it would come in subject to the same limiting

15   instruction, but based upon the testimony, not as to page 1.

16          MR. KALOYANIDES:  Your Honor, I object.  It lacks

17   foundation.  I'll just maintain -- the first page, I'll

18   maintain the objection.

19          THE COURT:  The objection is overruled.  Exhibit 51,

20   both pages may be admitted.

21      Ladies and gentlemen, page 2 of Exhibit 51 will be subject

22   to the same limiting instruction that I just previously gave to

23   you.  All right.  Otherwise, it's received.

24          MS. BAEHR-JONES:  Thank you.

25              (Exhibit 51 received into evidence.)

Q BY MS. BAEHR-JONES: Looking at page 1, I'm going to show this to you. Can you just read aloud what is written there.
A Five, three, 35 K, 29, dash, 32, dash, 32, A, Cristine Joy E. Tolentino, 1205 Claro M. Recto Street, B-R-G-Y, dot, T-I-N-A-G-O, Bayawan City, 6221, Philippines.
Q Looking at this portion, what does that appear to be?
A It appears to be an address.
Q And looking at the first portion, what does the 5-3 appear to be?
A For someone's height.
Q What does the 29, 32, 32 A appear to be?
MR. KALOYANIDES: Objection. Calls for speculation.
THE COURT: Sustained.
MS. BAEHR-JONES: Thank you.
Q BY MS. BAEHR-JONES: Looking at page 2 of Government's Exhibit 51, can you read the first two words on this page.
A Dear Dan.
Q And then can you skip down and read just the third -- the third paragraph.
A Yes. I will be missing you. Hope, when you're already in U.S., you will call me. Okay? Don't worry about me. I will not find someone else here. I know I am too young, and I don't know how to lie a person.
Q And then looking down on the bottom, is there a name to the right hand over here that appears to be the person signing

1    or -- or writing that letter?

2    A     Yes.

3    Q     What's that name right over here?

4    A     Cristine Joy.

5    Q     And looking at the left -- the bottom over here where my

6    pen is pointing, what does that appear to be?

7    A     It appears to be a heart, and inside a heart is a circle

8    and the writing says size of my engagement, finger of mine.

9    Q     Thank you.

10          I'd like you to turn to Exhibit 49, and just very

11   quickly -- Government's Exhibit 49, and just very quickly tell

12   me what these are photographs of.

13   A     These are photographs of the defendant's luggage.

14   Q     Were you there when the photographs were taken?

15   A     I took these photographs.

16   Q     And when did you take them?

17   A     I took them after we took the luggage from the defendant.

18   Q     And was this during the search of the luggage?

19   A     That's correct.

20   Q     And looking at what's been marked as page 7 of

21   Government's Exhibit 49, what does that show?

22               THE COURT:  These are marked?

23               MS. BAEHR-JONES:  I apologize, Your Honor.  The --

24   the page numbers are not -- are not marked.  It should -- it's

25   page 7.

1          THE COURT:  The seventh page?

2          MS. BAEHR-JONES:  Yes, Your Honor.

3          THE COURT:  And it says 004357 on the bottom?

4          MS. BAEHR-JONES:  I apologize.  It says 004357, yes.

5          THE COURT:  All right.

6          THE WITNESS:  These are photographs that I found in

7    the defendant's luggage.

8    Q    BY MS. BAEHR-JONES:  And which piece of luggage did you

9    find those photographs in, the duffel bag or the large black

10   suitcase?

11   A    The duffel bag.

12   Q    And do you see in that, the photograph, that -- the

13   photographs that were marked as Government's Exhibit 50-A and

14   50-B?

15   A    Yes.

16   Q    Like you to turn to Government's Exhibit 53.

17          MR. KALOYANIDES:  Your Honor, may I confer with

18   counsel briefly.

19          THE COURT:  Yes.

20              (Counsel confer sotto voce.)

21          MR. KALOYANIDES:  Thank you, Your Honor.

22   Q    BY MS. BAEHR-JONES:  Have you turned to Government's

23   Exhibit 53?

24   A    Yes, I have.

25   Q    Okay.  Have you reviewed this before today?

1    A      Yes, I have.

2    Q      What is this?

3    A      This is something that I found in -- inside the

4    defendant's luggage.

5    Q      And looking -- can you just describe -- is part of this

6    handwritten?  Is part of this typed?  What does it look like?

7    A      Correct.  One of it is -- one of the -- the packet -- the

8    part of the packet, there's typed.  It's a typed packet, and

9    the other one has loose pieces of paper that are handwritten.

10   Q      And based on your review of the letters that -- that were

11   seized in this case that had defendant's name on the bottom of

12   them and his address on the -- the sent part -- portion, whose

13   handwriting -- do you recognize the handwriting on the

14   loose-leaf handwritten pages?

15   A      I do.

16   Q      And whose handwriting is that?

17   A      It appears to be the defendant's.

18          MR. KALOYANIDES:  Objection.  Lacks foundation.

19   Move to strike.

20          THE COURT:  Overruled.

21   Q      BY MS. BAEHR-JONES:  And have you reviewed -- and -- and

22   what is -- what is this exhibit?  What is that?  What are those

23   handwritten pages, and what are the typed pages?  What do they

24   represent?

25   A      If I may just read it.

**UNITED STATES DISTRICT COURT**

1   Q     Yes.

2   A     It's basically, he -- the defendant appears to have

3   written something to the petition team, Office of the High

4   Commissioner for Human Rights, United Nations, Geneva office.

5   Q     Okay.  Can you look at what's been marked as Government's

6   Exhibit 53-A.

7   A     Yes.

8   Q     What is that?

9   A     That's -- that's part of a redacted version of that, that

10  previous exhibit.

11  Q     And other than the redactions, does it look identical to

12  the exhibits in Government's Exhibit 53?  And that it's missing

13  the handwritten pages?

14  A     That's correct.

15          MS. BAEHR-JONES:  Your Honor, the Government would

16  move in Government's Exhibit 53-A and move to show it to the

17  jury.

18          THE COURT:  Any objection to 53-A?

19          MR. KALOYANIDES:  As to the last page, the signature

20  lacks foundation.

21          THE COURT:  Why don't you establish what the last

22  page, the signature purports to say, and we'll go from there.

23          MS. BAEHR-JONES:  Thank you, Your Honor.

24  Q     BY MS. BAEHR-JONES:  Looking at the last page, have you

25  seen the defendant's signature on documents in your work

**UNITED STATES DISTRICT COURT**

74

```
 1    investigating this case?

 2    A     Yes, I have.

 3    Q     What sort of documents?

 4    A     Letters, mostly.

 5    Q     Have you also reviewed court documents that the defendant

 6    has signed?

 7    A     That's correct.

 8    Q     And looking at what's been marked as -- it has 01360 on

 9    the bottom, and it's the last page of Government's

10    Exhibit 53-A.  After the word "sincerely," what appears there?

11    A     Stanley D. Reczko III.

12    Q     And based on your review of other documents the defendant

13    has signed, does that appear to be the defendant's signature?

14    A     Yes, it does.

15                THE COURT:  All right.  Any further objections?

16                MR. KALOYANIDES:  Just the same objection.

17                THE COURT:  Received.

18                (Exhibit 53-A received into evidence.)

19                MS. BAEHR-JONES:  Thank you.

20                THE COURT:  You've only offered 53-A; right?

21                MS. BAEHR-JONES:  That's correct, Your Honor.

22    Q     BY MS. BAEHR-JONES:  Can I ask that you read -- looking at

23    the top here, can you just read what's -- what's written there

24    on the page.  This is Government's Exhibit 53-A, page 1, and I

25    have it showing to the jury, trying to zoom in here.
```

A     I'm going to read it from the packet, if that's okay.

Q     That's fine.

A     Chronological events.  On January 1st, 2006, in the capital city of Cebu, at the courthouse in the Philippines, I was married to a Filipina and paid court fees of 20,000 pesos.

There's redacted parts.

And Number 3 says, I stayed with the family on a tourist visa at BLK 3-175, Missionary Street, Suba Pasil, Cebu, Philippines, until March 2006.

Number 4, in March 2006 I went back to Los Angeles where I resided at 210 North Kenmore Avenue, Apartment No. 6.

Number 5, I worked as a supervisor for ATA Construction, and I supported my wife.

Number 6, being the months of March 2006 and June 2006, per request, my wife Lucia and mother searched for an apartment for my wife and I.

Number 7, in June 2006 Lucia Del Rosario rented an apartment from Lucy Planas, close friend, at Mike and Tess Apartments, Salvador Extension, Labangon, Cebu, Apartment No. 1.

Redacted.

Number 10, in November 2006 I took a vacation to the Philippines.  While on vacation I furnished the apartment with appliances and an addition, dirty kitchen for cooking.  My visit was for three weeks.

1          Number 11, I went back to the U.S. in November 2006 after

2     a three week -- three-week stay.

3     Q     And looking at what's been marked -- what's page 2 of

4     Government's Exhibit 53-A, can you read that line that's under

5     13.

6     A     13, upon my return in March 2007 to see my wife.

7     Q     Looking at the next page, can you read what's marked as

8     32.

9     A     32, on July 2nd, 2007, while in Dumaguete, I was

10    apprehended by the local authorities in Dumaguete to be held

11    until the Bureau of Immigration picked me up.

12    Q     Finally, looking at the last page, we've looked at this

13    before.  Just read it quickly.

14    A     Sincerely, Stanley D. Reczko III, Stanley D. Reczko III.

15    Q     Thank you.

16          Can you turn to Government's Exhibit 43.  I'm actually

17    going to show it in front of you.  You don't have to turn to

18    it.

19          This has been admitted into evidence, Your Honor.

20    Permission to show the jury.

21               THE COURT:  All right.  43.

22    Q     BY MS. BAEHR-JONES:  Looking at what -- looking at this,

23    do you recognize this document?

24    A     Yes, I do.

25    Q     And can you just read the first paragraph after To whom it

1    may concern.

2    A    Thank you.

3         We certify that this office has no record of marriage

4    between Stanley Dan Reczko and Elcita Del Rosario, who are

5    allegedly to have been married on January 31st, 2006, in this

6    city or municipality.  Hence, we cannot issue, as requested, a

7    true copy of their marriage contract or transcription from the

8    register of marriages.

9    Q    And looking at the top of this document, what -- what are

10   the -- what is the sort of office heading here up at the top of

11   the document?

12   A    Republic of the Philippines, City of Cebu.

13   Q    And what office is it?

14   A    It's the office of the city civil registrar.

15   Q    And looking at the date on the letter, what's the date?

16   A    May 29, 2007.

17             MS. BAEHR-JONES:  Okay.  Thank you.

18        Nothing further, Your Honor.

19             THE COURT:  All right.  Cross-examination,

20   Mr. Kaloyanides.

21             MR. KALOYANIDES:  Thank you, Your Honor.

22                       CROSS-EXAMINATION

23   BY MR. KALOYANIDES:

24   Q    Agent, where did you first begin searching the luggage

25   that you say was Mr. Reczko's?

```
 1   A     I first looked at the luggage at the Los Angeles
 2   International Airport when he arrived.
 3   Q     And how did it come into your actual possession?
 4   A     When the defendant was arrested, it came into my
 5   possession.
 6   Q     All right.  So he got off the plane?
 7   A     That's correct.  When the -- do you want me to explain,
 8   sir?
 9   Q     Let me kind of walk you through it.
10   A     Okay.
11   Q     So he gets off the plane, and agents were waiting for him?
12   A     It was actually officers with U.S. Customs and Border
13   Protection.
14   Q     Law enforcement was there, waiting for --
15   A     Correct.
16   Q     -- him and --
17              THE REPORTER:  Stop, stop.
18              THE COURT:  Slow down.
19   Q     BY MR. KALOYANIDES:  Law enforcement arrested him as he
20   walked off the plane?
21   A     That's correct.
22   Q     Were you present?
23   A     Yes.
24   Q     Did he have his luggage with him at that time?
25   A     Yes.
```

```
1    Q    Was it in his hand?

2    A    He -- at that point U.S. Customs and Border Protection

3    officers waited for him to get his luggage, and at the time

4    that I saw him, he had his luggage with him, yes.

5    Q    All right.  So I want to be clear about this.  Do you know

6    if he was arrested as he walked off the plane or later sometime

7    going through the process of deplaning and getting his luggage?

8    A    No.  He was arrested as soon as he came off the plane.  I

9    was advised by Customs that he was.

10   Q    All right.  So you weren't there for the actual arrest at

11   that point?

12   A    That's correct.

13   Q    You came into contact with Mr. Reczko at baggage

14   retrieval?

15   A    Not at baggage retrieval, when he was escorted to an

16   interview room.

17   Q    All right.  So at that point his luggage was with him?

18   A    That's correct.

19   Q    Do you know who actually retrieved his luggage from the

20   plane?

21   A    Mr. Reczko, typically the way it works, would have been

22   assisted by Customs.  They would have waited for him to get his

23   luggage.

24   Q    They would have been with him?

25   A    Correct.
```

1    Q     But you weren't there to see it?

2    A     That's correct.

3    Q     Prior to him arriving in Los Angeles, do you know where

4    his luggage was?

5    A     Do I know?  No, no, I do not.

6    Q     Do you know who had access to his luggage?

7    A     No, I do not.

8    Q     You were informed at one time that he had been detained in

9    the Philippines, though?

10   A     That's correct.

11   Q     Do you have any knowledge of what was done with his

12   luggage at that time while he was detained in the Philippines?

13   A     His luggage was inspected when he was in the Philippines.

14   Q     You were informed of that; right?

15   A     Correct.

16   Q     You were not a participant in that?

17   A     I was not present.

18   Q     Do you know if an inventory was made?

19   A     I do not, no.

20   Q     Did you request an inventory?

21   A     No, I did not.

22   Q     Referring to Government's Exhibit 50-A, you testified that

23   this was one of the photos you found in the luggage as you

24   searched it in Los Angeles?

25   A     That's correct.

```
 1   Q    All right.  There seems to be a number at the bottom of
 2   the right-hand side of this exhibit.  That was on the back of
 3   the photo?
 4   A    I'm not sure which number you're referring to.
 5   Q    I'm sorry.  Right here.
 6   A    The -- the numbers?
 7   Q    Yes.
 8   A    Yes.  That's correct.
 9   Q    That was on the back of that photo?
10   A    That's correct.
11   Q    C-E-L and the number sign?
12   A    Correct.
13   Q    Did you try to call that number?
14   A    I did not.  I requested that another agent call that
15   number.
16   Q    Did anybody?
17   A    I was advised that he attempted to call that number, but
18   he was unsuccessful.
19   Q    Referring to Government's Exhibit 51, now, you have agents
20   in the Philippines who assist you in your investigations;
21   right?
22   A    That's correct.
23   Q    You have contact people in various other countries, but
24   particularly the Philippines, that will help you if you need
25   information on an investigation; right?
```

**UNITED STATES DISTRICT COURT**

1    A    That's correct.

2    Q    And there were such agents in place to assist you if you

3    needed it in this case; right?

4    A    That's correct.

5    Q    You testified that this appeared to be an address.  Have

6    you ever been to -- I'm not even going to try to pronounce it.

7    This city?

8    A    I have not been there, no.

9    Q    Did you ask any agents to go to that address and see if it

10   existed?

11   A    This information was given to another agent, correct.

12   Q    Did you ask them to actually go there and see if it

13   existed?

14   A    I don't recall.

15   Q    Do you know if anybody contacted anybody at that address?

16   A    I don't remember.

17   Q    Do you have any knowledge of any agent involved in this

18   investigation ever confirmed a Cristine Joy?

19   A    I do recall that attempts were made to locate these

20   individuals, but they were unsuccessful.

21            MR. KALOYANIDES:  Your Honor, Exhibit 50, has that

22   been admitted?  I'm sorry.

23            THE COURT:  50 is received as well as 50-A and 50-B,

24   subject to the limiting instruction.

25            MR. KALOYANIDES:  Thank you.

```
 1   Q    BY MR. KALOYANIDES:  Now, the first page of Exhibit 50,
 2   did you ask any agents to go to what -- what appears to be this
 3   address?
 4   A    I don't recall if I asked them to go to this specific
 5   address.
 6   Q    Now, we just have photos in the first page of Exhibit 50,
 7   but you saw the actual items -- right? -- because you took this
 8   photo?
 9   A    Correct.
10   Q    What are these items?
11   A    Those appear to be SIM cards.
12   Q    What is a SIM card?
13   A    It's a card that goes into a phone.
14   Q    Are all four of them SIM cards?
15   A    I would have to see them in front of me, but it appears
16   they might be.
17   Q    Page 2 of Exhibit 50, does this help?
18   A    Sir, I have them in front of me.
19   Q    Oh.
20   A    Two of them appear to be missing the SIM card, and the
21   other two appear to be calling cards.
22   Q    Did you ever locate the SIM card chip?
23   A    I don't remember.
24   Q    Are these the two calling cards that you're referring to?
25   A    That's correct.
```

1    Q     Did you do anything to confirm if they were ever

2    activated?

3    A     No.

4    Q     Page 3 of Exhibit 50, what are -- what is this depicting?

5    A     It depicts a user's guide for Nokia.

6    Q     Did you find a Nokia phone in the luggage?

7    A     Yes.  Let me -- let me correct myself.  I found a phone.

8    I can't exactly recall if it's Nokia.  I think it was.

9    Q     But you don't know?

10   A     I don't recall completely, yes.

11   Q     All right.  So this is -- appears to be a user's guide for

12   Nokia.  You found a phone but don't remember what kind of

13   phone?

14   A     Correct.

15   Q     Did you log it in somewhere?

16   A     It retained -- it stayed with the evidence, correct.

17   Q     I'm sorry.  What stayed with the evidence?

18   A     The phone stayed with the defendant's evidence.  It was --

19   the -- we did not find a phone in the luggage.  We did find a

20   phone in other evidence, but it was not in the luggage.

21   Q     Okay.  So you found a phone elsewhere?

22   A     Correct.

23   Q     Affiliated with Mr. Reczko?

24   A     Correct.

25   Q     What are these items?

1    A    I'm not sure.

2    Q    Found this -- does this appear to be a business card?

3    A    Yes, it appears to be a business card.

4    Q    Did any agents go to talk to anybody at this -- it claims

5    to be a law office.

6    A    I don't believe so.

7    Q    Did anybody try to call them?

8    A    I don't believe so.

9    Q    Any follow-up regarding this information on this card?

10   A    Not on my end.

11   Q    Do you know if anybody did?

12   A    I do not.

13   Q    Now, the photograph cuts off part of this other -- what

14   appears to be maybe a business card.  Was it actually cut off,

15   or was just the photo cutting it off?

16   A    I don't know.

17   Q    Did you take this picture?

18   A    I don't remember.

19   Q    To your knowledge, did anybody try to make contact with

20   anybody at the address listed here?

21   A    To my knowledge, no.

22   Q    Anybody call the numbers?

23   A    I did not.

24   Q    Do you know if anybody did?

25   A    I do not know.

```
1   Q    You were investigating Mr. Reczko for possible sex crimes
2   against minors?
3   A    Correct.
4   Q    To your knowledge, nobody followed up on this information
5   that has addresses?
6   A    That's not what I said.  We had an agent that was provided
7   various information in the Philippines.  He followed up, was
8   unsuccessful in locating these people.
9   Q    But to your knowledge, nobody followed up on the business
10  cards?
11  A    Correct.
12  Q    To your knowledge, do you know if any agent actually went
13  to the addresses listed on the other pieces of paper?
14  A    I do not recall if he went to the addresses.  I do recall
15  that he followed up.
16  Q    Did something?
17  A    Correct.
18  Q    You don't know, as you sit here, what it was?
19  A    He -- he attempted to locate these people.  I do not know
20  what length he went, but he attempted to call them.  I do
21  recall that.
22  Q    So at least a phone call was made?
23  A    Correct.
24  Q    To -- and that would have been to the one of -- that cell
25  number that I pointed out?
```

```
 1   A     Various cell phone numbers that we found --
 2   Q     Okay.
 3   A     -- throughout the investigation.
 4   Q     To your knowledge, was anything else done other than
 5   calling cell phone numbers?
 6   A     I do not know exactly what that agent did.
 7   Q     Was that the only agent tasked with following up on the
 8   information in these items?
 9   A     At that time, yes.
10   Q     Was any subsequent efforts -- to your knowledge, was any
11   subsequent effort made to follow up on the information that you
12   found in the luggage?
13   A     I do not recall.
14   Q     How long have you been involved in investigating sex
15   crimes against minors?
16   A     I've worked these kinds of cases for over seven years.
17   Q     You've been trained in the particularities of these kinds
18   of investigations; right?
19   A     That's -- that's correct.
20   Q     One of the things you look for are potential other
21   victims; right?
22   A     Correct.
23   Q     It's very important to make sure you follow up on any lead
24   you have; right?
25   A     That is correct.
```

1  Q    Government's Exhibit 50-A again, there's no date on this

2  document; right?

3  A    No.  It does not appear to have one.

4  Q    You have no idea when it was -- the photo was taken;

5  right?

6  A    No, I do not.

7  Q    You have no idea when the handwriting was put on there;

8  right?

9  A    That's correct.

10  Q    And you don't know whose handwriting it is?

11  A    No, I do not.

12  Q    Similarly, there's no date on 50-B; right?  I'm sorry.

13  There's -- there's no -- there is a date there.  You don't know

14  what date the photo was taken?

15  A    No, I do not.

16  Q    You don't know when the handwriting was written; right?

17  A    That's correct.

18  Q    The only date we have here is this date, March 25, 1991?

19  A    There's also writing on the photograph that could

20  potentially be a date.

21  Q    These three numbers?

22  A    No.  I don't think you will be able to see it on your --

23  your copy.

24  Q    Oh.  Do you have -- do you have the original?

25  A    There's -- appears maybe November of 2002 or November 2nd.

```
 1                MR. KALOYANIDES:  Your Honor, may I approach to see.

 2                THE COURT:  Yes.

 3                MR. KALOYANIDES:  Thank you.

 4                THE WITNESS:  It's when this photograph was probably

 5    taken.

 6    Q    BY MR. KALOYANIDES:  You're referring to --

 7    A    I mean printed.  Correct.

 8    Q    Let me -- let me do it.

 9         This is the back side of the original of 50-A.  You're

10    referring to --

11                THE COURT:  Are you talking about -- I think that's

12    50-B.

13                MR. KALOYANIDES:  50-B.  Thank you, Your Honor.

14    Q    BY MR. KALOYANIDES:  You're referring to the print -- let

15    me turn it this way.  Something printed on the back side here;

16    right?

17    A    Correct.

18    Q    That's the number you're referring to?

19    A    Correct.

20    Q    Are you referring to the 11-02 as a possible date?

21    A    It could potentially be a date.

22    Q    You don't know?

23    A    I do not.

24    Q    You don't know what the rest of these numbers are; right?

25    A    No, I do not.
```

1    Q    In any event, you don't know when the photo itself was

2    taken?

3    A    I do not.

4              MR. KALOYANIDES:  May I approach, Your Honor.

5              THE COURT:  Yes.

6              THE WITNESS:  Thank you.

7    Q    BY MR. KALOYANIDES:  Now, as for all of the photos that

8    you located in Mr. Reczko's luggage, is it correct that you

9    don't know when those photos were taken?

10   A    That's correct.

11   Q    You don't know by whom?

12   A    I do not.

13   Q    And on Exhibit 51 -- and as far as my copy is concerned --

14   and please, if the original that you have has some sort of very

15   subtle printing somewhere, please let me know.

16   A    Okay.

17   Q    But as far as -- as this exhibit is concerned, there's no

18   date on this document in any writing; right?

19   A    That's correct.

20   Q    Is -- is there some sort of faint printing on the original

21   that we can't see on these copies?

22   A    No.

23   Q    So again, you have no idea when this was written; right?

24   A    I do not.

25   Q    Have you ever -- strike that.

```
 1        In your investigation and your dealings with Mr. Reczko as
 2   part of the investigation, did you ever get a handwriting
 3   sample from him?
 4   A    No, I did not.
 5   Q    Do you know if any other agent did?
 6   A    I do not believe so.
 7   Q    Have you ever seen him sign anything?
 8   A    No, I have not.
 9   Q    Have you ever seen him hand-write anything?
10   A    I have not.
11           MR. KALOYANIDES:  One moment, Your Honor.
12   Q    BY MR. KALOYANIDES:  As part of the investigation, you
13   looked for electronic equipment; right?
14   A    Correct.
15   Q    You looked for some cameras --
16   A    Correct.
17   Q    -- for a computer?
18   A    Correct.
19   Q    In Mr. Reczko's luggage, did you find a camera?
20   A    No, I did not.
21   Q    Now, as part of your investigation, you were -- you sought
22   some information from Canon USA; right?
23   A    That's correct.
24   Q    And also Nikon Corporation?
25   A    That's correct.
```

UNITED STATES DISTRICT COURT

1    Q    And you asked them if they had any documentation

2    concerning purchases or registration or any information at all

3    relating to Mr. Reczko; right?

4    A    Correct.

5    Q    What was their response?

6    A    If I recall correctly, they said they did not have

7    anything for the defendant.

8    Q    So they returned -- did you send a subpoena or just a

9    letter request?

10   A    No, a subpoena.

11   Q    And they complied with the subpoena?

12   A    Correct.

13   Q    They told you, we've got no records of anything like that

14   indicating Mr. Reczko has either registered or purchased?

15   A    I don't remem- -- recall if they -- it went through the

16   detail of him purchasing a Nikon, but he had not registered a

17   Nikon or Canon with them.

18   Q    Canon said they didn't have any records for Canon; Nikon

19   said they didn't have any records for Nikon?

20   A    That's correct.

21   Q    Did you send any similar subpoenas to computer

22   manufacturers?

23   A    Not that I recall.

24   Q    Did you locate a computer in his luggage?

25   A    He had a hard drive -- in his luggage, no.

1    Q    You understand that at some time there was a hard drive?

2    A    Correct.

3    Q    And where was that?

4    A    It was not in the luggage.

5    Q    Do you know where it was found?

6    A    It was turned over to me by the attaché office by another

7    agent in the Philippines.

8    Q    When you say the "attaché office," is that a U.S. law

9    enforcement officer in the Philippines?

10   A    That's correct.

11   Q    So somebody in the Philippines sent to you a computer hard

12   drive?

13   A    Correct.

14   Q    Nothing in the luggage when he arrived in the

15   United States?

16   A    Correct.

17              MR. KALOYANIDES:  Nothing further, Your Honor.

18              THE COURT:  Any redirect?

19              MS. BAEHR-JONES:  No, Your Honor.

20              THE COURT:  Agent Sagalovich, thank you very much.

21   You may step down.

22        Ladies and gentlemen, we will take our first morning

23   recess at this time for 15 minutes.  Please keep in mind the

24   admonition of the Court not to discuss this matter among

25   yourselves or with anybody else until it is finally given to

```
 1    you for your deliberations.  You are excused.
 2        We'll stay in session.
 3                    (Jury out at 10:06 A.M.)
 4                    (The following proceedings were held out of the
 5                    presence of the jury:)
 6              THE COURT:  We're outside the presence and hearing
 7    of the jury.  All right.
 8        Ms. Baehr-Jones or Ms. Blanch, how many other witnesses do
 9    you expect to call in this case?
10              MS. BLANCH:  Two, possibly three, Your Honor.  We're
11    still discussing whether we're going to call the last witness,
12    but --
13              THE COURT:  All right.  Mr. Kaloyanides, do you plan
14    on proposing any jury instructions?  You've seen the ones that
15    the Government has proposed.  I don't know whether you intend
16    to propose any.
17              MR. KALOYANIDES:  No substantive, Your Honor, and I
18    just have one objection to one of the proposed.
19              THE COURT:  Why don't you tell me what that
20    objection is, and depending upon when we get done, maybe it's
21    time for us to settle the instructions.
22              MR. KALOYANIDES:  And it's a very -- I mean, it's
23    a -- it's a technical objection, Your Honor.  It's -- it's the
24    standard Ninth Circuit jury instruction that relates to taking
25    notes.  It is the Ninth Circuit.  The law is clear that this is
```

```
 1   an instruction that should be given.  However, I object to it
 2   because I don't think it accurately reflects the current state
 3   of science in that the jury instruction says that the jurors
 4   should rely on their memory over their notes.  And the current
 5   state of science does indicate that actually your memory is not
 6   as good as the notes taken contemporaneous, and that's my
 7   objection.
 8             THE COURT:  You want to be heard on that?
 9             MS. BAEHR-JONES:  Your Honor, the Government
10   doesn't argue that the Ninth Circuit model -- the model
11   Ninth Circuit instructions are correct and appropriate.
12             THE COURT:  The objection is overruled.
13        You have no other disputes with the Government's proposed
14   instructions?
15             MR. KALOYANIDES:  No.
16             THE COURT:  Very good.  We'll take a 15-minute
17   recess, and we'll come back.  How many witnesses do you plan to
18   have in your case?  Because it looks like we're going to be
19   able to get to your case before two o'clock.
20             MR. KALOYANIDES:  I'm hoping none.  There's a
21   possibility of two, one being our expert and possibly one
22   impeachment witness about what a prior witness said, but it is
23   unlikely.
24             THE COURT:  Okay.  See you in 15 minutes.
25             THE CLERK:  This court now stands in recess.
```

```
 1                      (Recess taken.)
 2               THE CLERK:  Please remain seated.
 3                      (Jury in at 10:32 A.M.)
 4                      (The following proceedings were held in the
 5                      presence of the jury:)
 6               THE CLERK:  Please remain seated and come to order.
 7    This United States District Court is now in session, the
 8    Honorable George H. King, Chief Judge presiding.
 9               THE COURT:  Back on the record in the matter of
10    United States versus Reczko.  Counsel are present.  Mr. Reczko
11    is present.  Jurors, in their seats.
12         Ms. Baehr-Jones.
13               MS. BAEHR-JONES:  Your Honor, the Government calls
14    Richelle Reczko.
15               THE COURT:  All right.
16               MS. BAEHR-JONES:  While we're getting her,
17    Your Honor, can we read a stipulation into the record.
18               THE COURT:  Yes.
19               MR. KALOYANIDES:  I'm sorry, Your Honor.  Do you
20    have the stipulation?
21               THE COURT:  Oh, you folks don't have a copy of it?
22    All right.  Here.
23               MR. KALOYANIDES:  Not with the handwriting.
24               THE COURT:  Bea.
25               THE CLERK:  Yes, Your Honor.
```

1          THE COURT:  Go ahead, give it to them.

2      Stand by for a second.

3          MS. BLANCH:  Your Honor, the trial stipulation

4  reads, Plaintiff, the United States of America, and Defendant

5  Stanley Dan Reczko, by and through their respective counsel of

6  record --

7          THE COURT:  Slow down.  There's a record being made.

8          MS. BLANCH:  I apologize.

9      -- hereby stipulate and agree that the following facts

10  should be accepted as conclusively proven for the purposes of

11  this trial.

12      The current exchange rate between the United States dollar

13  and the Philippine peso is as follows:  One United States

14  dollar equals 44.13 Philippine pesos, 40 United States dollars

15  equals 1,765.20 Philippine pesos.

16      Further, the parties agree that, by statute, fact

17  witnesses receive a $40-per-day witness fee and a $71-per-day

18  stipend for meals and expenses while they are away from home.

19          THE COURT:  Is that so stipulated on behalf of the

20  United States, Ms. Blanch?

21          MS. BLANCH:  Yes, Your Honor.

22          THE COURT:  And, Mr. Kaloyanides, on behalf of your

23  client?

24          MR. KALOYANIDES:  Yes, Your Honor.

25          THE COURT:  Is it also so stipulated, Mr. Reczko?

```
 1              THE DEFENDANT:  Yes, Your Honor.
 2              THE COURT:  The Court will accept that stipulation.
 3                        RICHELLE RECZKO,
 4    called as a witness by the Government, was sworn and testified
 5    as follows:
 6              THE CLERK:  Please come forward.  Wait right here.
 7    Raise your right hand to be sworn, please.  Do you solemnly
 8    swear the testimony that you shall give in the cause now
 9    pending before the Court shall be the truth, the whole truth,
10    and nothing but the truth so help you God?
11              THE WITNESS:  Yes, I do.
12              THE CLERK:  Thank you, ma'am.  You may go around and
13    take a seat, please.  Please adjust the microphone and speak
14    directly into it.  Would you please state your full name for
15    the record, spell both your first and your last name, please.
16              THE WITNESS:  Richelle Reczko.  It's
17    R-i-c-h-e-l-l-e, R-e-c-z-k-o.
18              THE COURT:  All right, Ms. Baehr-Jones.
19                        DIRECT EXAMINATION
20    BY MS. BAEHR-JONES:
21    Q    Good morning, Ms. Reczko.
22    A    Good morning.
23    Q    What do you do for a living?
24    A    I work as an administrative assistant for an insurance
25    company.
```

```
 1   Q     I'm going to --
 2         Your Honor, actually, the parties stipulated that
 3   Exhibits 61, 62 and 63 are admissible, and I'm going to show --
 4             MR. KALOYANIDES:  That's correct.
 5             THE COURT:  61, 62, and 63.  All right.  And you're
 6   offering them at this time?
 7             MS. BAEHR-JONES:  I am, and I would ask permission
 8   to show them to the jury.
 9             THE COURT:  They're received because they're
10   stipulated; right, Mr. Kaloyanides?
11             MR. KALOYANIDES:  That's correct, Your Honor.
12             THE COURT:  All right.
13                 (Exhibits 61, 62, and 63 received into evidence.)
14   Q     BY MS. BAEHR-JONES:  Looking at what's in front of you on
15   the screen there, what is that?
16   A     My marriage certificate.
17   Q     And is it your name on the marriage certificate?
18   A     Yes.
19   Q     And who is -- who else is on that marriage certificate?
20   A     Stanley D. Reczko.
21   Q     Do you know that person?
22   A     Yes.
23   Q     Do you see him in the courtroom today?
24   A     Yes.
25   Q     Can you identify the -- the place where he is seated and
```

1    an article of clothing he is wearing?

2    A    Yes.  He's in the middle, wearing a purple tie.

3    Q    And looking at this --

4         THE COURT:  Record may reflect that the witness has

5    identified the defendant.

6    Q    BY MS. BAEHR-JONES:  Looking at page 3 of Exhibit 61, can

7    you tell me the -- can you tell the jury the date of marriage

8    that's listed there.

9    A    Yes.

10   Q    What's that date?

11   A    February 11, 2005.

12   Q    I want to show you what's been marked as Government's

13   Exhibit 63.  This is the first page of that exhibit.  And can

14   you just read where my finger is pointed to.

15   A    Notice of entry of judgment.

16   Q    In Box 1 what does that say?

17   A    Dissolution.

18   Q    What's the date on that?

19   A    April 18 of 2008.

20   Q    Is that when you got divorced from the defendant?

21   A    Yes.

22   Q    Now, your marriage license shows that you and the

23   defendant got married in New York state; is that correct?

24   A    Yes.

25   Q    At some point did you and the defendant move to

1   Los Angeles?

2   A     Yes.

3   Q     And around when was that?  Around what year?

4   A     2005.

5             MS. BAEHR-JONES:  Your Honor, at this time I would

6   like to move in --

7   Q   BY MS. BAEHR-JONES:  Actually, at the time that you moved

8   to Los Angeles, did the defendant begin traveling

9   internationally?

10  A     Yes.

11            MS. BAEHR-JONES:  Like to move into evidence

12  Exhibit 36, Government's Exhibit 36 and Government's

13  Exhibit 36-A.

14            THE COURT:  Any objection to that?

15            MR. KALOYANIDES:  No, Your Honor.

16            THE COURT:  36, 36-A received.

17            (Exhibits 36 and 36-A received into evidence.)

18            MS. BAEHR-JONES:  And I'd like to show the jury the

19  last page of Government's Exhibit 36-A.

20            THE COURT:  Last page?

21            MS. BAEHR-JONES:  The last page of 36-A, Your Honor.

22            THE COURT:  All right.

23            MS. BAEHR-JONES:  And a travel history at the top.

24  Q   BY MS. BAEHR-JONES:  Looking at this page that should be

25  on the screen in front of you, Ms. Reczko, can you just read

```
 1   where it says, right -- right here, the bottom line --
 2   actually, first, can you -- can you tell me what my finger is
 3   pointing to right there.
 4   A     Reczko Stanley.
 5   Q     And at the top of it, what does it say right here?
 6   A     That's the travel history.
 7   Q     As of what date?
 8   A     January 24 of 2008.
 9   Q     Okay.  And looking at the last line here where my pen is
10   pointed to, can you just read what's marked under the flight
11   date right there.
12   A     That's September 11 of 2005.
13   Q     And under the --
14               THE COURT:  Did you say "2005"?
15               MS. BAEHR-JONES:  I apologize.  Let me zoom in on
16   that.
17               THE WITNESS:  Two thousand -- 2006.
18   Q     BY MS. BAEHR-JONES:  Okay.  Thank you.  Thank you.
19         And looking at what is marked as the origin, what does it
20   say there?
21   A     That's LAX.
22   Q     And where is the destination?
23   A     Hong Kong.
24   Q     And moving up one line, what's the date on that flight
25   date?
```

1    A    That's November 11, 2006.

2    Q    And where is the origin?

3    A    Hong Kong.

4    Q    And where's the destination?

5    A    That's Cebu.

6    Q    And moving up one line, it says November -- sorry.   What

7    is the flight date there?

8    A    That's November 30 of 2006.

9    Q    And what's the origin?

10   A    Hong Kong.

11   Q    And where is the destination?

12   A    LAX.

13   Q    And moving up one line, what's the flight date on that?

14   A    November 30, 2006.

15   Q    And where is the origin?

16   A    Cebu.

17   Q    And destination?

18   A    To Hong Kong.

19   Q    Okay.   Thank you.

20        Do you recall Mr. Reczko coming back from travel

21   internationally to the United States at the end of November of

22   2006?

23   A    Yes.

24   Q    Did he stay with you in an apartment in Los Angeles during

25   the month of December 2006?

```
1   A     Yes.

2   Q     And who else was living in that apartment with you?

3   A     My daughter.

4   Q     What's your daughter's name?

5   A     Averie.

6   Q     And is she your daughter that the -- that you had with the

7   defendant?

8   A     Yes.

9   Q     I want you to look at what's been marked as Government's

10  Exhibit 31.  It should be in a binder -- actually, we might

11  have the originals out here.

12          THE CLERK:  31?

13          MS. BAEHR-JONES:  Yes.

14          THE CLERK:  It's in this binder here.

15          MS. BAEHR-JONES:  That's what I figured.  Thank you.

16  Q     BY MS. BAEHR-JONES:  Can you turn to what's been marked as

17  Government's Exhibit 31 in that binder.  Before coming to court

18  here today, have you had a chance to review what -- what's in

19  Government's Exhibit 31?

20  A     Yes.

21  Q     And do you recognize the pages or the images that are

22  depicted on the pages of Government's Exhibit 31?

23  A     (No audible response.)

24  Q     And how do you recognize?

25  A     These are the pictures of my daughter in our apartment.
```

1   Q     And where is that apartment?

2   A     Kenmore.

3   Q     And where is Kenmore?

4   A     Los Angeles, California.

5          MS. BAEHR-JONES:  Okay.  I'd just like to show

6   page 12.  Actually, I'd like to provisionally move in page 12

7   of Exhibit 31.

8          THE COURT:  Any objection to page 12,

9   Mr. Kaloyanides?

10         MR. KALOYANIDES:  One moment, Your Honor.

11     No objection.  I'm not sure what the Government's

12  restriction on provisionally moving in.  I've got no objection

13  to its admission.

14         THE COURT:  Received.  Page 12 only; right?

15         MS. BAEHR-JONES:  Yes, Your Honor.

16         THE COURT:  Received.

17         MS. BAEHR-JONES:  Permission to show it, Your Honor.

18         THE COURT:  Yes.

19         MS. BAEHR-JONES:  Thank you.

20          (Exhibit 31, page 12 received into evidence.)

21  Q     BY MS. BAEHR-JONES:  Just looking at this picture, do you

22  recognize the girl in that picture?

23  A     Yes.  That's Averie.

24  Q     And who is the man behind her?

25  A     That's Stanley.

1   Q    When was that picture taken, approximately, based on your

2   memory?

3   A    That's sometime Halloween of 2006.

4   Q    And where was it taken?

5   A    That's in our apartment at Kenmore.

6   Q    I want you to turn to Exhibit 32, please, page 30.  Do you

7   recognize what this is?

8   A    Yes.

9   Q    And what does it depict?

10  A    That's a holiday picture --

11  Q    And --

12  A    -- of my daughter.

13  Q    And is it -- anyone else in the picture?

14  A    And Stanley.

15          MS. BAEHR-JONES:  Your Honor, the Government would

16  move page 30.

17          THE COURT:  Any objection to that?

18          MR. KALOYANIDES:  One moment.

19          MS. BAEHR-JONES:  32.  Government's Exhibit 32,

20  page 30.

21          MR. KALOYANIDES:  No objection.

22          THE COURT:  Received.

23              (Exhibit 32, page 30 received into evidence.)

24          MS. BAEHR-JONES:  Permission to show it to the jury,

25  Your Honor.

1          THE COURT:  Yes.

2   Q    BY MS. BAEHR-JONES:  Looking at this picture -- I'll flip

3   it around here.  Do you recognize -- where was this picture

4   taken?

5   A    At the Grove.

6   Q    And where is the Grove?

7   A    That's in Third Street and Fairfax.

8   Q    Is that in Los Angeles?

9   A    Los Angeles.

10  Q    Okay.  In the United States?

11  A    Yes.

12  Q    And when was that photograph taken.  Approximately when,

13  if you don't remember the specific date.

14  A    That's a holiday.  December.

15  Q    December around the holidays.  Okay.

16       And who took that picture?

17  A    I did.

18  Q    Just to confirm, that was the holidays of December 2006?

19  A    Yes.

20  Q    And looking at actually just the page before that in the

21  Exhibit 32, page 29, do you recognize that photograph?

22  A    Yes.

23  Q    And who's in that photograph?

24  A    Myself and Averie.

25           MS. BAEHR-JONES:  Your Honor, the Government would

```
 1   move in page 29 of Exhibit 32 as well.

 2              THE COURT:  Any objection?

 3              MR. KALOYANIDES:  No objection.

 4              THE COURT:  Received.

 5                  (Exhibit 32, page 29 received into evidence.)

 6              MS. BAEHR-JONES:  Permission to show it to the jury.

 7              THE COURT:  Yes.

 8   Q    BY MS. BAEHR-JONES:  Looking at this photograph, where was

 9   that taken?

10   A    At my friend's house.

11   Q    And why were you at your friend's house that day?

12   A    We were invited to have the holiday Christmas celebration

13   with them.

14   Q    And so what date was that -- was that taken on?

15   A    Sometime in December 2006.

16              THE COURT:  Can you speak closer into the microphone

17   or speak up so we can hear you.

18              THE WITNESS:  Sometime in December 2006.

19   Q    BY MS. BAEHR-JONES:  And you said it was at a holiday

20   party, a Christmas party?

21   A    Yes.

22   Q    Did the defendant go with you to that party?

23   A    He did.

24   Q    And who took that picture?

25   A    He did.
```

UNITED STATES DISTRICT COURT

1    Q     And that was in Los Angeles?

2    A     Yes.

3    Q     In 2006?

4    A     2006.

5    Q     In 2006 when the defendant was in the Los Angeles

6    apartment, do you recall if he had a laptop computer?

7    A     Yes.

8    Q     Did you ever use the laptop computer?

9    A     No.

10   Q     Can I ask you to look at -- actually, can you -- while I'm

11   doing -- can you turn to what's been marked as Government's

12   Exhibit 66 and 67.

13              THE COURT:  Did you say 66?

14              MS. BAEHR-JONES:  66 and 67.

15              THE COURT:  That would be in a different binder --

16              MS. BAEHR-JONES:  I apologize.

17              THE COURT:  -- Ms. Reczko.  It should say the range

18   of what exhibits they are.

19   Q     BY MS. BAEHR-JONES:  Do you recognize what's been marked

20   as Government's Exhibit 66?

21   A     Yes.

22   Q     Yes?  And how do you recognize that?

23   A     A handwritten letter from Stanley.

24   Q     Do you recognize the handwriting in it?

25   A     Yes.

1    Q    And whose handwriting is that?

2    A    Stanley.

3         MS. BAEHR-JONES:  And, Your Honor, these have been

4    moved into evidence, but I would like to -- they've been

5    redacted.  I would like to move them in without redactions, if

6    I can just ask a couple questions about -- well, here.  I'll

7    just ask.

8    Q    BY MS. BAEHR-JONES:  Looking at the upper right-hand

9    corner of the page, the first page of Government's Exhibit --

10   Exhibit 66, do you see a name on the upper right-hand corner?

11   A    Yes.

12   Q    What is that name?

13   A    It's my name, Richelle.

14   Q    And did you write that?

15   A    Yes, I did.

16   Q    When did you write that?

17   A    March 11, 2009.

18   Q    And why did you write your name in the corner?  What event

19   caused you to -- to write your name there?

20   A    I handed it to Agent Olga.

21        MS. BAEHR-JONES:  The Government would now move in

22   unredacted Government's Exhibit 66.

23        THE COURT:  Any objection?

24        MR. KALOYANIDES:  No objection, Your Honor.

25        THE COURT:  All right.  Received.

```
 1              MS. BAEHR-JONES:  Thank you.

 2                  (Exhibit 66 received into evidence.)

 3              MS. BAEHR-JONES:  I'm going to show it to the jury.

 4   Q   BY MS. BAEHR-JONES:  Did you find this letter?

 5   A   Yes, I did.

 6   Q   Where did you find it?

 7   A   In our old apartment at Kenmore.

 8   Q   And where in the apartment did you find it?

 9   A   In a closet.

10   Q   And where in -- where in the closet did you find it?

11   A   It's inserted in one of his notebook, the journal book.

12   Q   And when you say "his," do you mean the defendant?

13   A   Stanley, yes.

14   Q   Can you read the second sentence, looking at the second

15   paragraph here.  Can you read the second sentence starting from

16   where my pen is.

17   A   I know our age is different, but it don't matter to me how

18   people feel.

19   Q   Okay.  What's the date on this letter?

20   A   That's December 21, 2005.

21   Q   And who is it addressed to?

22   A   Sheryl.

23   Q   Do you remember around when you found this letter in the

24   apartment of your Los Angeles home?

25   A   I cannot recall.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Was it sometime before you gave it over to the agent?

 2   A    No.

 3   Q    I apologize.  That's a bad question.  You don't recall the

 4   specific date?

 5   A    No.

 6   Q    Do you remember around what year?

 7   A    2006.

 8   Q    Can you turn to Exhibit 67.  Do you recognize this?

 9   A    Yes.

10   Q    Okay.  And looking at the upper right-hand corner of the

11   first page, is there a name written there?

12   A    Yes.  It's my name.

13   Q    And did you write that?

14   A    Yes, I did.

15   Q    And what date is underneath it?

16   A    It's March 11 of 2009.

17              MS. BAEHR-JONES:  Government would move into

18   evidence the unredacted version of Exhibit 67.

19              THE COURT:  Any objection?

20              MR. KALOYANIDES:  No objection.

21              MS. BAEHR-JONES:  Do you recognize --

22              THE COURT:  Received.

23              MS. BAEHR-JONES:  Thank you.

24              (Exhibit 67 received into evidence.)

25   Q    BY MS. BAEHR-JONES:  Do you recognize the handwriting in
```

**UNITED STATES DISTRICT COURT**

```
 1   this?
 2   A     Yes.
 3   Q     Whose handwriting is it?
 4   A     Stanley.
 5   Q     I'm going to show this to the jury.  Did you find this
 6   letter?
 7   A     Yes.
 8   Q     Where did you find it?
 9   A     Cabinet -- I mean in a closet.
10   Q     Okay.  And where in the closet was it?
11   A     It's inserted to one of his book.
12   Q     Looking at page 2 of this letter, I'll put it in front of
13   you on the screen.  Looking at where my pen is pointing, can
14   you just read that word, that -- that sentence right where I'm
15   pointing?
16   A     You are not allowed to come into the United States 'til
17   you are 21 years of age.
18   Q     And then the next sentence?
19   A     I cannot be away from you for five years.
20   Q     And what's the date that's on the front page, the first
21   page of Government's Exhibit 67, this letter?
22   A     January 2, 2006.
23   Q     And who is it addressed to?
24   A     Elcita.
25   Q     I want you to look at page 7 of Exhibit 34.  I apologize.
```

1    You're going to have to go back to the other binder for that.

2    Do you recognize that picture?

3    A    Yes.

4    Q    Who's in that picture?

5    A    Stanley.

6    Q    And where was that picture taken?

7    A    My friend's house.

8    Q    And when was that picture taken?

9    A    December 25, '06.

10   Q    Do you remember that being around the holidays of 2006?

11   A    Yes.

12   Q    And which friend of yours?

13   A    It's my daughter's godmother.

14   Q    And does she live in Los Angeles?

15   A    At that time, yes.

16        MS. BAEHR-JONES:  Your Honor, the Government would

17   move in page 7 of Exhibit 34, and show it to the jury.

18        THE COURT:  Any objections?

19        MR. KALOYANIDES:  No objections.

20        THE COURT:  Received.

21        MS. BAEHR-JONES:  Thank you.

22        (Exhibit 34, page 7 received into evidence.)

23   Q    BY MS. BAEHR-JONES:  And just to confirm, you recognize

24   that man as Mr. Reczko, Stanley Dan Reczko?

25   A    Yes.

```
 1   Q    Who took this picture, if you recall?

 2   A    I did.

 3   Q    I'd like you to turn to what's been marked as Government's

 4   Exhibit 42.  It's probably back in the other binder.  Can you

 5   take out what's in there.

 6        Do you recognize -- do you recognize one of those rings?

 7   A    Yes, I do.

 8   Q    Which one do you recognize?

 9   A    My old engagement ring.

10   Q    So looking at -- so that's your old engagement ring?

11   A    This one.

12   Q    Who gave that to you?

13   A    Stanley.

14   Q    At some point did he take it back?

15   A    Yes, he did.

16   Q    Do you remember around when?

17   A    No.

18   Q    Looking at Government's Exhibit 42-A and the second page

19   of 42-A, is that an accurate representation of the engagement

20   ring you were just holding in Exhibit 42?

21   A    Yes.

22            MS. BAEHR-JONES:  Your Honor, the Government would

23   move in Exhibit 42-A.

24            THE COURT:  Any objection to 42-A?

25            MR. KALOYANIDES:  No objection.
```

```
 1              THE COURT:  Received.
 2                  (Exhibit 42-A received into evidence.)
 3   Q    BY MS. BAEHR-JONES:  Showing the jury what's been moved in
 4   as Government's Exhibit 42-A, that's the engagement ring that
 5   you were referring to in Government's Exhibit --
 6   A    Yes.
 7   Q    -- 42?  And when did the defendant give that to you?
 8   A    2004.
 9   Q    Did the defendant ever threaten you if you cooperated with
10   the Government and provided information about the charges in
11   this case?
12   A    Yes.
13              MR. KALOYANIDES:  Objection.  Vague.  Move to
14   strike.
15              THE COURT:  Come to sidebar.
16                  (Bench conference on the record:)
17              THE COURT:  Where are you going with this?
18              MS. BAEHR-JONES:  Your Honor, the Government --
19              THE COURT:  This is?
20              MS. BAEHR-JONES:  Vanessa Baehr-Jones.  The
21   Government has letters -- the defendant sent a letter to her
22   family in the Philippines, telling them that Richelle was going
23   to be deported.  Defendant also threatened her that he would --
24   she would be deported if she talked, and he also told her not
25   to talk to HSI.  The letters that he sent her telling her not
```

1    to talk to HSI, we are not intending to move in because this

2    was before their divorce was finalized.

3         However, the fact that she was threatened with

4    deportation, to not cooperate with the Government, certainly

5    would fall under a crime fraud exception to a marital

6    privilege, and her impression that she was being threatened is

7    not protected by their marital communications.

8              THE COURT:  Mr. Kaloyanides?

9              MR. KALOYANIDES:  Well, before I address the issue

10   of the marital privilege aspect, if I understand the

11   Government, what they're trying to do is introduce a statement

12   by Mr. Reczko that she was going to be deported?

13             THE COURT:  To whom did he purportedly make that

14   statement?

15             MS. BAEHR-JONES:  He wrote a letter to Ireana,

16   whom --

17             THE COURT:  To who?

18             MS. BAEHR-JONES:  A family member of hers in the

19   Philippines.

20             THE COURT:  Not to her?

21             MS. BAEHR-JONES:  He did to her too, but we can't --

22   we're not moving to introduce those.

23             THE COURT:  So you're only asking -- is there a

24   letter or what?

25             MS. BAEHR-JONES:  There is a letter to her family

1    member that we do not intend to introduce through her that says

2    Richelle will be deported.  I'm going to bring a judgment

3    against Richelle for crashing the car.  We've redacted it.

4              THE COURT:  When did this happen?

5              MS. BAEHR-JONES:  That was in 2008.  I can look at

6    the letter for the specific date.  This was after he was in MDC

7    custody.

8              THE COURT:  Was he already divorced from her?

9              MS. BAEHR-JONES:  I believe the date -- no, before

10   those letters -- the letters he sent to her were before his

11   divorce to -- to her.

12             THE COURT:  But this letter was not sent to her?

13             MS. BAEHR-JONES:  No, it was not.

14             THE COURT:  So it's not covered by --

15             MS. BAEHR-JONES:  It's not covered.

16             THE COURT:  -- any kind of marital privilege?

17             MS. BAEHR-JONES:  Correct.

18             THE COURT:  Do you want to comment on that?  We're

19   focusing on that letter right now.

20             MR. KALOYANIDES:  We're talking about the letter to

21   the family?

22             THE COURT:  Right.

23             MR. KALOYANIDES:  It doesn't constitute a threat to

24   this witness, and it's a statement that she's going to be

25   deported.  He's got no authority over that.  If he decides that

```
 1   they're going to report a crime -- although, deportation, I
 2   don't know that that would even qualify for that.
 3        But the point is, if he's making some sort of statement
 4   that he's going to take action against her, that's one thing.
 5   But simply to say you're going to be deported --
 6             THE COURT:  What exhibit is it?
 7             MS. BAEHR-JONES:  This is exhibit -- I'm sorry.  I
 8   left it at the lectern.  I can -- I can --
 9        Do you have the exhibit list?
10             MR. KALOYANIDES:  I do.
11             THE COURT:  Here.
12             MS. BAEHR-JONES:  Oh.  So the letter to Ireana --
13   here, 72, Your Honor.
14             MR. KALOYANIDES:  Did you get the letter back?
15             MS. BAEHR-JONES:  Yeah.
16             THE COURT:  Is this it?
17             MS. BAEHR-JONES:  Yes.  And we have a redacted
18   version.  We're going to offer the redacted version, which is
19   marked as Government's Exhibit 73.  This is the full letter,
20   72.
21             MR. KALOYANIDES:  Your Honor, may I go get my copy.
22             THE COURT:  Yes, yes.  This is --
23             MS. BAEHR-JONES:  Yes.
24             THE COURT:  -- what you're talking about?
25             MS. BAEHR-JONES:  Yes, Your Honor.
```

1          THE COURT:  What's the point of this?

2          MS. BAEHR-JONES:  Your Honor, the point is to show

3    knowledge of guilt, culpability.  The fact he repeatedly

4    threatened her, told her in other letters that we are not

5    moving to introduce, told her not to talk to Homeland Security

6    Investigations about this case.

7          THE COURT:  But you're not introducing those.

8          MS. BAEHR-JONES:  You're right, Your Honor.

9          THE COURT:  This is all that's coming in, if I allow

10   it in.  Okay?

11         MS. BAEHR-JONES:  That's correct, Your Honor.

12         THE COURT:  Telling me what else you have, but

13   you're not going to use, doesn't help because the jury won't be

14   seeing that.  So I want to know what's the value of this to the

15   jury?

16         MS. BAEHR-JONES:  Your Honor, the value is that the

17   statements in here are false.  She's not -- she was not going

18   to be deported, and he's telling this to her family members.

19   And the Government -- the inference the Government will argue

20   and draw from it is that these are threats, and it's

21   consistent -- that's consistent.  I offer the other evidence

22   just as -- as an offer of proof that it's consistent with his

23   actions.

24         THE COURT:  Mr. Kaloyanides?

25         MR. KALOYANIDES:  Well, Your Honor, first of all, to

```
 1   the extent that these are Mr. Reczko's statements, they're his
 2   statements.  Whether they're threats or not, that's for a jury
 3   to decide.  The Government is saying that he makes a false
 4   statement that she'll be deported --
 5            THE COURT:  The question is do you oppose --
 6            MR. KALOYANIDES:  Yes.
 7            THE COURT:  -- the admission of this?
 8            MR. KALOYANIDES:  Yes, because this has got nothing
 9   to do with a statement made to this witness (inaudible).
10            THE REPORTER:  I can't hear him.
11            MR. KALOYANIDES:  I'm sure she'll testify this is a
12   letter to her family.  She might be able to authenticate the
13   handwriting, but again it is not a statement to this witness.
14   It has nothing to do, no statement about her providing
15   testimony in this case.
16            THE COURT:  Okay.  I'm not going to admit it.  Under
17   403 this is very, very distant.  It is not clear at all that it
18   is a threat to be a sufficient instance of consciousness of
19   guilt.
20            MR. KALOYANIDES:  I'm going to ask Your Honor if you
21   could not only strike the testimony but ask the jury to
22   disregard.
23            THE COURT:  I will.
24            MS. BAEHR-JONES:  Actually, Your Honor, since we're
25   up here, the other letters that we have -- we believe that the
```

1    crime fraud exception applies to the letters that he sent her,

2    which we also have exhibits which I can move in, which are very

3    direct evidence that he was telling her not to cooperate with

4    authorities.

5              THE COURT:  Why didn't you brief this?  It's not

6    clearly established whether the crime fraud exception applies.

7    Maybe it does, maybe it doesn't.  You briefed a lot of things.

8    I'm not going to make the determination on the fly.  Denied.

9                   (The following proceedings were held in open

10                  court, in the presence of the jury:)

11             THE COURT:  All right.  Ladies and gentlemen, the

12   last question -- and I don't know whether there was an answer

13   or not, but to the extent there was an answer to the last

14   question, both of those are stricken, and you are not to

15   consider that whatsoever in your deliberations or decision in

16   this case.

17         All right.  Ms. Baehr-Jones, you may proceed.

18             MS. BAEHR-JONES:  Your Honor, nothing further.

19             THE COURT:  All right.  Cross-examination,

20   Mr. Kaloyanides.

21             MR. KALOYANIDES:  One moment, Your Honor.

22         Thank you, Your Honor.

23                        CROSS-EXAMINATION

24   BY MR. KALOYANIDES:

25   Q    If you could, please turn -- turn back to Exhibit 34 in

```
 1    the binder.  I will also put it up on the screen if it's easier
 2    for you.
 3                THE COURT:  You're referring to page 7?
 4                MR. KALOYANIDES:  I am referring to page 7, the only
 5    picture in this exhibit that has been admitted.
 6    Q    BY MR. KALOYANIDES:  It's on the screen, if it's helpful,
 7    but please feel free to look at the binder if that's better for
 8    you.  You testified you recall taking this picture?
 9    A    Yes.
10    Q    Now, you were asked what day it was taken.  Were you
11    reading this information here?
12    A    Yes.
13    Q    Do you have an independent recollection of the date you
14    took the photo?
15    A    No.
16    Q    So you're relying on this information here, yes?
17    A    Yes.
18                MR. KALOYANIDES:  One moment, Your Honor.
19          Nothing further, Your Honor.
20                THE COURT:  Any redirect, Ms. Baehr-Jones?
21                MS. BAEHR-JONES:  One question, Your Honor.
22                          REDIRECT EXAMINATION
23    BY MS. BAEHR-JONES:
24    Q    Do you have an independent recollection of going to a
25    Christmas party --
```

```
 1    A      Yes.

 2    Q      -- with the defendant?

 3    A      Yes.

 4    Q      In 2006?

 5    A      Yes.

 6               MS. BAEHR-JONES:  Nothing further.

 7               THE COURT:  All right.  Any recross?

 8               MS. BAEHR-JONES:  I -- I -- I apologize.

 9    Q      BY MS. BAEHR-JONES:  December of 2006?

10    A      December of 2006.

11    Q      And that was in Los Angeles?

12    A      Los Angeles, at my friend's house.

13    Q      And the picture that we were looking at in Exhibit --

14               THE COURT:  34, page 7.

15    Q      BY MS. BAEHR-JONES:  -- 34, page 7, the -- the page that

16    we were just talking about -- I apologize -- Exhibit 34,

17    page 7, is that from the Christmas party?

18    A      Yes.

19               MS. BAEHR-JONES:  No further questions.

20               THE COURT:  Mr. Kaloyanides?

21               MR. KALOYANIDES:  Yes, Your Honor.

22                         RECROSS-EXAMINATION

23    BY MR. KALOYANIDES:

24    Q      Do you remember what time you went to the party?

25               THE COURT:  When you say "time," you mean time of
```

**UNITED STATES DISTRICT COURT**

1   the day?

2           MR. KALOYANIDES:  Time of the day, yes, Your Honor.

3   Thank you.

4           THE WITNESS:  I cannot recall, but that's close

5   around 7:00, early evening.

6   Q    BY MR. KALOYANIDES:  Early evening.  Do you recall -- was

7   this party actually on December 25th?

8   A    No.

9   Q    You don't recall?

10  A    No.

11          MR. KALOYANIDES:  Thank you.

12      Nothing further.

13          THE COURT:  All right.  Ms. Reczko, thank you very

14  much.  You may step down.

15      Government may call its next witness.

16          MS. BLANCH:  Your Honor, the Government calls

17  Bruce Pixley.

18          THE COURT:  All right.

19                       BRUCE PIXLEY,

20  called as a witness by the Government, was sworn and testified

21  as follows:

22          THE CLERK:  Please come forward, sir.  Please wait

23  right here, sir, raise your right hand to be sworn.  Do you

24  solemnly swear the testimony you shall give in the cause now

25  pending before the Court shall be the truth, the whole truth,

```
 1    and nothing but the truth so help you God?

 2              THE WITNESS:  I do.

 3              THE CLERK:  Thank you, sir.  You may go around and

 4    take a seat, please.  Please adjust the microphone and speak

 5    directly into it.  Would you please state your full name for

 6    the record, spell both your first and last name, please.

 7              THE WITNESS:  It's Bruce William Pixley, B-r-u-c-e

 8    P-i-x-l-e-y.

 9              THE COURT:  All right.  Ms. Blanch.

10              MS. BLANCH:  Thank you, Your Honor.

11                        DIRECT EXAMINATION

12    BY MS. BLANCH:

13    Q    Mr. Pixley, what is your job?

14    A    I'm a computer forensic examiner.

15    Q    How long have you been a computer forensic examiner?

16    A    I started this as a duty assignment when I was with the

17    Santa Barbara Sheriff's Department back in 1999.

18    Q    And how long were you a computer forensic examiner with

19    the Santa Barbara Sheriff's Department?

20    A    Probably three to four years, up to the time that I left

21    the department.

22    Q    Before you began working as a computer forensic examiner

23    with the -- excuse me -- with the Santa Barbara Sheriff's

24    Department did the Santa Barbara Sheriff's Department have a

25    computer forensics department?
```

1   A     No.  It -- at that time we did not have it.  I started --

2   at the time I was a detective sergeant, and I started the unit.

3   Q     And what was involved in starting a computer forensics

4   unit?

5   A     We needed to attend training so we knew what we were

6   doing.  We needed to purchase equipment.  We needed to set up a

7   forensic lab to conduct the -- conduct our work.

8   Q     And were you responsible for all of those things?

9   A     Yes.

10  Q     And after you left the Santa Barbara Sheriff's Department,

11  what did you do?

12  A     I went to the private sector as an instructor.  I started

13  teaching.  While I was with the sheriff's department, I started

14  teaching in the private sector and also for the State of

15  California.  When I left the sheriff's department, it was

16  because I went to teach full time.

17  Q     What were you teaching?

18  A     Computer forensics.

19  Q     And when you went to teach full time, where were you

20  employed?

21  A     With a company called Guidance Software.

22  Q     What do they do?

23  A     They design -- they wrote the program called Encase, which

24  is a computer forensics software application.

25  Q     And when you were employed for them, what -- what did you

1   do?

2   A      I put together the training materials and taught classes.

3   So we taught classes to state, local, and federal law

4   enforcement agencies and also to the private sector because

5   there's corporations that will have a computer forensic unit,

6   and so they would attend classes.

7   Q      And how long did you work for Guidance Software?

8   A      I worked for Guidance Software up until probably about

9   2005, so just a couple of years as an instructor.  But at that

10  time I -- I missed doing investigations; so I left.

11  Q      And where did you go from there?

12  A      From there I went to a company called Aon, which is an

13  insurance company, but they had a consulting practice that

14  provided computer forensic services to corporations.  So I -- I

15  went there to head up the west coast division of computer

16  forensics for them.

17  Q      And where are you employed now?

18  A      I'm self-employed.

19  Q      Doing what?

20  A      I conduct -- same thing, computer forensic examinations.

21  I do work for -- for law firms and for corporations.

22  Q      You still teach?

23  A      I still teach, yes.

24  Q      Where do you teach?

25  A      For the California Department of Justice I teach at

1   various sites that we will host the class at different

2   locations around the state, and I'll teach classes on computer

3   forensic examinations.

4   Q    Do you have any special training in forensics on CD-ROMs?

5   A    I do.

6   Q    Do you teach a class on CD forensics?

7   A    I do.  I incorporated this -- this material into the

8   classes that I teach for the State.

9   Q    Do you have any special certifications as a computer

10  forensic examiner?

11  A    I do.

12  Q    What are those?

13  A    One is called Encase forensic examiner.  It's a -- it's a

14  certification put on by Guidance Software that consists of a

15  written test and a practical practice application.  So we had

16  to go through that process.

17       I also have a certification from the SANS Institute as a

18  certified forensic analyst.

19            MS. BLANCH:  Your Honor, I'd offer Mr. Pixley as an

20  expert in computer forensics.

21            THE COURT:  You may proceed without that and --

22            MS. BLANCH:  Thank you.

23            THE COURT:  -- if Mr. Kaloyanides on

24  cross-examination wishes to inquire, he may.

25            MS. BLANCH:  Thank you, Your Honor.

1    Q    BY MS. BLANCH:  Mr. Pixley, if you can turn to the binder

2    in front of you that starts with Exhibit 1 --

3              THE COURT:  That's not before him yet, Counsel.

4              MS. BLANCH:  Oh.  Actually, in the originals it

5    might start with Exhibit 9.

6              THE CLERK:  Okay.

7              MS. BLANCH:  Sorry.

8    Q    BY MS. BLANCH:  I'd first like to just take you through

9    some of these exhibits and see if you recognize them.  Could

10   you look first at Exhibit 10.

11       Do you recognize that?

12   A    I do.

13             MS. BLANCH:  Your Honor, I believe Exhibit 10-A is

14   also in evidence.  It's a photograph of Exhibit 10.  May I show

15   that to the jury.

16             THE COURT:  10-A, yes, it's in evidence.  Yes, you

17   may.

18   Q    BY MS. BLANCH:  Is this a photograph of Exhibit 10 that

19   you're looking at?

20   A    Yes.

21   Q    Do you recognize those -- those CDs?

22   A    Yes.

23   Q    Did you conduct forensic examination on these CDs?

24   A    On the one that's labeled Baby Girl, the one that's at the

25   top there, no.

```
 1    Q     The one that's broken?

 2    A     Correct.

 3    Q     When you received this CD, was it already broken?

 4    A     Yes.

 5    Q     Once it's broken like that, can you conduct forensics?

 6    A     No.

 7    Q     But you did conduct forensics on the Baby Girl CD?

 8    A     Yes.

 9    Q     Could you turn to Government's Exhibit 17, please.

10          MS. BLANCH:  Your Honor, while he's doing that, if I

11    can publish to the jury 17-A, which is already in evidence.

12          THE COURT:  All right.

13    Q     BY MS. BLANCH:  Looking at Exhibit 17, is Exhibit 17-A on

14    the screen a photograph of the CDs that you're holding?

15    A     Yes.

16    Q     And looking at those CDs, did you -- do you recognize

17    those?

18    A     Yes.

19    Q     That's one CD labeled -- what -- what are the CDs labeled,

20    if you can read on there?

21    A     Sure.  So starting at the bottom there where you have

22    Averie 2006, that CD is labeled "Averie Fall Holloween 2006."

23    Q     Is that on the CD itself?

24    A     Yes.

25    Q     And the next CD?
```

1    A    On that CD we see it's the same thing where it says

2    "Mulabuyuk," an abbreviation of B-r-g-y, and an abbreviation

3    for C-a-p-t.

4    Q    And the last CD?

5    A    The last CD is labeled San Diego Zoo.

6    Q    And did you conduct forensics on these CDs?

7    A    Yes.

8    Q    And if you could turn to Exhibit 18, please.

9         And, Your Honor, while he's doing that, if I can publish

10   18-A, which is a photograph already in evidence.

11              THE COURT:  Yes.

12   Q    BY MS. BLANCH:  Do you recognize Government's Exhibit 18?

13   A    Yes.

14   Q    And what is that?

15   A    They're compact discs for a digital camera.  Well, not a

16   compact -- compact memory cards, compact media cards.

17   Q    Did you conduct forensics on these media cards?

18   A    Yes.

19   Q    Could you please turn to Exhibit 25.

20   A    Okay.

21   Q    When you conduct forensics on multiple digital devices, is

22   there anything that you do to keep the devices straight so that

23   you know in your reports which device you're talking about?

24   A    Yes.

25   Q    What do you do?

1   A    Well, in this case the Government had a chain of evidence

2   form that already had these items identified as Item 1 through

3   8; so I continued using that same -- that same identifier.  So

4   in this case it just -- using Item 1, Item 2, so forth, to

5   Item 8.

6   Q    And have you prepared a summary exhibit to assist the jury

7   in understanding which piece of evidence you're talking about

8   when you refer to an item by item number?

9   A    Yes.

10  Q    And is that Exhibit 25?

11  A    Yes.

12        MS. BLANCH:  Your Honor, I move Government's

13  Exhibit 25 into evidence.

14        MR. KALOYANIDES:  No objection.

15        THE COURT:  25.  Okay.  Received.

16        (Exhibit 25 received into evidence.)

17  Q    BY MS. BLANCH:  So when you're talking about Item 1, what

18  is Item 1?

19  A    So Item 1 would be the compact disc that was labeled

20  "Baby Girl 2006 Hot Wow."  And I'd also received copies of

21  that -- that disc as well.

22  Q    And Item 2?

23  A    Item 2 would be trial Exhibit 17, and this is that CD that

24  we showed earlier called Mulabuyuk, B-r-g-y, C-a-p-t.

25  Q    Item 3?

1  A    Item 3 would be trial Exhibit 17, the compact disc that

2  was labeled San Diego Zoo.

3  Q    And Item 4?

4  A    The trial Exhibit 17, the fourth CD that was labeled

5  "Averie Fall Holloween 2006."

6  Q    And Item 5?

7  A    Item 5 is the compact disc, the SanDisk memory card,

8  128 megabyte memory card.

9  Q    And 6?

10  A    Item 6 is trial Exhibit 18.  This is the second memory

11  card, and this is a SanDisk 64 megabyte memory card.

12  Q    7?

13  A    7, trial Exhibit 18.  This is the Ritz 32 megabyte memory

14  card.

15  Q    And Item 8?

16  A    It is trial Exhibit 18.  This is the Canon compact flash

17  16 megabyte memory card.

18  Q    I'd like to talk a little more about forensics on memory

19  cards and CDs.  Have you prepared an exhibit that would assist

20  you in explaining to the jury how you conduct forensics on a CD

21  and a memory card?

22  A    Yes.

23  Q    Could you please turn to Government's Exhibit 22.  Is this

24  that exhibit?

25  A    Yes.

```
 1              MS. BLANCH:  Your Honor, may I publish to the jury.
 2              THE COURT:  Any objection?
 3              MR. KALOYANIDES:  Just for clarification, this is a
 4    demonstrative exhibit; correct?
 5              MS. BLANCH:  Yes.  I have not --
 6              MR. KALOYANIDES:  No objection.
 7              THE COURT:  All right.
 8    Q    BY MS. BLANCH:  I'm going to show you the first page of
 9    that exhibit.  Let me zoom out here.  Can you explain to me
10    what this exhibit is showing.
11    A    So this is for a compact disc and where you would find
12    information stored on the compact disc after data has been
13    copied to it.
14    Q    All right.  So if we can start over from this side, what
15    is this?
16    A    So there's a block of data on the memory -- or on this
17    compact disc that would contain information such as when the CD
18    was actually burned.  So information such as the volume label
19    of -- of the disc would be there.  Date and time information
20    may be there.  The software used to burn the disc, copy data to
21    the disc, would be stored in this block.
22    Q    And just to be clear, is that data stored in exactly this
23    spot on a CD, or is this just an example?
24    A    That's just an example.
25    Q    And then moving over, what is where my pen is marked table
```

1    of contents?  What is that?

2    A    So on another block of the compact disc would be the table

3    of contents of where files are actually located.  So in this --

4    in this -- this is similar to a book, the table of contents.

5    You're going to have the list of file names, folders, date and

6    time stamps.

7        In this case it will be the last written date and time

8    which would include the time zone, the size of the file, and

9    where exactly that file is located on the compact disc.

10   Q    And over here on the far right-hand side underneath --

11   where the block says "myvacation.jpeg," what is this intended

12   to illustrate?

13   A    This is just an example.  So I used a digital photograph

14   called myvacation.jpg.  Within the digital photograph itself,

15   there's three key pieces of information.  Most people just see

16   the digital photograph at face value, but there's data embedded

17   within that digital photograph, what we refer to as metadata.

18   So information about the camera, the make and model of the

19   camera, the date and time the photograph was actually taken,

20   that would be stored within the digital photograph.

21       And also a thumbnail image of the full size picture is

22   stored within the digital photograph.

23   Q    Showing you page 2, how does that change if you're looking

24   at a memory card for a digital camera instead of a compact

25   disc?

1    A    Well, the memory card for the camera would act similar to

2    a hard drive on a computer.  It's not going to have the

3    information about -- about when the data was copied, like

4    burned on a CD.  That's different.

5         But a media card does have a directory listing with the

6    dates and time stamps of the files and where exactly that file

7    is located on the memory card.  And in this example I used the

8    same thing with the digital photograph, using myvacation.jpg.

9    But the digital photograph information doesn't change.  It's

10   still the same photograph.  It's just stored on the memory

11   card.  It still contains the same pieces of information

12   embedded within the photograph.

13   Q    I'm showing you the first page again.  If you have a

14   compact disc and you make a copy of it, do any of these blocks

15   change?

16   A    What would likely change, if you were making a copy of a

17   compact disc, and depending on the software that you use, the

18   thing that would change would be the CD burning information.

19   So that would change.  But the copies of the data -- such as

20   the digital photographs, the directory structure, the names of

21   the files, and the date and time stamps -- those would remain

22   the same.

23   Q    What if you were making a copy of a CD using Windows Media

24   Player?  Would that change the date and time stamp if that was

25   what you were using to burn the copy?

1  A     Well, if you were using -- you said Windows Media Player.

2  If you were using the operating system to make a copy --

3  Q     Yes.

4  A     -- of the disc as opposed to media player, yes.  It

5  would -- it would change to the date that you were making that

6  copy.

7  Q     So if you burned a copy using Windows, this information

8  would change?

9  A     Yes.

10  Q     But what about the information embedded within the

11  photographs themselves?  Would that change?

12  A     No.

13  Q     Would the date and time that the photograph was taken

14  change?

15  A     No.

16  Q     What about the table of contents?  Would that change?

17  A     Same data and you have the same folder structure, that's

18  not going to change.  The file names are not going to change,

19  and the time stamps are not going to change.

20  Q     Let's talk a minute about Exhibit 10.  If you can turn to

21  Exhibit 10, do you have that in front of you?

22  A     Exhibit 10, the compact disc?

23  Q     Uh-huh.

24  A     Okay.

25  Q     If you can look at the disc that's labeled Baby Girl,

1   2006.

2   A    Okay.

3   Q    You stated you conducted forensics on that disc?

4   A    Yes.

5   Q    Is there anything special or unique about conducting

6   forensics on that disc?

7   A    Well, the thing that really stuck out in conducting

8   forensics on this disc is the disc had been damaged.

9   Q    How had it been damaged?

10  A    Well, what it appears, somebody had tried to put their

11  initials and the date on the disc, on the top layer, and they

12  used a ballpoint pen to do that.  So when you take a ballpoint

13  pen and you press down on the top layer, that causes damage to

14  transfer through to the bottom layer, which is a reflective

15  layer for the laser beam to hit, and that would cause damage.

16  Q    Were you still able to recover data from this disc?

17  A    Yes.

18  Q    From the damage you're talking about with the ballpoint

19  pen, would that cause data on the CD to change?

20  A    It would cause data, as far as where the ballpoint pen had

21  pressed through, that would change because the data would be

22  corrupt.  The rest of the data on the disc is still intact and

23  is not corrupted.

24  Q    So, for example, if the CD -- if someone wrote on a CD

25  with a ballpoint pen, could that change the metadata in a

1    photograph?

2    A    Oh, no.  In that case, it's not going to change the data

3    in the photograph.  It would just be that the photograph may

4    not be readable.  You're not going to see the picture because

5    the files are corrupt.

6    Q    When you conducted forensics on that Government's

7    Exhibit 10, the Baby Wow CD, were you able to recover a folder

8    structure from that CD --

9    A    Yes.

10   Q    -- despite the damage?

11   A    Yes.

12   Q    Did you create a exhibit that would help explain or

13   illustrate to the jury what that folder structure was?

14   A    Yes.

15   Q    Could you please turn to Exhibit 23.  Do you recognize

16   this?

17   A    I do.

18   Q    What is that?

19   A    This is the folder structure that's contained on the disc

20   we were just talking about on Item 1, or Exhibit 10.

21   Q    Is that for the first page?

22   A    Yes.

23            MS. BLANCH:  Your Honor, may I publish the first

24   page for the jury.

25            THE COURT:  Any objections?

```
1              MR. KALOYANIDES:  No objections.

2              THE COURT:  Received.  I mean, it's not being

3    received.  It's just for demonstrative purposes.

4              MS. BLANCH:  Yes, Your Honor.

5              THE COURT:  All right.  You may.

6    Q    BY MS. BLANCH:  Okay.  Tell me what I'm looking at in this

7    exhibit.

8    A    In this, it's just a simple illustration of the Baby Girl

9    Wow CD that contains multiple folders on there.  So we see the

10   folder icons to -- just to depict the folder exists, and then

11   the name of the folder to the right of it.

12   Q    When you obtain a CD, a blank CD, does it come preloaded

13   with a folder structure?

14   A    No.

15   Q    Are folders user-created items?

16   A    Yes.  I mean, the user would have to put these folders

17   onto the disc.

18   Q    And when a user puts a folder onto a disc, do they have

19   the opportunity to put a name on that folder?

20   A    They would have put it on -- they would have named the

21   folder ahead of time and then copied the data to the disc.

22   Q    When you say they name the folder ahead of time, is that

23   on a computer?

24   A    Yes.

25   Q    So the text next -- next to each of these folders, are
```

1    these user created -- that's user-created text?

2    A    Yes.

3    Q    And can we just go through the folders on this exhibit.

4    Are these the folders that were found on Government's

5    Exhibit 10?

6    A    Yes.

7    Q    What's the name of this first folder?

8    A    2006, 11-18, Philippines.

9    Q    And the name of the second folder?

10   A    2006, 11-25, Sasi.

11   Q    And the third?

12   A    2006-11-25, us.

13   Q    And the fourth?

14   A    2006-11-26, Hot Mami.

15   Q    And the next?

16   A    Barangay Cap.

17   Q    And then?

18   A    Dan and Sheryl.

19   Q    And then?

20   A    Our Marriage, Papa Birthday, Sasi, Sexy Sheryl.

21   Q    And then what's this down here?

22   A    This compact disc also contained a zip file called

23   papabirthday.zip.

24   Q    What's a zip file?

25   A    A zip file is similar to a folder where it's a file that

```
 1   will contain multiple files, and then that information is
 2   compressed into a single file.  So it's similar to a file.
 3   It's just -- or similar to a folder.  It's just a single file.
 4   Q    So when you conducted forensics on Government's
 5   Exhibit 10, in addition to the folder structure, were you able
 6   to recover actual items off of that CD?
 7   A    Yes.
 8   Q    What sort of items?
 9   A    Digital photographs.
10   Q    And were you able to recover all of the digital
11   photographs from that CD?
12   A    No.
13   Q    Were some of them damaged?
14   A    Yes.
15   Q    Were there some photographs where you could recover a
16   portion of the photograph but not the whole thing?
17   A    Yes.
18   Q    Can you to turn to Government's Exhibit 10-C.
19        I believe that's already in evidence.  Not yet?
20            THE CLERK:  Not to my knowledge.
21            MS. BLANCH:  I think you're right, actually.  Sorry.
22   Q    BY MS. BLANCH:  Do you recognize this?
23   A    Yes.
24   Q    Does it have any handwriting on it?
25   A    Yes, it does.
```

```
 1   Q     What does the handwriting say?

 2   A     Looks like 05-09-14, copy, with the name of A, dot, Grove,

 3   G-r-o-v-e, what may be somebody's initial.

 4   Q     And did you have the opportunity to conduct forensics on

 5   this CD?

 6   A     Yes.

 7              MS. BLANCH:  Your Honor, I move Government's

 8   Exhibit C into evidence.

 9              THE COURT:  10-C?

10              MS. BLANCH:  10-C.

11              THE COURT:  Any objection?

12              MR. KALOYANIDES:  No objection.

13              THE COURT:  Received.

14                 (Exhibit 10-C received into evidence.)

15              MS. BLANCH:  May I retrieve it from the witness.

16              THE COURT:  Yes.

17   Q     BY MS. BLANCH:  Okay.  So I'm showing you the case here.

18   What does that say?

19   A     IJM CD.

20   Q     And then on the inside it's marked with the name,

21   A. Grove?

22   A     Yes.

23   Q     And the date?

24   A     Yes.

25   Q     Did you have the opportunity to conduct forensics on this
```

**UNITED STATES DISTRICT COURT**

```
 1   CD?
 2   A     Yes.
 3   Q     And did you form any opinions about whether or not it
 4   related to the CD that you examined in Exhibit 10, the Baby
 5   Girl CD?
 6   A     Yes.
 7   Q     What's your opinion?
 8   A     That the -- that the folder structure was the same, that
 9   the files were the same, but in the case of where they were
10   corrupted files on the Baby Girl CD, those files were not
11   corrupt on the copy.
12   Q     Did you conduct -- create an exhibit comparing the folder
13   structure from the Baby Girl CD, the original, with
14   Exhibit 10-C, the copy?
15   A     Yes.
16   Q     Is that the second page of Exhibit 3?
17   A     Yes.
18           MS. BLANCH:  May I publish, Your Honor.
19           THE COURT:  Yes.
20   Q     BY MS. BLANCH:  Comparing the folder structure between the
21   Baby Girl Wow CD and what you've labeled the IJM CD, when you
22   refer to the IJM CD, are you referring to the CD that's
23   Government's Exhibit 10-C?
24   A     Yes.
25   Q     Is this the folder structure from Government's Exhibit
```

1    10-C?

2    A    Yes.

3    Q    Can we just call that the IJM CD for now?

4    A    Yes.

5    Q    Are there any differences in the folders that you found on

6    the Baby Girl Wow CD and the IJM CD?

7    A    The folder structure was the same.

8    Q    Were there any differences between the folder structures?

9    A    No.

10   Q    I'm going to show you again the first page of Exhibit 22.

11   Comparing the Baby Girl CD and the IJM CD, Exhibit 10 and

12   Exhibit 10-C, did any blocks of these data change?

13   A    The CD burning information was different.

14   Q    Okay.  So CD burning information, not the same?

15   A    Right.

16   Q    What about the table of contents?

17   A    The table of contents was the same.

18   Q    And for the files that you were able to recover on the

19   original, were there any differences in the files on the copy?

20   A    No.

21   Q    Where you found fragments of files on the original, did

22   you find the full file on the copy?

23   A    Yes.

24   Q    Did you conduct any sort of mathematical comparison

25   between the contents of the original Baby Wow CD and the

1    contents of the copy?

2    A    Yes.

3    Q    Could you explain that, please.

4    A    Sure.  To compare files in -- in forensics, we use a math

5    algorithm which is called MD5, method-digest five.  It's just a

6    math equation, and it's a way of just taking a math equation

7    and calculating it against a block of data such as a digital

8    photograph.

9        So what you can do is you can take two similar files, two

10   digital photographs, and run this math equation.  And when the

11   output is the same, then you know that that file is exactly the

12   same file.  It hasn't been degraded, compared to, like, a Xerox

13   copy where, if you make a copy of something ten times, over

14   time that Xerox copy will degrade.  But if you make ten copies

15   of the same digital file and the hash values match, that file

16   is exactly the same.  It was no degrade of that file just

17   because it's a copy.

18   Q    When you compared the hash value of the recovered

19   information, the recovered data from Exhibit 10, did it match

20   the hash value of the corresponding data on the IJM copy?

21   A    Yes.

22   Q    So looking at the photographs, were you able to recover

23   photographs from the IJM copy?

24   A    Yes.

25   Q    Where the photograph appeared on both CDs, did the

1    metadata embedded in that photograph change in any way?

2    A     No.

3    Q     The date and time of that photograph remained the same?

4    A     Yes.

5    Q     And the camera make and model remained the same?

6    A     Yes.

7    Q     All right.  I'd like to turn your attention to

8    Government's Exhibits 1 through 8.

9          And, Ms. Herrera, I believe that's the binder in front of

10   you.

11         Before coming here today, have you had the opportunity to

12   review exhibits 1 through 8, including the sub exhibits behind

13   each of those numbers?

14   A     Yes.

15   Q     What are they?

16   A     Exhibits 1 through 8 are -- you have digital photographs.

17   They're from the compact disc from the IJM CD.  And you also

18   have thumbnail versions of those digital photographs as well.

19   Q     And did these photographs come from the original Baby Wow

20   CD or did it come from the IJM copy?

21   A     These came from the IJM copy.

22   Q     And did you do anything to these exhibits to indicate

23   whether or not that photograph was also recovered from the

24   original Baby Wow CD?

25   A     Yes.

1    Q     What did you do?

2    A     On the photographs that were also on the original compact

3    disc, is -- there is a purple check mark that would appear next

4    to the name of the file on the full-sized digital photograph.

5    Q     I'm just going to find one example.  If you could turn to

6    Government's Exhibit 1-B.

7    A     Yes.

8    Q     Is there a blue check on the bottom of that photograph?

9    A     Yes.

10   Q     And what does that indicate?

11   A     That this picture also appears on the original Baby Girl

12   CD, and it was not corrupt.

13             THE COURT:  Where is the checkmark?

14             THE WITNESS:  At the bottom of the name of the file,

15   the bottom of the -- bottom left corner, it says

16   "philippines028.jpg," and there's a white block --

17             THE COURT:  Yes.

18             THE WITNESS:  -- at the bottom, and there's a

19   checkmark in that box.

20             THE COURT:  There's no checkmark in the box.

21             MS. BLANCH:  Do you have a checkmark on yours?

22        I'm sorry, Your Honor.  We swapped out some of these

23   exhibits, and I think your set may have not gotten the swap

24   outs.  I apologize.

25             MR. KALOYANIDES:  May I confer with counsel.

**UNITED STATES DISTRICT COURT**

150

```
1              THE COURT:  Yes.
2                  (Counsel confer sotto voce.)
3              MR. KALOYANIDES:  I'm sorry, Your Honor.  Which
4    exhibit?
5              MS. BLANCH:  1-B.
6              MR. KALOYANIDES:  Yes.  There's a checkmark.
7              THE COURT:  Do every one of the white boxes have a
8    checkmark, or some of them have and some do not have?
9              MS. BLANCH:  Some of them have, some do not.
10             THE COURT:  So I have no way of telling what you're
11   talking about.
12             MS. BLANCH:  Can I give you a copy of these
13   exhibits?
14             THE COURT:  That would be helpful.  All right.  I
15   see it now.  Okay.
16             MS. BLANCH:  Your Honor, may I publish Exhibit 1-B,
17   not with the photograph but with just the lower one quarter so
18   they can see what the checkmark looks like.
19             THE COURT:  Have these been already moved into
20   evidence?
21             MS. BLANCH:  Not yet, Your Honor.
22             THE COURT:  Any objection to just publishing the
23   checkmark part?
24             MR. KALOYANIDES:  One moment, Your Honor.
25                 (Counsel confer sotto voce.)
```

**UNITED STATES DISTRICT COURT**

1           MR. KALOYANIDES:  Your Honor, these are part of the

2     stipulation.

3           THE COURT:  So you have no objection to all of these

4     coming into evidence?

5           MR. KALOYANIDES:  Yes, because we've stipulated.

6           THE COURT:  All right.

7           MS. BLANCH:  Actually --

8               (Counsel confer sotto voce.)

9           MS. BLANCH:  Your Honor, pursuant to stipulation,

10    the Government moves Exhibits 1 through 8 into evidence,

11    including the -- up to Exhibit -AY.

12          THE COURT:  When you say 1 through 8, do you mean 1

13    and 1-A through 1-AA, all of that?

14          MS. BLANCH:  Yes, Your Honor, everything.

15          THE COURT:  Everything through 8 --

16          MS. BLANCH:  Through 8-Y.

17          THE COURT:  8-Y, the letter Y, any objection to

18    that?

19          MR. KALOYANIDES:  No objection.

20          THE COURT:  Exhibits 1 through 8, including all sub

21    exhibits within each, received.

22              (Exhibits 1 through 8 received into evidence.)

23    Q    BY MS. BLANCH:  Mr. Pixley, I'm showing you a portion of

24    Exhibit 1-B.  So can we talk about what these exhibits look

25    like?  You have the photograph and then there's information

1   down along the bottom.  Can we talk about this information.

2   A     Yes.

3   Q     There's a date here.  What is that?

4   A     That is the date and time stamp that came -- that's

5   embedded within the digital photograph itself.

6   Q     And what does that indicate?

7   A     This is the date and time that the photograph was taken.

8   Q     And over here after the date -- so in this example we've

9   got it marked 11-12-2006, and then to the right of that there

10  are some numbers.  What do the numbers say?

11  A     That's the time stamp of 16:48 and 57 seconds.  So this

12  would be 4:00 P.M. in the afternoon.

13  Q     And underneath it it says "philippine028.jpg."  What does

14  that mean?

15  A     That is the name of the file as it was stored on the

16  compact disc.

17  Q     And then here there's a white box.  Do you see that check?

18  A     Yes.

19  Q     What does that check indicate?

20  A     That's the checkmark I placed there to note that that

21  file, this digital photograph, appears on the original

22  Baby Girl CD, the one that had the ballpoint pen used on it.

23  Q     Thank you.

24        Okay.  Let's talk about these exhibits for a second.  If

25  you could turn to Exhibit 1, to the first page of Exhibit 1,

1    it's a two-page exhibit.  Do you see both pages?

2    A    Yes.

3    Q    Could you tell me what that is.

4    A    So what Exhibit 1 depicts are thumbnail images of the

5    digital photographs, of some of the digital photographs that

6    were taken on November 12, 2006.

7    Q    Okay.  So turning to the second page of Exhibit 1, it's a

8    series of how many photographs?

9    A    27 photographs.

10   Q    And they're all in thumbnail.  What is the text at the top

11   of this page?

12   A    At the top of the page it says Exhibit 1, Images from

13   Baby Wow CD taken November 12, 2006.

14   Q    And when it says taken November 12, 2006, how do you get

15   that information?

16   A    That's based on the date that was embedded within the

17   digital photograph.

18   Q    And then underneath -- actually, if I can publish the

19   first page of that exhibit, is there any difference between the

20   first page and the second page of that exhibit?

21   A    Yeah.  The first page differs in that the thumbnail images

22   on the first page are completely redacted, all -- all blackened

23   out.

24   Q    So the first page of Exhibit 1 is exactly the same as the

25   second page; it just contains none of the images itself --

1    A      Correct.

2    Q      -- is that correct?

3           Your Honor, may I publish the first page?

4              THE COURT:  Yes.

5    Q      BY MS. BLANCH:  So we get an idea of what we're looking

6    at, at the top it says Exhibit 1, and then could you read the

7    text underneath Exhibit 1.

8    A      This was the images from Baby Wow CD taken November 12,

9    2006.

10   Q      All right.  And these images may have come from the

11   original or from the copy.  It's not designated on this form?

12   A      Correct.

13   Q      And then underneath each of these thumbnails there is some

14   text.  What does it say?

15   A      So using the first one as an example, it says Exhibit 1-A.

16   So this is where we would see later -- we'll actually see in

17   Exhibit 1-A it's a full-size image of the digital photograph.

18   And then below that we see the time stamp of the actual time of

19   when the photograph was taken on November 12, and this is --

20   this time stamp is also embedded within the digital photograph.

21   Q      And are they arranged in any particular order?

22   A      They are arranged in chronological order.  So if you see

23   the first one, Exhibit 1-A starts at 16:47:12, or 4:47:12 P.M.,

24   up to Exhibit 1-AA at the end, which was taken at 17:21 and 20

25   seconds, or in military time that would be 5:21 and 20 seconds

```
 1   P.M.
 2   Q     And this information comes from the photographs
 3   themselves?
 4   A     Yes.
 5   Q     So based on this exhibit alone, this is how many
 6   photographs?
 7   A     27.
 8   Q     Taken over how long of a period?
 9   A     You have about a half-hour window approximately.
10   Q     And according to the date on the photographs, they were
11   all taken on the same day?
12   A     Yes.
13   Q     Two of these photographs have a circle around them.  Do
14   you know what the reason for the circle is?
15   A     Yes.
16   Q     What's the reason for the circle?
17   A     That those digital photographs actually have the defendant
18   depicted in the picture itself.
19   Q     So going forward on Exhibit 1, 2, 3, 4, 5, 6, 7, and 8,
20   just the Exhibits 1, 2, 3 themselves, not the subparts, do each
21   of those exhibits -- are they in the same format?
22   A     Yes.
23   Q     And are each of those exhibits depicting thumbnail
24   photographs all taken on the same day?
25   A     Yes.
```

**UNITED STATES DISTRICT COURT**

1    Q    And are they all arranged in chronological order based on

2    time stamp?

3    A    Yes.

4    Q    And on the first page of the exhibit, where there are

5    circles, does that mean the same thing?  That's a photograph

6    that depicts the defendant?

7    A    Yes.

8    Q    So taking Exhibit 1 as an example, if this is the first

9    page of Exhibit 1, is the second page identical?

10   A    The second page is identical, except we actually see the

11   thumbnail images, and there are some additional redaction

12   within those, but it's not completely blacked out like it is

13   here.

14   Q    You say some of the thumbnail images are redacted.  Were

15   they redacted in the original?

16   A    No.

17   Q    So just for purposes of trial, there are some portions of

18   those exhibits blacked out or whited out?

19   A    Yes.

20   Q    But in the original on the Baby Wow CD or on the copy, no

21   blackouts?

22   A    Correct.

23   Q    Do the circles appear on the first page as well as the

24   second page or only on the first page?

25   A    It may only be on the first page.

1    Q     So with Exhibit 1 again as an example, we have

2    Exhibit 1-A.  Where it's marked Exhibit 1-A, the very first

3    thumbnail, it's marked underneath?

4    A     Yes.

5    Q     So if we turn to Exhibit 1-A behind it, is that a

6    full-size blowup of the photograph that corresponds with this

7    thumbnail?

8    A     Yes.

9    Q     And is that true of all of the exhibits here?  If we look

10   at Exhibit 1-B, is that a full-size blowup of this thumbnail?

11   A     Yes.

12   Q     And the same with Exhibit 1-C and all the way to the end?

13   A     Yes.

14   Q     Turning to the second page of Exhibit 1, this is the same

15   as the first page that we're looking at here, except that the

16   images, for the most part, are not redacted?

17   A     Correct.

18            MS. BLANCH:  Your Honor, may I briefly publish the

19   second page of Exhibit 1.

20            THE COURT:  Yes.

21            MS. BLANCH:  Thank you.

22       All right.  That's Exhibit 1.  Let's turn to Exhibit 2.

23            THE COURT:  Why don't we take our second recess at

24   this time.

25            MS. BLANCH:  Okay.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Ladies and gentlemen, we'll take our

2    second recess for 15 minutes.  Please keep in mind the

3    admonition of the Court not to discuss this matter among

4    yourselves nor anybody else until it is finally given to you

5    for deliberations.  We'll see you in 15.

6          THE CLERK:  This court now stands in recess.

7              (Recess taken.)

8              (Jury in at 12:18 P.M.)

9          THE CLERK:  Please remain seated and come to order.

10   This United States District Court is now in session, the

11   Honorable George H. King, Chief Judge presiding.

12         THE COURT:  Back on the record in the matter of

13   United States versus Reczko.  Counsel are present.  Mr. Reczko

14   is present.  And the jurors, in their seats.

15       All right.  Further examination of Mr. Pixley by

16   Ms. Blanch.

17         MS. BLANCH:  Thank you, Your Honor.  Before I get

18   started moving on to Exhibit 2, I would like to move in by

19   stipulation Government's Exhibits 29 through 35.

20         THE COURT:  Any objections?

21         MR. KALOYANIDES:  No objection.

22         THE COURT:  Received.

23             (Exhibits 29 through 35 received into evidence.)

24         MS. BLANCH:  Thank you, Your Honor.

25   Q    BY MS. BLANCH:  Okay.  Mr. Pixley, going back to the

1   contents of the Baby Girl CD, we talked about Exhibit 1.  Can

2   we now look at Exhibit 2.  I'm going to show you the first page

3   of Exhibit 2.  This is redacted.  Can you explain this exhibit?

4   A    It is similar to Exhibit 1 except that these are thumbnail

5   images of digital photographs that were taken on November 13th,

6   2006, and all of these digital photographs were found on the

7   Baby Girl CD.

8   Q    Moving to Exhibit 3, I'm going to show you the first page

9   of Exhibit 3, which is redacted.  What does this exhibit show?

10  A    This is the same thing.  This is -- for Exhibit 3 we have

11  thumbnail images of the digital photographs that were taken on

12  November 14th, 2006, and these are the thumbnail versions of

13  the full-size images that are found within Exhibit 3.

14  Q    And Exhibit 4, the first page of Exhibit 4, which is

15  redacted?

16  A    Exhibit 4, the difference here, we have thumbnail images

17  that were taken on November 15, 2006.  Again, these are the

18  thumbnail versions of the full-size pictures, and below these

19  thumbnail images, just like we could see below the others, we

20  have the time stamp displayed below each of the thumbnail

21  images.

22  Q    And, again, these are thumbnail images of the full-sized

23  images which follow Exhibits 4-A through 4-H?

24  A    Yes.

25  Q    And Exhibit 5, first page of Exhibit 5, is this the same?

1   A    This is the same.  These are thumbnail images of

2   photographs taken on November 18, 2006.

3   Q    And the full-size image follows?

4   A    The full-size image follows, and the timestamps are listed

5   below each of these thumbnail images.

6   Q    And the first page of Exhibit 6 which is redacted?

7   A    Exhibit 6 are from digital photographs -- thumbnail images

8   of digital photographs taken on November 19, 2006.

9   Q    Does the full-size image follow at Exhibit 6-A through

10  6-C?

11  A    Yes.

12  Q    I'm going to show you the first two pages of Exhibit 7.

13  Are both of those pages redacted?

14  A    I don't have the redaction page.

15          MS. BLANCH:  Your Honor, may I show the witness the

16  first two pages.

17          THE COURT:  Yes.

18              (Document tendered.)

19  Q    BY MS. BLANCH:  And the first two pages of Exhibit 7 which

20  are redacted, are those the same?

21  A    Yes.  They are thumbnail images that were taken --

22  thumbnail images of digital photographs that were taken on

23  November 22, 2006.

24  Q    And why is this over two pages?

25  A    Well, we have a much longer series of photographs; so

UNITED STATES DISTRICT COURT

1   it -- the thumbnail images span two pages.

2   Q    So it's not a duplication.  It's actually -- this exhibit

3   starts here at the first exhibit, 7-A?

4   A    Yes.

5   Q    And it continues in chronological order?

6   A    In chronological order, yes.

7   Q    Ending at 7-AAA at the bottom of the second page?

8   A    Correct.

9   Q    And if you could just remind me what the circles

10  represent?

11  A    The circles represent that the full-size digital

12  photograph depicts -- are pictures containing the defendant.

13  Q    And just to be clear, not all of these photographs depict

14  sexual activity; is that correct?

15  A    That is correct.

16  Q    But they were all taken on the same day?

17  A    Yes.  These are all November 22nd, 2006, photographs.

18  Q    And they're in order by time?

19  A    Yes.

20  Q    And, finally, Exhibit 8, this is the first page of

21  Exhibit 8.  Is this the same?

22  A    It is the same.  These are thumbnail images of full-size

23  photographs that were taken on November 24, 2006.

24  Q    And what do the circles represent?

25  A    These are -- circles represent that the defendant is

```
 1   contained within the full-size digital photograph.
 2   Q    And all of the photographs depicted in Exhibits 1 through
 3   8, did they all come from the Baby Wow CD?
 4   A    Well, they would come from either the Baby Wow CD or they
 5   came from the copy of that copy that had the noncorrupted
 6   versions of the digital photographs.
 7   Q    Thank you.
 8        Okay.  Moving on from the photographic content of the
 9   Baby Wow CD, can we talk about the content of the CD labeled
10   Mulabuyuk, Barangay Captain?  Can you turn to Government's
11   Exhibit 29, which is already in evidence.
12        And just to refresh the jury's memory, which -- which item
13   number was this CD?
14   A    Well, this -- this appeared as item -- I believe it was
15   Item 2 in my list.  We need to get the Government's exhibit.
16   Q    I was actually just referring to your item number.
17   A    Oh, okay.
18   Q    And this is depicted on the exhibit key which is
19   Government's Exhibit 25?
20   A    Yes.
21   Q    In case there's ever any question?
22   A    Yes.
23   Q    What is this exhibit?
24   A    These are basically the photographs that come from that --
25   that compact disc that were stored on that disc.
```

UNITED STATES DISTRICT COURT

1   Q    If I can just show you the first page of that exhibit,

2   just to let the jury see what we're talking about, it's not the

3   first page of the exhibit, but it says page 1 at the top.

4   Where it says Item 2, page 1.  Do you see that?

5   A    Yes.

6   Q    Do all of the pages in the exhibit, are they in this

7   format?

8   A    Yes.

9   Q    So at the top it says Item 2.  Does that indicate which

10  digital device it comes from?

11  A    Yes.

12  Q    And then there's a photograph?

13  A    Yes.

14  Q    Are these all photographs that come from Item 2?

15  A    Yes.

16  Q    And then what is this information above it?

17  A    It shows the name of the file itself.  For example, the

18  name of this picture is called house1.jpg.  Then it gives the

19  full path of what folder this file is actually located in on

20  that disc.  Then the last written date and time, the size of

21  the file, and the hash value of the file, which kind of

22  reflects back to our earlier conversation, that math equation

23  that's used the calculate the hash value of a digital

24  photograph.

25  Q    Thank you.

1       And this exhibit, Government's Exhibit 2, does this

2   contain a similar page for every one of the photographs found

3   on that CD?

4   A    Yes.

5   Q    Turning to Exhibit 30, which has already been admitted,

6   what is this?

7   A    These are digital information and the digital photographs

8   that were contained on Item 3, which was another compact disc.

9   Q    I'm going to put back on the screen Government's

10  Exhibit 25, which is the key.

11       So this is Item 3.

12  A    Yes.

13  Q    And which CD is that?

14  A    This would be the CD that's labeled "San Diego Zoo."

15  Q    And is the format the same?

16  A    The same information?

17  Q    Well, let me show you the -- page 1 of that exhibit.

18       Exhibit 30, it's actually the second page of the exhibit,

19  but it says page 1 at the top.  Is this the same format?  It

20  indicates the item number at the top?

21  A    Yes.

22  Q    And Item No. 3 refers to what?

23  A    The San Diego Zoo CD.

24  Q    And then it also contains the same information we just

25  talked about?

**UNITED STATES DISTRICT COURT**

```
 1    A      Yes.

 2    Q      As well as the photograph?

 3    A      Correct.

 4    Q      And like the previous exhibit, is there a page like this

 5    in this exhibit for every photograph that was on that CD?

 6    A      Yes.

 7    Q      If you could turn to Exhibit 31, what is this?

 8    A      This is an exhibit that I prepared that has the file and

 9    information about the photographs that are contained on Item 4,

10    which is the CD that was labeled "Averie Fall Holloween 2006."

11    Q      And just as an example, I'm going to show you what's

12    marked at the top as page 12 of that exhibit.

13           Is this a photograph that was found on the Averie Fall

14    Holloween 2006 CD?

15    A      Yes.

16    Q      Moving to Exhibit 32, what is this?

17    A      These are digital photographs that were found on Item 5,

18    which was the SanDisk compact flash memory card, the 128

19    megabyte memory card.

20    Q      And if I can show you page 28 from that exhibit, do you

21    recognize this?

22    A      Yes.

23    Q      Is this a photograph that came off of Item 5, one of those

24    memory cards?

25    A      Yes.
```

**UNITED STATES DISTRICT COURT**

1    Q    And up here there's the last written date and the file

2    created date.  What are those dates?

3    A    So the file creation date, in general the file creation

4    date will be the time that this file was stored on that -- that

5    memory card.

6    Q    And --

7    A    This is different than the compact disc.

8    Q    So the file creation date, when a file is created on a

9    photograph, on a photographic memory card, is that generally

10   the date the photograph is taken?

11   A    It -- it can be, if that was the memory card that was in

12   the camera as opposed to somebody copying this file to that

13   card later.

14   Q    And is that possible?

15   A    They -- they could have, certainly.

16   Q    And I'm going to show you the next page in that exhibit,

17   page 29.  Was this a photograph that was found on that same

18   card?

19   A    Yes.

20   Q    And what's the last written and the file creation date for

21   that photograph?

22   A    This was on December 25th, 2006, and the time is 12:04 and

23   16 seconds P.M., so just a little bit after noon.

24   Q    And is this information that's embedded in this

25   photograph?

A    Well, this is actually information that's from the memory card from the directory itself, not that's embedded within the photograph.

Q    I see.  Thank you.

You can turn to Government's Exhibit 33.  That's already in evidence.  What is this?

A    This is an exhibit that I prepared that contains the digital photographs that were stored on Item 6, the SanDisk 64 megabyte memory card.

Q    And turning to Exhibit 34, which is in evidence, what is that?

A    This is an exhibit that I prepared that contains the digital photographs of Item 7, which is the Ritz compact flash 32 megabyte memory card.

Q    Turning to page 7 of that exhibit, is this a photograph that was on that card?

A    Yes.

Q    What is the last written and the file created dates on this photograph?

A    They're exactly the same.  It's December 25, 2006, at 12:13 and 36 seconds.

Q    I can show you back from Government's Exhibit 32 -- I'm going to show you these two pages next to each other.  So for Item 5 we have this photograph, and according to the last written and the file creation dates, those are December 25th,

1    2006, at what time?

2    A    12:04 P.M.

3    Q    And then skipping over to the next memory card, which is

4    Item 7, you have this photograph taken on -- or with the same

5    date and time.

6         What time were -- do they reflect?

7    A    It's the same date, but the time is now 12:13 P.M.

8    Q    So shortly afterwards?

9    A    Yes.

10   Q    Finally, if you can turn to Government's Exhibit 35, what

11   is this?

12   A    This is an exhibit that I prepared that contains all the

13   digital photographs that were stored on Item 8, which was the

14   Canon 16 megabyte memory card.

15   Q    Okay.  So now that we've talked about the photographic

16   contents of those devices, I'd like to talk about a different

17   piece of data from the Baby Wow CD.  Is there any information

18   that you were able to recover from the original Baby Wow CD,

19   which is Government's 10, that indicates the date that that CD

20   was burned?

21   A    Yes.

22   Q    And have you created a series of exhibits that would help

23   explain to the jury the evidence that there is regarding what

24   date that CD was burned?

25   A    Yes.

1    Q    Could you turn, please, to Government's Exhibit 22.  I'm

2    sorry.  It's 24.

3         Are you at Government's Exhibit 24?

4    A    Yes.

5    Q    Is this the series of slides that you created to help

6    explain to the jury what evidence there is regarding the date

7    this CD was burned?

8    A    Yes.

9              MS. BLANCH:  Your Honor, may I publish.

10             THE COURT:  Any objection to 22?

11             MR. KALOYANIDES:  No objection.

12             THE COURT:  Received.  Yes.

13                (Exhibit 22 received into evidence.)

14   Q    BY MS. BLANCH:  Okay.  Starting on the first page, explain

15   to me what this exhibit is showing.

16   A    What we're seeing in the middle of the page is the

17   timestamp information that was pulled from the compact disc,

18   the Baby Girl CD that was damaged.

19   Q    Showing you Exhibit 22, is that this block of information

20   right here?

21   A    Correct.

22   Q    So on this timeline, this timeline just shows one single

23   day?

24   A    Yes.

25   Q    Which day?

1   A    This would be Christmas 12/25/2006.

2   Q    And --

3          THE COURT:  Did you say this is 24?

4          MS. BLANCH:  This is 24.

5          THE COURT:  That's not what I have as 24.  Go ahead.

6   I'll just look at it on the monitor.

7          MS. BLANCH:  I apologize, Your Honor.

8   Q    BY MS. BLANCH:  Okay.  So on this timeline, on

9   December 25th, 2006, according to the CD burning information

10  from this CD, what time was this CD burned?

11  A    At 11:28 in the morning.

12  Q    Was there any other information contained on the Baby Girl

13  CD?  Again, we're talking about the original; correct?

14  A    Yes.

15  Q    Not the copy?

16  A    Correct.

17  Q    Was there any other information on the original Baby Girl

18  CD that also indicated the date and time that CD was created?

19  A    Well, there was other events occurring around that time

20  frame that would be consistent with that CD being burned.

21  Q    Okay.  Let me show you page 2.  What evidence was there on

22  that CD that evidenced what else was going on around the time

23  that CD was burned?

24  A    When somebody organizes the content, the folders and files

25  that are going to be placed on a CD, they'll typically organize

**UNITED STATES DISTRICT COURT**

1  those folders on a computer.  And as you make changes to a

2  folder on a computer, you will change the last written date of

3  that folder.  When you burn or copy the contents of that data

4  onto the compact disc, that last written date will get

5  transferred to the compact disc.

6      So what I found on the compact disc itself was that there

7  were folders -- in this case there were five folders that had a

8  last modified time stamp prior to that disc being burned, which

9  is consistent with somebody organizing their data prior to

10  burning or copying that data to the disc.

11  Q    Now, I didn't ask you, in the block of data on the CD that

12  indicates the date and time that CD was burned, does it say

13  anything about the time zone?

14  A    Well, in this case it didn't have it in -- in that

15  particular block, but where it did indicate the time zone --

16  and I did mention it -- was in the directory information.

17      So when the last written time stamp in the directory

18  listing is there, there's a date and time stamp field.  The

19  user doesn't see this information.  It's behind the scenes, but

20  there is a field specific to say what time zone it is or what

21  time zone this information was coming from.  So that

22  information was there.

23  Q    And it was the Pacific time zone?

24  A    It was in Pacific Standard Time.  So when we see these

25  timestamps here through, like, the modified directory -- if we

1    start at the very top, the modified directory of the folder

2    Sexy Sheryl had a last modified time of December 25, 2006, at

3    10:30 and 32 seconds in morning, Pacific Standard Time.

4    Q    And is Los Angeles in specific -- Pacific Standard Time?

5    A    It would be during December 25th.  It's Pacific Standard

6    Time, yes.

7    Q    Were you able to find any other information from the other

8    digital devices that you reviewed that would also give us some

9    information about what was going on around the date and time

10   this CD was created?

11   A    I did.  I started looking at the totality of all events

12   that were occurring around this time frame.

13   Q    So did you add to this timeline?

14   A    I did.

15   Q    So looking at the next page, what's added on this

16   timeline?

17   A    Starting at the very top, we'll see a second entry there

18   called the burn CD, the Averie Fall Holloween 2006.  That CD

19   was burned, or data was copied to that CD that morning at

20   11:12 A.M.

21   Q    So you start up here with --

22   A    At the very top, that folder is being organized.  A change

23   was made to that folder at 10:30, the Sexy Sheryl folder.  And

24   then the Averie Fall Holloween 2006 CD was burned, and then

25   other directories were being organized -- they're displayed

1    there -- up to the point of the Baby Girl CD being burned at

2    11:28 A.M.

3    Q    So did you find anything else from other digital devices

4    that would help indicate what was going on around the time this

5    CD was burned?

6    A    Yes.

7    Q    So looking at this next slide, what have you added to this

8    slide?

9    A    We see about a half hour -- approximately a half hour

10   after the Baby Girl CD being burned is then we see that we find

11   four new photos are being taken on -- on Government's

12   Exhibit 32.  This is one of the media cards that we saw some

13   pictures from earlier.

14   Q    Is that your Item 5?

15   A    That would be my Item 5, yes.

16   Q    I'm going to show you Government's Exhibit 32, page 29,

17   again.  Is this one of those four photographs you're talking

18   about?

19   A    Yes.

20   Q    And any information from any other of the devices that

21   tells us what was going on this day?

22   A    Yes.

23   Q    So looking at the next slide, so after the four

24   photographs were taken on Item 5, that media card, then what

25   happens?

1    A     Then a new media card was being used, which is

2    Government's Exhibit 34, to take 32 additional photographs

3    starting at 12:09 P.M.

4    Q     I'm going to show you from Exhibit 32, page 7, again.  Is

5    this one of those photographs?  You probably can't tell.  I've

6    got it turned sideways.

7    A     It looks like it's zoomed in.  Is this one of the ones we

8    saw earlier?  Yeah.  So this is from my Item 7, which is the

9    Ritz 32 meg media card.

10   Q     Is this one of those 32 photographs that were taken later

11   that afternoon?

12   A     Yes.

13   Q     All right.  So all of this activity appears to be taking

14   place on the same day; is that correct?

15   A     That is correct.

16   Q     Was there any other information on these digital devices

17   that would give us some information about what was going on, on

18   the days leading up to December 25th, or this day?

19   A     Yes.

20   Q     Looking at the next slide, so right over here on the right

21   hand corner, underneath on this timeline, are we looking at

22   multiple days instead of one day?

23   A     Correct.

24   Q     And over here on the right, this column, is this all the

25   activity from the previous slides?

**UNITED STATES DISTRICT COURT**

1    A     Yes.

2    Q     All on one day?

3    A     Yes.

4    Q     So looking back over here on the left-hand side, if I can

5    zoom up a little, what are we looking at here with these eight

6    entries?

7    A     What we see here are the photographs that we just

8    discussed earlier from Government's Exhibits 1 through 8, the

9    digital photographs which are labeled on -- or notated on this

10   chart as photos with EDR, and below that it shows the actual

11   date.

12         So we see that for Exhibit 1 those were photographs that

13   were taken on November 12, 2006.  Exhibit 2 taken on

14   November 13, 2006.  Exhibit 3 taken on November 14, 2006.  We

15   have Exhibit 4 taken on November 15, 2006.  Exhibit 5 on

16   November 18, 2006.  Exhibit 6, 11/19/2006.  Exhibit 7,

17   November 22nd, 2006.  And then for Exhibit 8 was taken on

18   November 24th, 2006.

19   Q     And did you continue adding information to this timeline

20   from the other digital devices?

21   A     Yes.

22   Q     Looking at the next page, what has been added to this

23   timeline?

24   A     In this timeline now we see that there were some

25   photographs taken on November 30th, 2006, on one of the media

1    cards which was Government Exhibit 32.

2         And we also see that photographs were also being taken

3    starting -- it's -- so we have pictures on November 30th, 2006,

4    just on that day.

5         And then we see, on Government Exhibit 32, photographs

6    that are being taken from December 4th, 2006, through

7    December 25th, 2006, on that same media card.

8    Q    Okay.  So I'm going to turn to Government's Exhibit 32.

9    Is that all of the photographs that were found on the media

10   card, Item 5?

11   A    Yes.

12   Q    I'm just going to show you the very first photograph.

13   It's labeled page number 1.

14        Actually, let me ask you, Mr. Pixley, in Government's

15   Exhibit 32, was anything done to any of these photographs to

16   change the way they looked from the originals?

17   A    They --

18   Q    If I could direct your attention to page 3 and page 4.

19   A    Okay, yes.

20   Q    What was done to those photographs?

21   A    The photographs that are in this exhibit have been

22   redacted with white tape.

23   Q    And as you go through the pages from Government's

24   Exhibit 32, do the first photographs appear to depict the same

25   girl and the same man that are depicted in Government's

1    Exhibit 1 through 8?

2    A     What were the picture numbers again, please, or the pages?

3    Q     In Government's Exhibit 32, when you start from the first

4    page and start looking through the photographs, do the first

5    few photographs appear to depict the same girl and the same

6    adult that are in Government's Exhibit 1 through 8?

7    A     Yes.

8    Q     For example, I'm going to show you page 20.  On your

9    timeline where you say there are photographs with EDR on this

10   media card up until November 30th, 2006, is this one of those

11   photographs?

12   A     Yes.

13   Q     And again that's on your Item 5?

14   A     Yes.

15   Q     And the last written and the file created dates?

16   A     November 30th, 2006.

17   Q     And the photograph itself, does it depict the same girl

18   and the same man depicted in the Exhibits 1 through 8?

19   A     Yes.

20   Q     So after November 30th, are there any photographs on that

21   media card that appear to have been taken between November 30th

22   and December 4?

23   A     No.

24   Q     But then photographs start up again on December 4?

25   A     Yes.

1    Q    I'm going to show you again on Government's Exhibit 32,

2    page 28.  Is this one of the photographs that indicates it was

3    taken on December 4th, on the same media card?

4    A    Yes.

5    Q    And did photographs continue to be taken between

6    December 4 and December 25th on that media card?

7    A    Yes.

8    Q    Ending with the four photographs taken on December 25th?

9    A    Yes.

10   Q    Now, after creating this timeline, did I ask you to add

11   some travel dates to this timeline?

12   A    Yes.

13   Q    This date over here on the far left that says

14   November 10th, 2006, what does that say?

15   A    Defendant travels to Philippines.

16   Q    And there's a reference here to Government's Exhibit 36-A?

17   A    Yes.

18   Q    And then here after the photographs on the 30th, on media

19   card 5, also on November 30th, 2006, what does this say?

20   A    Defendant returns to the United States.

21   Q    With also a reference to Government's Exhibit 36-A?

22   A    Correct.

23            MS. BLANCH:  Your Honor, I have no further questions

24   for this witness.

25            THE COURT:  All right.  Thank you very much.

1       Counsel --

2               MS. BLANCH:  Oh, I'm sorry.  I actually --

3                   (Counsel confer sotto voce.)

4               MS. BLANCH:  I'm sorry.  I still have no further

5       questions for this witness.

6               THE COURT:  Cross-examination, Mr. Kaloyanides.

7               MR. KALOYANIDES:  Thank you, Your Honor.

8       One moment, Your Honor.

9       Thank you, Your Honor.

10                          CROSS-EXAMINATION

11      BY MR. KALOYANIDES:

12      Q    Good afternoon, Mr. Pixley.

13      A    Good afternoon, sir.

14      Q    Now, you prepared a report in connection with your

15      analysis of the various digital media that we've been looking

16      at; right?

17      A    Correct.

18      Q    Now in your report -- I believe it's Exhibit 27, so if

19      you'd like to have it available -- on the first page of your

20      report, you talk about that the physical evidence that you

21      reviewed, meaning the electronic media, was maintained in

22      custody of the facility where you did your analysis; right?

23      A    Correct.

24      Q    What's the significance of maintaining custody of the

25      electronic media that you're going to perform a forensic

1  analysis of?

2  A    Well, in this case, since -- well, one, this evidence

3  differs from maybe a civil case that I may work on because

4  there were images depicting child pornography.  So in this

5  case, I wanted just to make reference that this evidence stayed

6  within the ICE facility.  This isn't stuff that I took home to

7  look at.

8  Q    Is there a significance in keeping some form of

9  documentation or an audit trail of any electronic media that

10 you would perform a forensic analysis on?

11 A    Yes.

12 Q    And what would that be?

13 A    If you're talking about who possessed the evidence, maybe

14 could have altered the evidence, if that's -- if that was a

15 possibility in this case, then you would want to know who had

16 custody of the evidence at the time.

17 Q    Is it important in your analysis of electronic data, such

18 as the items you've been testifying about -- is it important to

19 know whether or not you can verify who has had this evidence

20 prior to your analysis?

21 A    In this case I do try to find out maybe who had possession

22 of this evidence.  I mean, really I'm looking at the evidence

23 at the time of when it was handed to me for analysis.  And then

24 I'm keeping the evidence at their facility.

25 Q    So am I correct that your forensic analysis is really

**UNITED STATES DISTRICT COURT**

```
 1   focused on from when the items, whenever it may be, comes into
 2   your possession?
 3   A    Yes, meaning my possession while I'm at that facility.
 4   Q    So what would be a reason you might want to know what had
 5   happened with that evidence prior to you having it for
 6   examination?
 7   A    In this case, if you were looking at who had possession,
 8   maybe if the -- one of the questions rises up in court, we're
 9   always looking at chain of evidence, who possessed that piece
10   of evidence at one time, and can it be traced.  And if you were
11   looking for altering of that evidence or if you thought that
12   would happen or who had it and what did you do with it and
13   where was it stored.
14   Q    So it's important for you to be able to verify, to the
15   best of your ability, the source of the information you're
16   about to analyze; right?
17   A    Yes, meaning at that point I don't go back and verify.  I
18   just know that I received it at that time.  I don't go back to
19   look at who had it at what time.  This is the state of the
20   evidence when I received it and then conducted my analysis.
21   Q    Now, if you were to learn during the course of your
22   analysis that there is some information suggesting tampering
23   with the item prior to you receiving it, would that be
24   important in your analysis?
25   A    If I knew about it or if that was a possibility -- I'm
```

**UNITED STATES DISTRICT COURT**

1    sorry.  You're asking if I would want to know that?

2    Q     Yes.

3    A     Yes, I would want to know that.

4    Q     And with electronic data and media like we've been talking

5    about, what kind of concerns regarding changes in the

6    information would you be particularly concerned about?

7    A     Well, if there was a change, I know that -- for one, that

8    Homeland Security had conducted a preliminary review of this

9    evidence prior to -- prior to I -- that I had taken a look at

10   it.  They had made a forensic image of this information; so one

11   the things I looked at is -- when I received it, I also made a

12   forensic image, but I know later in a supplemental report I

13   wrote that the -- the hash values of the digital evidence that

14   I had imaged had matched the digital evidence that had

15   previously been analyzed.

16   Q     You mention a forensic image.  What is that?

17   A     Well, a forensic image is a sector copy, meaning a

18   complete block-by-block sector copy of a piece of digital

19   media, such as a digital media card.  It's a little bit

20   different with a compact disc, though, but that's how you

21   define it when you're talking about a hard drive or a compact

22   flash memory card.

23   Q     What is the difference between a forensic image and just

24   copying a CD to another CD using Windows Media Player?

25   A     Well, a forensic image would be making a complete sector

1   copy of the entire -- in case of like a media card, you're

2   making a copy of every block of data on that -- on that memory

3   card.

4        But, again, on a -- but there are times in forensics, and

5   even what we would use would be maybe a targeted copy, or can

6   you verify the copy of the files, that it is a forensically

7   sound copy of those files.

8   Q    So there's two ways for your analysis, am I correct, that

9   you might use depending upon the situation, one being a true

10  forensic image versus a verified forensic copy?

11  A    Well -- and, again, when we're talking about a compact

12  disc, a compact disc -- as we mentioned earlier, a compact disc

13  for the most part is completely blank when you start off with a

14  new disc.  There's no data on it except some very basic

15  information placed there by the manufacturer.  No one sees the

16  data.  It's designed to be read by the compact disc player

17  itself.

18       But the difference with a compact disc is you cannot make

19  a forensic image of a compact disc.  You make a forensic copy,

20  but the difference is, if I copy files to a compact disc, that

21  disc was blank, and let's say I fill that disc and it's half

22  full.  The other half is unused.  I cannot make a forensic copy

23  of every block of data on that compact disc because there's no

24  data out there to copy.

25       So in that sense, what I mean is that, when we talk about

1    a forensic image of a compact disc, we're really talking about

2    can I get a copy of the sectors off of that disc.  And so there

3    is a difference between those two types of media.

4    Q    And when you're talking about a computer hard drive, is

5    there a difference in the forensic image of a computer hard

6    drive versus a compact disc?

7    A    Yes, because in a forensic image of a hard drive, is --

8    for the most part you're able to grab and copy every sector of

9    data off of that drive into a forensic image, and then we look

10   at the forensic image.

11        The process is the same whether we're talking about a

12   compact disc or we're talking about a media card.  We're trying

13   to select as much data as we can, and then we look at the copy.

14   So we put the original away.

15        So sometimes hard drives go bad.  So we want to work from

16   a forensic copy of that piece of media.

17   Q    Is that the same also for the media cards that you

18   analyzed in this case, the SanDisk cards?

19   A    Right.  In the SanDisk card, I made a forensic image of

20   each card using a write block device, and then I worked off of

21   the copy, the forensic image.

22   Q    And that's in order to preserve the integrity of the data

23   that you're analyzing; correct?

24   A    Not just the data that I'm analyzing.  We're just trying

25   not to subject the original evidence to use that -- you know,

185

1  electricity or something happens to cause things to go sideways

2  on the card, we want to work from a copy of it.

3  Q    Now, when you make a regular copy, if someone was to make

4  a regular copy using a Windows Media Player or some other

5  commercially available disc copy program, I think you mentioned

6  that every time you burn a new disc, the time and date

7  information of the burning or copying of the disc will change

8  from one disc to the next; is that right?

9  A    Yes, depending on the software.  So more than likely

10  you're probably going to see a new date and time stamp of when

11  that copy was made as opposed to the original disc itself.

12  Q    When you use a system that allows you to make a forensic

13  copy, however, does it also create a new disc burn or copy date

14  for your forensic copy?

15  A    No.  If I had a forensic copy of the disc, then I'm going

16  to be looking at the same information as if I was looking at

17  the actual disc.

18  Q    So in your analysis for doing a forensic evaluation of

19  data as in this case, it would be important that you have as

20  close to an original of the data as possible for your analysis;

21  is that right?

22  A    Yeah that.  Would be help, yes.

23  Q    And in the best of possible worlds, if you could have all

24  the information and sources of information to determine the

25  data for a particular image, what is the original source you

1  would be looking for?

2  A    Well, I would go back to the original disc itself, and if

3  we had a forensic copy or a forensic image of that disc, that

4  original disc, that would be ideally what I would want to work

5  from.

6  Q    Now, if that is a disc that comes from a computer, would

7  you want to see the computer?

8  A    You mean the computer that was used to copy the data to

9  the disc?

10  Q    Yes.

11  A    That would be nice.

12  Q    And what is important about having the computer versus

13  just a copy of the disc?

14  A    Well, if I had the computer, then what I would be looking

15  on the computer is what CD burning software is installed or

16  used to create compact discs.  I may even find evidence of the

17  original photographs still on the computer.  There's other

18  pieces of information, but those are two things I would start

19  with.

20  Q    With -- in connection with the kind of software used to

21  make the copy, are there issues with software being to effect

22  the metadata of an image, for example, from a computer to a CD?

23  A    You threw a lot of terms out there.  Can you rephrase your

24  question.

25  Q    Sure.  You mentioned that one of the things you would like

1    to know is what was the program used to make the copy, in other

2    words, from the computer to the CD; is that correct?

3    A    Okay.  We're talking about two things.  I thought you were

4    referring to the original computer that was used to make the

5    original CD.  You're talking about inspecting the computer that

6    was used to make the copy of the CD?

7    Q    Well, let's talk about both.  All right.

8    A    Which --

9    Q    Let's start with the computer that creates the CD

10   originally.

11   A    Okay.

12   Q    All right.  Is there -- if there's an image on the

13   computer that's being put on the CD, is there something about

14   the program used to copy that might affect the metadata?

15   A    Meaning the CD burning software, knowing what software was

16   installed to me would just corroborate -- each CD burning

17   software will put maybe some different information, the

18   metadata that's on the disc.  But all I'd really be looking for

19   initially is to corroborate, is this the computer that was used

20   to create that compact disc.

21   Q    Now, what about the second scenario where you just have a

22   computer that was used to copy disc to disc?  Is there anything

23   in the copying software that would be of concern to you?

24   A    In this case, since we have a copy and I already know that

25   I'm being presented with a copy, the copy didn't transfer over

188

1    the original burn date, but that wasn't really a factor since I

2    had the original CD.  Since I have the original Baby Girl CD

3    and it tells me that information, that's really what I want to

4    focus on.

5        About the date and time stamp that it was copied or didn't

6    transfer over the burn date of the original CD, if I never had

7    the original CD and all I was being presented with was this new

8    copy and I couldn't tie it to anything else, then I would never

9    know what the original burn date was.  But since I have that,

10   that's not really an issue.

11       What I'm focused on here is I have two discs, one that has

12   corrupted images and good images, and I have one that has all

13   good images.  Can I compare the complete files to ensure that

14   they are mathematically the same files?  In this case, yes, I

15   can.  Can I look at the directory structure of the original CD

16   and compare it?  I can do that.  And can I look at the date and

17   time stamp and file name information?  And I did that.

18       So what I was able to show is on the second CD, is

19   mathematically I have exactly the same files as the original

20   disc.  And for the corrupted files, I have files with the same

21   name, same file size, same date and stamp that the original

22   disc was telling me about, but I just couldn't look at them.

23   But I can look at the new disc, the copy.  I can look at the

24   metadata within the digital photographs, and they're lining up

25   to the other digital photographs that are taken.

**UNITED STATES DISTRICT COURT**

1    So that's how I'm able to put these together.  Just

2    because I don't have the computer that made it, okay, but I can

3    still look at the original burn date from the original CD,

4    which is really where I want to focus my attention on.

5    Q    And where does the original burn date of the original

6    damaged Baby Wow CD come from?  Where does the burn date come

7    from?

8    A    The burn date -- you mean where it's stored or where does

9    it come from?

10   Q    Where does it come from?  What generates that date?

11   A    That date is generated by the computer that would have

12   created that disc.

13   Q    So in order to confirm the burn date, what would you need?

14   A    To confirm the burn date, if I had the original disc --

15   but the problem with -- even if I had the original computer,

16   the problem, though, is even if I had the original computer,

17   and depending on what software is installed on there, not all

18   CD burning software keeps a log to say I burned this disc at

19   this time, like there's going to be a -- like a black box

20   keeping track of that type of information.

21       So I still have this disc on its face value saying this is

22   the date and time stamp information of when the disc was

23   burned.  Okay.  And if I had the original computer that made

24   that disc, I can look at that computer and go, here's CD

25   burning software.  Here's the same pictures.  These the same

**UNITED STATES DISTRICT COURT**

1    folders.  The last written time stamps are matching up.  Yes,

2    this is highly likely this is the computer that was used to

3    create that disc.

4    Q     Now, let me be a little more specific about the burn date.

5    The burn date is somewhere stored, that time stamp is stored

6    somewhere on the disc; right?

7    A     On the compact disc.

8    Q     On the compact disc.

9          Where does it get that time stamp from?  It gets it from

10   the computer; right?

11   A     Yes.

12   Q     And it's the computer's internal file system clock that

13   determines that; right?

14   A     Correct.

15   Q     So in order to determine -- if you've got a disc that says

16   it was burned on January 3rd, 2011, the only way you would know

17   that, in fact, it was burned that day is if you saw the system

18   that burned it and confirmed the clock was accurate; right?

19   A     If you had the computer and it was around the same time

20   frame, you don't know the accuracy of the clock during that

21   time -- so if you were to hand me the computer that made that

22   disc today, I don't know the accuracy of the clock at that time

23   other than seeing the date and time stamps that are there --

24   maybe there are some other time stamps on the computer, but

25   that's why in this case I looked at all the other surrounding

1   events that are going on -- is do I have a consistent timeline

2   or, like in another case where things were not accurate, but

3   then I was able to show that these time stamps were not

4   accurate.

5   Q    So one of the things, if you could have had, you would

6   have wanted to verify the time stamp of the computer that had

7   made these various discs; right?

8   A    That would be helpful, yes.

9   Q    And you didn't have that computer; right?

10  A    No, I do not have that computer.

11  Q    No one told you where that computer was?

12  A    I don't think -- as far as I know, no one had been able to

13  track down that computer.

14  Q    Okay.  Now, we have CD -- we have CDs in this case, and

15  you indicated I think in some of your exhibits, CD-R.  What's

16  the difference between a CD-R and a CD-RW?

17  A    So a CD-R would be a disc that you could write to one

18  time, that you're going to put a session of data on there, and

19  then the disc is done.

20       The CD-RW would be a disc that you can write to, you could

21  delete files from, you can add files and delete files and use

22  it more like an external thumb drive, if that makes sense.

23  Q    So you can write to it and rewrite to it?

24  A    Yes, because the RW stands for rewritable.

25  Q    Okay.  Now, what about the SanDisks?  How did those

1   operate as compared to a CD?

2   A    Well, they are -- okay.  In the case of the SanDisk or the

3   external media cards, the other ones, they're rewritable media.

4   You can use them as many times until those cards actually fail

5   on you.

6   Q    Now, the SanDisks that you examined, those are from

7   cameras; right?

8   A    Had been used in cameras, from what I can tell you.

9   Q    So they don't have to be used in cameras.  They can be

10  used with other media?

11  A    Yes.

12  Q    Now, they're just a different type of electronic data

13  storage; right?

14  A    Yes.

15  Q    Now, they -- do they have the same -- this may not be the

16  right word, but the same property, in that when a file is

17  written to them, there will be a time stamp of that?

18  A    So in that case, it would be different.  You're talking

19  with a file creation date?

20  Q    Yes.

21  A    So on a SanDisk memory card like we have here, there is a

22  file creation date, and in general that's the time of when that

23  file is copied or lands on that piece of media.

24  Q    And that can be either a copy from another disc, or it

25  could be from the camera itself?

**UNITED STATES DISTRICT COURT**

1    A      Yes.

2    Q      So just to be clear, if I've got a -- if I've got one of

3    these discs from a camera and I take a picture and it's set up

4    to store to that disc, the creation date would be basically the

5    date of the photo; right?

6    A      Correct.

7    Q      And if I had used this disc as some sort of external

8    storage and copied it from a CD, that would just be the --

9    creation date would be the date that I copied the file from the

10   CD; right?

11   A      Yes.

12   Q      Is there any way to tell on a SanDisk-type storage media,

13   whether or not a particular file image comes from the camera

14   directly or from some other storage media?

15   A      In this case there's not going to be an independent

16   property that is going to tell you exactly how that came to be,

17   like in this case we don't have -- I didn't have an inspection

18   of the digital camera that stored the picture there.

19         But in this, really I was focused on the properties of the

20   date and time stamp within the photographs, but really this is

21   all based -- date and time stamp analysis, just being based on

22   the face value of this time stamp, how did it get there, I

23   didn't see it happen.  I'm just reporting this is the activity

24   that's being reported.

25   Q      Am I correct that for a camera on a -- a camera using a

1  SanDisk, the date and time stamp of the image on that disc

2  comes from the camera hardware itself or the system inside the

3  camera itself?

4  A     Yes.

5  Q     And some cameras -- are you familiar if they have

6  automatic ability to -- either from the Internet or some other

7  cellular service to verify location and accuracy of the time in

8  that location?

9  A     Newer cameras, yes.

10  Q     Do you know if any of the cameras in this case had such an

11  ability?

12  A     I don't know because I've never inspected those cameras to

13  know if they had that.

14  Q     Cameras were not provided to you?

15  A     No.

16  Q     Just the discs themselves?

17  A     Just the discs.

18  Q     Again, best of possible worlds, would having the camera be

19  something you would like to have in your analysis?

20  A     It can, but, again, the problem with digital cameras is

21  that you have a date and time stamp.  And if that date and time

22  is set by the user, then somebody can change that just like

23  they can change the date and time stamp on the computer.

24        So really in both scenarios we have to look at what is the

25  value today and do events within the pictures, do they help

1    corroborate what we're seeing in the pictures, because we have

2    no other independent means to know.  Even if you were to hand

3    me that camera today and I said, okay, the camera today says

4    that the date and time is right now, do I know for a fact that

5    that was accurate at the time the photograph was taken in 2006?

6    I -- I don't know.  I just know that the date and time at the

7    time the picture was taken, the camera was set to this date and

8    time.  Thereafter, that date and time was embedded within the

9    picture.

10   Q    So, again, you're just relying on what's in the metadata

11   of the image, and there's no way to independently confirm the

12   date and time in that -- in it; right?

13   A    For me.  That's why then you would ask somebody else, when

14   were these photographs taken?  Does it match up to what -- you

15   know, if you had independent witnesses to help corroborate

16   that.

17   Q    So you're going to look to other evidence other than just

18   the forensic analysis to help you on the date and time?

19   A    Exactly.

20   Q    Now, we've talked a little bit about metadata, and in your

21   report you refer to something called E-X-I-F.  What is EXIF?

22   A    EXIF would be the standard, the industry standard of

23   information, and just in simple terms is the standard of how

24   information is stored within the digital photograph.  So all

25   cameras are storing the same information.  So if you look at

1    this picture on your computer, your computer can display.  This

2    is a picture from a Nikon camera.  Here's the picture.  Here's

3    the date and time stamp information.  You're going to get the

4    same information whether it was a Canon or Sony or Nikon

5    because they're all using the same industry standard to store

6    that information.

7    Q    That's part of what we've been calling metadata; right?

8    A    Yes.  In this case it would be the EXIF metadata.  There's

9    different types of metadata.

10   Q    And for -- in all digital images, they all have the same

11   standard, I think you said, of the type of information in the

12   EXIF?  So there's the industry standard that all digital images

13   will provide the same type of information under the EXIF?

14   A    Yes, meaning that EXIF is a standard.  How that

15   information is stored will be consistent.  Exactly what pieces

16   of information they store within the metadata or EXIF data

17   within the picture may vary from camera to camera.  But

18   consistently how it is stored will be the same.

19   Q    So one camera might not store the type of camera that took

20   the picture?

21   A    It might store the make and model of the camera.  Some may

22   store the actual serial number of the camera.  Some cameras

23   today will actually store the longitude and latitude of where

24   the picture was taken.  That's what I mean.  Cameras are

25   different in that respect.

1      But for the most part, we'll see that make and model of

2   the camera and the date and time stamp is consistent with most

3   digital photographs that are taken.

4   Q    Now, you mentioned on direct something about hash values,

5   and I'm not sure we've defined what a hash value is.  Can you

6   tell the jury what a hash value is.

7   A    Well, in one of the pictures that we used from -- from the

8   memory card, below it it says there's a hash value.  It's 32

9   characters.  That's just alphanumeric characters, and it's a

10  math equation that you run a math equation against a digital

11  photograph, against an entire hard drive.  You can run it

12  against a word document, any file, and the output will be 32

13  characters long.

14      And if you want to know that you had an exact copy, you

15  run that against the similar file.  And if there was any

16  deviation at all, then there's some change to the file.  You

17  don't know what the change is.  You just know there's a

18  difference.

19  Q    Now, if the digital camera takes an image that gets stored

20  to a SanDisk and then that disc data is transferred to a CD,

21  all the metadata affiliated with that image would transfer

22  exactly; correct?

23  A    Which data are you referring to?  You said all data, so --

24  Q    The EXIF data would transfer?

25  A    Okay.  That's all embedded within the photograph; so it

1    would transfer.

2    Q     So any -- is that true for all metadata embedded in the

3    photo?

4    A     Embedded within the photo.  The com- -- when you burn a

5    CD, it doesn't know what you're burning.  It just says I want

6    to make a copy of this file.  It's not trying to interpret the

7    file.  It just says, okay.  We'll copy this file onto the disc.

8    Q     So anything embedded in that data would transfer over?

9    A     If it's within the file.  It's transferring the entire

10   file.

11   Q     Directing your attention to Government's Exhibit 31,

12   page 12, this comes from a CD that you examined; correct?  Item

13   No. 4?

14   A     Sorry.  Which page?

15   Q     12.

16   A     Yes.

17   Q     And this came from the Averie Halloween CD?

18   A     Yes.

19   Q     Now, here we just have a last written date as opposed to

20   elsewhere where you were testifying about a file creation date;

21   correct?

22   A     Yes.

23   Q     The last written date, why is that called a last written

24   date versus file creation date?  Do you know?

25   A     On a compact disc?

1    Q    Yes.

2    A    Well, a compact disc only stores one time stamp.  So it

3    doesn't have a file creation and last written.  There is only

4    one time stamp per the specification for how that file system

5    works.

6    Q    And when you're transferring a digital image that has the

7    creation date, how does it know which date?  If it has multiple

8    dates, how does a CD know which one it's going to choose?

9    A    Normally, the purpose of a compact disc was really to

10   archive or back up your data.  So by design, the compact disc,

11   when this -- when the teams were designing the specification,

12   you're looking at -- they don't really care about when the file

13   was created.  They're really looking at, if I have five CDs and

14   I have five copies of the same file but they all have different

15   last-written dates, if you're going to the compact discs

16   because you want an archive from a specific time, then the last

17   written time is what you would be looking for.

18        So that's -- that's why there's just one date there of

19   which one it's going to take.  In this case, the compact disc

20   is taking the last written date for that file.

21   Q    So can you tell if this is the date that this photo was

22   copied over to the disc or it's the date the photo was actually

23   taken?

24   A    Well, from here -- and there's different metadata -- this

25   is file system metadata.  And so that's why I just don't like

1  to generically use the term "metadata."

2       So if we're talking about file system metadata and it's

3  displaying a date of November 5, 2006, I don't know what's

4  occurring on November 5, 2006, because I don't have the

5  computer of what created this disc in this case.

6       If I'm interested in knowing when was this photograph

7  taken, I don't want to look at this time stamp.  I have a

8  different exhibit that lists the EXIF date and time stamps.

9  This exhibit here and what I put in my report only lists the

10  metadata from the file system.

11  Q    Okay.  And that would be true of the time as well?

12  A    Yes.  This is file system metadata.

13  Q    Now here we've seen some other photographs that show the

14  time in 24-hour time, right?

15  A    Yes.

16  Q    The dates and time stamps, the time has been in 24-hour

17  time; right?

18  A    From the EXIF data, yes.

19  Q    Do you know why this one is listed as 12:02 A.M. as

20  opposed to 0002 A.M.?

21  A    Well, in this case on the disc itself, just interpreting

22  the data, you're really still talking about exactly the same

23  thing.

24  Q    Is that dependent on the computer that's actually burning

25  the CD?

**UNITED STATES DISTRICT COURT**

```
1    A      No.  This is based on my forensic software.  When I said

2    export this information, I'm just telling it to put it out in

3    normal time stamp, not in military time.  I could have said put

4    it in military time, and then you'd see it as 0002, but I

5    didn't do that.

6    Q      So that was something based on your forensic system?

7    A      Yeah.  That was just based on an exhibit for demonstration

8    purposes.

9    Q      Now, looking at Exhibit 32, page 28, does this contain the

10   XF -- EXIF data for this image?

11   A      This exhibit here is displaying file system metadata from

12   the memory card itself.  This is not displaying the EXIF data.

13   In my report I reference this, that if you want to know what

14   the EXIF date and time stamps are, there's a separate exhibit

15   that actually lists that.

16   Q      Is that Exhibit H to your report?

17   A      Yes.

18   Q      And so you did an analysis of the actual date and time

19   stamp that was embedded in each of the images that you

20   evaluated; right?

21   A      Yes.

22   Q      And that is not necessarily what we're seeing in

23   Exhibit 32 here?

24   A      There are two different exhibits.

25   Q      Okay.  And that's two different sets of data?
```

1  A    There are two different sets of data, but when you look at

2  them, you have here on page 1 of Exhibit F that lists --

3  Exhibit H, that lists that photograph.

4  Q    And it has a consistent date and time stamp as to what's

5  here?

6  A    Yes.

7  Q    So what -- the date and time stamp for this photograph,

8  the image is telling you it was taken at 4:33 A.M.?

9  A    Yes.

10 Q    Now, in here it says full path -- I'm sorry.  Here it says

11 full path on page 2.  Do you see that?

12 A    Yes.

13 Q    Where does that come from?

14 A    That would be on the memory card itself.

15 Q    All right.  And this 117NIKON, what does that refer to?

16 A    That would be the folder on that memory card.

17 Q    And that identifies that the camera that took it was a

18 Nikon?

19 A    Well, that's not really where I would look.  I would look

20 at the actual EXIF data of the digital photograph itself.

21 Q    And that would tell you more accurately what kind of

22 camera took the photo?

23 A    Yes.

24 Q    And in this case it was a Nikon?

25 A    Yes.

```
 1   Q    And is there a -- you said that there -- the cameras

 2   actually vary as far as how much detail about the camera will

 3   be in the EXIF data, and sometimes it might go down to the

 4   serial number of the actual camera; right?

 5   A    Yes.

 6   Q    Did you find any such information in your analysis of any

 7   of the photos in this case?

 8   A    The serial number of the camera?

 9   Q    Yes.

10   A    No.  I do not recall seeing the serial number of the

11   camera.

12   Q    Just make and maybe model number?

13   A    Make and model.

14   Q    If this particular Nikon camera that took this photo only

15   has the EXIF data for make and model, you wouldn't be able to

16   tell that another same make and model camera took a different

17   photo, could you?  I didn't ask that very well.  Let me try

18   again.

19        If the EXIF data of this particular Nikon camera only

20   lists make and model of the camera, then a different Nikon

21   camera of the same model would only have make and model in its

22   EXIF data; correct?

23   A    Yes.  There can be some additional information.  I have

24   seen some where EXIF data would actually show firmware

25   information that might show that it was a different -- same
```

**UNITED STATES DISTRICT COURT**

1    make and model but maybe one generation older or a little bit

2    different.

3         In this case I was just focused on really the make and

4    model and date and time of the camera at the time I created

5    this.  I wasn't looking for other information, but I -- I do

6    recall not seeing serial number as part of that metadata.

7    Q    And so there's no way to tell, for example, just based on

8    the EXIF data, if the same camera, the same Nikon camera, took

9    the photo in Exhibit 32, page 29, and Exhibit 32, page 28,

10   based on the EXIF data?

11   A    Based on the EXIF data that I pulled, I think that if that

12   was something that we thought that there was two different

13   cameras, other than we have two Nikon E995 cameras taking these

14   pictures and you have them put in the same folder or it's going

15   into the same folder, it fits the same numbering, because you

16   got the camera that's generating the number sequence there.  If

17   I thought that there were two different cameras, then perhaps

18   I'd dig through the EXIF data to see if there was other

19   identifiers to see if I could show that, oh, wow, there was,

20   you know, like a difference in firmware or I see there's a

21   difference between.

22        But in this case I just have it listed as two Nikon E995

23   cameras that were used to take these photographs along with

24   that same make and model I saw was used to take other digital

25   photographs.

1    Q    And you weren't requested to do any further than that in

2    your analysis to see if there were multiple cameras being used?

3    A    No.

4    Q    Now, I'm going to show you page 30 from the same exhibit,

5    next to page 28.  Let me see if I can zoom this out.  Let's do

6    it this way:  So, again, we've got two photos that have a

7    creation date of 12/4/06.  First one 4:33:06 A.M., and the next

8    one at 4:33:50 A.M.; correct?

9    A    Yes.

10   Q    Now, if -- if somebody had set their camera's date and

11   time stamp incorrectly or -- let me ask a different question.

12   Strike that.

13        If a camera has gone through some sort of alteration or

14   damage, that could affect the clock.  It might produce an

15   inaccurate time and date stamp; right?

16   A    If the camera is damaged?

17   Q    Somehow, yes.

18   A    Yeah.  It could also be that somebody had used their

19   camera while traveling and had the date and time set, and they

20   haven't changed the date and time since they're in a new time

21   zone and had not updated the camera to the current date and

22   time.

23   Q    If the camera is not functioning but has been set to

24   either an inaccurate day, or as you just stated, wrong time

25   zone time date, the sequence of photos would follow the clock

1   as set; correct?  It would still go in that -- it would still

2   be chronological based on the incorrect start time?

3   A    Yes.

4   Q    So while you might see photos that are in a series

5   chronologically, it still depends on what the actual clock in

6   the camera was set at to determine the accuracy of that date

7   and time stamp; right?

8   A    Yes.

9   Q    Again, back to 28.  Does the 117 have any significance

10  before the Nikon?

11  A    It can be based on the series of photos, but ideally to

12  really determine why that folder structure is named that way

13  would be to take a look at that camera and how it formats the

14  cards and how it got to be that.  And in some cases I've done

15  that, but not in this case.

16  Q    Turning your attention to Exhibit 34, page 7, here there's

17  a file path that says 101 Nikon.  The other one is 117.  Does

18  the difference between 117 and 101 have any significance in

19  your analysis?

20  A    Well, again, it can be based on -- in this case where

21  we're talking about a new media card being stored or placed

22  into the camera, it can often be based on how has that card

23  been formatted or reformatted.  So when you put the card in, it

24  says, okay, I don't have any other folders here; so you're

25  101 Nikon.  Next time until be 102 Nikon.  It depends on how

 1   the person organized or set that up.

 2       I don't have that particular camera; so I can't tell you

 3   exactly why, but in this case clearly we do have two media

 4   cards, same date, same make and model camera, but the folder

 5   structure is different.  But, again, that's going to be based

 6   on the formatting of that card.

 7   Q    And that was a different card from 30 -- Exhibit 32?

 8   A    Yes.

 9   Q    And in your timeline Exhibit 24 -- again, I just want to

10   make sure you got this accurate -- where you have the burn CD,

11   Baby Girl CD, at 12/25/2006 at 11:28 A.M., that date is

12   generated by the computer that actually burned that CD; right?

13   A    That is correct.

14   Q    On page 2 of the same exhibit, when you were looking at

15   the directory modifications here, these are from the disc that

16   you examined; right?

17   A    Yes.

18   Q    Again, those dates and times come from the computer that

19   was doing the modification?

20   A    Correct.

21   Q    And I think this is page 4 of that same exhibit,

22   Exhibit 32, the media card information you examined.  The

23   12/25/2006 12:04 P.M. comes from the camera?

24   A    Yes.

25   Q    That would be true for all EXIF data in all the images

**UNITED STATES DISTRICT COURT**

```
 1    that you examined in this case.  The time and date stamp comes

 2    from the camera that took the photo; right?

 3    A    That is correct.

 4    Q    And you did not have that to examine?

 5    A    No.

 6              MR. KALOYANIDES:  One moment, Your Honor.

 7    Q    BY MR. KALOYANIDES:  Going back to Exhibit 34, page 7, one

 8    last thing.  There's this last access date.  What does that

 9    refer to?

10    A    The last access date would be based on the -- whatever

11    computer that this card was plugged into, that something opened

12    or accessed the file such as opening the file or copying the

13    file.

14    Q    So that's something that's dictated by the computer that

15    is maybe copying or doing something to this image?

16    A    Yes.

17    Q    And in this case it's -- the access date is dated at

18    9/10/2007; right?

19    A    Correct.

20    Q    So that's going to be some time significantly after the

21    file creation date?

22    A    Yes.

23    Q    So it would have to be something happens later on, some

24    computer device is accessing that file in some way on that

25    date?
```

1    A     Yes.

2    Q     Is there any way to know what type of access was

3    happening?

4    A     No.  As I said, something that could trigger an access

5    date change could be something that you open the file, you

6    copied the file.  Those are two events that will trigger that

7    date to be updated.

8              MR. KALOYANIDES:  One moment, Your Honor.

9    Q     BY MR. KALOYANIDES:  Do you have any information about

10   where that card was September 10, 2007?

11   A     Not as I sit here right now.

12   Q     Do you have any information who might have accessed it?

13   A     No.

14             MR. KALOYANIDES:  Nothing further, Your Honor.

15             THE COURT:  Ms. Blanch, any redirect?

16             MS. BLANCH:  Very briefly, Your Honor.

17                       REDIRECT EXAMINATION

18   BY MS. BLANCH:

19   Q     Mr. Pixley, I just have a couple of questions about

20   something that I -- I thought could be confusing.  On the

21   exhibits that look like this -- I'm going to show you, for

22   example -- this is page 28 from Exhibit 32.

23        On the exhibits that look like this that you've prepared

24   with the item number at the top and then some data with the

25   photograph at the end --

1  A      Yes.

2  Q      -- where you have last written and file created and last

3  accessed date, that is not -- that information does not come

4  from the information that was embedded in the photograph?

5  A      No.

6  Q      Did you actually create a report that did pull out the

7  EXIF data from these photographs, specifically the date that

8  this photograph was taken?

9  A      Yes.

10 Q      Could you look at Government's Exhibit 6.  Is this that

11 report?

12 A      Yes.

13         MS. BLANCH:  Your Honor, I move Exhibit 26 into

14 evidence.

15         MR. KALOYANIDES:  No objection.

16         THE COURT:  Received.

17         (Exhibit 26 received into evidence.)

18 Q      BY MS. BLANCH:  I just want to show the jury this report

19 so they can see how it's set up.  If we take this photograph as

20 an example -- well, first, let's look at this.

21        This is the first page of this report, and along the top

22 there are some columns of data.  Can you just tell us what

23 these columns represent.

24 A      So the event date and time is just the month -- month,

25 day, and date and the actual time of whatever event that this

1    line is representing.

2         Then the description would be the description or the event

3    that is occurring.

4         Then the file name.

5    Q    Is that the file name of the photograph itself?

6    A    Of the digital photograph.

7         Where that file is actually stored or what folder that's

8    stored in, the size of the file, the actual EXIF date and time

9    stamp.  This is the date and time stamp that's embedded within

10   the photograph.

11        Then the make and model of the camera.  Again, this is

12   information that's embedded within the photograph.

13        The image size of the photograph itself.

14        And then the source, in this case it's saying Item 7.  So

15   this would be Item 7 of my report, not Government Exhibit 7.

16   Q    And then this last paragraph, this last column?

17   A    This last column is to represent -- because we've talked

18   about on -- today we've talked about two compact discs, the

19   original Baby Girl Wow CD and the copy, the IJM copy of that

20   CD.  And what I put on here in this column is, does this file

21   exist on the Baby Girl CD.

22   Q    The original?

23   A    On the original CD.

24        So if you look down at the bottom of this report here,

25   you'll see from Item 1, that's the Baby Girl CD.  And where it

1   says yes, this file, or in this case this folder, is on that

2   disc.

3   Q    Okay.  So taking this photograph as an example -- that's

4   Exhibit 32, page 28 -- the EXIF data is not on this exhibit,

5   but it would be found on this exhibit is Exhibit 26?

6   A    Correct.

7   Q    So looking for the source Item 5 and this file name, which

8   is DSCN0028.jpg, can we find the entry for this photo?  Would

9   that be here on this first page?

10  A    It's --

11  Q    Where my sticky note is?

12  A    Yes.

13  Q    So if that's the file name --

14          THE COURT:  Wait a second.

15          THE WITNESS:  Well, no, I'm sorry.

16          THE COURT:  That's Item 7.

17          THE WITNESS:  That's Item 7.  You want to go to

18  page 3 of this report.

19  Q    BY MS. BLANCH:  Okay.

20  A    Because you're looking for DSCN0028.jpg.

21  Q    So here on page 3 where it says Item 5 --

22  A    If you can just bring that over on the screen to make sure

23  that -- yes, that's the entry.  And if we go to the left of

24  that, or go the other way, we can see there's the date and time

25  stamp of the last modified time.

UNITED STATES DISTRICT COURT

1      And then as we move to the right, now we actually see the

2  embedded information for that digital photograph.

3  Q    So according to this report, it was taken on December 4,

4  2006?

5  A    Correct.

6  Q    At 4:33:07?

7  A    Yes.

8  Q    And that's information embedded in the photograph itself?

9  A    Correct.

10 Q    And it was taken with a Nikon camera?

11 A    Yes.

12 Q    And then it was found on Item 5, which is one of the

13 memory cards?

14 A    Yes.

15 Q    So by matching up the information from these reports,

16 Exhibit 32, 33, et cetera, with the information on this

17 spreadsheet at Government's Exhibit 26, you can actually see

18 the date and time the photograph was taken, according to the

19 EXIF data embedded in the photograph?

20 A    Yes.

21          THE COURT:  Ms. Blanch, go back to that picture.

22 Display that picture.  Yes.

23      So in this case, does it appear that the EXIF data for

24 this picture, as to when it was taken and what you have here as

25 last written or file created, is -- it's virtually the same?

214

1          THE WITNESS:  Virtually the same.  Off by one

2     second.  And there's a reason for that, but yes.

3          THE COURT:  And what's the reason?

4          THE WITNESS:  The file system metadata from the

5     memory card itself only has the capability of storing seconds

6     in even increments.  So it can't do an 07 in increments.

7          THE COURT:  So this was taken at -- according to the

8     EXIF metadata, this picture on the screen was taken at

9     4:33 A.M.

10         THE WITNESS:  Correct.  That's going to be based on

11    the camera setting at the time.

12         THE COURT:  If you look at the camera -- if you look

13    at the picture, it doesn't look like it was taken at 4:33 A.M.

14    in most places.

15         THE WITNESS:  Correct, Your Honor.

16         THE COURT:  So that would just mean that the camera

17    was not necessarily set to the time zone where the picture was

18    taken?

19         THE WITNESS:  That is correct.

20         MS. BLANCH:  Thank you, Your Honor.  I have no

21    further questions for this witness.

22         THE COURT:  Any recross, Mr. Kaloyanides?

23         MR. KALOYANIDES:  The Court handled it.  Thank you.

24         THE COURT:  Didn't mean to do anybody 's work.

25       All right.  Thank you very much, Mr. Pixley.

```
 1              THE WITNESS:  Thank you, Your Honor.
 2              THE COURT:  You may step down.
 3         Let me see counsel at sidebar for one moment.
 4         Ladies and gentlemen, please bear with us.  I know we're a
 5    couple minutes past two o'clock, but just bear with us for a
 6    moment.
 7                   (Bench conference on the record:)
 8              THE COURT:  Does the Government intend to call any
 9    other witnesses?
10              MS. BLANCH:  (Inaudible.)
11              THE COURT:  I'm sorry, I didn't hear you.
12              MS. BLANCH:  The Government does not intend to call
13    any more witnesses in its case in chief.
14              THE COURT:  What about you?
15              MR. KALOYANIDES:  If I have one minute, I will
16    determine if I call anyone, but I don't think I'm going to.
17              THE COURT:  But I can release the jury because, even
18    if you're calling somebody, we're not going to do it now.
19              MR. KALOYANIDES:  Yes.
20              THE COURT:  Let me release the jury.  You find out.
21    You let me know, and we'll decide whether or not we take a
22    break, and we'll settle the jury instructions.  I know you
23    don't have objection other than that one, but there's some I
24    have a question about, and I want to talk to you folks about,
25    and we can have it all settled.
```

1        And then tomorrow morning first thing -- do you want --

2   well, if you're not going to offer anything, you're going to

3   waive your opening too, I take it?

4        MR. KALOYANIDES:  Yes.  The only thing I will do is

5   make a fairly standard Rule 29.

6        THE COURT:  Sure.  In fact, you can make it right

7   now because they're done.

8        MR. KALOYANIDES:  I think the Court knows where I'm

9   going, that the evidence does not show evidence that -- where

10  the photos were taken, or they actually -- the discs were made

11  in the United States.  And the time and date, that's what is

12  clear from this evidence.

13       THE COURT:  All right.  The motion is denied.

14       Why don't you go ahead and announce that you've completed

15  your case in chief, and I'll send them off.

16       And then you'll let me know whether you're going to

17  present anything.  If not, I say we come back at about 3:30 and

18  then settle the jury instructions.

19       Tomorrow morning I'll start with jury instruction,

20  closing, closing, closing, and then the remainder of the jury

21  instructions, and we're ready to go.

22       MR. KALOYANIDES:  Thank you, Your Honor.

23       THE COURT:  Very good.

24              (The following proceedings were held in open

25              court, in the presence of the jury:)

1          THE COURT:  All right.  Ms. Blanch, does the

2    Government have any further evidence --

3          MS. BLANCH:  No, Your Honor.

4          THE COURT:  -- at this time in its case in chief?

5          MS. BLANCH:  No, Your Honor.  The Government rests.

6          THE COURT:  Ladies and gentlemen, we'll take our

7    afternoon recess for the day at this time.  Please remember the

8    admonition of the Court not to discuss this matter among

9    yourselves or with anybody else until it is given to you for

10   deliberations.

11        Thank you for being here promptly at eight o'clock.  I

12   appreciate it.  And please do likewise for tomorrow so that we

13   can proceed with the remainder of the case.

14        And have a pleasant afternoon and evening.  We'll see you

15   folks tomorrow morning.

16        We'll stay in session.

17             (Jury out at 2:06 P.M.)

18             (The following proceedings were held out of the

19             presence of the jury:)

20        THE COURT:  All right.  We're outside the presence

21   and hearing of the jury.

22        Mr. Kaloyanides, have you made any determinations?

23        MR. KALOYANIDES:  I need to just talk with my

24   investigator and expert for one minute.

25             THE COURT:  Go ahead.

```
 1              MR. KALOYANIDES:  Thank you.

 2                   (Brief pause.)

 3              MR. KALOYANIDES:  Thank you, Your Honor.  The

 4    defense is going to rest.

 5              THE COURT:  All right.  Let's do this:  We'll take a

 6    recess right now.  Don't leave.  I want you folks to go over

 7    all the exhibits.  I know sometimes it can be a little

 8    confusing.  Some exhibits were in.  Some parts of exhibits were

 9    in.  Some exhibits were to be redacted and so forth and so on.

10    I want you to stay and go through everything with Ms. Herrera

11    to make sure everybody here is on the same page as to what was

12    admitted, in what form, and to the page.

13         And of course, Exhibits 1 through 8 will not be back with

14    the jury.  If you have any problems at 3:30 when we come back

15    to settle jury instructions, let me know, and we'll try to

16    resolve it.  If you don't have a problem -- I'm going to ask

17    you at 3:30 -- that will be your consent to that set, and there

18    will be no objections to that to be heard later on.

19         Is that understood, Ms. Blanch?

20              MS. BLANCH:  Your Honor.  Can I ask one question?

21              THE COURT:  Yes.

22              MS. BLANCH:  Would it be possible for the redacted

23    version of 1 through 8 to go back to the jury?  I had agreed

24    not to send anything back from 1 through 8, but that was before

25    we added the entirely redacted version, so that they can just
```

1    see the -- just -- just the cover, Your Honor.  It's the --

2            THE COURT:  You mean the ones that are totally

3    blacked out except for the information underneath it?

4            MS. BLANCH:  Yes.  So they can see the date and

5    the -- the time that the photograph was taken.

6            THE COURT:  In other words, Exhibit 1, 2, 3, 4, 5,

7    6, 7, 8, not the ones with the letters attached.

8            MS. BLANCH:  Right.  Exactly.  Just the blacked out.

9            THE COURT:  Only the blacked-out part of Exhibit 1

10   through 8.

11           MS. BLANCH:  Just this page, Your Honor.

12           THE COURT:  Any objection to that going back?

13           MR. KALOYANIDES:  No, Your Honor.  We'll just have

14   to be very careful to make it just that page going back.

15           THE COURT:  Go over it with my clerk.  Make sure

16   everybody is on the same page on that.  When we come back at

17   3:30, like I said, let me know if you have any problems.  If

18   you don't bring it up, it will be deemed your agreement that

19   whatever you folks have worked out going into the jury room

20   would be the correct set to go back.

21       Is that understood, Ms. Blanch?

22           MS. BLANCH:  Yes, Your Honor.

23           THE COURT:  And, Mr. Kaloyanides?

24           MR. KALOYANIDES:  Yes.

25           THE COURT:  At 3:30 we'll resolve the jury

1    instructions.  I don't think it should take a lot of time, but

2    we'll do that so we'll be ready to go.  Mr. Reczko may or may

3    not be here, depending on what he wants, because we're only

4    going to talk to issues of law with respect to jury

5    instruction.  Some clients want to stay, some clients don't.

6    It's up to him.

7         I'm not saying don't stay.  If you want to be here, fine.

8    If you don't want to be here for the jury instruction, that's

9    fine.  It's up to you to decide.

10              MR. KALOYANIDES:  Thank you, Your Honor.

11              THE COURT:  We'll see you at 3:30.

12              THE CLERK:  This court now stands in recess.

13                  (Recess taken.)

14              THE COURT:  Back on the record in the matter of

15    United States versus Reczko.  Counsel are present.  Mr. Reczko

16    is not present.

17         Mr. Kaloyanides, I take it then Mr. Reczko is waiving his

18    appearance for the purpose of settling jury selection?

19              MR. KALOYANIDES:  Yes, Your Honor.

20              THE COURT:  And we are outside the presence and

21    hearing of the jury.  Let's just go through the set of jury

22    instructions.

23         Let's go with the Government's proposed jury instruction

24    packet, and the Government can give me clean copies overnight

25    so that we can have it tomorrow morning.

1      We'll be starting really on proposed number 14, because

2  all the rest of the 1 through 13 are at the beginning of the

3  trial.  14 is -- so we'll go by that number.  Number 14 is fine

4  with me.

5      Mr. Kaloyanides, as we go through here, if you have an

6  objection, lease pipe up.  If you don't say anything, I will

7  just assume that you have no objection.

8           MR. KALOYANIDES:  That's fine, Your Honor.

9           THE COURT:  Number 14 I do intend to give, which is

10  duty of the jury to find facts.

11      15 I intend to give, charge against defendant not

12  evidence, presumption of innocence.

13      Number 16, what is evidence, I intend to give.

14      Number 17, stipulation of fact, there have been a couple

15  stipulations of fact; so I will give that.

16      What we should probably do with those stipulations is to

17  have them marked as an exhibit as well so that they can have it

18  in case they want to see what the stipulations are.  Rather

19  than just having it directly filed as a record of the court, I

20  think we should make them exhibits.

21      What is next in order in terms of exhibits, Bea?

22           THE CLERK:  The next in order would be 279 and 280.

23           THE COURT:  Okay.  Mark these as 279 and 280, and

24  these will be exhibits.

25      That's agreeable with the Government, Ms. Blanch?

1          MS. BLANCH:  Yes, Your Honor.  Thank you.

2          THE COURT:  And, Mr. Kaloyanides?

3          MR. KALOYANIDES:  Yes, Your Honor.

4          THE COURT:  Okay.  I will give number 17,

5   stipulation of fact.

6                (Exhibit marked for identification.)

7          THE COURT:  I will give 18, what is not evidence.

8       I will give number 19, direct and circumstantial evidence.

9       I will give number 20, credibility of witness.

10      Number 21, Ms. Blanch, go ahead and modify that so that it

11   would only talk about the non-testimony by the defendant.

12   Okay?

13         MS. BLANCH:  Yes, Your Honor.

14         THE COURT:  Okay.  And also, by the way, when you

15   prepare a clean copy for me, the way I want it done is don't

16   put the mast head with the United States Attorney and all of

17   that.  Leave all that blank.  Go directly to United States

18   District Court, Central District of California, the caption,

19   the case number, and just say court jury instructions.

20      Skip the trial date, all of that, time.  Skip this thing

21   about the United States and defendant are submitting these

22   instructions.  That's it.  Don't sign it.  Don't do anything.

23      And then the next page, it will start with Court

24   Instruction Number 1, and then all the way through.

25         Do not have the authorities at the bottom of the page.

1    Make sure it's a clean copy so that we have that.  Okay?

2        Now we're up to 21 of the proposed.  You're going to

3    modify it so that it's just decision not to testify.

4        22, reasonable doubt, I will give that.

5        23, activities not charged, I will give that.

6        24, let's talk about that.  It says statements by

7    defendant.  You know, if you look at this instruction, which is

8    4.1 of the standard, it really is meant for a situation where

9    the defendant has given a statement to the authorities.

10   Previously we called that a confession, and if you look at the

11   comment to it, "statement" is a more neutral way of saying it

12   than a more loaded term, like a confession.

13       We don't have any statements of this kind that I can think

14   of.  Mr. Reczko didn't give a post-arrest statement, did he?

15   And certainly we don't have any evidence of that.  So my

16   question is should we really give 4.1?  Because it wasn't meant

17   for this situation.

18           MS. BLANCH:  We have no objection if the Court

19   doesn't give it.

20           THE COURT:  Mr. Kaloyanides, what about you?

21           MR. KALOYANIDES:  I don't think it's necessary in

22   this case, Your Honor.

23           THE COURT:  Let's delete that.

24       Next is proposed 25, other crimes, wrongs, acts, and all

25   of that.  This was meant to be if there were 404(b), 413, 414

1    evidence.  That did not come in.  You actually ended up not

2    proffering it; so I don't think we're going to need that.

3        Do you agree with that, Ms. Blanch?

4            MS. BLANCH:  Your Honor, we did end up admitting the

5    Cristine Joy pictures, the two pictures of the other girls.  I

6    don't know if the Court considers that standard 404(b) evidence

7    because, although it is other bad acts, it is quite, quite

8    intertwined with the facts of this case.  I just remind the

9    court that we did do that.

10           THE COURT:  What's your view on that,

11   Mr. Kaloyanides?

12           MR. KALOYANIDES:  Well, Your Honor, I'm not sure

13   that the evidence of those photos establishes any actual

14   conduct by defendant other than he had it in his possession.

15           THE COURT:  Right.

16           MR. KALOYANIDES:  The Court gave a limiting

17   instruction on it.

18           THE COURT:  And the limiting instruction is not

19   inconsistent with this particular one because it's the standard

20   404(b) type of instruction.

21           MR. KALOYANIDES:  Yes.

22           THE COURT:  And the limiting instruction effectively

23   dovetails it into a 404(b) situation by saying only for

24   knowledge, intent, mode of operation, or purpose.

25           MR. KALOYANIDES:  My only concern is the first line,

1    first sentence.

2            THE COURT:  We can change that.  Rather than call it

3    a crime or wrong, defendant committed other acts not charged

4    here?

5            MR. KALOYANIDES:  Well, again, that suggests that

6    there was something wrong, and my concern is the jury is going

7    to think about what other bad things did he do.  And if we're

8    really just referring to those two pictures -- if we left it as

9    just he committed other acts, period, maybe that would --

10           THE COURT:  You have heard evidence defendant has

11   committed other acts, period, and you may consider --

12           MR. KALOYANIDES:  I think that fits more with what

13   the Court's limiting instruction is as to those two photos

14   involved.

15           THE COURT:  Is that agreeable with the Government?

16           MS. BLANCH:  Your Honor, I think saying that there's

17   evidence defendant committed other acts --

18           THE COURT:  It's a little vague.

19           MS. BLANCH:  It's a little vague.  I think it's

20   quite confusing without differentiating it from other crimes

21   charged.

22           THE COURT:  Maybe what we should do is not even give

23   this, because the limiting instruction has already been given,

24   and they know that -- and these instructions will say, where

25   I've given you a limiting instruction, you must follow that.

1    So that's certainly incorporated into that.  So maybe we should

2    say further we don't even get into it.

3              MR. KALOYANIDES:  Is it the Court's intention to

4    restate the limiting instructions already given?

5              THE COURT:  I think that's standard, isn't it?

6              MR. KALOYANIDES:  I think that's appropriate.

7              THE COURT:  Well, let's see.  Right.  On proposed

8    number 18, paragraph 2, it says any testimony that I have

9    excluded, stricken, or instructed you to disregard is not

10   evidence.  In addition, some evidence was received only for a

11   limited purpose.  When I have instructed you to consider

12   certain evidence in a limited way, you must do so.

13        And also take the brackets off of it.

14        So as far as you're concerned, Mr. Kaloyanides, you'd

15   rather not even have number 25?

16             MR. KALOYANIDES:  I would prefer not to have it at

17   all.

18             THE COURT:  Okay.  Ms. Blanch?

19             MS. BLANCH:  That's fine, Your Honor.

20             THE COURT:  All right.  We'll consider that

21   withdrawn.

22        Number 26, we will not give that because he didn't

23   testify.  There was no impeachment by conviction.

24             MS. BLANCH:  I think that's correct, Your Honor.

25        I just noticed that, when you directed our attention to

**UNITED STATES DISTRICT COURT**

```
 1   number 18 --

 2              THE COURT:  Yes.

 3              MS. BLANCH:  -- in paragraph 1 in the proposed, it

 4   assumes that the defendant is acting as his own lawyer.

 5              THE COURT:  Oh.

 6              MS. BLANCH:  So we need to change that language.

 7              MR. KALOYANIDES:  Since we're on that topic,

 8   Your Honor, I just assumed that instruction 3 was going to be

 9   out because that is the pro se defendant instruction, proposed

10   number 3.

11              THE COURT:  No.  We're not doing any of those.

12              MR. KALOYANIDES:  We're not doing any of the --

13              THE COURT:  Remember, those were at the beginning of

14   the case.  We're starting at the end of the case.  We're

15   starting at proposed 14, on.

16              MR. KALOYANIDES:  Very good.

17              THE COURT:  I'm sorry, Ms. Blanch.  We should -- we

18   should basically go back to the standard number -- which is

19   what?  3.7?

20              MS. BLANCH:  Yes, Your Honor.

21              THE COURT:  The standard 3.7 not modified for pro se

22   status.  Okay?

23         Okay.  Proposed 25, other crimes, wrongs, and acts of the

24   defendant, not given.

25         26 not given because there's no impeachment by prior
```

1  conviction.

2      27.  All right, let's talk about 27.  That's sort of a

3  hybrid type of instruction.  I don't think it's appropriate in

4  its present format because you took really part of 4.8 of the

5  Ninth Circuit and part of 4.9, but you sort of turned it into

6  some sort of a hybrid without recognizing that, to the extent

7  that you are characterizing E.D. of having received benefits

8  from the Government and/or her immediate family, then you

9  cannot not give the final paragraph of 4.9, which is that you

10  have to examine that testimony with greater caution than that

11  of other witnesses.

12      So you somehow mushed together 4.8 and 4.9, and I don't

13  think the result is satisfactory.

14      My suggestion is that you should go ahead and say you have

15  heard evidence that witnesses received benefits from the

16  Government in connection with this case, including travel to

17  the United States for the witnesses and two minor members of

18  E.D.R.'s immediate family.

19      Well, except that the mom and dad didn't get called to be

20  a witness, and older sister didn't get called as a witness.

21      Including travel to the United States for -- and we should

22  not refer to her as E.D.R. anymore.  Just say Elcita, quote,

23  Sheryl, close quote, Del Rosario so everybody knows we're

24  talking about who we're talking about.

25      Including travel to the United States for Elcita "Sheryl"

1  Del Rosario's immediate family, lodging, and per diem for

2  purpose of testifying at trial.

3      And then you may consider evidence in deciding whether or

4  not to believe -- well, I think -- I think that second sentence

5  you should take out because that really belongs in 4.8.

6      And then you incorporate the last paragraph of 4.9, which

7  says for this reason, in evaluating the testimony of Sheryl Del

8  Rosario, you should consider the extent to which or whether her

9  testimony may have been influenced by this factor.  In

10  addition, you should examine her testimony with greater caution

11  than that of other witnesses.  I think that would be

12  consistent, internally consistent and appropriate.  That's what

13  I think we should do.

14      Ms. Blanch?

15          MS. BLANCH:  One second, Your Honor.

16      We have a couple concerns, Your Honor.  First of all, I --

17  I am concerned because travel to the United States, lodging,

18  and per diem is not really the sort of benefit that this

19  generally --

20          THE COURT:  Why did you propose this?

21          MS. BLANCH:  I -- I -- I am not sure.  I think -- I

22  think -- I think the issue was less about the witnesses and

23  more about the two minor members of her family.

24      But then more than that, it wasn't just Sheryl Del Rosario

25  who received those benefits.  There are standard benefits for

1   all fact witnesses.  So singling her out as opposed to every

2   other witness --

3           THE COURT:  Maybe what you should say, including

4   travel to the United States, lodging -- and lodging for two

5   minor members of Sheryl's immediate family, because they were

6   never designated to be witnesses.

7           MS. BLANCH:  No.

8           THE COURT:  So the fact that they were brought here

9   is a benefit to her.  So we can do that, and that would be no

10  inconsistency, nor would it be somehow suggesting that somehow

11  the witnesses are getting a benefit of the sort -- and I think

12  you're right.  Every witness is entitled to $40 as a witness

13  fee.  That is -- if that were the case, then we would give this

14  instruction in every case, which clearly is not the intent.

15          MS. BLANCH:  Right.

16          THE COURT:  So that would be fine.  So we change it

17  to received benefits from the Government in connection with

18  this case, such as the travel to the United States and

19  lodging -- travel to and lodging in the United States for

20  Sheryl so-and-so's two minor -- minor members -- or for two

21  minor members of Sheryl's immediate family.  And then the last

22  paragraph.  Okay?

23      So as modified, did you understand what I just said?

24          MS. BLANCH:  I think so, Your Honor.

25          THE COURT:  As modified, is that agreeable with you?

1          MS. BLANCH:  Yes, Your Honor.

2          THE COURT:  Mr. Kaloyanides?

3          MR. KALOYANIDES:  Yes, Your Honor.

4          THE COURT:  All right.  So let's modify.  Just to be

5    clear, it should say, you have heard evidence that a witness

6    received benefits from -- a witness received benefits from the

7    United States in connection with this case, such as travel to

8    and lodging in the United States for two minor members of

9    witness Elcita Sheryl Del Rosario's immediate family.  Period.

10   And for this reason, in evaluating, blah, blah, blah.  Okay?

11       Summary not received in evidence.  Summary is not

12   received, number 29 on page 31.  Remind me what summaries were

13   not received in evidence but referred to.  It says during --

14   the instruction says, during the trial certain charts and

15   summaries were shown to you in order to help explain the

16   evidence in the case.  These charts and summaries were not

17   admitted in evidence and will not go into the jury room with

18   you.  They are not themselves evidence or proof of any facts.

19   If they do not correctly reflect the facts or figures shown in

20   the case, you should disregard those charts and summaries and

21   determine the facts from underlying evidence.

22       Do we have some like that?

23          MS. BLANCH:  We didn't end up doing that,

24   Your Honor.  We had a few demonstrative slides that were

25   identified, but they weren't really summaries.  And then the

```
 1   summary charts essentially were printouts of the CDs and excel
 2   spreadsheets and --
 3               THE COURT:  You want to withdraw this?
 4               MS. BLANCH:  Yes, Your Honor.
 5               THE COURT:  Any objection to withdrawing proposed
 6   29?
 7               MR. KALOYANIDES:  No, Your Honor.
 8               THE COURT:  Now, number 30, I don't know why you
 9   folks cited authority the Ninth Circuit.  This is an improper
10   citation.  There is no Ninth Circuit model criminal jury
11   instruction for 18 USC Section 2251(c).  There's one for (a).
12   It's very similar, but it's not (c).
13       So really this is a misleading citation.  You should have
14   cited this as modified or some other way, but there's --
15   literally that 8.181 does not go to (c).  It only goes to (a).
16       And I think there are some differences.  Here's what I
17   suggest, that we make some small changes.  The defendant is
18   charged in the Indictment with, rather than characterizing a
19   sexual exploitation of a child or creating child pornography,
20   whatever it is, I would take that out and just say defendant is
21   charged in the Indictment with a violation of Section 2251(c),
22   and then it can go to the rest of that.
23       And then, first, at the time -- put her name in --
24   Elcita "Sheryl" Del Rosario was under the age of 18 years.
25       Second, the defendant employed, used, persuaded, induced,
```

1  enticed, or coerced -- again, put her name in -- to engage, not

2  take part.  Take part is, I think, 2251(a) language.  Engage is

3  2251(c) language -- to engage in sexually explicit conduct and

4  then outside the United States, which is again something that

5  is an element of 2251(c), but not (a).  So add the words

6  outside the United States for the purpose of producing a visual

7  depiction of such conduct.  And then the rest of it is fine.

8          Any objection to that, Ms. Blanch?

9              MS. BLANCH:  No, Your Honor.

10             THE COURT:  Mr. Kaloyanides?

11             MR. KALOYANIDES:  No, Your Honor.

12             THE COURT:  Next, proposed 31.  These are the

13 definitions.  Here's what I also propose to do with respect to

14 the definition of sexually explicit conduct.  It might make it

15 easier for the jury to understand if you broke it down into

16 one, two, and three.  Okay?  And I suggest that we take out

17 bestiality, and we take out sadistic and masochistic abuse

18 because they're just not applicable here.

19         So what I would do is say "sexually explicit conduct"

20 means, one, actual or simulated sexual intercourse, including

21 genital-genital, et cetera, et cetera, whether between persons

22 of the same or opposite sex; two, masturbation; or, three,

23 lascivious exhibition of the genitals or pubic area of any

24 person.  I think it's just easier to understand that's where

25 the breaks are.

1        And because the first thing about sexual intercourse, it

2  goes on and on with so many parenthetical-type things, it's

3  hard to figure out where the -- another example of it picks up.

4        Any objection to that, Ms. Blanch?

5             MS. BLANCH:  No, Your Honor.  I'm just going to

6  double-check the statute because I'm not sure if the one goes

7  between means and actual or if it goes between simulated and

8  sexual.

9             THE COURT:  You know, I thought about that.  I

10  suppose it could mean actual or simulated masturbation, but

11  what is actual or simulated lascivious exhibition of the

12  genitals?  How do you simulate lascivious exhibition?

13             MS. BLANCH:  I agree with you, Your Honor, except

14  the way the statute is actually written, it says -- it breaks

15  it down as the Court says and says, except as provided in

16  paragraph B, which is not applicable here.  Sexually explicit

17  conduct means actual or simulated, and then it has a dash --

18             THE COURT:  Okay.

19             MS. BLANCH:  -- one, two, three, four, five.

20             THE COURT:  Fine.  I think you're right.  Then let's

21  put the one after the word "simulated," before the word

22  "sexual."  Okay?

23             MS. BLANCH:  Thank you, Your Honor, yes.

24             THE COURT:  Any objection to that, Mr. Kaloyanides?

25             MR. KALOYANIDES:  No, Your Honor.  It's consistent

1    with the evidence in this case.

2           THE COURT:  Okay.  And in number 32, that seems to

3    be consistent with the cited case.  I don't have a problem with

4    that.  I will give 32, proposed 32.

5       33, do we need that?  That's the affirmative defense.

6    You're not raising the affirmative defense.

7           MR. KALOYANIDES:  We haven't raised it.  We haven't

8    presented any evidence of it.  In fact, I believe my

9    cross-examination of Ms. Del Rosario said we acknowledged that.

10   So I think it should be withdrawn.

11          THE COURT:  Well, if they're not raising the

12   defense, it's their burden.

13          MS. BLANCH:  We agree, Your Honor.

14          THE COURT:  Let's withdraw it.

15      The rest of the proposed, I think, are fine.  Let me make

16   sure.

17      Oh, we should add some.  Okay.  I think we need to add

18   knowingly, 5.6, somewhere in here because these acts all

19   obviously have to be done knowingly.  I think what we can do is

20   maybe just add knowingly after -- I think the statute itself,

21   I'm not sure, uses the word "knowingly."

22          MS. BLANCH:  It does not, Your Honor.  And that's

23   the reason we did propose it.

24          THE COURT:  But I think the law is that it always

25   has to be done knowingly, whether it says it or not; otherwise,

     1    there might be a problem, constitutional problem with validity

     2    of the statute.  So I think it always has to be knowingly.

     3         Willfully is different.  If it doesn't say "willfully,"

     4    then you don't instruct it or require willfully.  But I think

     5    knowingly is sort of like the irreducible minimum that you have

     6    to have, maybe except for certain administrative strict

     7    liability type of violations.  So I think we can't get out of

     8    anything without giving knowingly.

     9              MS. BLANCH:  I -- I -- I think where we get hung up

    10    just a little bit, Your Honor, is that the statute is really

    11    clear that the defendant did not have to know that he was using

    12    a minor.  Knowledge of age, or mistake of knowledge of age in

    13    any other circuit is not a defense.  The cases show that it is

    14    strict liability as to age.  And in the Ninth Circuit, the

    15    Ninth Circuit has read a knowing element into the statute only

    16    to the extent that it's an affirmative defense, and he's not

    17    raising it.

    18              THE COURT:  Well, the other problem is you also

    19    charged knowingly in your Indictment.

    20              MS. BLANCH:  Well --

    21              THE COURT:  So --

    22              MS. BLANCH:  The --

    23              THE COURT:  Right?

    24              MS. BLANCH:  Yes, we did.  I think the knowing part

    25    applies to the second and the third --

1          THE COURT:  You know what we can do, then?  We can

2  say first, at the time Elcita Sheryl Del Rosario was under the

3  age of 18 years.

4          MS. BLANCH:  Yes.

5          THE COURT:  Second, the defendant knowingly employed

6  blah, blah, blah.  And that's it.

7      And then, third, he intended or he knowingly transported,

8  which makes sense.  If somebody stuck it in his baggage and he

9  no intention of -- didn't even know it's there.  So somebody

10  before he gets on the plane sticks this camera with all this

11  stuff in it and he transports it over here, I don't think you

12  can find him guilty of transportation.

13          MS. BLANCH:  I think that's correct, Your Honor.  We

14  have no objection to inserting knowingly in those two portions

15  and then defining knowingly.

16          THE COURT:  In argument you can argue that the law

17  does not require him --

18          MS. BLANCH:  Right.

19          THE COURT:  The law does not require you to prove

20  that he knew it, just that she, in fact, was under 18.  And

21  you're not fighting that battle anyway.

22          MR. KALOYANIDES:  That's correct, Your Honor.

23          THE COURT:  Okay.

24          MS. BLANCH:  That's acceptable, Your Honor.

25          THE COURT:  Is that all right with you two that we

1    add "knowingly" in proposed number 30, the elements.  That we

2    add the word "knowingly" under the second element, the

3    defendant knowingly employed blah, blah, blah.  And under 3(b)

4    the defendant knowingly transported.

5              MR. KALOYANIDES:  That's acceptable, Your Honor.

6              THE COURT:  All right.  That's fine.

7        And then I will give the knowingly instruction, which is

8    5.6.  And it says an act is done knowingly if the defendant is

9    aware of the act and does not act or fail to act through

10   ignorance, mistake, or accident.

11       The Government is not required to prove that a defendant

12   knew that his acts or omissions were unlawful.  You may

13   consider evidence of the defendant's words, acts, or omissions

14   along with all the other evidence in deciding whether defendant

15   acted knowingly, which is the standard 5.6.  Okay?

16       That's agreeable, Mr. Kaloyanides?

17             MR. KALOYANIDES:  That is, Your Honor.  Thank you.

18             THE COURT:  Ms. Blanch?

19             MS. BLANCH:  Yes, Your Honor.

20             THE COURT:  And, finally, I think we probably -- oh,

21   now where to put it.  I think what we should do is put it right

22   after the proposed 30, before proposed 31, because that's when

23   we first introduce the word "knowingly."  Let's get it defined

24   and get it out of the way, and then we go on to other

25   definitions.  Okay?

1      The only other one that I suggested that perhaps you folks

2  should consider is "on or about," because you're talking about

3  a range of dates here, and we ought to have the standard "on or

4  about."  There is no standard "on or about" Ninth Circuit

5  instruction, but there's a standard one from O'Malley.  Now

6  they call it O'Malley.  In the stone age, when I was trying

7  cases, we would call it Devitt & Blackmar.

8      But it basically says the Indictment charges the offense

9  alleged was committed on or about a certain date.  Although it

10  is necessary for the Government to prove beyond a reasonable

11  doubt that the offense was committed on a date reasonably near

12  the date or dates alleged in the Indictment, it is not

13  necessary for the Government to prove that the offense was

14  committed precisely on the date charged.

15      Okay.  Any objection to adding "on or about"?

16          MS. BLANCH:  No, Your Honor.

17          THE COURT:  And, Mr. Kaloyanides?

18          MR. KALOYANIDES:  No objection.

19          THE COURT:  And we should probably put that

20  somewhere.  Maybe we should do that right after we do the

21  elements but even before we talk about knowingly, because

22  that's the definition.  This just talks about on or about.

23  Okay?  So this will be right after proposed 30, and then right

24  after this one will be knowingly, and then we go on to proposed

25  31.

1      The other question is whether or not we need to send a

2  copy of the redacted Indictment to the -- to the jury.  I'm

3  sort of agnostic about it, frankly.  I don't know if you folks

4  have a strong view about that or not.  It is redacted.

5          MR. KALOYANIDES:  Your Honor, I also don't in this

6  particular case have a particular concern one way or the other.

7  They're going to have the jury instructions.  It's just the one

8  count redacted.  It's a simple statement.  If the Government

9  would like it to go back, I'm not going to object.  I am not

10  asking for it to go back, but --

11          THE COURT:  Does this need to go back?

12          MS. BLANCH:  It probably doesn't, Your Honor.

13          THE COURT:  Then let's not send it.

14      Finally, the verdict form.  I do want you to modify the

15  verdict form.  Let's add the words "beyond a reasonable doubt"

16  right after the entry of either guilty or not guilty.

17      And right before "of the offense charged in the

18  Indictment," don't even say Count 1, just "charged in the

19  Indictment."

20      And then what's really important you didn't put in there,

21  a place for the date and a place for the signature of the

22  foreperson.  I don't know whether this verdict would be any

23  good without that.  Okay?

24      I think that's all I have.  If you folks have anything

25  else you want to discuss, let me know.

1          Okay.  I'm sorry.  Did you have something else?

2               MS. BLANCH:  Yes.  It doesn't necessarily have to do

3     with jury instructions or even tomorrow, but if we receive a

4     guilty verdict, then when does the Court anticipate doing the

5     second half of the proceedings?

6               THE COURT:  Let me ask you this.  Here's what I'm

7     thinking.  Obviously, if the jury comes back not guilty,

8     everything is over.  There's nothing else to do.  Everybody

9     agrees on that.

10         If the jury comes back guilty verdict, then the question

11    about the judicial fact-finding as to Count 1 doesn't have to

12    be done tomorrow because that's a sentencing issue.  You folks

13    present it, your evidence.  I make my findings at the time of

14    sentencing as to whether or not he had been previously

15    convicted of a qualifying sex offense, so forth.  And that's

16    that.

17         The question then becomes the necessity of Count 2.  If

18    the jury were to find him guilty of Count 1, is it even

19    necessary to go on Count 2?  Because count -- Count 2 is

20    necessarily dependent on Count 1.  If Count 1 goes up on appeal

21    and it doesn't stand because it's insufficient evidence, you

22    can't try him on Count 2 anyway.  You're done.

23         And if he is found guilty and it's not reversed but it's

24    affirmed, and if I were to find that he was, in fact, convicted

25    of whatever it is, he's already looking at a mandatory life

1    sentence.  So I don't know what the necessity is of Count 2

2    under any circumstances.

3        It's up to you.  You guys get to charge however you want,

4    but I'm curious as to whether or not it really is necessary

5    under these unique circumstances.

6            MS. BLANCH:  Your Honor, I think the Court is

7    entirely correct if the Court -- if he is convicted and if the

8    Court finds that the mandatory life statute applies.

9        If the Court finds that the mandatory life enhancement

10   doesn't apply because the language in the recidivism

11   enhancement that's inherent in 2251 is slightly different than

12   the language in the mandatory life enhancement, which is a

13   different statute, if the Court were to find that the mandatory

14   life portion did not apply, then the plus ten consecutive

15   actually does have some meaning.

16       If the Court found that the mandatory life did apply, then

17   you're entirely correct.  The consecutive ten has no meaning at

18   all.

19           THE COURT:  It doesn't matter.  That's fine.  I

20   think it would just be -- you would just present what, one

21   witness on the issue of whether or not he was a registered sex

22   offender during the course the alleged Count 1?

23           MS. BLANCH:  Yes, Your Honor.  The statute actually

24   requires that he -- that the Court find that he be required to

25   be a registered sex offender, and the Court may consider the

1    fact that he was, in fact, registering.

2         So we have the same certified conviction documents that we

3    would be putting in already plus certified copies of his

4    registration plus one witness who will say that he did, in

5    fact, register.  And then we would ask the Court to take

6    judicial notice of the California registration statutes, which

7    are -- it's California Penal Code 290.

8              THE COURT:  Which says what?

9              MS. BLANCH:  Off the top of my head, I can't quote

10   the statute, but it's the sex offender registration statute.

11             THE COURT:  Is this really something that you think

12   will be disputed?

13             MR. KALOYANIDES:  I can't honesty imagine how it's

14   going to be disputed.  I don't see any viable defense to it.

15   Of course, I will examine it and research, make sure everything

16   is done correctly, but I just don't see --

17             THE COURT:  I guess we could -- you have your

18   witness here; so it makes sense, if there is a verdict, that at

19   the time of the verdict we go ahead and continue for the

20   purposes of the court trial; right?

21             MS. BLANCH:  Well, Your Honor, with the -- the

22   witness is an L.A.P.D. officer.  He is currently working.  He's

23   working a night shift right now.  So that's why I ask, because

24   we didn't know whether the Court -- if the Court wanted to do

25   it directly after the verdict, we would have to pull him off of

1    his regular duties and make him wait in the courtroom.  But if

2    the Court wanted to do it the next day --

3              THE COURT:  I don't think we need to do that.  You

4    tell me if you disagree.  If there is a guilty verdict, we can

5    then set a time that's convenient for the witness and

6    convenient for all of us for purposes of having a court trial

7    on the remaining issue as to Count 5.  The enhancement, of

8    course, we'll leave that to the time of sentencing.

9        Is that satisfactory, Ms. Blanch?

10             MS. BLANCH:  Yes, Your Honor.

11             THE COURT:  And, Mr. Kaloyanides?

12             MR. KALOYANIDES:  Yes, Your Honor.

13             THE COURT:  Okay.  All right.  So then, Ms. Blanch,

14   go ahead and give us clean copies and send a clean copy tonight

15   by e-mail to my law clerk.  She'll give you her e-mail.  And so

16   tomorrow morning, before we get together at eight o'clock, I'll

17   have had a chance to review all of it, make sure it's fine,

18   there's no problems with it.  Make sure you give her also a

19   Word Perfect -- do you still do Word Perfect?

20             MS. BLANCH:  We don't have it any longer,

21   Your Honor.

22             THE COURT:  Only Word?

23             MS. BLANCH:  Yes.

24             THE COURT:  We can do Word, can't we?

25             THE LAW CLERK:  (Indicates affirmatively.)

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Make sure she also gets a Word version

2     of it in case, last minute, we want to make some changes, then

3     you don't have to go run back and change it.  We can go back

4     there and do it on the computer.

5          Anything else?

6          MR. KALOYANIDES:  No.  Thank you, Your Honor.

7          THE COURT:  Thank you very much.  Have a nice

8     evening.  We'll see you tomorrow promptly -- well, actually,

9     come before 8:00 because, if there is something, I want to talk

10    to you about -- about the jury instructions at the last minute,

11    we can talk about it rather than waste the jury's time.  Okay?

12    So be here about 7:30.

13         MR. KALOYANIDES:  Yes, Your Honor.

14         THE COURT:  Thank you very much.

15         MS. BLANCH:  Thank you, Your Honor.

16         THE CLERK:  This concludes the Court's calendar.

17    This court is now adjourned.

18              (Proceedings concluded at 4:24 P.M.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                          DATED THIS 24TH DAY OF OCTOBER, 2015.

16

17

18                     /S/ KHOWOONSUN CHONG

19                     _____
                       KHOWOONSUN CHONG, CSR NO. 12907, CRR
20                     FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**UNITED STATES DISTRICT COURT**