1          **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3      **HONORABLE GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE**

4

5     UNITED STATES OF AMERICA,           )
                                          )
6                    PLAINTIFF,           ) CASE NO.
                                          ) 2:07-cr-01221-GHK
7          VS.                            )
                                          )
8     STANLEY DAN RECZKO III,             )
                                          )
9                    DEFENDANT.           )
      _____)

10

11

12

13

14               **REPORTER'S TRANSCRIPT OF**
                 **JURY TRIAL - DAY 4**
15            **FRIDAY, FEBRUARY 20, 2015**
                    **7:39 A.M.**
16            **LOS ANGELES, CALIFORNIA**

17

18

19

20

21

22     _____

23          **KHOWOONSUN CHONG, CSR 12907, CRR, RMR**
              F E D E R A L   O F F I C I A L   C O U R T   R E P O R T E R
24          2 5 5   E A S T   T E M P L E   S T R E E T ,   R O O M   1 8 1 - G
              L O S   A N G E L E S ,   C A L I F O R N I A   9 0 0 1 2
25                k c h o n g 1 2 9 0 7 @ y a h o o . c o m

1                       **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        STEPHANIE YONEKURA
         UNITED STATES ATTORNEY
5        BY:   JOEY L. BLANCH
               VANESSA BAEHR-JONES
6        Assistants United States Attorney
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California 90012

8

9    **FOR THE DEFENDANT:**

10       DAVID J.P. KALOYANIDES LAW OFFICES
         BY:  DAVID KALOYANIDES
11       Attorney At Law
         15538 Central Avenue
12       Chino, California 91710

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| 1 | **I N D E X** | |
| 2 | **CASE 2:07-cr-01221-GHK** | **FRIDAY, FEBRUARY 20, 2015** |
| 3 | **PROCEEDINGS:** | **PAGE** |
| 4 | CLOSING ARGUMENTS | |
| 5 |    GOVERNMENT | 17, 45 |
| 6 |    DEFENSE | 32 |
| 7 | | |
| 8 | VERDICT | 67 |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

1         **LOS ANGELES, CALIFORNIA; FRIDAY, FEBRUARY 20, 2015**

2                            **7:39 A.M.**

3                          -oOo-

4

5       THE CLERK:  Please remain seated and come to order.

6 This United States District Court is now in session, the

7 Honorable George H. King, Chief United States District Judge,

8 presiding.

9       THE COURT:  Back on the record in the matter of

10 United States versus Reczko.  Counsel are present.  Mr. Reczko

11 is not present because we are still discussing the jury

12 instructions and other preliminary matters, and he is waiving

13 his appearance for these purposes.

14    Is that right, Mr. Kaloyanides?

15       MR. KALOYANIDES:  Yes, for review of the jury

16 instructions.

17       THE COURT:  Right.  And we are, of course, not in

18 the presence or hearing of the jury.

19    All right.  Counsel, I have received your jury

20 instructions.  I think they're mainly fine.  Let me just call

21 your attention to some first minor issues.

22    On Instruction No. 11, you say, "We have heard evidence

23 that a witness received."  I don't think we should be coy about

24 that.  It is who it is.  So we should say, "You have heard

25 evidence that Elcita 'Sheryl' Del Rosario received benefits

from the Government," et cetera, et cetera.  So I propose we make that change to substitute the name.  She's clearly named later on anyway.

Any objection to that from the Government?

MS. BLANCH:  No, Your Honor.

THE COURT:  Mr. Kaloyanides?

MR. KALOYANIDES:  No, Your Honor.

THE COURT:  Next is, as I was looking at the "on or about" instruction, it sort of hit me that it doesn't make a whole lot of sense if we're not going to send the Indictment. But on the other hand, the Indictment potentially creates more difficulties unless we have some further explanation because the Indictment -- and I don't know why the U.S. Attorney's Office always does this by charging everything in the "and" when the law is you only have to prove an "or."

And so if the Indictment goes back and they look at it and they say, well, you have to do all of those things, employed, used, persuaded, induced, enticed, and coerced versus just an "or," there's a potential inconsistency because the instructions say "or" and the Indictment says "and."

To sort of accommodate all of those things, perhaps we still should not give the Indictment to the jury but modify instruction 14 to say that, "The Indictment charges that the offense alleged was committed between on or about November 11, 2006, and on or about March 15, 2007," and strike a certain

```
 1    date out and leave it at that.
 2         Ms. Blanch, what's your view on that?
 3              MS. BLANCH:  We agree, Your Honor.
 4              THE COURT:  Mr. Kaloyanides?
 5              MR. KALOYANIDES:  I think that's fine, Your Honor.
 6              THE COURT:  Okay.  So this the Indictment will not
 7    go back to the jury then.
 8         Then if you go to Instruction 17, there was a typo.  The
 9    word "designed" on my 19 was misspelled so we fixed it.
10         We also switched Instruction 14 and 15 because my
11    recollection was that I had said we would put the "on or about"
12    immediately after we talk about the elements and before we go
13    to the actual definitions.
14         I think one of those instructions was not headed in all
15    caps.  To be consistent, I changed it to all caps, okay, at the
16    line that says Court's Instruction Number.
17         Okay.  Any objection to those matters --
18              MS. BLANCH:  No, Your Honor?
19              THE COURT:  -- Ms. Blanch?
20         And, Mr. Kaloyanides?
21              MR. KALOYANIDES:  No.
22              THE COURT:  I think that's all I have.  We'll make
23    the changes, and we'll run clean copies for you folks to take a
24    look at.  If you have any issues, please let my clerk know
25    before 8:00 so that we can fix it.  If you don't let me know by
```

```
 1    8:00 and if the jurors are here and Mr. Reczko is here, we'll
 2    just get going at 8:00 with the instructions.
 3          Who is going to give the opening closing?
 4                MS. BLANCH:  I am, Your Honor.
 5                THE COURT:  And how long do you expect your opening
 6    closing to be?
 7                MS. BLANCH:  Between 30 and 40 minutes.
 8                THE COURT:  Mr. Kaloyanides, how long do you expect
 9    to be?
10                MR. KALOYANIDES:  I'd say about 30 minutes.
11                THE COURT:  And who is giving the rebuttal?
12                MS. BLANCH:  I am.
13                THE COURT:  I guess it would depend on what he says,
14    but I don't suppose it will be more than about 15 minutes?
15                MS. BLANCH:  Probably not.
16                THE COURT:  We just need an estimate for purposes of
17    having the bailiff come and so forth.  All right.  Very good.
18    I hope to get going just as soon as we can.  Thank you very
19    much.
20          Oh, the verdict form.  Yeah, the verdict form is fine.  I
21    think you made the right change, Ms. Blanch, because I had put
22    "beyond a reasonable doubt" after "not guilty" and it's really
23    not right.  They don't have to find him not guilty beyond a
24    reasonable doubt, only guilty beyond a reasonable doubt.
25          Is that agreeable with you, the way that she has it?  Have
```

**UNITED STATES DISTRICT COURT**

1    you seen it?

2              MR. KALOYANIDES:  Yes, I have.  And that's correct,

3    Your Honor.  Thank you.

4              THE COURT:  Angela, here's the verdict form.  And

5    that's the only thing.  The Indictment is not going in.

6              THE CLERK:  Yes, Your Honor.

7         This court stands in recess.

8                   (Recess taken.)

9              THE CLERK:  Please remain seated.

10                  (Jury in at 8:01 A.M.)

11                  (The following proceedings were held in the

12                  presence of the jury:)

13             THE CLERK:  Please remain seated and come to order.

14   This United States District Court is once again in session, the

15   Honorable George H. King, Chief United States District Judge,

16   presiding.

17             THE COURT:  We're back on the record in the matter

18   of United States versus Reczko.  Counsel are present,

19   Mr. Reczko is present, and the jurors in their seats.

20        Good morning, ladies and gentlemen of the jury.  Once

21   again, thank you so much for being timely.  I appreciate it

22   very much.

23        All right.  The Government has now rested its case.

24        Mr. Kaloyanides?

25             MR. KALOYANIDES:  The defense rests.

1          THE COURT:  All right.  Both sides now have rested.

2     Ladies and gentlemen of the jury, at this time I'm going

3  to give you the bulk of the jury instructions, and then you're

4  going to hear closing arguments by counsel.  After that, I'll

5  have some brief sort of housekeeping instructions about your

6  deliberations.  And after that, you will be ready to go to the

7  deliberation room to begin your deliberations.

8     Members of jury, now that you have heard all of the

9  evidence, it is my duty to instruct you on the law that applies

10  to this case.  A copy of these instructions will be available

11  in the jury room for you to consult.

12     It is your duty to weigh and evaluate all of the evidence

13  received in this case and, in that process, to decide the

14  facts.  It is also your duty to apply the law, as I give it to

15  you, to the facts as you find them whether you agree with the

16  law or not.

17     You must decide the case solely on the evidence and the

18  law and must not be influenced by any personal likes or

19  dislikes, opinions, prejudices, or sympathy.  You will recall

20  that you took an oath promising to do so at the beginning of

21  the case.

22     You must follow all of these instructions and not single

23  out some and ignore others.  They are all important.  Please do

24  not read into these instructions, or into anything I may have

25  said or done, any suggestion as to what verdict you should

1    return.  That is a matter entirely up to you.

2         The Indictment is not evidence.  The defendant has pleaded

3    not guilty to the charge.  The defendant is presumed to be

4    innocent unless and until the Government proves the defendant

5    guilty beyond a reasonable doubt.

6         In addition, the defendant does not have to testify or

7    present any evidence to prove innocence.  The Government has

8    the burden of proving every element of the charge beyond a

9    reasonable doubt.

10        The evidence you are to consider in deciding what the

11   facts are consists of, one, the sworn testimony of any witness;

12   two, the exhibits received in evidence; and, three, any facts

13   to which the parties have agreed.

14        The parties have agreed to certain facts that have been

15   stated to you.  You should, therefore, treat those facts as

16   having been proved.

17        In reaching your verdict, you may consider only the

18   testimony and exhibits received in evidence.  The following

19   things are not evidence, and you may not consider them in

20   deciding what the facts are:  One, questions, statements,

21   objections, and arguments by the lawyers are not evidence.  The

22   lawyers are not witnesses.  Although you must consider a

23   lawyer's question to understand the answer of a witness, the

24   lawyer's questions are not evidence.

25        Similarly, what the lawyers have said in their opening

statements or closing arguments and at other times -- and at

other times is intended to help you interpret the evidence, but

it is not evidence.  If the facts as you remember them differ

from the way the lawyers stated them, your memory of them

controls.

Two, any testimony that I have excluded, stricken, or

instructed you to disregard is not evidence.  In addition, some

evidence was received only for a limited purpose.  When I have

instructed you to consider certain evidence in a limited way,

you must do so.

Three, anything you may have seen or heard when the court

was not in session is not evidence.  You are to decide the case

solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence

is direct proof of a fact such as testimony by a witness about

what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence.  That is, it is

proof of one or more facts from which you can find another

fact.

You are to consider both direct and circumstantial

evidence.  Either can be used to prove any fact.  The law makes

no distinction between the weight to be given to either direct

or circumstantial evidence.  It is for you to decide how much

weight to give to any evidence.

In deciding the facts in this case, you may have to decide

which testimony to believe and which testimony not to believe.

You may believe everything a witness says or a part of it or

none of it.

In considering the testimony of any witness, you may take

into account, one, the witness's opportunity and ability to see

or hear or know the things testified to; two, the witness's

memory; three, the witness's manner while testifying; four, the

witness's interest in the outcome of the case, if any; five,

the witness's bias or prejudice, if any; six, whether other

evidence contradicted the witness's testimony; seven, the

reasonableness of the witness's testimony in light of all of

the evidence; and, eight, any other factors that bear on

believability.

The weight of the evidence as to a fact does not

necessarily depend on the number of witnesses who testify.

What is important is how believable the witnesses were and how

much weight you think their testimony deserves.

A defendant in a criminal case has a constitutional right

not to testify.  You may not draw any inference of any kind

from the fact that the defendant did not testify.

Proof beyond a reasonable doubt is proof that leaves you

firmly convinced that the defendant is guilty.  It is not

required that the Government prove guilt beyond all possible

doubt.  A reasonable doubt is a doubt based upon reason and

common sense and is not based purely on speculation.  It may

1   arise from a careful and impartial consideration of all the

2   evidence or from lack of evidence.

3         If, after a careful and impartial consideration of all the

4   evidence, you are not convinced beyond a reasonable doubt that

5   the defendant is guilty, it is your duty to find the defendant

6   not guilty.  On the other hand, if, after a careful and

7   impartial consideration of all the evidence, you are convinced

8   beyond a reasonable doubt that the defendant is guilty, it is

9   your duty to find the defendant guilty.

10        You are here only to determine whether the defendant is

11  guilty or not guilty of the charge in the Indictment.  The

12  defendant is not on trial for any conduct or offense not

13  charged in the Indictment.

14        You have heard evidence that Elcita Sheryl Del Rosario

15  received benefits from the Government in connection with this

16  case, such as travel to and lodging in the United States for

17  two minor members of witness Elcita Sheryl Del Rosario's

18  immediate family.

19        For this reason, in evaluating the testimony of Elcita

20  Sheryl Del Rosario, you should consider the extent to which or

21  whether her testimony may have been influenced by this factor.

22  In addition, you should examine the testimony of Elcita Sheryl

23  Del Rosario with greater caution than that of other witnesses.

24        You have heard testimony from persons who, because of

25  education or experience, were permitted to state opinions and

1    the reasons for their opinions.  Such opinion testimony should

2    be judged like any other testimony.  You may accept it or

3    reject it and give it as much weight as you think it deserves,

4    considering the witness's education and experience, the reasons

5    given for the opinion, and all the other evidence in the case.

6        The defendant is charged in the Indictment with a

7    violation of Section 2251(c) of Title 18 of the United States

8    Code.  In order for the defendant to be found guilty of that

9    charge, the Government must prove each of the following

10   elements beyond a reasonable doubt:

11       First, at the time Elcita "Sheryl" Del Rosario was under

12   the age of 18 years; second, the defendant knowingly employed,

13   used, persuaded, induced, enticed, or coerced Elcita "Sheryl"

14   Del Rosario to engage in sexually explicit conduct outside the

15   United States for the purpose of producing a visual depiction

16   of such conduct; and, third, the defendant intended such visual

17   depiction to be transported to the United States, its

18   possessions or territories, by any means, including by using

19   any means or facility of interstate or foreign commerce or

20   mail; or the defendant knowingly transported such visual

21   depiction to the United States, its territories or possessions,

22   by any means, including by using any means or facility of

23   interstate or foreign commerce or mail.

24       The Indictment charges that the offense alleged was

25   committed between on or about November 11, 2006, and on or

about March 15, 2007.  Although it is necessary for the
Government to prove beyond a reasonable doubt that the offense
was committed on a date reasonably near the date alleged in the
Indictment, it is not necessary for the Government to prove
that the offense was committed precisely on the date charged.

An act is done knowingly if the defendant is aware of the
act and does not act through ignorance, mistake, or accident.
The Government is not required to prove that the defendant knew
that his acts or omissions were unlawful.  You may consider
evidence of the defendant's words, acts, or omissions, along
with all the other evidence in deciding whether the defendant
acted knowingly.

The following definitions apply to this case:

Visual depiction includes undeveloped data that has been
stored on computer disc and is capable of conversion into a
visual image.

A minor is any person under the age of 18 years.

Sexually explicit conduct means actual or simulated, one,
sexual intercourse, including genital-genital, oral-genital,
anal-genital, or oral-anal, whether between persons of the same
or opposite sex; two, masturbation; or, three, lascivious
exhibition of the genitals or pubic area of any person.

Producing means producing, directing, manufacturing,
issuing, publishing, or advertising.

In order to determine whether the visual depiction is a

1  lascivious exhibition of the genitals or pubic area, you must

2  consider the overall content of the visual depiction while

3  taking into account the age of Elcita "Sheryl" Del Rosario.

4  The following list of factors, while not exhaustive, are among

5  the things you should consider.

6      One, whether the focal point of the visual depiction is on

7  Elcita "Sheryl" Del Rosario's genitalia or pubic area.

8      Two, whether the setting of the visual depiction is

9  sexually suggestive, i.e., in a place or pose generally

10 associated with sexual activity.

11     Three, whether Elcita "Sheryl" Del Rosario is depicted in

12 an unnatural pose or in inappropriate attire, considering her

13 age.

14     Four, whether Elcita "Sheryl" Del Rosario is fully or

15 partially clothed or nude.

16     Five, whether the visual depiction suggests sexual coyness

17 or a willingness to engage in sexual activity.

18     And, six, whether the visual depiction is intended or

19 designed to elicit a sexual response in the viewer.

20     A visual depiction need not involve all of these factors

21 to be a lascivious exhibition, and it is for you to decide the

22 weight or lack of weight to be given to any of these factors.

23     All right.  Ladies and gentlemen, that's the bulk of the

24 instructions.  We're now ready to go to final argument.  We'll

25 begin with the United States.

1        Ms. Blanch.

2           MS. BLANCH:  Ladies and gentlemen, you've sat

3    through this trial for a week.  You've seen the evidence.

4    You've heard the witnesses.  And I submit to you that in all of

5    that time the Government has proven beyond a reasonable doubt

6    that the defendant, Stanley Dan Reczko, used Sheryl Del

7    Rosario, who was 16 years old, to engage in sexually explicit

8    activity for the purpose of producing pictures of that sexual

9    activity and that he did this intending to bring those pictures

10   into the United States.

11       I also submit that the Government has proven beyond a

12   reasonable doubt that the defendant used 16-year-old Sheryl,

13   Elcita Del Rosario, to engage in sexually explicit activity in

14   the Philippines for the purpose of producing a visual depiction

15   thereof, and he, in fact, brought those pictures into the

16   United States.

17       And if you agree that the Government has proven either of

18   those things beyond a reasonable doubt, then you can and should

19   convict the defendant of sexual exploitation of a minor in

20   violation of Title 18, United States Code, Section 2251(c).

21       You met Elcita "Sheryl" Del Rosario this week.  Right now,

22   she's 24 years old.  This is Elcita Del Rosario when the

23   defendant met her in 2005.  She was 15 years old.

24       This is a picture taken on the very first day the

25   defendant met her.  And you heard Elcita Del Rosario tell you

**UNITED STATES DISTRICT COURT**

1    that on that very first day, he began grooming her for sexual

2    activity.  She was home with her 17-year-old brother as the

3    only other person in the house.  The defendant showed up late

4    at night, gave the brother money to go out and buy drinks.  And

5    while he was gone, he put the victim on his lap.

6         The next day he took her to the mall.  He bought her jeans

7    and clothes.  And by the third day, he had taken her on a date

8    to the Pizza Hut.  He was romancing her.  She was 15 years old.

9    And here was this handsome American man talking about

10   engagement rings and love and marriage within three days.

11        He went home to the United States shortly after that.  But

12   he came back in November of 2005.  This is Sheryl Del Rosario

13   on the first day he came back in November 2005.  She was 15

14   years old.

15        This is a picture taken at the Marriott Hotel.  Ms. Del

16   Rosario and her mother picked up the defendant from the airport

17   and drove him to the Marriott in Cebu, Philippines.  And he

18   took them up and showed them his hotel room.  And this is a

19   picture of Sheryl when she was 15, just hours before he took

20   her to the disco, gave her alcohol for the first time, brought

21   her back to the hotel room, and started touching her.

22        Later on that same trip, he paid for the entire Del

23   Rosario family to go on a family vacation to Mindanao.  She was

24   still 15.  This is what she looked like on that trip.  On this

25   trip, the defendant bought her lingerie, started taking

1   pictures of her wearing it, started talking about marrying her,

2   and started talking about having sex with her.

3       She was a virgin.  He asked her to give him her virginity.

4   And you heard her say she was afraid because she'd never done

5   that before.  But he persisted, and he suggested if she didn't

6   give in, he would find another girl to marry.

7       So she gave him a date, December 6, 2005.  She said she

8   gave him that date because it was one she wouldn't forget.  It

9   was the birthday of one of her good girlfriends.  And you heard

10  what happened on December 6, 2005.  She went to his hotel in

11  the Grand Cebu Hotel in Cebu, Philippines, and he had sex with

12  her for the first time.

13      A few days later, he went back to the United States, back

14  to spend Christmas with his wife and his child in their

15  apartment on Kenmore Street in Los Angeles.  And while he was

16  there, he continued communicating with 15-year-old Sheryl

17  Del Rosario.  He spoke to her over the Internet.  He spoke to

18  her on the telephone.

19      And he wrote her love letters, love letters where he

20  admitted that he understood that she was a minor, love letters

21  where he said he wanted to bring her to the United States when

22  she turned 21, but he didn't think he could wait five whole

23  years.

24      Those love letters never got to Ms. Del Rosario because

25  they were intercepted by Richelle Reczko, his wife, who had

UNITED STATES DISTRICT COURT

1    kept them and later, a few years later, turned them over to

2    HSI, the Homeland Security Investigations Agency.

3        Later in January 2006, the defendant returned to the

4    Philippines, and he purported to marry this 15-year-old girl.

5    He well knew that this was not a legal marriage because he had

6    a wife and child in the United States.  But what better way to

7    gain access and control to a romantic, naive 15-year-old girl

8    than to go through a fake marriage ceremony with her, put a

9    ring on her finger, a ring that she didn't know he had taken

10   from his wife in the United States and given to her.

11       He went back to the United States again.  While he was

12   gone, he arranged for her to get an apartment.  What better way

13   to get unfettered access to Sheryl Del Rosario, who was now 16

14   years old, than to take her out of her family home and set her

15   up in an apartment.  It was one room, but compared to the

16   pictures you saw of her family home, it was fancy.  He bought

17   furniture.  There was a TV.  There was a refrigerator.  And her

18   parents weren't there to protect her.

19       And you will see the travel records that show in November

20   of 2006, the defendant came back to the Philippines.  He came

21   back to Cebu, and he was there for two weeks, approximately two

22   weeks.  And on almost every day that he was in the Philippines,

23   he produced child pornography of the victim.

24       You will see that he took -- well, you've heard testimony

25   that he took sexually explicit activity -- pictures of sexually

1    explicit activity with her on at least eight days during that

2    trip.

3         The images he took on the first day are Government's

4    Exhibit 1, the next day Government's Exhibit 2, Government's

5    Exhibit 3, 4, 5, 6, 7, and 8.  Every one of these exhibits

6    contains the child pornography that the defendant took of

7    Elcita Del Rosario while he was on that two-week trip in the

8    Philippines.

9         And then he took that child pornography back home with

10   him.  He went back to the United States.  He took his cameras,

11   he took his laptop, and he took the pictures of his vacation in

12   the Philippines.  And those pictures included pictures of

13   himself engaged in sexually explicit conduct with Elcita Del

14   Rosario when she was 16 years old.  And for that conduct, the

15   defendant has been charged in this single-count Indictment

16   charging him with sexual exploitation of a minor.

17        The Court has given you some instructions on the elements

18   of that offense, and I want to go over them one at a time so we

19   can quickly discuss what evidence there is regarding this

20   offense.

21        The first element is that the defendant -- that Sheryl

22   Del Rosario was under the age of 18 at the time.  And I submit

23   to you that this element is undisputed.  You heard testimony

24   from Ms. Del Rosario herself.  You saw a copy of her certified

25   birth certificate.  And, most importantly, the defendant has

conceded that she was 16 years old at the time he took those
pictures.

You heard read to you a trial stipulation which will go
back to you in the jury room.  The trial stipulations are
Exhibit 279 and 280.  And one of those trial stipulations is
that Elcita Del Rosario was 16 years old at the time the
photographs were taken.  So I submit to you that this fact is
not in dispute.

The second element is that the defendant knowingly
employed, used, persuaded, induced, enticed, or coerced the
victim to engage in sexually explicit conduct outside the
United States for the purpose of producing a visual depiction
of this conduct.  And ladies and gentlemen, I submit to you
that these facts are also not in dispute.

You've heard the testimony of the victim, Sheryl Del
Rosario, who talked to you about how the defendant started
speaking with her when she was 13 years old.  He got her to
engage in sexual activity over the phone.  He met her when she
was 15 and over the next year groomed and seduced and romanced
her into sexual activity which he took pictures of.

And, more importantly, ladies and gentlemen, you have the
defendant's own admission in the trial stipulation.  And,
again, if you read the trial stipulation, you will see that the
defendant has admitted that many of the exhibits in
Government's Exhibits 1 through 8 depict 16-year-old minor

1    Sheryl Del Rosario engaged in sexually explicit activity with

2    him.

3         He specifically admits that some of those images depict

4    Sheryl Del Rosario performing oral sex on him and that some of

5    those images depict him engaged in vaginal intercourse with

6    16-year-old Sheryl Del Rosario.  And he admits that he took

7    those pictures.

8         And, ladies and gentlemen, I submit to you that if the

9    defendant took the pictures, the defendant used her to engage

10   in sexually explicit activity for the purpose of producing a

11   visual depiction of that conduct.  He employed her to engage in

12   sexually explicit activity for the purpose of taking a picture

13   of that conduct.

14        If he took those pictures, and he admits that he did, and

15   if those pictures show 16-year-old Elcita Del Rosario engaged

16   in sexually explicit conduct with the defendant, which he

17   admits that he did, I submit to you that that is almost

18   everything the Government has to prove to meet the second

19   element.

20        The only thing missing is that the pictures were taken in

21   the Philippines.  And, again, ladies and gentlemen, I submit to

22   you that those -- that fact is undisputed.  Exhibits 1, 2, 3,

23   4, 5, 6, and 8 all depict Sheryl Del Rosario and the defendant

24   engaged in sexually explicit conduct in their apartment outside

25   of Cebu, Philippines.

1    And you heard from Ms. Del Rosario that at the end of

2    November 2006, they went on a vacation to Manila and that the

3    pictures in Government's Exhibit 7 show the two of them engaged

4    in sexually explicit activity in the hotel room in Manila.  So

5    I submit to you that the first two elements are simply not in

6    dispute, which leaves us with the Element No. 3, that the

7    defendant either intended the visual depictions -- which we can

8    just call child pornography at this point -- that the defendant

9    intended that child pornography to be transported into the

10   United States, that he intended those pictures to be

11   transported, or that the defendant actually transported these

12   depictions into the United States.

13   Ladies and gentlemen, if you find either one of these

14   elements beyond a reasonable doubt, then you must find the

15   defendant guilty.  And I submit to you that the Government

16   hasn't proven one or two; we have proven both.

17   Let's talk about the first one, that the defendant

18   intended those images to be transported back to the

19   United States.  Well, first of all, think about what Sheryl

20   Del Rosario told you about why the defendant took those

21   pictures.  She asked him, why are you taking these pictures of

22   me?  And he told her it was for fantasy.  It was for fantasy so

23   he could look at them and fantasize about her while they were

24   apart.  He told her he needed those pictures so he could

25   fantasize about her instead of having sex with other girls

1   while they were apart.

2       Ladies and gentlemen, he was in the Philippines for

3   approximately two weeks in November of 2006.  And on November

4   30th, he got on a plane and traveled back to the United States.

5   When he said he needed those pictures so he could fantasize

6   about her while they were apart, he meant while he was in the

7   United States, because that is where he was going.

8       You are allowed to use your common sense when it comes to

9   reviewing the evidence and comparing the elements to the law.

10  And I submit to you that the commonsense reading of what the

11  defendant said and did proves beyond a reasonable doubt that

12  when the defendant took sexually explicit images of that

13  16-year-old girl, he did it because he wanted to take them home

14  with him.  He was traveling back and forth between the

15  Philippines and the United States relatively regularly during

16  that one-year period while she was 15 and 16 years old.

17      He took pictures of her over a two-week period, got on a

18  plane, took his cameras and his laptop with him, and he took

19  his vacation photos, and you know what those photos include.

20  They include the photos in Government's Exhibit 1 through 8.

21  And that satisfies beyond a reasonable doubt that the defendant

22  intended those pictures to travel into the United States.

23      We don't have to, but we can go one step further and show

24  that the defendant, in fact, brought those pictures into the

25  United States.  I want you to think about the testimony of

1   Bruce Pixley who examined not only the CD containing the child

2   pornography on it -- that's Government's Exhibit 10.  This is

3   the Baby Girl CD.  This is what all this fuss is about.  It's

4   labeled in his handwriting, "Baby Girl Wow Hot 2006."  And he

5   labels what the contents are.  These -- this label matches up

6   to the folder structure on this CD in his handwriting.  You

7   know he's the one who burned this CD.

8        And let's talk about the evidence that we have that you

9   have heard about why we know this CD was created in the

10   United States.  This is the chart that Bruce Pixley spoke

11   about.  And I know it's a little small, but you'll have it back

12   with you, and you can go and look at this print as you go back

13   in the jury room.

14        But this is a timeline of the days leading up to the

15   burning of the CD.  The first date on the timeline is

16   November 10, 2006.  That is the day that the defendant traveled

17   to the Philippines, and you can see his travel records at

18   Government's Exhibit 36, 36-A.

19        He traveled to the Philippines on November 10th, and he

20   started taking child pornography of Elcita Del Rosario on

21   November 11th.  Those are the pictures on Government's

22   Exhibit 1 -- excuse me -- November 12th.  It is small.  I can't

23   read it.  November 12th.  So he traveled to the Philippines on

24   November 10th.  He began taking sexually explicit pictures of

25   the victim on November 12th, Exhibit 1.

1          Exhibit 2 are the pictures he took the next day on

2     November 13th.

3          Exhibit 3 are the pictures he took the next day on

4     November 14th.

5          Exhibit 4 are the pictures he took the next day on

6     November 15th.

7          Exhibit 5, November 18th.

8          Exhibit 6, November 19th.

9          Exhibit 7, November 22nd.

10          And, ladies and gentlemen, those are the pictures that

11     Elcita Del Rosario told you were taken when he took her on a

12     vacation to Manila.  And she told you that vacation happened at

13     the end of November of 2006.  And those pictures, in fact,

14     depict them in a hotel room, not their apartment.

15          And that helps -- the content of the pictures helps inform

16     you of the accuracy of the date and time stamp on that camera.

17     It might not be accurate to the minute.  It might not be

18     accurate to the hour.  But if you look at the EXIF data on

19     these photographs, they tell you they were taken starting a

20     couple of days after the defendant arrived in the Philippines.

21          And, in fact, the defendant did arrive in the Philippines

22     on November 10, 2007 -- '6, 2006.  And if you look at the EXIF

23     data on the pictures, they tell you that the pictures taken in

24     Manila were taken at the end -- towards the end of November of

25     2006.

1          And if you look at the pictures, in fact, those pictures

2     depict the defendant and 16-year-old Del Rosario engaged in

3     sexually explicit conduct in a hotel room in Manila.  And,

4     again, that helps inform you that the date and time embedded in

5     those pictures is correct, maybe not to the minute and maybe

6     not to the hour, but reliable.

7          He keeps taking pictures.  Government's Exhibit 8, they're

8     back in Cebu.  He's taking pictures of her at their apartment.

9     Government's Exhibit 8, according to the photographs, the

10    information embedded in the photographs, were taken around

11    November 24th, 2006.  And a couple of days later, he gets on a

12    plane and travels back to the United States.

13         Now, what was he doing between November 24th and

14    November 30th?  We don't have child pornography pictures in

15    evidence, but we do have the media card that he was using to

16    take photographs during that period.  That's media card item

17    number 5.  And on that media card, based on the information

18    embedded in those pictures, he took pictures.  He took pictures

19    at the end of November up until November 30th, 2006.

20         And if you look at the contents of those pictures, you can

21    see he's in the Philippines.  The people in those pictures are

22    Elcita Del Rosario and members of her family.  And those

23    pictures stop on November 30th, 2006, according to the EXIF

24    data embedded in those photographs.  And it turns out the

25    travel records agree.  On November 30th, 2006, the defendant

1    got on a plane and went home to the United States.

2         And he didn't change out the media card in his camera

3    because four days later on December 4th, he started taking

4    pictures again.  And you saw some of the pictures that were

5    dated December 4th, 2006, that were on that media card.  And

6    you heard testimony that they depict the defendant and his wife

7    and his baby at the Grove, a mall in Los Angeles, at a

8    Christmas village at a mall in Los Angeles.

9         And that, ladies and gentlemen, proves that the date and

10   time stamps on those photographs are accurate, because the

11   contents of the pictures match up with exactly what was

12   happening on those days.  And between December 4th and

13   December 5th, he continues to take pictures in the

14   United States using that media card, which is Item 5.

15        Now, let's look at what happened on December 25th.  On

16   December 25th, Christmas morning, he's using a computer to

17   organize his photographs.  He's using a computer to take that

18   child pornography and organize it into folders which he labels.

19   At 10:30 A.M., he modifies a folder, "Sexy Sheryl."  And then

20   he goes away from the child pornography, and he burns family

21   photos onto a CD.  He burns the CD.  He labels "Averie Fall

22   Holloween 2006."

23        And, ladies and gentlemen, we have the contents of that

24   CD.  It's in evidence.  And if you look at it, you can see that

25   it depicts Averie, his daughter, in a Halloween costume.  And

according to the date and time stamp embedded in those

pictures, they were taken around Halloween of 2006.  And he

labeled that CD "Averie Fall Holloween 2006" when he burned it

on Christmas day.

     And then he goes back to organizing his child pornography

collection.  He modifies the "Sasi" folder.  He modifies the

"Papa Birthday" folder.  He modifies a folder he labels "Our

Marriage, Barangay Captain."  And then at eleven --

approximately 11:20 A.M., he burns this CD.  He uses a computer

to transfer those images from his computer onto this CD.

     And later that day he takes his camera with the same media

card in it, and he goes to a Christmas party.  And you will see

four pictures taken on the media card that's Item 5, taken at

that Christmas party.  It's got a Christmas tree in it.  It's

got his wife and his baby in those pictures.

     And you heard his wife say that those pictures depict a

Christmas party at a friend's house that the defendant

attended, and it was around Christmas.  She doesn't remember if

the party was specifically on the 25th or not, but she

remembers it was around Christmas in 2006.  And he took those

four pictures, and then he switched media cards, and he moved

to media card Item 7, and he kept taking pictures at that

party.  Some of those pictures have him in them.  And according

to the EXIF data embedded in those pictures, those were

pictures taken at a -- on Christmas day, which is consistent

1    with the content of those pictures.

2         Ladies and gentlemen, the forensic evidence combined with

3    the content of the pictures, combined with his travel records,

4    combined with the testimony of the witnesses who told you where

5    the defendant was and what he was doing when those pictures

6    were taken, all paint a very consistent picture of what the

7    defendant did.

8         He traveled to the Philippines.  He spent two weeks there.

9    He took lots and lots of child pornography of the victim who

10   was 16 years old.  Then he got on a plane.  He took his cameras

11   and his computer and his pictures with him, and then he spent

12   Christmas with his family in the United States.  And around

13   Christmas day he organized those pictures into folders, and he

14   burned this CD.  And you know where the defendant was located

15   when this CD was burned because you know he was in the

16   United States in December of 2006.

17        So, ladies and gentlemen, I submit to you that the

18   Government has proven beyond a reasonable doubt that Sheryl

19   Del Rosario was under the age of 18 when those pictures were

20   taken, that the defendant knowingly employed, used, persuaded,

21   induced, enticed, and coerced.  We only have to prove one of

22   those things.  It's "or."  Did he employ her?  Did he use her?

23   Did he persuade her?  Did he induce her?  Did he entice her?

24   Did he coerce her into engaging in sexually explicit activity

25   for the purpose of taking pictures?

1    And did he do that in the Philippines?  I submit to you
2    that the Government has proven beyond a reasonable doubt that
3    he did.  And the Government has proven beyond a reasonable
4    doubt that when he took those pictures, he had every intention
5    of bringing them home to the United States so he could use them
6    as fantasy material.  And that's enough.  That's all the
7    Government needs to prove for you to find him guilty of the
8    charge in the Indictment.
9        But we went one step further.  We didn't have to.  You can
10   still find him guilty based on this evidence alone.  But I
11   submit that we have proven beyond a reasonable doubt that he
12   did, in fact, take those pictures back to the United States.
13       And because of that fact, in addition to the fact that he
14   intended to bring them into the United States, I ask you to
15   find the defendant guilty.  Thank you.
16           THE COURT:  All right.  Thank you very much.
17       Now closing argument on behalf of the defendant,
18   Mr. Kaloyanides.
19           MR. KALOYANIDES:  Thank you, Your Honor.
20       Good morning, ladies and gentlemen.
21       You just heard the Government's view of the case.  Now I'm
22   going to get an opportunity to tell you how we view the
23   evidence in the case.  This is going to be my only chance to
24   talk to you about the evidence that's come in and how we see
25   the interpretation.  And then the Government will get a chance

1    to respond to my comments.

2        I want to thank you for listening throughout this week and

3    for your careful attention.  And I just need a little bit more

4    of your time so we can really get to the crux of this case.

5        Now, at their opening the Government said this was a case

6    about power, poverty, and control.  Ladies and gentlemen, I

7    submit to you that this is a case about real estate.  Location,

8    location, location.

9        Why is location key?  The Government is correct.  We don't

10   dispute the images that are in evidence in this case constitute

11   child pornography.  We've stipulated because this is not the

12   issue in the case.  We've stipulated that Mr. Reczko is the man

13   in those pictures.  This is not the issue in the case.  We've

14   stipulated Ms. Del Rosario was under 18 when those photos were

15   taken.  That's not the question in this case.

16       The question in this case, where were the photos taken?

17   Where was the CD-ROM burned?  Where did the photos and the

18   CD-ROM travel, if anywhere?

19       Now, in this particular case, as the evidence has come in,

20   the only evidence that helps us identify location is date and

21   time.  We need the date and time to determine where the CD-ROM

22   was burned, where and when the photos were taken.

23       And what's the proof of the date and time?  There is no

24   confirming evidence of when the CD-ROM was burned, when those

25   photos on the SanDisk, the camera storage media, when it was --

1    when those items got onto that disc or when those photos were

2    taken.

3        The key question in this case is the third element of the

4    charged count.  The question is did the Government prove beyond

5    a reasonable doubt that Mr. Reczko intended the visual

6    depiction, the child pornography to be transported to the

7    United States or that he knowingly did it.

8        As the judge has instructed you, Mr. Reczko has no burden.

9    I didn't have to ask one question of one witness.  I don't have

10   to be standing here to explain anything to you at all.  I know

11   it's not normal for us to say, well, there's just this question

12   in my mind.  I want an answer and he's not giving it to me.

13   That must mean something.  That's normal.  That's how our daily

14   interactions occur.

15       That's not the law, and your sworn duty is to follow the

16   law.  And the law says I don't have to do anything.  I don't

17   have to prove anything.  I don't have to answer any question.

18   It's their burden.  And not only do they have to answer and

19   establish the facts of the case, they have to prove each and

20   every element beyond a reasonable doubt.

21       The prosecution must prove each and every element.  It has

22   to be based only on the evidence that has been submitted to you

23   during the proceedings.  It cannot be based on any sympathies,

24   bias, prejudice, feelings, or emotion.  And it must focus on

25   the charged count, not on some other thing, some other issue,

1  some other conduct, some other event that you feel might have

2  happened.  It's this charged count alone.

3      Let's talk about the burden of proof.  The Government has

4  to prove beyond a reasonable doubt.  Now, if no evidence is

5  submitted, the only verdict under the law can be not guilty

6  because they have to prove the case.

7      Now, let's say they present some evidence that says in

8  your mind, well, maybe it's possible.  Under the law, you have

9  to return a verdict of not guilty.  What if the evidence shows,

10  well, maybe more likely than not they've proved the element?

11  It is still a not guilty verdict.

12      Even if they establish that it was probable, it is still a

13  not guilty verdict.  Even if they establish it was very

14  probable, it is a not guilty verdict.  They have to prove

15  beyond a reasonable doubt based on the evidence.

16      So we're back to the location.  And what's the proof of

17  the location?  The date and time embedded in the images.  And

18  where do we get this date and time data?  Where is this

19  evidence coming from?

20      You heard from Mr. Pixley.  The camera.  The computer.

21  The proof of location for the images is what he described as

22  the EXIF data.  It is the metadata embedded in the image, and

23  that comes from the camera.  It's not an independent calendar

24  out there in the cloud that every picture gets to access.  It's

25  the hardware that took the photo.  It's the camera itself that

1    dictates the evidence of the time and date.

2         So what do we say about the camera?  If the camera's date

3    and time is not set correctly, you have no way of knowing the

4    actual date and time.  It is the GIGO principle.  Garbage in,

5    garbage out.

6         Mr. Pixley said he is not able to rely on the source data

7    because he didn't have it.  He was asked to make an assumption

8    that the information on the disc, whether it was the CD-ROM or

9    the SanDisks themselves, was the starting point.  If that

10   assumption is wrong, the analysis is wrong.

11        What do we know about the EXIF data in this case?  Well,

12   we've got Exhibit 32, page 28.  We have the photograph that was

13   taken supposedly on December 4, 2006.  Mr. Reczko with his

14   daughter at the Grove, looks like some sort of holiday,

15   Christmas, Santa thing going on there.

16        If you look at the item number that's circled there in red

17   and you take it over to Exhibit 26, page 4, as Mr. Pixley

18   showed you during the examination of the prosecution, there's a

19   line item there on page 4 that shows that item and that EXIF

20   data, 4:33 in the morning.  That's what this photo says is the

21   time and date.  That's 4:33 in the morning according to this

22   camera.

23        Now, the Government has said, well, yeah, but look at the

24   content, look at the context.  Sure.  Go ahead.  I agree you

25   should look at the context.  There is a holiday display.  Did

1    anybody happen to present evidence, testimony, a document, that

2    said on what day the Grove had that set up?  Was it the 4th of

3    December, 2006?  Was it the 5th?  Was it the 10th?  Was it the

4    20th?  Well, it's around.

5        They have to prove beyond a reasonable doubt each and

6    every element.  Not hypothetical, not maybe, not possible, not

7    probable.  Beyond a reasonable doubt.  Garbage in, garbage out.

8        So what other proof of location beyond a reasonable doubt?

9    We had Mr. Pixley talk about it.  He said the proper procedure,

10   in a best of all possible worlds, you want to use forensic

11   software to image a hard drive or get a forensic copy of a

12   CD-ROM.  That's the best way to do it so you preserve the data

13   to make sure what the -- what the analyst is looking at is

14   accurate and it's not been compromised in any way.  That's what

15   he said is the best way to do it.

16       And, yes, if you can, get the original source data from

17   the source itself.  That would be great.  But you can't always

18   do it.  Mr. Pixley was very honest.  His report is very well

19   laid out because he told you the truth.  He was basing it on an

20   assumption that what he got was accurate.

21       But he had no way to verify it independently.  He didn't

22   have the camera.  He didn't have the computer.  He was told,

23   assume this data on this disc and on these SanDisks are

24   accurate.  Now tell us what your opinion is.  Is that proof

25   beyond a reasonable doubt of the location of the photos and the

1    disc?

2        What about that computer?  Defense Exhibit 408, the

3    computer hard drive was found, a close-up of it, the Hitachi.

4    There was a computer.  It was seized.  Where is it?  What

5    happened to it?  What did it show?  Mr. Pixley says he wasn't

6    given it.  No camera, no computer.  That's because this was a

7    sloppy investigation from the start.

8        It starts with IJM, International Justice Mission, and

9    Mr. Purviance.  He's the IJM's main man.  He gets the evidence

10   from Ms. Suico.  Now, remember what Ms. Suico testified about.

11   She went with Ms. Del Rosario and Ms. Del Rosario's mother to

12   the apartment along with somebody from the women's desk of the

13   local police.

14       The police were involved at that time, and that's when she

15   got the disc and some photos from Ms. Del Rosario.  But what

16   did Ms. Del Rosario tell you from the stand?  It was Ms. Suico

17   and her mom only, no police, nobody from the women's desk, just

18   the three of them.  Ms. Suico added this fourth person.

19       All right.  Well, fine.  Ms. Suico got the photos, got the

20   disc, turns them over to Purviance.  All right.  Mr. Purviance

21   then gets Mr. Reczko's suitcases and searches it, and he gets

22   other items.

23       And yet, with all of Mr. Purviance's police training, his

24   work in sex crimes against minors, he can't even follow basic

25   protocol to ensure the integrity of the evidence he seizes.  He

1    uses some commercial disc copying software to copy the disc,

2    not a forensic, not one that ensures the accuracy.  He just

3    tosses it in the vault with everything else, not only the

4    evidence in Mr. Reczko's case, but all the evidence of what

5    they're searching for.  There's no assurance that this is

6    protected from any kind of damage, any kind of interference

7    that could affect the digital media.

8        Mr. Pixley said you want to take care with digital media

9    to try to make sure you keep the integrity of the data.  And

10   Mr. Purviance, coincidentally, is the only guy with the key to

11   this very important vault.

12       And if you look at Exhibit 22, there it is, the hard drive

13   for a computer.  Purviance noted it down.  It was there.  They

14   had it.  Where is it?  What happened to it?  Wouldn't it be

15   nice to know what's on that computer?  Wouldn't it be nice to

16   see what the system's date was on that computer, if this is

17   even the computer that burned the disc in the first place?  We

18   don't know.  We don't know.  It's a question.  It's a question

19   they haven't answered and they can't answer.

20       Let's go back to Exhibit 22.  This is the list -- the IJM

21   inventory of some of the items seized out of Mr. Reczko's

22   luggage.  Compare it to Exhibit 21, which is the list of items

23   Mr. Purviance provided to the Philippine immigration

24   authorities.  So when the cops asked him, we want to know

25   everything that's in there, he prepares this little list, and

 1    it's missing items from the IJM official list.

 2          So apparently Mr. Purviance doesn't think it's as

 3    important to be accurate with the police request as it is for

 4    IJM.  Was he trying to lie?  Probably not.  He said I made a

 5    mistake.  I made a mistake.  Six items on the IJM list.  Five

 6    items made on the list for the Philippine immigration

 7    authorities.  And even of the five items, it's not accurate.

 8    Was he rushed?  Was this just something quick he had to do?

 9    Maybe.  Either way, it's a sloppy investigation.

10          Then we come to Dante Orate.  He signs off on the chain of

11    custody sheet from IJM as having received all these items in

12    the investigation.  But he couldn't remember if he actually

13    verified each item.  He fills out a different form that had

14    attached to it all of IJM's list.  Well, it's okay, I'll just

15    trust him, I guess, is what he says.  He doesn't recall

16    verifying each item.  As he's looking at the Baby Wow CD, he

17    damages it.  He has no recollection of seeing a computer or a

18    hard drive, and he has no idea of its whereabouts.

19          For Mr. Orate, apparently policy, procedures, and protocol

20    just really isn't very important, because you know, as long as

21    he's just got a sense that it's probably accurate, that's okay,

22    which is kind of why he did what he did in 1999, which was when

23    he lied on a form saying he saw a payment to an informant when

24    he wasn't there.  But, oh, it was okay.  I trust the agent.  He

25    told me it happened.  I was running late.  These policies and

procedures must just not make a difference.  Mistake,
oversight?  Maybe.  It's still a sloppy investigation.

     Now, I could spend a lot of time going through each
particular piece of evidence that came into the case, but it's
really not necessary.  I could talk about in detail each
witness's testimony, and we could try to pick it apart here and
tell you what I thought there.  But, again, what's the crux of
this case?

     I asked Ms. Del Rosario about the statutory witness fee
she was getting.  Every witness gets it.  This is nothing
unusual.  $40 a day for the witness fee.  And if they have to
come out of town, they get $71 per diem for cost, expenses,
meals.  She and her family got that because her family were
here as witnesses, potential witnesses.  Nothing wrong with
that.

     40 plus 71, $111 a day, maybe not a whole lot of money,
maybe it is to her.  You've got a stipulation as to how much
that translates into Philippine pesos.  Is that a lot of money
to her?  Maybe, maybe not.  The fact that her daughter -- her
child -- I don't know if it was a son or daughter -- but her
child was brought over, her younger sister was brought over,
does that affect her credibility?  That's for you to decide.

     But really at the end of the day, it doesn't matter
because the one thing with all her testimony -- understandably,
she can't remember specific dates.  It's ranges of times.  She

was testifying to the best of her ability.  Fine, take it at

face value.  Because it doesn't really matter at the end of the

day because the one thing she couldn't answer was the critical

question in the case:  Location.

Not one witness could testify that they saw Mr. Reczko

burn the Baby Wow CD.  Not one witness testified they ever saw

Mr. Reczko burn any CD.  Not one witness could testify that

they saw him transferring data from a camera onto any storage

media.

Ladies and gentlemen, again, this is not about the

production of child pornography.  It's a transportation case.

It's about did he intend to transport it to the United States,

or did he actually transport it to the United States?  And

there is no reliable proof that he intended or actually moved

child pornography to the United States.

How do we know there's no evidence of his intent?  The

disc was not in any luggage of his.  The disc was not on his

person when he was stopped.  Where was the disc?  Ms. Del

Rosario told you.  In a cabinet in their apartment, a disc he

made for her.  And what was also in that cabinet?  A camera, a

camera that was never turned over, a camera in the cabinet in

their apartment, which he left.  He's paying for an apartment.

Now, you don't have to like Mr. Reczko.  You don't have to

like what he was doing with Ms. Del Rosario, setting up this

relationship.  But let's look at the facts.  As sympathetic as

1    you may feel for Ms. Del Rosario -- and that's

2    understandable -- you have to set that aside and look at the

3    evidence in this case, just the evidence.

4        He was paying for an apartment.  He had his things there.

5    She had her things there.  That's where the disc was located.

6    That's where a camera was located.  What do we know about that

7    camera?  Absolutely nothing.  Again, here's the question.

8    You've got to be asking yourself, well, what -- there's got to

9    be something going on.  Maybe.  But the law says I don't have

10   to provide that answer.  The law says they do.  And they

11   haven't.

12       I'm going to go back a couple of decades and go to a

13   different kind of technology, because it's a little easier to

14   see this exhibit on the overhead.  This is Exhibit 24 that

15   Mr. Pixley prepared.  And why do I want to focus on this?  This

16   is the timeline based on the data he got from the images.  This

17   is the timeline he prepared in his analysis based on the

18   assumption that everything he got was accurate.

19       And what did he say to each of my questions about these

20   dates?  These dates are based on, for a burning of a CD, the

21   computer's system date, whatever that might be.  And he didn't

22   know what it was, and there was no way to confirm it.

23       What did he say about the modification dates in the

24   directory?  They're based on the system date in the computer

25   that burned the CD, and he couldn't confirm it because he

1  didn't have the computer.

2      What did he say about the photographs that were taken and

3  the date?  It would be based on the camera and the settings of

4  the camera, and he didn't have the camera; so he couldn't

5  confirm it.

6      What did he say about every single EXIF data, every single

7  metadata in every single image that is in his analysis?  It's

8  based on the hardware's setting, and he didn't have the

9  original source.  He can't confirm it.  It's based on hardware

10  that he wasn't given access to.  He has no idea where it was.

11  He can only make an opinion based on the material he's

12  provided.

13      It comes down to this, and he admitted it.  If his

14  assumption is wrong about the accuracy of the EXIF data, then

15  his analysis is wrong.  Without the correct date and time, you

16  can't prove the location.  No one can.  And the Government has

17  to prove it beyond a reasonable doubt.

18      4:33 in the morning.  4:33 in the morning.  Maybe it's not

19  accurate to the minute.  That's their argument.  Maybe it's not

20  accurate to the hour.  That's their argument.  It was around

21  Halloween.  That's their argument.  It was around Christmas.

22  That's your argument.

23      Well, ladies and gentlemen, that's not proof beyond a

24  reasonable doubt of the location of any of these items, and the

25  location is key, because Mr. Reczko may have produced child

1   pornography in the Philippines.  He may have done things that

2   are -- we just don't like what he did to Ms. Del Rosario.  We

3   may not like the man.  We may think he's got problems.  It's

4   okay.  That's not the question.

5        Did he intend to transport or did he transport those items

6   into this country?  There is no evidence that supports beyond a

7   reasonable doubt the dates and times, which are the only

8   evidence that can show us what his intent was and what he

9   actually did.

10       The only verdict in this case is not guilty.  Thank you.

11           THE COURT:  All right.  Thank you very much,

12   Mr. Kaloyanides.

13       Rebuttal then by the United States, Ms. Blanch.

14           MS. BLANCH:  Thank you, Your Honor.

15       Ladies and gentlemen, defense counsel says this is not a

16   case about the production of child pornography.  Of course it's

17   a case about the production of child pornography.  That's what

18   the defendant is charged with.  It's what he did.  He produced

19   child pornography in the Philippines.

20       And then you have to ask yourself, why did he do that?

21   What was the point of taking those pictures?  Why would he take

22   those pictures of Elcita Del Rosario when she was 16 in the

23   Philippines?  And I submit to you that answer is the third

24   element of this offense.  He took them because he wanted them.

25   He took them because he wanted the pictures of Ms. Del Rosario

1    when he wasn't with her.  He wanted those pictures in the

2    United States when he returned from his vacation in the

3    Philippines.

4         Of course this is a case about the production of child

5    pornography.  Of course it is.  And when you think about the

6    purpose of taking child pornography, you are allowed to use

7    your common sense.  And your common sense tells you, when he

8    travels to the Philippines for approximately two weeks and

9    takes child pornography on almost every day of that vacation

10   and then he gets on a plane and travels back to Los Angeles, he

11   takes his pictures with him.  That's the point of taking the

12   pictures in the first place.

13        Now, the defendant says -- or defense counsel says that

14   there's just no evidence at all about where that CD was burned.

15   And he says that Bruce Pixley said, you know what, I just

16   assumed that the dates on the camera and the dates on the

17   computer were accurate because I didn't have them so I just

18   assumed they were accurate.  That's not what he said.  Your

19   memory governs, but I submit to you that's not what he said.

20        He said the date and time stamp on those pictures depends

21   on the accuracy of the camera, and I didn't have the camera.

22   He said the date and time stamp that that CD was burned depends

23   on the accuracy of the computer, and I didn't have the

24   computer.

25        So what I did was create a timeline.  I looked at the

external evidence outside simply the date and time on the

photograph to see if I could figure out if the date and time

stamp was accurate, and he came up with a timeline.

    And, ladies and gentlemen, I submit to you that that

timeline and all of the evidence that provided the information

on that timeline establishes beyond a reasonable doubt that the

defendant burned that CD in the United States.

    Defense counsel says, well, if you don't know to the

minute or you don't know to the hour, that's just sloppy and

it's not beyond a reasonable doubt.  That's not true.  The

Government does not have to prove the minute or the hour that

that CD was burned.  We just have to prove it was burned in the

United States.

    If the camera was off by a few minutes or a few hours or

if it was set to Philippine time instead of U.S. time, it

doesn't matter.  What matters is do you believe it was off by

so far that it couldn't possibly have been burned in the

United States?

    And if you look at the timeline and the contents of the

pictures and the travel dates, you will see that they all match

up.  The travel records show he travels to the Philippines on

November 30th, 2000 -- excuse me, November 10th, 2006.  Not

surprisingly, the data embedded in those pictures shows you

that a couple days later he starts taking pictures in the

Philippines.

1        That tells you the camera date is correct.  It might not
2   be correct to the minute.  It might not be correct to the hour.
3   But it doesn't have to be.  And that's where defense counsel
4   makes his mistake.  It doesn't have to be accurate to the
5   minute and the hour.
6        Is it correct enough that you know those pictures were
7   taken on around November 12th, November 13th, November 14th?
8   Yeah, because you know that's when he arrived in the
9   Philippines.  Is it correct enough that you know the pictures
10  of him in Manila in a hotel room were taken at the end of
11  November?  Yeah, because that's when they were in Manila, at
12  the end of November, November 22nd.  That's what it says on the
13  pictures, the end of November.
14       And you know that the date and time stamp on the memory
15  card, which relates to the camera that we don't have, are
16  accurate, because if you look at the pictures on that memory
17  card, he takes pictures in the Philippines up until
18  November 30th.  And if you look at the travel records, that's
19  when it went back to the United States.
20       And then there are no pictures for a few days, and on
21  December 4th he starts taking pictures again.  And where is he?
22  He's at the Grove, not that far from here, in Los Angeles.  And
23  you know what?  That picture on that camera says that that
24  picture was taken at 4:00 in the morning, and there's no way it
25  was taken at 4:00 in the morning.  He's right.  It wasn't taken

1   at 4:00 in the morning.

2        But was it taken on probably December 4th?  Yeah.  And

3   when I say probably, the defense counsel says, well, that's not

4   enough because it's beyond a reasonable doubt.  You're right.

5   Beyond a reasonable doubt is a high standard.  It should be,

6   and it's the Government's burden.  But I don't have to prove

7   that that picture was taken at 4:00 A.M. on December 4th.  It's

8   not one of the elements.

9        What I have to show you is that that CD was burned in the

10  United States.  Was the date and time stamp on that camera,

11  when the picture at the Grove was taken, a little off?  Yeah,

12  it was a little off because it says 4:00 A.M.  Could that just

13  mean, as Bruce Pixley stated, that he hadn't changed the time

14  zone back on his camera because he had just returned from the

15  Philippines?  Maybe.  What we know is that that's a picture

16  taken in December of 2006 because his wife said it was taken in

17  December of 2006 here in the United States.

18       We know when he arrived in the United States because we

19  have his travel records.  So we know that the date and time

20  stamp on that camera is essentially accurate.  Is it accurate

21  to the minute?  No, it's not.  Is it accurate to the hour?  No,

22  it clearly is not, not when he's taking pictures in the

23  United States on that day.  But I don't have to prove that

24  because that's not one of the elements.

25       What we have to establish is that CD was burned in the

1   United States.  And I submit to you that when you look at all

2   of the evidence, not just the EXIF data, but the travel

3   records, the contents of the pictures, the place where he was,

4   when the picture says the picture was taken in Halloween and

5   you've got kids in Halloween costumes, when the picture says it

6   was taken in December, you've got a Christmas tree and presents

7   in the background.

8        I submit to you that it is simply not true that, because

9   we don't have the camera and we don't have the computer, we

10  have no idea whether the date and time on the camera and the

11  computer were accurate.  That's just not true.  We have a ton

12  of evidence that the date and time on that camera was accurate

13  because we look at the pictures and we look at the travel

14  records and we listen to the witnesses' testimony.

15       And when you put all of that together, there is no

16  question that that CD was burned in the United States.  Was it

17  burned on exactly the time by the minute and the hour that it

18  says it was on the CD?  Maybe not.  Maybe it was a couple

19  minutes off.  I'm not sure.

20       But remember the time zone that Bruce Pixley told you that

21  computer was set to?  Pacific time zone.  Where's that?

22  Los Angeles.  Where was the defendant at the end of December?

23  Los Angeles.  He got back in Los Angeles at the very beginning

24  of December, and he spent all of December and most of January

25  in the United States, at least according to the travel records.

1        Ladies and gentlemen, I want you to look at the elements

2   again.  Let's look at the elements again.

3        The first element is that the victim was under the age of

4   18.  Not in dispute.

5        The second element is that those pictures were taken in

6   the Philippines and they depict the victim with the defendant

7   engaged in sexually explicit activity, that the defendant took

8   those pictures, that he used her, he employed her, he persuaded

9   her and coerced her -- any of those things -- to engage in

10  sexually explicit activity with him for the purpose of taking

11  those pictures.

12       Ladies and gentlemen, that's not disputed.  Where were the

13  pictures taken?  They were taken in the Philippines.  It's not

14  disputed.  But I submit to you, when the defense counsel says

15  this isn't a case about child pornography, of course it is.

16  It's a case about child pornography and why he took the child

17  pornography.  And that's important because of the first part of

18  the third element.

19       And remember, we only have to prove one or the other.  The

20  first part of that third element is that the defendant took

21  those pictures intending to bring them to the United States.

22  Look at the dates.  He took those pictures on his two-week

23  vacation in the Philippines.  And he took the pictures home

24  with him.  What's the point of taking the pictures if you're

25  not going to take them back with you when you're going back to

your wife and your kids in the United States for the next
couple of months?  The point of taking vacation pictures is to
remember your vacation.  And the point of taking child
pornography pictures is to remember having sex with that
16-year-old girl when you're no longer with her.

Where did he go when he finished taking those pictures?
He went back to the United States.  And that's where he was
when he took this CD and he organized those pictures into
folders and he wrote those folders down on the label of the
case.  And he labeled the CD with "Baby Girl Wow Hot 2006."  He
was in the United States.

Do we wish that Dante Orate had not used a ballpoint pen
to write on this CD?  Oh, yeah, we really do.  Luckily, we had
a copy.  Was it a forensic copy?  No.  But Bruce Pixley told
you that he compared the contents from the original CD with the
copy of the CD, and it was identical, other than the date and
time that the CD was burned.

And he told you he conducted forensics on the original CD
to find out when it was burned, and it was burned on Christmas
day on a computer set to the Pacific time zone, which is
Los Angeles.

And the defense counsel says, well, you have no evidence
that he ever burned any CDs.  Nobody ever testified that he
burned a single CD.  Really?  Because we found CDs on him.  We
found the "Averie Fall" CD that according to the date and time

1   stamp on it was burned just minutes before this one was burned.

2   And it contained his family photos on it, and it was labeled in

3   his handwriting with her name.

4       We found a CD on him that was labeled in his handwriting,

5   "San Diego Zoo."  And you know what was on it?  And you can

6   look.  It's evidence.  Pictures of the zoo.

7       Of course we had testimony that he makes CDs.  He loves to

8   take pictures.  He loves to take pictures, and he organizes

9   those pictures on his computer, and he burns them and stores

10  them on CDs.  And that's what he did here.

11      He took his vacation photos, which include the photos of

12  him having sex with a 16-year-old girl in the Philippines, and

13  then he packed his bags and he packed his laptop and he packed

14  his computers, and he got on a plane and he went home to

15  Los Angeles.

16      Ladies and gentlemen, I submit to you that Title 18

17  United States Code, Section 2251(c) was supposed to protect

18  Elcita Del Rosario, and it didn't.  But you have the

19  opportunity now to follow the law and look at the evidence and

20  convict him of violating that statute.  And you ought to,

21  because the Government has proven beyond a reasonable doubt

22  that that's what he did.  Thank you.

23          THE COURT:  All right.  Thank you very much.

24      Ladies and gentlemen of the jury, I'm just going to give

25  you these concluding instructions.

1      When you begin your deliberations, elect one member of the

2  jury as your foreperson who will preside over the deliberations

3  and speak for you here in court.  You will then discuss the

4  case with your fellow jurors to reach agreement, if you can do

5  so.  Your verdict, whether guilty or not guilty, must be

6  unanimous.

7      Each of you must decide the case for yourself, but you

8  should do so only after you have considered all the evidence,

9  discussed it fully with the other jurors, and listened to the

10  views of your fellow jurors.

11      Do not be afraid to change your opinion if a discussion

12  persuades you that you should, but do not come to a decision

13  simply because other jurors think it is right.

14      It is important that you attempt to reach a unanimous

15  verdict but, of course, only if each of you can do so after

16  having made your own conscientious decision.  Do not change an

17  honest belief about the weight and effect of the evidence

18  simply to reach a verdict.

19      Because you must base your verdict only on the evidence

20  received in the case and on these instructions, I remind you

21  that you must not be exposed to any other information about the

22  case or to the issues it involves.  Except for discussing the

23  case with your fellow jurors during your deliberations, do not

24  communicate with anyone in any way and do not let anyone else

25  communicate with you in any way about the merits of the case or

1    anything to do with it.

2         This includes discussing the case in person, in writing,

3    by phone, or electronic means, via e-mail, text messaging, or

4    any Internet chat room, blog, Web site or other feature.  This

5    applies to communicating with your family members, your

6    employer, the media or press, and the people involved in the

7    trial.

8         If you are asked or approached in any way about your jury

9    service or anything about this case, you must respond that you

10   have been ordered not to discuss the matter and to report that

11   contact to the Court.

12        Do not read, watch, or listen to any news or media

13   accounts or commentary about the case or anything to do with

14   it.  Do not do any research such as consulting dictionaries,

15   searching the Internet, or using other reference materials.

16   And do not make any investigation or in any other way try to

17   learn about the case on your own.

18        The law requires these restrictions to ensure the parties

19   have a fair trial based upon the same evidence that each party

20   has had an opportunity to address.  A juror who violates these

21   restrictions jeopardizes the fairness of these proceedings, and

22   a mistrial could result that would require the entire trial

23   process to start over.  If any juror is exposed to any outside

24   information, please notify the Court immediately.

25        Some of you have taken notes during the trial.  Whether or

not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the Court to decide.  You may not consider punishment in deciding whether the Government has proved its case against the defendant beyond a reasonable doubt.

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the bailiff that you are ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff signed by one or more of you.  No member of the jury should ever attempt to communicate with me except in a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, and that may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember, you are not to tell anyone, including me, how the jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt

1    of the defendant, until after you have reached a unanimous

2    verdict or have been discharged.

3        All right.  I'll see counsel at sidebar at this time.

4            (Bench conference on the record:)

5            THE COURT:  Counsel, any objection to the Court's

6    reading of any of the instructions?

7        Ms. Blanch?

8            MS. BLANCH:  No, Your Honor.

9            THE COURT:  Mr. Kaloyanides?

10           MR. KALOYANIDES:  No, Your Honor.  Question, though.

11   I noticed the Court for practical purposes identified

12   communicating with the bailiff, and the written instructions I

13   have says the clerk.  I don't know if we need to correct that

14   for purposes of the record.  It's a practical issue I wanted to

15   raise.

16           THE COURT:  I don't think it's something that makes

17   any difference.  I would just leave it alone, because we are

18   about -- I'm about to swear the bailiff -- I'm about to have

19   the clerk swear the bailiff so that the bailiff can be with

20   them.  Any objection to just leaving it alone at this point?

21           MS. BLANCH:  No.

22           MR. KALOYANIDES:  No objection.

23           THE COURT:  Okay.  Ms. Blanch?

24           MS. BLANCH:  Yes.  I'm sorry.

25           THE COURT:  Okay.  What I want to do now is, A, I'm

**UNITED STATES DISTRICT COURT**

1    going to swear the bailiff.

2        B, I'm going to tell the jury that they can go, but the

3    alternates can stay for further instruction.

4        C, I'm going to tell them in a few minutes we're going to

5    send in the exhibits.  However, we are not going to send in

6    Exhibits 1 through 8 because they contain certain images of

7    sexually explicit conduct, because they are sensitive, and

8    because the parties have already stipulated to the nature of

9    those depictions.  If, however, you still want to see them,

10   send a note out, and we'll all convene here in court, and we

11   will review them while in court.

12       I'm also going to tell them, if at the end of our normal

13   day, 2:00, we have not reached a verdict, we will not reconvene

14   with the Court, but they are free to go.  They will come back

15   Monday and every other day they're in deliberations, and we

16   will follow the same procedure, in at 8:00 and then they can

17   leave at 2:00, with the further proviso that once you leave or

18   once you are out of that room, once there's less than all 12

19   present, you will not discuss this case whatsoever until you

20   come back the next day and when all 12 members are physically

21   present in that same room.

22       And then after that, I will let the jury go.  And then

23   I'll tell the alternates to continue not to discuss this case,

24   that they should give my clerk a number where they can be

25   reached promptly in case we need them to come back in.

1      And if they do, they'll be called to come in, and then the

2  deliberations will start over with them.  But in the meantime

3  they shall not talk about it.  They don't have to come in until

4  the call.  And if the case is over, their service is no longer

5  needed, we'll call them to tell them that too.  They will be

6  relieved of any obligation to not discuss the case.

7           MS. BAEHR-JONES:  One thing.  I think that Exhibits

8  1 through 8, there are a cover page that we put in another

9  binder.

10           MS. BLANCH:  Right, we did discuss that.

11           MS. BAEHR-JONES:  That are in another binder.

12  They're the images, the thumbnail images blacked out.

13           THE COURT:  Yes.  Okay.  Hopefully I can remember

14  everything.  If I don't remember something, tell me you want to

15  see me at sidebar and remind me.  Okay?  At my age, I tend to

16  forget things.

17               (The following proceedings were held in open

18                court, in the presence of the jury:)

19           THE COURT:  Angela, would you please swear the

20  bailiff.

21           THE CLERK:  Yes, Your Honor.

22        Please state your name for the record.

23           THE BAILIFF:  Peter J. Recendez, R-E-C-E-N-D-E-Z.

24           THE CLERK:  Please raise your right hand.  Do you

25  solemnly swear to keep this jury together in some private and

1   convenient place, that you will not permit any person to speak

2   or communicate with them, nor do so yourself, unless by order

3   of the Court or to ask them whether they have agreed upon a

4   verdict, and that you will return them into court when they

5   have so agreed or when ordered by the Court, so help you God?

6          THE BAILIFF:  I do.

7          THE COURT:  All right.  Thank you very much.

8      Ladies and gentlemen, in a few moments, the regular jury

9   members, not the alternates, will follow the Court's bailiff to

10  the jury room to begin your deliberations.  Let me just say a

11  couple of final things before you go.

12     After you go there, the clerk will bring in the exhibits

13  that have been received into evidence except for Exhibits 1

14  through 8.  As to Exhibits 1 through 8, we will only send back

15  that sort of first sheet that has the thumbnail pictures of the

16  contents, but those thumbnail pictures are all blacked out, but

17  they still have the date and time stamp on it.

18     There are a couple of reasons why we're doing that.  We're

19  not sending back the other parts of Exhibits 1 through 8

20  because they contain the sexually explicit conduct that we

21  talked about, so they're sensitive; secondly, because whether

22  they are sexually explicit conduct is already the subject of a

23  stipulation where the parties have so stipulated.

24     But if you think you need to look at those pictures, send

25  out a note through the bailiff, and then we will reassemble

1    here in court, and we'll be happy to show you those exhibits or

2    parts of those exhibits that you want to see from 1 through 8.

3    But 1 through 8 except for the first page will not be sent to

4    you in the jury room.  All the other exhibits will be sent to

5    you for your review in the jury room.

6         Now, let me talk briefly about timing.  As you know, we

7    observe an 8:00 to 2:00 court day, and we will maintain that.

8    So today if by 2:00 you have not reached a verdict, we will not

9    reassemble so that I can dismiss you.  After 2:00, you may be

10   excused and go, and then you will please come back on Monday at

11   8:00 to begin deliberation.  And then you will be deliberating

12   from 8:00 to 2:00, just like that for every day that you happen

13   to be in deliberations.  We will, again, not reconvene just to

14   dismiss you.

15        Because we're not doing that, let me please tell you now

16   that when you do leave -- if, let's say, at 2:00 you have not

17   reached a verdict today or on any day at 2:00 if you have not,

18   when you leave, anytime anybody leaves that jury deliberation

19   room so that there are less than 12 of you present, you have to

20   stop deliberating about this case.  You can talk about anything

21   else, talk about the weather, talk about whatever, but not

22   about the case or anything to do with it.

23        Then when you come back the next morning, some of you may

24   be earlier than others, but I hope, again, all of you will at

25   least be here at 8:00.  But at any time when you don't have all

1  12 of you physically present in that room, do not discuss this

2  case.  Wait until everybody is here, and then you can

3  deliberate and talk about this case.  All right?

4      So anything further, Counsel, as far as before we let the

5  jury go deliberate?

6              MS. BLANCH:  No, Your Honor.

7              THE COURT:  Mr. Kaloyanides?

8              MR. KALOYANIDES:  No.  Thank you, Your Honor.

9              THE COURT:  All right.  So ladies and gentlemen of

10  the regular jury panel, please at this time take your notes

11  with you now to the jury deliberation room.  Follow the bailiff

12  at this time.  Thank you.

13      And the alternate jurors, will you please remain.

14              (At 9:49 A.M., the jury commenced deliberations.)

15              THE COURT:  All right.  We're now outside the

16  presence and hearing of the regular jury, but we are within the

17  presence and hearing of the alternate jurors, the two alternate

18  jurors.

19      At this time, you, of course, will not be going into the

20  jury room to deliberate, but we would like you to still be on

21  call in the event something happens during the deliberative

22  process that would require us to substitute either one or both

23  of you into the jury room to deliberate.

24      But in order to maintain your qualification to do so,

25  please follow the -- continue to follow the Court's instruction

1   to not discuss this case with anyone about it.  Don't talk

2   about it among yourselves.  Do not discuss it with literally

3   anybody else, whether it's your family, your employer, on

4   social media of any kind whatsoever.

5       That way, if there is a need for us to call you, then you

6   can come and you can deliberate because you will not have been

7   exposed to any outside information.  So what I request that you

8   do -- of course, if you come back, the deliberations -- I will

9   direct deliberations to begin anew so that you will be every

10  part of the deliberations, not just substituting in for

11  whatever they've already talked -- and miss whatever they've

12  talked about and just go forward from there.

13      Please, when you leave, give my clerk a number where we

14  can reach you promptly, not a number that's simply going to go

15  into voice mail or someplace else and we can't get ahold of

16  you.  If we're calling you, that means we need you.  So please

17  make sure it's a number where we can reach you so that you can

18  come in promptly to be substituted into the case.

19      If, however, at some time it turns out that the case is

20  over and we don't need you anymore, my clerk will call you also

21  to let you know you are free of any obligations, any

22  limitations the Court has given you.  You can talk about the

23  case to anybody that you'd like, or not talk about it.  It's up

24  to you.  So one way or another, we're going to be -- we'll call

25  you, and so you're not going to be left hanging out there

1  forever.  Okay?

2      With that in mind, then, please follow my clerk out, and

3  then she -- please give her your contact information where we

4  can reach you promptly.

5      Okay.  Angela?

6          THE CLERK:  Yes, Your Honor.

7          THE COURT:  Yes.  Leave your notes there.  Please

8  step outside first.

9              (The following proceedings were held out of the

10             presence of the jury:)

11         THE COURT:  All right.  We're outside the presence

12  and hearing of the alternate jurors as well.

13      When the clerk comes back, please make sure that you give

14  my clerk a phone number where she can reach you; likewise, not

15  something that goes to voice mail or disappears into whatever

16  electronic either.  Just make sure you're here within 15

17  minutes.  Make yourself available within 15 minutes' call and

18  go from there.

19      Also wait until she comes in.  I know you folks have

20  cleared the exhibits with Ms. Herrera yesterday.  Make sure

21  that it's still in that condition before it goes in.  If

22  there's a problem, let my clerk know.  I'll resolve it.  If you

23  don't, it will be deemed that you have no objection to the way

24  that the exhibits go in.

25      Do likewise for the jury -- set of jury instructions.  I'm

1  going to give my set of jury instructions to the clerk, and she

2  will show it -- ask her to see it.  Make sure this is fine with

3  you and it goes in.  Once it goes in, if you don't object, then

4  it will be deemed your waiver of any other objections about

5  whether this was the proper set to go in.

6         Is that all understood, Ms. Blanch?

7             MS. BLANCH:  Yes, Your Honor.

8             THE COURT:  And, Mr. Kaloyanides?

9             MR. KALOYANIDES:  Yes, Your Honor.

10             THE COURT:  Anything further at this time before we

11  take our recess?

12             MS. BLANCH:  Not from the Government, Your Honor.

13             MR. KALOYANIDES:  No.  Thank you, Your Honor.

14             THE COURT:  All right.  Thank you very much.

15               (Recess taken.)

16             THE CLERK:  Please remain seated and come to order.

17  This United States District Court is once again in session, the

18  Honorable George H. King, Chief United States District Judge,

19  presiding.

20             THE COURT:  We're back on the record in the matter

21  of the United States versus Reczko.  Counsel are present.

22  Mr. Reczko is present.  We're outside the presence and hearing

23  of the jury.

24     Counsel, we have received jury note number one which says

25  the jury has reached a unanimous verdict, and it appears to be

1   signed by Juror Nudell.

2        Ms. Blanch, have you seen a copy of this note?

3            MS. BLANCH:  Yes, Your Honor.

4            THE COURT:  Mr. Kaloyanides?

5            MR. KALOYANIDES:  I have.

6            THE COURT:  All right.  Then I guess at this time

7   we're ready to receive the verdict from the jury.

8        Angela, would you please bring out the jury.

9            THE CLERK:  Yes, Your Honor.

10           THE COURT:  And I also direct the clerk to please

11   file this jury note number one.

12           THE CLERK:  Yes, Your Honor.

13               (Jury in at 11:16 A.M.)

14               (The following proceedings were held in the

15               presence of the jury:)

16           THE COURT:  All right.  We're now in the presence

17   and hearing of the jury.

18        Ladies and gentlemen of the jury, we have received your

19   jury note number one saying that you have reached a unanimous

20   verdict.  It appears to be signed by Mr. Nudell.

21        Mr. Nudell, are you the foreperson of this jury?

22           THE FOREPERSON:  Yes, sir.

23           THE COURT:  All right.  Would you please hand the

24   verdict form, please, to the bailiff.

25               (Documents tendered.)

1          THE COURT:  Mr. Nudell, would you please date this

2     form also above your signature.

3          THE FOREPERSON:  Yes, sir.  I'll use the official

4     pen.

5               (Documents tendered.)

6          THE COURT:  Go ahead and publish the verdict.

7          THE CLERK:  The verdict form reads as follows:  "We,

8     the jury, unanimously find Defendant Stanley Dan Reczko III

9     guilty beyond a reasonable doubt of the offense charged in the

10    Indictment."

11         THE COURT:  That's dated?

12         THE CLERK:  It's dated February the 20th, 2015,

13    Your Honor.

14         THE COURT:  And signed?

15         THE CLERK:  Signed by the foreman, Mr. Nudell.

16         THE COURT:  All right.

17         THE CLERK:  Ladies and gentlemen of the jury, is

18    this your verdict as presented and read?

19              (The jurors responded collectively in the

20               affirmative.)

21         THE COURT:  "So say you one, so say you all."  Read

22    all of it.

23       Ladies and gentlemen, is this your verdict as presented in

24    court, so say you one, so say you all?

25              (The jurors responded collectively in the

1            affirmative.)

2            THE COURT:  Is there a request for individual

3    polling, Ms. Blanch?

4            MS. BLANCH:  Not from the Government, Your Honor.

5            THE COURT:  Mr. Kaloyanides?

6            MR. KALOYANIDES:  No.  Thank you, Your Honor.

7            THE COURT:  All right.  Ladies and gentlemen of the

8    jury, thank you very much for your service.  Even though this

9    has been a relatively short trial -- we said it would be three

10   to four days -- we nevertheless recognize that, as always, it's

11   an imposition upon your daily routine and your lives.  We

12   appreciate the time that you have taken.  We appreciate the

13   fact that you have been timely in coming here on time and that

14   you have paid attention throughout.

15        So on behalf of all the judges of the court, I want to

16   thank each and every one of you for your service.  You are now

17   discharged and excused.  You may discuss this case with anybody

18   you care to, but you are not obligated to talk to anyone about

19   the case.  That decision rests solely with you and only you.

20        Thank you very much.  You are now excused.  We will remain

21   in session.

22            (Jury out at 11:20 A.M.)

23            (The following proceedings were held out of the

24            presence of the jury:)

25            THE COURT:  All right.  We're now outside the

**UNITED STATES DISTRICT COURT**

1   presence and hearing of the now discharged jury.

2       Let's go ahead and -- well, first of all, let's go ahead

3   and set a time for sentencing.  But I also want to let counsel

4   know, why don't you folks meet and confer with -- actually,

5   wait until Monday when Ms. Herrera gets back -- on a time for

6   the court trial as to Count 2.  All right?  And then you folks

7   can, once you've cleared that time, file a stipulation to that

8   effect and present it to me, and then we'll hear the court

9   trial.

10      But at this time let's go ahead and set sentencing in this

11  case per the usual cycle.

12      Angela, propose a sentencing date.

13          THE CLERK:  Yes, Your Honor.

14      May the 18th, Your Honor.

15          THE COURT:  Is that a Monday?

16          THE CLERK:  Yes, Your Honor.

17          THE COURT:  Okay.  Clerk has proposed May 18, 2015,

18  11:00 A.M. for sentencing.

19      Is that agreeable, Ms. Blanch?

20          MS. BLANCH:  Yes, Your Honor.

21          THE COURT:  And, Mr. Kaloyanides?

22          MR. KALOYANIDES:  Yes.  Thank you, Your Honor.

23          THE COURT:  All right.  And I also direct the

24  preparation of a presentence report by the probation officer.

25      Anything further at this time?

**UNITED STATES DISTRICT COURT**

 1          MS. BLANCH:  No, Your Honor.  Thank you.

 2          THE COURT:  Mr. Kaloyanides?

 3          MR. KALOYANIDES:  Briefly, Your Honor.  As far as

 4   the timing for post-trial motions, I'm assuming that that will

 5   be calculated as of the conclusion of part 2 of the trial?

 6          THE COURT:  Yes.

 7          MR. KALOYANIDES:  I just want to make sure on the

 8   record.

 9          THE COURT:  It will be at the conclusion of Count 2,

10   which will be a court trial.  I don't think that you have to

11   wait until the Court's fact-finding in terms of sentencing as

12   to the enhancement.  That would be a sentencing element.

13          MR. KALOYANIDES:  Correct.

14          THE COURT:  All right.

15          MR. KALOYANIDES:  But as far as any post-trial

16   motions, the seven-day time limit, I just want to make sure

17   that we don't have a jurisdictional --

18          THE COURT:  Right, because we still have a Count 2

19   to deal with.

20          MR. KALOYANIDES:  Thank you.

21          THE COURT:  I'm going to direct the clerk to enter

22   and -- file and enter the verdict of the jury as to Count 1,

23   and then I'll receive your stipulation, and we'll set the date

24   for the court trial as to Count 2.  Very good.

25          THE CLERK:  Thank you, Your Honor.

1          THE COURT:  All right.  We're in recess.

2          THE CLERK:  This court stands in recess.  All rise.

3

4              (Matter adjourned at 11:23 A.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15                    DATED THIS 26 DAY OF OCTOBER, 2015.

16

17

18                    /S/ KHOWOONSUN CHONG

19                    _____
                      KHOWOONSUN CHONG, CSR NO. 12907, CRR
20                    FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**UNITED STATES DISTRICT COURT**